DYLAN J. LIDDIARD, State Bar No. 203055
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304
Telephone: (650) 493-9300
Facsimile: (650) 565-5100
Email: dliddiard@wsgr.com

MICHAEL J. LOCKERBY (admission *pro hac vice* pending)
FOLEY & LARDNER LLP
3000 K Street, N.W. | Suite 600
Washington, DC 20007
Telephone: (202) 672-5300
Facsimile: (202) 672-5399
Email: mlockerby@foley.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

| | |
|---|---|
| G.P.P., INC. d/b/a GUARDIAN INNOVATIVE SOLUTIONS, <br><br> Plaintiff, <br><br> v. <br><br> GUARDIAN PROTECTION PRODUCTS, INC., <br><br> Defendant. | CASE NO.: <br><br> <u>COMPLAINT</u> <br><br> **JURY TRIAL DEMANDED** |

Plaintiff G.P.P., Inc. d/b/a Guardian Innovative Solutions ("GIS"), by and through its attorneys, hereby complains and alleges against Guardian Protection Products, Inc. ("Defendant"), as follows:

## THE PARTIES

1.      GIS, a Pennsylvania corporation based in Pitcairn, Pennsylvania, is a family-run business that has purchased products from Defendant for nearly three decades.

2.      Defendant is a Delaware corporation with its offices and primary place of business in Hickory, North Carolina.  Defendant, a self-described leader in the furniture protection industry, sells furniture and upholstery protection products, furniture warranties, and other related items to entities such as GIS, which in turn sell to retail chains and establishments. In 2000, Defendant was acquired by RPM International, Inc., a multi-national, multi-billion dollar, Fortune 300 company.

## VENUE AND JURISDICTION

3.      Venue and jurisdiction are proper in this Court as this action arises out of written agreements between the parties deemed executed in the County of Stanislaus in the State of California and which contain forum selection clauses naming this Court as the forum for any actions arising thereunder.

4.      The parties are of diverse citizenship, and the amount in controversy exceeds the sum of $75,000 exclusive of interest and costs.

## FACTS COMMON TO ALL COUNTS

5.      On or about May 5, 1988, GIS and Defendant entered into a written agreement whereby GIS acquired exclusive distribution rights to Defendant's products in certain counties in Pennsylvania (the "Pennsylvania Agreement").  A true and correct copy of the Pennsylvania Agreement is attached hereto as Exhibit 1, and is incorporated herein by reference.  The Pennsylvania Agreement expressly required GIS to make a minimum initial purchase of Defendant's products of $40,000.  Provided GIS made purchases that were in sum sufficient to meet an annual purchase requirement, the Pennsylvania Agreement automatically renewed on an annual basis.

6.      On or about December 6, 1988, GIS and Defendant entered into a second written agreement whereby GIS acquired exclusive distribution rights to Defendant's products in Maryland, Washington D.C., the remaining counties in Pennsylvania not covered by the Pennsylvania Agreement, and specified counties in Western New York (the "Mid-Atlantic Agreement").  A true and correct copy of the Mid-Atlantic Agreement is attached hereto as Exhibit 2, and is incorporated herein by reference.  The Mid-Atlantic Agreement expressly

1    required GIS to make an initial purchase of Defendant's products of $75,000 as consideration.

2    Provided GIS made purchases that were in sum sufficient to meet an annual purchase

3    requirement, the Mid-Atlantic Agreement automatically renewed on an annual basis.

4          7.      On or about April 2, 1990, GIS and Defendant entered into a third written

5    agreement whereby GIS acquired exclusive distribution rights to Defendant's products in Ohio

6    (the "Ohio Agreement").  A true and correct copy of the Ohio Agreement is attached hereto as

7    Exhibit 3, and is incorporated herein by reference.  The Ohio Agreement expressly required GIS

8    to make an initial purchase of Defendant's products of $20,000 and to pay an additional $20,000

9    fee.  Provided GIS made purchases that were in sum sufficient to meet an annual purchase

10   requirement, the Ohio Agreement automatically renewed on an annual basis.

11         8.      On or about April 23, 2007, GIS also acquired exclusive distribution rights to

12   Defendant's products in Illinois, Indiana, Iowa and certain counties in Eastern Missouri pursuant

13   to a valid written assignment (the "2007 Assignment") of three additional written agreements

14   originally entered into between Defendant and another company (the "Cook County Agreement,"

15   "Indiana Agreement," and "Midwest Agreement," respectively).  A true and correct copy of the

16   2007 Assignment is attached hereto as Exhibit 4, and is incorporated herein by reference.  True

17   and correct copies of the Cook County, Indiana, and Midwest Agreements are attached hereto as

18   Exhibits 5-7, respectively, and are incorporated herein by reference.  Provided GIS made

19   purchases that were in sum sufficient to meet an annual purchase requirement, the Cook County,

20   Indiana, and Midwest Agreements automatically renewed on an annual basis.  GIS paid

21   $200,000 for these three agreements to the prior company.  Defendant consented to the 2007

22   Assignment.

23         9.      On or about March 5, 2010, GIS also acquired exclusive distribution rights to

24   Defendant's products in Alabama, Florida, and Tennessee pursuant to a valid written assignment

25   (the "2010 Assignment") of three additional written agreements originally entered into between

26   Defendant and another company (the "Alabama Agreement," "Florida Agreement," and

27   "Tennessee Agreement," respectively).  A true and correct copy of the 2010 Assignment is

28   attached hereto as Exhibit 8, and is incorporated herein by reference.  True and correct copies of

the Alabama, Florida, and Tennessee Agreements are attached hereto as Exhibits 9-11,
respectively, and are incorporated herein by reference. Provided GIS made purchases that were
in sum sufficient to meet an annual purchase requirement, the Alabama, Florida, and Tennessee
Agreements automatically renewed on an annual basis. GIS paid $50,000 for these three
agreements to the prior company. Defendant consented to the 2010 Assignment.

10.     To recap, Defendant and GIS are parties to the following agreements
(collectively, the "Agreements"), entered into on or about the following dates:

| Name of Agreement | Date of Agreement |
| --- | --- |
| Pennsylvania Agreement | May 5, 1988 |
| Mid-Atlantic Agreement | December 6, 1988 |
| Ohio Agreement | April 2, 1990 |
| Cook County Agreement | April 23, 2007 |
| Indiana Agreement | April 23, 2007 |
| Midwest Agreement | April 23, 2007 |
| Alabama Agreement | March 5, 2010 |
| Florida Agreement | March 5, 2010 |
| Tennessee Agreement | March 5, 2010 |

11.     Pursuant to the Agreements, GIS has been granted exclusive distribution rights to
Defendant's products in numerous territories throughout the United States ("GIS's Exclusive
Territory").

12.     Defendants have engaged in a series of wrongful, coercive acts, many of which
continue to this day, including the following:

    a.     refusal to pay commission due GIS;

    b.     improper purported termination of the Alabama Agreement;

    c.     improper purported termination of the Florida Agreement;

    d.     improper purported termination of the Tennessee Agreement; and

    e.     actual and implicit threats to terminate all of the existing Agreements
while insisting that GIS enter into a new "Distributorship Agreement" that—while containing
much less advantageous terms and conditions for GIS than its existing Agreements—is in fact a

"franchise" within the meaning of federal and state law, but one that has been offered without providing the required disclosures and, in some states, without obtaining prior state registration of its "franchise" offering.

An expanded description of each of these wrongful acts follows.

**Refusal to Pay Commission under the Bob's Discount Furniture Agreement**

13.     During the spring of 2010, GIS learned that Defendant in violation of the Agreements was directly selling products in GIS's Exclusive Territory to retail locations associated with one of the largest furniture chains in the country, Bob's Discount Furniture.

14.     GIS and Defendant agreed that Defendant would pay GIS a 5% commission on all sales of Defendant's products made to Bob's Discount Furniture retail locations in GIS's Exclusive Territory for as long as such sales were being made (the "Bob's Discount Furniture Agreement").  Defendant made such payments and continued to make such payments through November 14, 2014.

15.     In December 2014, Defendant unilaterally stopped paying GIS the 5% commission.

**Improper Purported Termination of the Alabama Agreement**

16.     On or about October 23, 2013, Defendant sent a notice to GIS that purportedly terminated the Alabama Agreement (the "Alabama Notice").  A true and correct copy of the Alabama Notice is attached hereto as Exhibit 12.

17.     GIS informed Defendant that it had no basis to terminate the Alabama Agreement.  GIS stated that the Alabama Notice was invalid and demanded that Defendant rescind the Alabama Notice immediately.

18.     In response to GIS protest, Defendant attempted to downplay the significance of the Alabama Notice.  Johnny Green, Defendant's Vice President and General Manager, represented to GIS that GIS should not be concerned about the Alabama Notice and that Defendant was merely attempting to renegotiate the Alabama Agreement.  Mr. Green further represented that GIS and Defendant could continue to do business in Alabama, though the threat of termination remained ever present, adversely affecting GIS's business and business decisions.

19.     In or around December 2014, Defendant informed GIS that the Alabama Agreement had been terminated and stated that it would not recognize GIS's exclusive rights.

**Improper Purported Termination of the Florida Agreement**

20.     On or about October 23, 2013, Defendant sent a notice to GIS that purportedly terminated the Florida Agreement (the "Florida Notice").  A true and correct copy of the Florida Notice is attached hereto as Exhibit 13.

21.     GIS informed Defendant that it had no basis to terminate the Florida Agreement. GIS stated that the Florida Notice was invalid and demanded that Defendant rescind the Florida Notice immediately.

22.     In response to GIS protest, Defendant attempted to downplay the significance of the Florida Notice.  Johnny Green, Defendant's Vice President and General Manager, represented to GIS that GIS should not be concerned about the Florida Notice and that Defendant was merely attempting to renegotiate the Florida Agreement.  Mr. Green further represented that GIS and Defendant could continue to do business in Florida, though the threat of termination remained ever present, adversely affecting GIS's business and business decisions.

23.     In or around December 2014, Defendant informed GIS that the Florida Agreement had been terminated and stated that it would not recognize GIS's exclusive rights.

**Improper Purported Termination of the Tennessee Agreement**

24.     On or about October 23, 2013, Defendant sent a notice to GIS that purportedly terminated the Tennessee Agreement (the "Tennessee Notice").  A true and correct copy of the Tennessee Notice is attached hereto as Exhibit 14.

25.     GIS informed Defendant that it had no basis to terminate the Tennessee Agreement.  GIS stated that the Tennessee Notice was invalid and demanded that Defendant rescind the Tennessee Notice immediately.

26.     In response to GIS protest, Defendant attempted to downplay the significance of the Tennessee Notice.  Johnny Green, Defendant's Vice President and General Manager, represented to GIS that GIS should not be concerned about the Tennessee Notice and that Defendant was merely attempting to renegotiate the Tennessee Agreement.  Mr. Green further

1   represented that GIS and Defendant could continue to do business in Tennessee, though the

2   threat of termination remained ever present, adversely affecting GIS's business and business

3   decisions.

4         27.     In or around December 2014, Defendant informed GIS that the Tennessee

5   Agreement had been terminated and stated that it would not recognize GIS's exclusive rights.

6   **Violation of Federal and State Franchise Laws**

7         28.     Beginning in 1988, as provided in the Agreements, Defendant licensed and

8   otherwise permitted GIS to use its "Guardian" trademarks, service marks, trade names, trade

9   dress, and logos—including the federally registered stylized "G" (collectively, the "Licensed

10  Trademarks").  Each of these Agreements licensed GIS to use the name "Guardian" in its trade

11  name and to use the Licensed Trademarks in connection with the distribution of certain goods

12  and services.  Pursuant to each of these Agreements, Defendant provided substantial assistance

13  to GIS and exercised substantial control over GIS's business.  GIS marketed goods and services

14  under the Licensed Trademarks pursuant to a "marketing plan" prescribed in substantial part by

15  Defendant, and there has been a "community of interest" between Defendant and GIS in the

16  goods and services sold under the Licensed Trademarks.  To obtain the trademark license,

17  product distribution, and other rights granted by the Agreements, GIS has been required to make

18  certain payments that have not been limited to the bona fide wholesale price of goods.

19        29.     Each Agreement licensed and otherwise authorized GIS to use the Licensed

20  Trademarks—including the "Guardian" word mark and the stylized "G" logo—in its assigned

21  exclusive territory.  Pursuant to each of the Agreements, GIS has been authorized to use and in

22  fact has used a variant of the Guardian trade name as part of its own trade name, including as

23  follows with respect to the following Agreements:

| Agreement | State(s) | Variant of Guardian Trade Name Used in Franchisee's Trade Name |
|---|---|---|
| Mid-Atlantic Agreement | Maryland, District of Columbia, New York, and remainder of Pennsylvania | Guardian Distributors of [city or state or appropriate geographic area], Guardian Protection Products of [city or state or appropriate geographic area], or GPP of [city or state or appropriate geographic area] (¶ 8) |

| Agreement | State(s) | Variant of Guardian Trade Name Used in Franchisee's Trade Name |
|---|---|---|
| Ohio Agreement | Ohio | Guardian Distributors of [city or state or appropriate geographic area], Guardian Protection Products of [city or state or appropriate geographic area], or Guardian of [city or state or appropriate geographic area] (¶ 9) |
| Cook County Agreement | Illinois | Guardian Distributors of [city or state or appropriate geographic area], Guardian Protection Products of [city or state or appropriate geographic area], or GPP of [city or state or appropriate geographic area] (¶ 8) |
| Indiana Agreement | Indiana | Guardian Distributors of [city or state or appropriate geographic area], Guardian Protection Products of [city or state or appropriate geographic area], or Guardian of [city or state or appropriate geographic area] (¶ 9) |
| Midwest Agreement | Iowa, Missouri, and Illinois | Guardian Midwest (¶ 9) |
| Alabama Agreement | Alabama | GPP Alabama (¶ 9) |
| Florida Agreement | Florida | Guardian Distributors of [city or state or appropriate geographic area], Guardian Protection Products of [city or state or appropriate geographic area], or GPP of [city or state or appropriate geographic area] (¶ 8) |
| Tennessee Agreement | Tennessee | GPP Tennessee (¶ 9) |

30.     In marketing and selling Defendant's products pursuant to the Agreements, GIS uses printed and promotional materials distributed by Defendant and bearing Defendant's trade name, trademarks, service marks, and other commercial symbols and marks, including the Licensed Trademarks.

31.     Pursuant to each of the Agreements:

a.      Defendant has provided substantial assistance to or exercised substantial control over GIS.

b.      GIS has sold goods and services in accordance with a marketing plan prescribed in substantial part by Defendant.

c.      GIS and Defendant have had a community of interest in marketing goods and services under the Licensed Trademarks.

d.      GIS paid a non-*de minimis* fee for the right to sell goods and services under the Licensed Trademarks that was not simply for the *bona fide* wholesale purchase price of goods.

32.     At no time before offering a "franchise" in connection with each of the foregoing Agreements (including any subsequent renewal) did Defendant ever provide GIS with a Uniform Franchise Offering Circular ("UFOC") or Franchise Disclosure Document ("FDD") in accordance with the FTC Franchise Rule, 16 CFR Part 436.

33.     At no time before offering a "franchise" in connection with each of the foregoing Agreements (including any subsequent renewal) did Defendant ever provide GIS with a UFOC or FDD in accordance with the franchise disclosure and registration laws of the following states:

| **Franchise Agreement** | **State** | **Franchise Statute** |
| --- | --- | --- |
| Mid-Atlantic Agreement | Maryland | Maryland Franchise Registration and Disclosure Law (Md. Code Ann. §§ 14-201 - 14-233) |
| Mid-Atlantic Agreement | New York | New York Franchises Law (N.Y. Gen. Bus. Law § 680-95) |
| Indiana Agreement | Indiana | Indiana Franchises Law (Ind. Code §§ 23-2-2.5-1 - 23-2-2.5-51) |
| Cook County Agreement | Illinois | Illinois Franchise Disclosure Act (Ill. Comp. Stat. 1992, ch. 815 §§ 705/1-705/44) |

34.     At no time before offering a "franchise" in connection with each of the foregoing Agreements (including any subsequent renewal) did Defendant ever register its franchise offering in accordance with the franchise disclosure and registration laws of the following states:

| **Franchise Agreement** | **State** | **Franchise Statute** |
| --- | --- | --- |
| Mid-Atlantic Agreement | Maryland | Maryland Franchise Registration and Disclosure Law (Md. Code Ann. §§ 14-201 - 14-233) |
| Mid-Atlantic Agreement | New York | New York Franchises Law (N.Y. Gen. Bus. Law |

| | | § 680-95) |
|---|---|---|
| Indiana Agreement | Indiana | Indiana Franchises Law (Ind. Code §§ 23-2-2.5-1 - 23-2-2.5-51) |
| Cook County Agreement | Illinois | Illinois Franchise Disclosure Act (Ill. Comp. Stat. 1992, ch. 815 §§ 705/1-705/44) |

35.     On December 9, 2014, Defendant sent GIS correspondence claiming that the Florida, Alabama, and Tennessee Agreements had been terminated on October 23, 2013 "based on quota breaches in those states" while implicitly threatening termination of GIS's remaining Agreements in other states if GIS did not sign the new January 2015 form of "Distributorship Agreement."  The stated grounds for termination of GIS's Agreements was that "[t]he old contracts held by [Franchisee] GIS are no longer applicable to the current business . . . . [Defendant] Corporate Guardian is seeking new contracts that reflect the current business relationship, and provide the appropriate market penetration to justify exclusive distribution rights."  The grounds for termination set forth in the December 9, 2014 notice from Defendant are not permissible grounds for termination of GIS's existing Agreements.  Nor does Defendant's belief that "[t]he old contracts … are no longer applicable to the current business" constitute "good cause" for termination as required by the "relationship" laws of certain states that comprise GIS's Exclusive Territory.

36.     Compared to GIS's existing Agreements, the new January 2015 form of "Distributorship Agreement" is much less advantageous for GIS.

37.     Although denominated as a "Distributorship Agreement,"  the new 2015 form contract offered by Defendant is in fact a "franchise" within the meaning of the FTC Franchise Rule and various state franchise disclosure and registration laws and is referred to hereafter as the "2015 Form Agreement."  Like the existing Agreements, the 2015 Form Agreement was offered to GIS without the provision of the FDD required by the FTC Franchise Rule and various state franchise disclosure and registration laws.  Nor was this new franchise offering registered in those states where franchise registration is required.

38.     Pursuant to the Agreements, GIS has invested substantial time and money in building name recognition for and brand equity in the Licensed Trademarks.  Rather than

1   recognize and reward GIS for its efforts, however, Defendant has sought to diminish and in some

2   cases take away altogether the rights previously granted by the Agreements.  Defendant has done

3   so for reasons unrelated to GIS's performance.  With respect to certain Agreements, Defendant

4   terminated or attempted to terminate them without good cause.  With respect to others,

5   Defendant amended or attempted to amend their terms and substantially changed or attempted to

6   substantially change GIS's competitive circumstances—all without good cause.

7        39.    The conduct of Defendant for which GIS seeks declaratory relief, injunctive

8   relief, compensatory damages, punitive damages, treble damages, and costs and attorneys' fees

9   has occurred—at least in part—in North Carolina.  North Carolina is where Defendant has its

10   principal place of business and where many of the acts and omissions at issue occurred.  This

11   conduct includes the following "unfair methods of competition" and "unfair or deceptive acts or

12   practices" in violation of N.C. Gen. Stat. § 75-1.1 *et. seq.* (the "North Carolina Little FTC Act"):

13        a.    offering a "franchise" without providing the UFOC or FDD required by

14   the FTC Franchise Rule, 16 CFR Part 436;

15        b.    offering a "franchise" without providing the UFOC or FDD required by

16   franchise registration laws in certain states (including Maryland, New York, Indiana, Iowa, and

17   Illinois);

18        c.    offering a "franchise" without complying with the registration and other

19   filing requirements of statutes in certain states (including Maryland, New York, Indiana, Iowa,

20   and Illinois);

21        d.    terminating, constructively terminating, or attempting to terminate or

22   constructively terminate the Agreements in violation of the "relationship" statutes applicable to

23   franchises, dealerships, and distributorships in certain states (including Maryland, Illinois, Iowa,

24   and Missouri);

25        e.    amending or attempting to amend the Agreements in violation of the

26   "relationship" statutes applicable to franchises, dealerships, and distributorships in certain states

27   (including Maryland, Illinois, Iowa, and Missouri); and

28

f.  substantially changing or attempting to substantially change the competitive circumstances of the Agreements in violation of the "relationship" statutes applicable to franchises, dealerships, and distributorships in certain states (including Illinois, Iowa, and Missouri).

40.  Defendant's wrongful conduct of which GIS complains also includes certain conduct that constitutes negligence per se, breach of contract, breach of the implied covenant of good faith and fair dealing, violation of the Illinois, Iowa, and Missouri state franchise laws, and violation of the Maryland Fair Distribution Act.

41.  With respect to certain Agreements, GIS will suffer irreparable harm if Defendant proceeds with the threatened or attempted termination, amendment, or substantial change in competitive circumstances described herein.  With respect to certain other Agreements, GIS needs a judicial determination of its rights and obligations vis-à-vis Defendant.  Otherwise the parties face a multiplicity of litigation.  With respect to certain other Agreements, GIS has already suffered injury by virtue of Defendant's wrongful conduct—thereby entitling GIS to compensatory damages, punitive damages, and treble damages along with costs and attorneys' fees.

## FIRST CAUSE OF ACTION

### Breach of the Alabama, Florida, and Tennessee Agreements

42.  GIS incorporates by reference paragraphs 1 through 41 as if fully set forth herein.

43.  The Alabama, Florida, and Tennessee Agreements provide GIS with exclusive purchase rights for Defendant's products in the defined regions.

44.  Defendant breached its obligations under these three agreements by, inter alia, purporting to terminate or actually terminating the agreements without cause and refusing to recognize the agreements as continuing to be valid and in effect, as alleged above, without cause and in violation of the terms of the agreements, as alleged above.

45.  To date, GIS has performed all of its covenants, conditions, promises, and obligations in accordance with the terms of the agreements, except to the extent its performance has been excused by, inter alia, Defendant's conduct.

46.     As a direct and foreseeable result of Defendant's conduct, GIS has been damaged in an amount to be determined at trial.

WHEREFORE, GIS seeks relief as set forth in the prayers below.

## SECOND CAUSE OF ACTION

### Breach of the Implied Covenants of Good Faith and Fair Dealing of the Alabama, Florida, and Tennessee Agreements

47.     GIS incorporates by reference paragraphs 1 through 46 as if fully set forth herein.

48.     The Alabama, Florida, and Tennessee Agreements contain covenants, implied in law, that Defendant would at all times act in good faith and deal fairly with GIS, and would not engage in any act that would prevent GIS from realizing the full benefit of the agreements.

49.     Conditions obligating Defendant to perform under the agreements occurred.

50.     Defendant acted in bad faith to frustrate the benefits of the agreements, and therefore breached Defendant's duty of good faith and fair dealing by, inter alia, purporting to terminate or actually terminating the agreements without cause and refusing to recognize the agreements as continuing to be valid and in effect, as alleged above.

51.     To date, GIS has performed all of its covenants, conditions, promises, and obligations in accordance with the terms of the agreements, except to the extent its performance has been excused by, for instance, Defendant's conduct.

52.     GIS was denied the benefits of the agreements by Defendant's bad faith conduct. Defendant's bad faith conduct therefore constitutes a breach of the implied covenant of good faith and fair dealing.

53.     As a direct and foreseeable result of Defendant's conduct, GIS has been damaged in an amount to be determined at trial.

WHEREFORE, GIS seeks relief as set forth in the prayers below.

## THIRD CAUSE OF ACTION

### Breach of the Bob's Discount Furniture Agreement

54.     GIS incorporates by reference paragraphs 1 through 53 as if fully set forth herein.

1    55.    GIS and Defendant entered into an agreement whereby Defendant agreed to pay

2  GIS a 5% commission on all sales Defendant made to Bob's Discount Furniture retail locations

3  in GIS's Exclusive Territory.

4    56.    Defendant breached this agreement by failing to pay GIS all commission payable

5  pursuant to the agreement, as alleged above.

6    57.    To date, GIS has performed all of its covenants, conditions, promises, and

7  obligations in accordance with the terms of the agreement, except to the extent its performance

8  has been excused by, for instance, Defendant's conduct.

9    58.    As a direct and foreseeable result of Defendant's conduct, GIS has been damaged

10  in an amount to be determined at trial.

11    WHEREFORE, GIS seeks relief as set forth in the prayers below.

12    **FOURTH CAUSE OF ACTION**

13    **Breach of the Implied Covenant of Good Faith and**
    **Fair Dealing of the Bob's Discount Furniture Agreement**

14

15    59.    GIS incorporates by reference paragraphs 1 through 58 as if fully set forth herein.

16    60.    The Bob's Discount Furniture Agreement contains a covenant, implied in law,

17  that Defendant would at all times act in good faith and deal fairly with GIS, and would not

18  engage in any act that would prevent GIS from realizing the full benefit of the agreement.

19    61.    Conditions obligating Defendant to perform under the agreement occurred.

20    62.    Defendant acted in bad faith to frustrate the benefits of the agreement, and

21  therefore breached Defendant's duty of good faith and fair dealing by, *inter alia*, failing to pay

22  GIS the full commission payable pursuant to the agreement, as alleged above.

23    63.    To date, GIS has performed all of its covenants, conditions, promises, and

24  obligations in accordance with the terms of the agreement, except to the extent its performance

25  has been excused by, for instance, Defendant's conduct.

26    64.    As a direct and foreseeable result of Defendant's conduct, GIS has been damaged

27  in an amount to be determined at trial.

28    WHEREFORE, GIS seeks relief as set forth in the prayers below.

COMPLAINT                                    -14-

## FIFTH CAUSE OF ACTION

### Declaratory Judgment - Termination of the Cook County Franchise
### Would Violate the Illinois Franchise Disclosure Act, 815 ILCS 705/1 *et seq*

65. GIS incorporates by reference paragraphs 1 through 64 as if fully set forth herein.

66. Pursuant to the Cook County Agreement, GIS agreed to sell and distribute Defendant's products in an exclusive sales territory in the state of Illinois (the "Illinois Territory").

67. Defendant agreed that GIS would be its exclusive distributor or franchisee in the Illinois Territory.

68. Pursuant to the Cook County Agreement, Defendant prescribed a marketing plan under which GIS was to promote, sell, and distribute Defendant's products through the Illinois Territory.

69. The marketing plan consisted of, *inter alia*, use of "printed promotional and packaging materials distributed by [Defendant]" (Cook County Agreement ¶ 1), pricing set by Defendant (*Id*. ¶ 4), use of specific sales techniques such as GIS and Defendant maintaining a "close liaison" to solicit "regional and national chain store accounts and governmental accounts," (*Id*. ¶ 7(b)), and use of "sales aids, literature, product samples, and dealer presentation packets" provided to GIS by Defendant (*Id*. ¶ 9).

70. The marketing plan also permitted GIS to use Defendant's trade name, trademark, service mark, and other commercial symbols.  (*Id*. ¶ 8).

71. In accordance with the marketing plan, GIS's promotion, sale, and distribution of Defendant's products was, at all times relevant herein, substantially associated with Defendant's trademark or trade name.

72. GIS paid franchise fees to Defendant in the form of a minimum monthly purchase requirement ranging between of $4,000 and $10,000, and other fees.

73. Consequently, the Cook County Agreement, at all times relevant herein, was a Franchise within the meaning of § 705/3(1) of the Illinois Franchise Disclosure Act (the "IFDA").

74.     GIS has a business presence in the state of Illinois and Defendant now requires that GIS develop a physical presence in each state where it operates a franchise on behalf of Defendant.

75.     Section 705/19 of the IFDA prohibits termination of a franchise "except for 'good cause.'"  Subsection (b) defines "good cause" to include "the failure of the franchisee to comply with any lawful provisions of the franchise or other agreement and to cure such default after being given notice thereof and a reasonable opportunity to cure such default, which in no event need be more than 30 days."

76.     Defendant has threatened to terminate the Cook County Agreement and GIS's exclusive distributorship in the Illinois Territory.  Defendant gave no notice or explanation to GIS for this action other than that the Franchise Agreement was "no longer applicable to the current business."

77.     The unilateral and unsubstantiated belief that the Franchise Agreement is "no longer applicable to the current business" does not constitute "good cause" for termination under § 705/19.

78.     Defendant has stated no other basis or cause for terminating the Cook County Agreement.

79.     Section 705/26 of the IFDA provides a private right of action to recover damages, including attorneys' fees, against a franchisor that, *inter alia*, terminates a franchise without good cause.  Section 705/26 also imposes joint and several liability on every principal executive officer or director, every person occupying a similar status or performing similar functions, and every employee of a corporation who materially aids in the act or transaction constituting the violation.

WHEREFORE, GIS seeks relief as set forth in the prayers below.

///

///

///

# SIXTH CAUSE OF ACTION

### Declaratory Judgment - Termination of the
### Iowa Franchise Would Violate Iowa Code § 523H.1 *et seq*.

80.   GIS incorporates by reference paragraphs 1 through 79 as if fully set forth herein.

81.   Pursuant to the Midwest Agreement, GIS agreed to sell and distribute Defendant's products in an exclusive sales territory in the state of Iowa (the "Iowa Territory").

82.   Defendant agreed that GIS would be its exclusive distributor or franchisee in the Iowa Territory.

83.   Pursuant to the Midwest Agreement, Defendant prescribed a marketing plan under which GIS was to promote, sell, and distribute Defendant's products throughout the Iowa Territory.

84.   The marketing plan consisted of, *inter alia*, use of "printed promotional and packaging materials distributed by [Defendant]" (Midwest Agreement ¶ 1), pricing set by Defendant (*Id*. ¶ 4), and use of specific sales techniques such as GIS and Defendant maintaining a "close liaison" to solicit "regional and national chain store accounts and governmental accounts." (*Id*. ¶ 7(b)).

85.   The marketing plan also required GIS to use Defendant's trade name, trademark, service mark, and other commercial symbols.  (*Id*. ¶ 9).

86.   In accordance with the marketing plan, GIS's promotion, sale, and distribution of Defendant's products was, at all times relevant herein, substantially associated with Defendant's trademark or trade name.

87.   GIS paid franchise fees to Defendant in the form of a mandatory minimum monthly purchase requirement of $10,000, and other fees.

88.   Consequently, the Midwest Agreement, at all times relevant herein, was a "franchise" within the meaning of Iowa Code § 523H.1.

89.   GIS has a business presence in the state of Iowa and Defendant now requires that GIS develop a physical presence in each state where it operates a franchise on behalf of Defendant.

90.     Iowa Code § 523H.7 provides, *inter alia*, that "a franchisor shall not terminate a franchise prior to the expiration of its term except for good cause."

91.     Iowa Code § 523H.7 further provides even when a franchise is terminated for good cause, the franchisor must give the franchisee "written notice stating the basis for the proposed termination" and further provide the franchisee with "a reasonable period of time to cure the default."

92.     Defendant has threatened to terminate the Midwest Agreement and GIS's exclusive distributorship in the Iowa Territory.  Defendant gave no notice or explanation for this action to GIS other than that the franchise agreement was "no longer applicable to the current business."

93.     The unilateral and unsubstantiated belief that a franchise agreement is "no longer applicable to the current business" does not constitute "good cause" for termination under § 523H.7.

94.     Defendant has stated no other basis or cause for terminating the Midwest Agreement in Iowa.

95.     Defendant did not provide GIS with the written notice or opportunity to cure required by § 523H.7.

96.     Iowa Code § 523H.13 provides a private right of action to recover damages caused by a violation of § 523H.7.  In addition to damages, the available statutory remedies include costs and reasonable attorneys' fees, experts' fees, and injunctive and other equitable relief.

WHEREFORE, GIS seeks relief as set forth in the prayers below.

### SEVENTH CAUSE OF ACTION

**Declaratory Judgment - Termination of
the Iowa Franchise Would Violate Iowa Code § 537A.10 *et seq*.**

97.     GIS incorporates by reference paragraphs 1 through 96 as if fully set forth herein.

98.     Pursuant to the Midwest Agreement, GIS agreed to sell and distribute Defendant's products in the Iowa Territory.

99.     The Midwest Agreement had an initial term of one year and has been automatically renewed each year since its execution.

100.     Defendant agreed that GIS would be its exclusive distributor or franchisee in the Iowa Territory.

101.     Pursuant to the Midwest Agreement, Defendant prescribed a marketing plan under which GIS was to promote, sell, and distribute Defendant's products throughout the Iowa Territory.

102.     The marketing plan consisted of, *inter alia*, use of "printed promotional and packaging materials distributed by [Defendant]" (Midwest Agreement ¶ 1), pricing set by Defendant (*Id.* ¶ 4), and use of specific sales techniques such as GIS and Defendant maintaining a "close liaison" to solicit "regional and national chain store accounts and governmental accounts." (*Id.* ¶ 7(b)).

103.     The marketing plan also required GIS to use Defendant's trade name, trademark, service mark, and other commercial symbols.  (*Id.* ¶ 9).

104.     In accordance with the marketing plan, GIS's promotion, sale, and distribution of Defendant's products was, at all times relevant herein, substantially associated with Defendant's trademark or trade name.

105.     GIS paid franchise fees to Defendant in the form of a mandatory minimum monthly purchase requirement of $10,000, and other fees.

106.     Consequently, the Midwest Agreement, at all times relevant herein, was a "franchise" within the meaning of Iowa Code § 537A.10.

107.     GIS has a business presence in the state of Iowa and Defendant now requires that GIS develop a physical presence in each state where it operates a franchise on behalf of Defendant.

108.     Iowa Code § 537A.10(7)(a) provides, *inter alia*, that "a franchisor shall not terminate a franchise prior to the expiration of its term except for good cause."

109.     Iowa Code § 537A.10(7)(b) further provides that even when a franchise is terminated for good cause, the franchisor must give the franchisee with "written notice stating

1    the basis for the proposed termination" and further provide the franchisee with "a reasonable

2    period of time to cure the default."

3         110.    Defendant has threatened to terminate the Midwest Agreement and GIS's

4    exclusive distributorship in the Iowa Territory.  Defendant gave no notice or explanation to GIS

5    for this action to GIS other than that the franchise agreement was "no longer applicable to the

6    current business."

7         111.    The unilateral and unsubstantiated belief that a franchise agreement is "no longer

8    applicable to the current business" does not constitute "good cause" for termination under

9    §523H.7

10        112.    Defendant does not have a legitimate business reason to terminate the Midwest

11   Agreement.

12        113.    Defendant did not provide GIS with the written notice or opportunity to cure

13   required by § 537A.10(7)(b).

14        114.    Iowa Code § 537A.10(13) provides a private right of action to recover damages

15   caused by a violation of § 537A.10(7).  In addition to damages, the available statutory remedies

16   include costs and reasonable attorneys' fees, experts' fees, and injunctive and other equitable

17   relief.

18        WHEREFORE, GIS seeks relief as set forth in the prayers below.

19                              **EIGHTH CAUSE OF ACTION**

20        **Breach of Duty of Good Faith in Violation of Iowa Code § 523H.1 *et seq*.**

21        115.    GIS incorporates by reference paragraphs 1 through 114 as if fully set forth

22   herein.

23        116.    Pursuant to the Midwest Agreement, GIS agreed to sell and distribute Defendant's

24   products in the Iowa Territory.

25        117.    Defendant agreed that GIS would be its exclusive distributor or franchisee in the

26   Iowa Territory.

27

28

118.    Pursuant to and throughout Midwest Agreement, Defendant prescribed a marketing plan under which GIS was to promote, sell, and distribute Defendant's products throughout the Iowa Territory.

119.    The marketing plan consisted of, *inter alia*, use of "printed promotional and packaging materials distributed by [Defendant]" (Midwest Agreement ¶ 1), pricing set by Defendant (*Id*. ¶ 4), and use of specific sales techniques such as GIS and Defendant maintaining a "close liaison" to solicit "regional and national chain store accounts and governmental accounts." (*Id*. ¶ 7(b)).

120.    The marketing plan also required GIS to use Defendant's trade name, trademark, service mark, and other commercial symbols.  (*Id*. ¶ 8).

121.    In accordance with the marketing plan, GIS's promotion, sale, and distribution of Defendant's products was, at all times relevant herein, substantially associated with Defendant's trademark or trade name.

122.    GIS paid franchise fees to Defendant in the form of a mandatory minimum monthly purchase requirement of $10,000, and other fees required by the Midwest Agreement.

123.    Consequently, the Midwest Agreement was, at all times relevant herein, a "franchise" within the meaning of Iowa Code § 523H.1.

124.    GIS has a business presence in the state of Iowa and Defendant now requires that GIS develop a physical presence in each state where it operates a franchise on behalf of Defendant.

125.    Iowa Code §523H.10 provides that "a franchise imposes on the parties a duty of good faith in performance and enforcement of the franchise agreement."

126.    Defendant has breached its duty of good faith by, *inter alia*, threatening to terminate the Midwest Agreement and GIS's exclusive distributorship in the Iowa Territory without good cause and by using the Midwest Agreement as leverage to force GIS to re-negotiate its other agreements with Defendant.

127.    Iowa Code § 523H.13 provides a private right of action to recover damages caused by a violation of § 523H.10.  In addition to damages, the available statutory remedies

1   include costs and reasonable attorneys' fees, experts' fees, and injunctive and other equitable

2   relief.

3         WHEREFORE, GIS seeks relief as set forth in the prayers below.

4                        **NINTH CAUSE OF ACTION**

5        **Breach of Duty of Good Faith in Violation of Iowa Code § 537A.10 _et seq_.**

6         128.   GIS incorporates by reference paragraphs 1 through 127 as if fully set forth

7   herein.

8         129.   Pursuant to the Midwest Agreement, GIS agreed to sell and distribute Defendant's

9   products in the Iowa Territory.

10        130.   The Midwest Agreement's term is for a period of one year and has been

11  automatically renewed each year since its execution.

12        131.   Defendant agreed that GIS would be its exclusive distributor or franchisee in the

13  Iowa Territory.

14        132.   Pursuant to and throughout the term of the Midwest Agreement, Defendant

15  prescribed a marketing plan under which GIS was to promote, sell, and distribute Defendant's

16  products throughout the Iowa Territory.

17        133.   The marketing plan consisted of, _inter alia_, use of "printed promotional and

18  packaging materials distributed by [Defendant]" (Midwest Agreement ¶ 1), pricing set by

19  Defendant (_Id_. ¶ 4), and use of specific sales techniques such as GIS and Defendant maintaining

20  a "close liaison" to solicit "regional and national chain store accounts and governmental

21  accounts."  (_Id_. ¶ 7(b)).

22        134.   The marketing plan also required GIS to use Defendant's trade name, trademark,

23  service mark, and other commercial symbols.  (_Id_. ¶ 8).

24        135.   In accordance with the marketing plan, GIS's promotion, sale, and distribution of

25  Defendant's products was, at all times relevant herein, substantially associated with Defendant's

26  trademark or trade name.

27        136.   GIS paid franchise fees to Defendant in the form of a mandatory minimum

28  monthly purchase requirement of $10,000, and other fees required by the Midwest Agreement.

137.     Consequently, the Midwest Agreement was, at all times relevant herein, a "franchise" within the meaning of Iowa Code § 537A.10.

138.     GIS has a business presence in the state of Iowa and Defendant now requires that GIS develop a physical presence in each state where it operates a franchise on behalf of Defendant.

139.     Iowa Code § 537A.10(11) provides that "a franchise imposes on the parties a duty of good faith in performance and enforcement of the franchise agreement."

140.     Defendant has breached its duty of good faith by, *inter alia*, threatening to terminate the Midwest Agreement and GIS's exclusive distributorship in the Iowa Territory without good cause and by using the Midwest Agreement as leverage to force GIS to re-negotiate its other agreements with Defendant..

141.     Iowa Code § 537A.10(13) provides a private right of action to recover damages caused by a violation of § 537A.10(11).  In addition to damages, the available statutory remedies include costs and reasonable attorneys' fees, experts' fees, and injunctive and other equitable relief.

WHEREFORE, GIS seeks relief as set forth in the prayers below.

## TENTH CAUSE OF ACTION

### Negligence *Per Se*

142.     GIS incorporates by reference paragraphs 1 through 141 as if fully set forth herein.

143.     GIS and Defendant have had a commercial relationship pursuant to the "Agreements".

144.     Pursuant to the Agreements, GIS was to operate its distribution franchise while utilizing and associating itself with Defendant's trade name, trademark, service mark, and other commercial symbols.

145.     The Agreements granted Defendant authority and control over the manner in which GIS operated its franchises.

146.    Pursuant to the various Agreements, GIS was required to make payments to Defendant in excess of $500 in the form of a mandatory initial inventory purchase of Defendant's products and equipment, a minimum monthly purchase requirement, and other fees as a condition to commencing operation of the franchise.

147.    The FTC has issued an advisory opinion noting that "[w]hether a business relationship constitutes a 'franchise,' is not dependent upon what the parties call the relationship ... [r]ather, a relationship is covered by the Franchise Rule if it satisfies the definitional elements of a 'franchise' set forth in the Franchise Rule."  Intent is not relevant under the FTC Rule; if the defining elements are present the relationship is a franchise. FTC Informal Staff Advisory Op. 98-4 (1998).

148.    Consequently, GIS is a "franchisee" within the meaning of the FTC Franchise Rule, 16 C.F.R. § 436.1(i), and falls within the class of persons that the FTC Franchise Rule, via the Federal Trade Commission Act ("FTC Act"), was intended to protect.

149.    Defendant is a "franchisor" within the meaning of the FTC Franchise Rule 16 C.F.R. § 436.1(k).

150.    The FTC Franchise Rule requires the franchisor to provide all GISs with disclosure documents required by 16 C.F.R. § 436.2-6, including, *inter alia*, the franchisor's financial information, patents, trademarks, and territories.  *See* 16 C.F.R. §§ 426.2(a), 436.4, 426.6(a).

151.    Despite the FTC Franchise Rule's requirements, Defendant never provided GIS with the necessary disclosures either at the outset of their franchise relationship or at the time of any of the Agreements' automatic renewals.

152.    But for Defendant's violation of the FTC Franchise Rule by failing to provide GIS with required financial and other disclosures, GIS would not have suffered harm at the hands of Defendant.  As a direct, proximate, and foreseeable result of Defendant's failure to comply with the FTC Franchise Rule and, hence violation of the FTC Act, GIS suffered and continues to suffer substantial damages.

WHEREFORE, GIS prays for judgment against Defendant for negligence *per se* and requests damages to be determined at trial.

### ELEVENTH CAUSE OF ACTION

**Violation of the North Carolina Unfair and Deceptive
Trade Practices Act, N.C. Gen. Stat. § 75-1.1, *et seq.***

153.    GIS incorporates by reference paragraphs 1 through 152 as if fully set forth herein.

154.    GIS was, at all times relevant hereto, engaged in commerce by selling and distributing Defendant's products pursuant to the Agreements.

155.    GIS and Defendant have been involved in a commercial relationship pursuant to the Agreements.

156.    Section 75-1.1 of the North Carolina Unfair and Deceptive Trade Practices Act provides that "[u]nfair methods of competition in or affecting commerce, and ***unfair or deceptive acts or practices*** in or affecting commerce, are declared unlawful." N.C. Gen. Stat. § 75-1.1 (emphasis added).

157.    The FTC Franchise Rule, 16 C.F.R. § 436 *et seq.*, requires a franchisor to provide prospective franchisees with a complete and accurate basic disclosure document containing twenty categories of information.  The FTC Franchise Rule further provides that the failure to provide a GIS with the necessary disclosures "***is an unfair or deceptive act or practice*** in violation of § 5 of the Federal Trade Commission Act."  (emphasis added).

158.    Pursuant to the Agreements, GIS was to operate its distribution franchise while utilizing and associating itself with Defendant's trade name, trademark, service mark, and other commercial symbols.

159.    The Agreements granted Defendant authority and control over the manner in which GIS operated its franchise.

160.    GIS was required to make payments to Defendant in excess of $500 pursuant to the various Agreements.  These payments included a mandatory initial inventory purchase of

1  Defendant's products and equipment, a minimum monthly purchase requirement, and other fees

2  as a condition to commencing operation of the franchise.

3       161.    The FTC has issued an advisory opinion noting that "[w]hether a business

4  relationship constitutes a 'franchise,' is not dependent upon what the parties call the relationship

5  ... [r]ather, a relationship is covered by the Franchise Rule if it satisfies the definitional elements

6  of a 'franchise' set forth in the Franchise Rule."  Intent is not relevant under the FTC Rule; if the

7  defining elements are present the relationship is a franchise. FTC Informal Staff Advisory Op.

8  98-4 (1998).

9       162.    Consequently, GIS is a "franchisee" within the meaning of the FTC Franchise

10  Rule, 16 C.F.R. § 436.1(i) and falls within the class of persons that the FTC franchise Rule, via

11  the Federal Trade Commission Act ("FTC Act"), was intended to protect.

12       163.    Defendant is a "franchisor" within the meaning of the FTC Franchise Rule 16

13  C.F.R. § 436.1(k).

14       164.    Defendant never provided GIS with the necessary disclosures either at the outset

15  of their franchise relationship, upon automatic renewal of any of Agreements, or in connection

16  with the offer of the 2015 Form Agreement.  This failure was and is "an unfair or deceptive act

17  or practice" under the FTC Franchise Rule.

18       165.    Each time that Defendant has offered a "franchise" in violation of the FTC

19  Franchise Rule and applicable state franchise disclosure and registration laws, Defendant has

20  violated the North Carolina Little FTC Act.

21       166.    A substantial portion of, the events giving rise to GIS's claim for violation of the

22  North Carolina Little FTC Act—including Defendant's material misrepresentations and

23  omissions—occurred in North Carolina.

24       167.    As a direct result of Defendant's failure to comply with the North Carolina Little

25  FTC Act, GIS has suffered and continues to suffer substantial damages.

26       WHEREFORE, GIS prays for judgment against Defendant for violation of the North

27  Carolina Little FTC Act and requests an award equal to three times its actual damages

28

COMPLAINT                                    -26-

determined at trial, all costs of this action, including reasonable attorneys' fees, and any other relief that this court deems just and proper.

### TWELFTH CAUSE OF ACTION

**Breach of the Implied Covenants of Good Faith and Fair Dealing**
**of the Pennsylvania, Mid-Atlantic, Cook County, Indiana, and Midwest Agreements**

168.     GIS incorporates by reference paragraphs 1 through 167 as if fully set forth herein.

169.     The Pennsylvania, Mid-Atlantic, Ohio, Cook County, Indiana, and Midwest Agreements are governed by California law and therefore contain an implied covenant of good faith and fair dealing.  This covenant obligates Defendant not to hinder or prevent GIS's ability to perform under the contract or receive the benefit of the contract.

170.     Defendant acted in bad faith by threatening the termination of the Mid-Atlantic, Cook County, and Midwest Agreements as a means of forcing GIS to renegotiate otherwise valid and binding contracts in Pennsylvania, Indiana, Ohio, and elsewhere.

171.     Defendant further acted in bad faith by usurping GIS's role as exclusive distributor in the GIS Territories.  On multiple occasions Defendant has attempted to harm the business reputation of GIS with the purpose of damaging GIS's relationship with its customers. Such actions were again an attempt to strong-arm Plaintiff into involuntarily submitting to forced contract re-negotiations.

172.     Defendant's conduct, as alleged above, constitutes a breach of the covenant of good faith and fair dealing implied in every contract under California law.

173.     Defendant's interference with GIS's contractual rights has resulted in and will result in various harms including lost profits, increased costs, expenditure of attorneys' fees, and loss of good will.  This harm was intentional and foreseeable from Defendant's action.

WHEREFORE, GIS seeks relief as set forth in the prayers below.

**PRAYER FOR RELIEF**

WHEREFORE, GIS prays for the following relief and judgment:

(a)     A declaration that the Alabama, Florida, and Tennessee Agreements were not properly terminated and are currently valid and in full effect;

(b)     A declaration that termination of the Cook County, Illinois, Mid-Atlantic, and Midwest Agreements would violate state law, as described above;

(c)     An award of compensatory damages in an amount according to proof;

(d)     Treble damages;

(e)     Punitive damages;

(f)     Pre-judgment interest on its damages in an amount to be determined at trial;

(g)     Costs of suit, including GIS's actual and/or reasonable attorneys' fees and experts' fees; and

(h)     Such other relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

GIS hereby demands a trial by jury of all claims so triable.

Dated:  February 27, 2015                                    Respectfully submitted,

                                                             s/ Dylan J. Liddiard
                                                             Dylan J. Liddiard, State Bar No. 203055
                                                             WILSON SONSINI GOODRICH & ROSATI
                                                             Professional Corporation
                                                             650 Page Mill Road
                                                             Palo Alto, CA 94304
                                                             Telephone:  (650) 493-9300
                                                             Facsimile:  (650) 565-5100
                                                             Email:  dliddiard@wsgr.com

                                                             MICHAEL J. LOCKERBY (admission *pro hac vice* pending)
                                                             FOLEY & LARDNER LLP
                                                             3000 K Street, N.W. | Suite 600
                                                             Washington, DC 20007
                                                             Telephone:  (202) 672-5300
                                                             Facsimile:  (202) 672-5399
                                                             Email:  mlockerby@foley.com

                                                             Attorneys for Plaintiff

COMPLAINT                                    -28-