1

2

3

4

5

6

# UNITED STATES DISTRICT COURT

7

### EASTERN DISTRICT OF CALIFORNIA

8

9  G.P.P., INC. dba GUARDIAN
   INNOVATIVE SOLUTIONS,

Case No.  1:15-cv-00321-SKO

10

             Plaintiff,

**ORDER DENYING IN PART AND
GRANTING IN PART DEFENDANT'S
MOTION TO DISMISS**

11

      v.

12

(Doc. 16)

13  GUARDIAN PROTECTION
    PRODUCTS, INC.,

14

             Defendant.

15  _____/

16

17

## I.   INTRODUCTION

18

19        On April 23, 2015, Defendant Guardian Protection Products, Inc. ("Guardian") filed a

20  motion to dismiss Plaintiff G.P.P. Inc., dba Guardian Innovative Solutions' ("GIS") complaint.

21  (Doc. 16.)  On May 20, 2015, GIS filed a brief in opposition to Guardian's motion, and on May 27,

22  2015, Guardian filed a reply brief.  (Doc. 22.)   At the Court's direction, GIS filed a sur-reply on

23  June 2, 2015, and Guardian filed a response to GIS' sur-reply on June 4, 2015.  Having reviewed

24  the parties' papers and all supporting material, the matter was found suitable for decision without

25  oral argument pursuant to Local Rule 230(g), and the June 17, 2015, hearing was vacated.

26        For the reasons set forth below, Guardian's motion to dismiss is DENIED IN PART AND

27  GRANTED IN PART.[1]

28

---

[1] The parties consented to the jurisdiction of a U.S. Magistrate Judge for all purposes.  (Docs. 11, 12.)

## II.   PLAINTIFF'S ALLEGATIONS[2]

GIS is family-run business that has purchased products from Guardian for nearly 30 years. Guardian is a Delaware company with its principal place of business in North Carolina.  Guardian sells furniture and upholstery protection products, furniture warranties, and other related items to distributors such as GIS, who in turn sell to retail chains and establishments.  (Doc. 1, ¶¶ 1-2.)

In May 1988, GIS and Guardian entered into a written agreement whereby GIS acquired distribution rights to Guardian's products in certain counties in Pennsylvania (the "Pennsylvania Agreement").  The Pennsylvania Agreement required GIS to make a minimum initial purchase of $40,000 of Guardian's products.  So long as GIS made purchases that were in a sum sufficient to meet an annual purchase agreement, the Pennsylvania Agreement automatically renewed on an annual basis. (Doc. 1, ¶ 5.)

GIS and Guardian subsequently entered into other agreements whereby GIS acquired exclusive distribution rights to Guardian's products in Maryland, Washington, D.C., certain remaining counties in Pennsylvania, specified counties in Western New York (collectively the "Mid-Atlantic Agreement"), and Ohio (the "Ohio Agreement").  The Mid-Atlantic Agreement required GIS to purchase $75,000 of Guardian's products as consideration for the exclusive distribution rights, and so long as GIS met a minimum annual purchase requirement, the Mid-Atlantic Agreement automatically renewed annually.  The Ohio Agreement required GIS to make an initial purchase of $20,000 of Guardian's products and to pay an additional $20,000 fee. Provided that GIS made purchases in a sum sufficient to meet an annual purchase requirement, the Ohio Agreement automatically renewed on an annual basis.  (Doc. 1, ¶¶ 6-7.)

Pursuant to a written assignment of three other written agreements originally entered into between Guardian and another company, GIS obtained exclusive distribution rights to Guardian's products in Illinois (the "Cook County Agreement"); Indiana (the "Indiana Agreement"); and Iowa and certain counties in Eastern Missouri (the "Midwest Agreement").  So long as GIS met

---

[2] GIS' allegations are drawn from the complaint and are not factual findings made by the Court.  (Doc. 1.)

1  minimum annual purchase requirements under each of these agreements, they each automatically
2  renewed on an annual basis.  (Doc. 1, ¶ 8.)

3         In March 2010, pursuant to three additional written assignments originally entered into
4  between Guardian and another company, GIS acquired exclusive distribution rights to Guardian's
5  products in Alabama (the "Alabama Agreement); Florida (the "Florida Agreement"), and
6  Tennessee (the "Tennessee Agreement") (collectively, these nine agreements will be referred to as
7  the "Distributor Agreements.").  To obtain the assignment of these Distributor Agreements, GIS
8  paid $50,000 to the company who had originally entered into these Distributor Agreements with
9  Guardian.  (Doc. 1, ¶ 9.)

10        GIS alleges that each of these Distributor Agreements constitutes a franchise.  (Doc. 1, ¶¶
11 28-31.)  GIS maintains that at no time before offering a "franchise" in connection with each of
12 these Distributor Agreements did Guardian ever provide GIS with a Uniform Franchise Offering
13 Circular or Franchise Disclosure Document in accordance with the Federal Trade Commission
14 ("FTC") Franchise Rule, 16 C.F.R., pt. 436.  GIS also alleges that Guardian failed to register its
15 franchise offering in accordance with the franchise disclosure and registration laws of Maryland,
16 New York, Indiana, and Illinois.  (Doc. 1, ¶¶ 33-34.)

17        Beyond franchise disclosure violations, Guardian began to engage in a series of wrongful
18 acts including refusal to pay commission due GIS; improperly purporting to terminate the
19 Alabama, Florida, and Tennessee Agreements; and making actual and implicit threats to terminate
20 the existing Distributor Agreements unless GIS entered into a new agreement (the "2015
21 Agreement") that contains much less advantageous terms and conditions to GIS than the existing
22 Distributor Agreements.  Moreover, GIS claims the 2015 Agreement constitutes a franchise itself
23 within the meaning of federal and state law, but Guardian failed to provide the required
24 disclosures and, where applicable, state registration of its franchise offering.  (Doc. 1, ¶¶ 35-37.)

25        Additionally, GIS alleges it discovered in 2010 that Guardian was violating the existing
26 Agreements by directly selling products in GIS' exclusive territory to retail locations associated
27 with Bob's Discount Furniture.  (Doc. 1, ¶¶ 13-15.)  To resolve this, GIS and Guardian agreed that
28 Guardian would pay GIS a 5% commission on all sales of Guardian's products made to Bob's

Discount Furniture retail locations in GIS's Exclusive Territory for the duration of such sales. Guardian made payments under this agreement until November 2014.   In December 2014, however, Guardian stopped paying GIS the 5% commission.

GIS filed a complaint on February 27, 2015, alleging the following causes of action: (1) breach of the Alabama, Florida, and Tennessee Agreements; (2) breach of the implied covenants of good faith and fair dealing in the Alabama, Florida, and Tennessee Agreements; (3) breach of Bob's Discount Furniture Agreement; (4) breach of the implied covenant of good faith and fair dealing of Bob's Discount Furniture Agreement; (5) declaratory judgment that termination of the Cook County Agreement would violate the Illinois Franchise Disclosure Act; (6) declaratory judgment that termination of the Iowa Agreement would violate Iowa Code § 523H.1, *et seq.*; (7) declaratory judgment that termination of the Iowa Agreement would violate Iowa Code § 537A.10, *et seq.*; (8) breach of the duty of good faith in violation of Iowa Code § 523H.1, *et seq.*; (9) breach of the duty of good faith in violation of Iowa Code § 537A.10 *et seq.*; (10) negligence *per se*; (11) violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, *et. seq.*; and (12) breach of the implied covenants of good faith and fair dealing of the Pennsylvania, Mid-Atlantic, Cook County, Indiana, and Midwest Agreements.

On April 23, 2015, Guardian filed a motion to dismiss GIS' complaint, which is currently pending before the Court.

## III.   DISCUSSION

### A.   Guardian's Motion to Dismiss Pursuant to Rule 12(b)(1) for Lack of Standing is DENIED

Guardian argues GIS' Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and Twelfth Causes of action should be dismissed because GIS was not a signatory to the Pennsylvania, Mid-Atlantic, Ohio, Cook County, Indiana, or Midwest Agreements attached to the complaint (Doc. 1, Exs. 1-3, 5-7).   According to Guardian, these exhibits therefore contradict GIS' allegation that it is a party to these agreements.   Because of this inconsistency, GIS' allegation that it is party to these agreements is not entitled to a presumption of truth.   Someone who is not a party to a contract has no standing to bring claims arising out of that contract.   As GIS has not established that it is a

4

party to these agreements, GIS has not met its jurisdictional requirement to sufficiently allege standing under Article III of the Constitution, which deprives the court of jurisdiction over any contract claims related to these particular agreements under Federal Rule of Civil Procedure 12(b)(1).

GIS contends it has repeatedly alleged (1) it is a party to these agreements; (2) a significant course of conduct between itself and Guardian under these agreements; and (3) that Guardian has threatened to terminate these agreements.  GIS also maintains it operates pursuant to various "doing business as" (dba) names, and each of the agreements authorized GIS to operate under certain Guardian-based dba names in different licensed territories.  Taken together, these allegations and the exhibits are sufficient to infer that GIS is a party to the agreements as alleged, and the agreements themselves do not contradict these allegations.

**1.      Standards Applicable to Motions to Dismiss Pursuant to Rule 12(b)(1)**

Federal Rule of Civil Procedure 12(b)(1) allows a defendant to raise a defense by motion that the court lacks jurisdiction over the complaint because of a lack of standing.  *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).  Pursuant to Article III, federal courts may adjudicate only actual cases or controversies.  U.S. Const. art. III, § 2, cl. 1.  Part of the case or controversy requirement implicates the doctrine of standing, which requires the plaintiff to suffer an actual or imminent injury in fact.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  The plaintiff has the burden of establishing the elements required for standing.  *Takhar v. Kessler*, 76 F.3d 995, 1000 (9th Cir. 1996).  Motions under Rule 12(b)(1) may challenge jurisdiction facially or factually.  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  In other words, a 12(b)(1) motion to dismiss may attack either the sufficiency of the allegations supporting subject matter jurisdiction (facial attack) or the existence of subject matter jurisdiction in fact (factual attack).  A factual attack on jurisdiction is made by presenting appropriate extrinsic evidence, and the party opposing the motion is then required to furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction.  *Savage v. Glendale Union High Sch. Dist. No. 205*, 343 F.3d 1036, 1040 (9th Cir. 2003).

1   The standards applied by courts in conducting a jurisdictional analysis vary according to
2   the nature of the jurisdictional challenge.  Thus, in a facial challenge, the court must accept the
3   plaintiff's allegations as true, and "the motion is granted only if the plaintiff fails to allege an
4   element necessary for subject matter jurisdiction."  *Westlands Water Dist. Distrib. Dist. v. NRDC*,
5   276 F. Supp. 2d 1046, 1049 (E.D. Cal. 2003).  In a factual challenge, the court is not required to
6   presume the truthfulness of the plaintiff's allegations and may resolve factual issues in an
7   evidentiary hearing.  *White*, 227 F.3d at 1242.  In resolving the matter on declarations without an
8   evidentiary hearing, the court presumes the truthfulness of the complaint's allegations.  *McLachlan*
9   *v. Bell*, 261 F.3d 908, 909 (9th Cir. 2001).

10   **2.      GIS Pled Sufficient Facts to Establish Standing to Assert Its Contract Claims**

11   Guardian's attack of GIS' complaint under Rule 12(b)(1) is facial because no additional
12   facts are offered to challenge GIS' allegations; rather, Guardian takes aim at the sufficiency of
13   GIS' allegations regarding standing.  Attached to GIS' complaint are, among other exhibits, 6
14   agreements and an assignment agreement.  Each agreement, with the exception of the assignment
15   agreement in Exhibit 4, is signed by Guardian and a distributor (signatory 2):

| Exhibit | Signatory 2 | Region/Area |
|---------|-------------|-------------|
| 1 | Frank Gibson, Treasurer on behalf of 1330, Inc. | Pennsylvania |
| 2 | Charles Gibson, President on behalf of Three Rivers Distributors, Inc. | Mid-Atlantic |
| 3 | Charles Gibson, President on behalf of Three Rivers Distributors, Inc. | Ohio |
| 5 | Jack R. Castella, owner, on behalf of GPP Northern Illinois | Cook County |
| 6 | Jack Castella, owner, on behalf of GPP Indiana | Indiana |
| 7 | Jack, and Sonya Castella,, Jr., dba Guardian Midwest | Midwest |
| 4 | Assignment Agreement between Frank Gibson, President, on behalf of Guardian North East and Jack Castella Jr., President, on behalf of Guardian Mid-West | Assignment of Cook County, Indiana, and Midwest Agreements |

27   In considering the sufficiency of the complaint, the court is required to take all allegations
28   of material fact as true and construe them in the light most favorable to the nonmoving party.

*Parks School of Business, Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).  When a plaintiff has attached exhibits to the complaint, those exhibits may be considered in determining whether dismissal is proper without converting the motion to one for summary judgment.  *Cooper v. Bell*, 628 F.2d 1208, 1210 n.2 (9th Cir. 1980), *overruled on other grounds as recognized in Valenzuela v. Kraft, Inc.*, 801 F.2d 1170, 1174 (9th Cir. 1986).   However, documents attached to the complaint that are inconsistent with the allegations such that they are mutually exclusive are not entitled to a presumption of truth.  *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).  Reading GIS' complaint and construing the allegations in the light most favorable to GIS requires the court to synthesize the documents attached to the complaint with the allegations, if such a synthesis can be logically made.

Here, the allegations of the complaint can be logically and plausibly reconciled with the agreements attached to the complaint.  The fact that GIS itself is not a signatory to certain agreements attached to the complaint does not, as a matter of law, preclude GIS from being a party to these agreements.  Under California law, a right arising out of an obligation may be transferred by the person to whom the obligation is due; "[t]he burden of an obligation may be transferred with the consent of the party entitled to its benefit, but not otherwise."  Cal. Civ. Code §§ 1457, 1458.  California has a strong policy in favor of the free transferability of all types of property, including rights under contracts.  *See Farmland Irrigation Co. v. Dopplmaier*, 48 Cal. 2d 208, 222 (1957).  Absent a contract provision prohibiting assignment, which is strictly construed, a contract may be transferred or assigned.  *Baum v. Duckor, Spradling & Metzger*, 72 Cal. App. 4th 54, 64 (1999).  Although GIS does not allege with specificity how it became a party under various agreements, it nonetheless alleges that it is a party to these agreements by which it obtained "exclusive distribution rights."   (Doc. 1, ¶¶ 5-7.)   GIS also alleges it acquired exclusive distribution rights under three of the agreements in April 23, 2007, by assignment (the Cook County, Indiana, and Midwest Agreements), which is attached to the complaint and was consented to by Guardian.  (Doc. 1, Ex. 4.)  Although GIS is not a signatory to the assignment (*see* Doc. 1, Ex. 4), it is plausible that the assignment itself was re-assigned to GIS.  Each of the agreements contains a clause that allows the distributor to sell or transfer the distributorship under the terms of

1  the agreement, provided Guardian is notified and consents to the sale or transfer of the agreement.

2  (Doc. 1-1, Exhibit 1, ¶ 6(a); Doc. 1-2, Exhibit 2, ¶ 6(a); Doc. 1-3, ¶ 6(a); Doc. 1-5, Exhibit 5, ¶

3  6(a); Doc. 1-6, Exhibit 6, ¶ 6(a); Doc. 1-7, Exhibit 7, ¶ 6(a).)

4      Moreover, as noted by GIS, it has alleged significant conduct between GIS and Guardian

5  sufficient to infer that GIS is a party to the Pennsylvania, Mid-Atlantic, Ohio, Cook County,

6  Indiana, and Midwest Agreements, notwithstanding that it is not a signatory to these agreements.

7  For example, GIS alleged that under each of the agreements, Guardian has licensed GIS to use

8  certain of its trademarks (Doc. 1, ¶ 30); Guardian has provided substantial assistance to, or

9  exercised substantial control over, GIS (Doc. 1, ¶ 30(a)); GIS has sold goods and services in

10  accordance with a marketing plan prescribed in substantial part by Guardian (Doc. 1, ¶ 31(b); and

11  GIS has paid a non-de minimis fee to Guardian for the right to sell goods and services under the

12  Licensed Trademarks (Doc. 1, ¶ 31(d)).

13      The complaint also alleges that Guardian has threatened to terminate the Pennsylvania,

14  Mid-Atlantic, Ohio, Cook County, Indiana, and Midwest Agreements with GIS unless GIS enters

15  into a new distribution agreement, the "2015 Form Agreement" (Doc. 1, ¶¶ 12, 35.)  This alleged

16  course of conduct is sufficient to infer a contractual relationship supporting GIS' allegation that it

17  is a party to these agreements.  Additionally, because the agreements each allow transfer of the

18  agreements and California law permits assignment or transfer of contractual obligations, GIS'

19  claim that it is a party to the agreements is plausible even though it is not a signatory to the

20  Pennsylvania, Mid-Atlantic, Ohio, Cook County, Indiana, and the Midwest Agreements.  Thus,

21  the agreements attached to the complaint are not necessarily inconsistent with the allegations of

22  the complaint, and the allegations are entitled to a presumption of truth.  As the allegation that GIS

23  is a party to these agreements is presumed true at this stage, GIS has standing to bring claims

24  related to these Agreements.  Guardian's motion to dismiss GIS' Fifth, Sixth, Seventh, Eighth,

25  Ninth, Tenth, and Twelfth Causes of Action for lack of standing under Federal Rule of Civil

26  Procedure 12(b)(1) is DENIED.

27

28

**B.** **Guardian's Motion to Dismiss Pursuant to Rule 12(b)(6) is DENIED in part and GRANTED in part**

Motions brought pursuant to Federal Rule of Civil Procedure 12(b)(6) test the sufficiency of the complaint. *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). A plaintiff must set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw reasonable inferences that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In considering whether a complaint states a claim on which relief may be granted, the court accepts as true the allegations in the complaint and construes the allegations in the light most favorable to the plaintiff. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). The court is not required to assume the truth of legal conclusions that are cast in the form of factual allegations. *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-55 (9th Cir. 1994). Although Rule 8(a) does not require detailed factual allegations, "it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. A pleading is insufficient if it offers more "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 676 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). It is inappropriate to assume that the plaintiff "can prove facts which it has not alleged or that defendants have violated the . . . laws in ways that have not been alleged." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

In ruling on a motion to dismiss brought under Rule 12(b)(6), the court is permitted to consider material which is properly submitted as part of the complaint, documents that are not physically attached to the complaint if their authenticity is not contested and the plaintiff's

complaint necessarily relies on them, and matters of public record.  *Lee v. City of L.A.*, 250 F.3d 668, 688-89 (9th Cir. 2001).

> **1.     GIS' First Cause of Action for Breach of the Alabama, Florida, and Tennessee Agreements is Sufficiently Pled**

Guardian argues GIS' First Cause of Action for breach of the Alabama, Florida, and Tennessee Agreements is inadequately pled and must be dismissed.  Guardian contends GIS must describe *all* bases upon which it contends Guardian breached the Alabama, Florida, and Tennessee agreements, not merely a "selected sample," and cite the specific contractual provisions breached. In pleading its claim for breach of these Agreements, GIS alleged Guardian breached "by, inter alia, purporting to terminate or actually terminating the agreements without cause and refusing to recognize the agreements as continuing to be valid and in effect, as alleged above, without cause and in violation of the terms of the agreement, as alleged above."  (Doc. 1, ¶ 44.)  By pleading the breaching conduct using the term "inter alia," GIS did not set forth *all* of the purported violations. Guardian argues such a vague allegation that does not specifically allege every breach of the contract prejudices Guardian by forcing it to address periodically expanding or evolving allegations.  (Doc. 16, pp. 16-17.)

GIS argues Guardian cites no authority to support its argument that *all* bases for any possible breach of contract claim must be specifically alleged to sufficiently state a claim for breach of contract.  The only case cited by Guardian is *Burke v. 401 N. Wabash Venture, LLC*, No. 08 C 5330, 2010 WL 2330334 (N.D. Ill. June 9, 2010), but this case did not hold that a plaintiff must describe *all* bases for any possible breach of contract to sufficiently state a claim and, even if it did, *Burke* is an Illinois case that does not apply California law.  GIS contends it has adequately alleged breaching conduct by Guardian and has sufficiently pleaded its contract claim.

To state a cognizable claim for breach of contract, the plaintiff must plead (1) a contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damage to the plaintiff.  *Walsh v. West Valley Mission Cmty. Coll. Dist.*, 66 Cal. App. 4th 1532, 1545 (1998).  GIS alleges the existence of a contract – i.e., the Alabama, Florida, and Tennessee Agreements, and that these agreements provided GIS with exclusive purchase rights for

Guardian's products in the defined regions.  (Doc. 1, ¶ 43.)  GIS alleges Guardian's breach – i.e., purporting to terminate or actually terminating the Distributor Agreements without cause and refusing to recognize the Distributor Agreements as valid.  (Doc. 1, ¶ 44.)  GIS alleges its performance and damages – i.e., that it has performed all of its obligations under the Agreements, and that it has been damaged by Guardian's breach.  (Doc. 1, ¶¶ 45-46.)  Although not every potential breach of the Distributor Agreements may have been alleged, Guardian has provided no persuasive case authority that all manner of possible breaches must be specifically articulated in the complaint to state a claim for breach of contract.  The use of the term "inter alia" in describing the conduct constituting the alleged breach by Guardian does not render the claim non-specific or not cognizable.

The Federal Rules require only that a complaint contain sufficient factual allegations to give the defendant fair notice of the claim for relief and show that a claim has "substantive plausibility."  *Johnson v. City of Shelby*, __ U.S. __, 135 S.Ct. 346 (2014) (per curiam).  As GIS has sufficiently alleged all the elements of its contract claim in more than a formulaic or conclusory manner, the pleading requirement is satisfied.  That is not to say, however, that unpled theories of breach may be litigated.  Rather, to the extent other, unpled grounds for breach become known during discovery, the pleadings must be timely amended.  Moreover, if theories of breach were known to GIS at the time of the initial complaint but simply not alleged, subsequent attempts to amend the pleadings to include such theories would likely be denied, mitigating any prejudice to Guardian.  *See Texaco, Inc. v. Ponsoldt*, 939 F.2d 794, 799 (9th Cir. 1991) (eight-month delay between time of obtaining relevant fact and seeking leave to amend is unreasonable).  Guardian's motion to dismiss GIS' First Cause of Action is DENIED.

### 2. GIS' Third Cause of Action for Breach of the Bob's Discount Furniture Agreement is Sufficiently Pled

GIS' Third Cause of Action for breach alleges that, after discovering in 2010 that Guardian was selling its products directly to Bob's Discount Furniture in territories exclusively reserved to GIS, the two companies agreed that Guardian would pay GIS a 5% commission on all sales Guardian made to Bob's Discount Furniture retail locations in GIS' exclusive territory.   Although

Guardian had agreed to the 5% commission payments and had been making the commission payments, it refused to pay the 5% commission after November 2014.  (Doc. 1, ¶ 14.)  As such, Guardian breached this agreement by failing to pay GIS all commission owed under the agreement.

Guardian contends this contract claim is insufficiently pled for several reasons:  GIS has not alleged (1) whether the agreement is oral or written; (2) any of the details as to when the agreement was made or who signed it; and (3) any of the terms or the legal effect of the terms of the agreement.  GIS has failed to plead all the material terms of the alleged agreement.

GIS argues the federal pleading standards require only sufficient factual allegations to establish each of the elements of the claim and to put Guardian on notice as to the basis of the claim, even if further facts must be developed during discovery.

In federal court in California,

> [a] cause of action for breach must include facts demonstrating (1) that a contract exists between the parties, (2) that plaintiff performed his contractual duties or was excused from nonperformance, (3) that the defendant breached those contractual duties, and (4) that plaintiff's damages were a result of the breach.

*Walters v. Fidelity Mortgage of Cal., Inc.*, No. 2:09-cv-3317 FCD-KJM, 2010 WL 1493131 at *7 (E.D. Cal. Aug. 14, 2010).  Federal procedural rules do not require the contract at issue to be attached to the complaint; rather the contract terms may be pled in the complaint.  *Mortgage Industry Solutions, Inc. v. Collabera, Inc.*, No. Civ S-10-2636-KJM-DAD, 2011 WL 1135907 (E.D. Cal. Mar. 25, 2011).  In *Collabera, Inc.,* the court found a contract claim sufficiently pled where the plaintiff alleged that it entered into a contract for the development of a search engine for mortgage information, the plaintiff paid the defendant's predecessor $300,000, the amount due under the agreement, that defendant refused to turn over the software incorporating the plaintiff's idea resulting in a breach, and the plaintiff lost access to its intellectual property as a result.  *Id.* at *2-3.

Similarly here, GIS alleges that it entered into an agreement with Guardian whereby Guardian would pay 5% commission on all sales of Guardian's products made to Bob's Discount Furniture retail locations in GIS' exclusive territory for as long as such sales were being made;

Guardian made payments until November 2014 but stopped paying GIS in December 2014.  (Doc. 1, ¶¶ 13-14.)  GIS also alleges it has performed its duties under the contract, and as a result of failing to pay the commission due under the Agreement, GIS has been damaged.  (Doc. 1, ¶¶ 59-64.)  Although there is no allegation whether the agreement is oral or written, Guardian provides no authority that this is mandated under federal notice pleading requirements.  *See TreeFrog Developments, Inc. v. Seidio, Inc.*, No. 13-cv-158-IEG (KSC), 2013 WL 4028096, *3 n.3 (S.D. Cal. Aug. 6, 2013).  Guardian notes that GIS has not alleged when the Agreement was made, who entered into the Agreement on either party's behalf, the frequency with which the parties agreed that commission payments were to be made, how the payments were to be made, or what consideration on the part of GIS supported the Agreement.

Although many of the specific details of the Agreement are not alleged, the allegations are sufficient to show that the claim has substantive plausibility.  There is an allegation of an agreement to pay a 5% commission on sales Guardian makes to a furniture store in GIS' exclusive territory, which was paid by Guardian through November 2014, but Guardian has not paid the Commission since that time, which has damaged GIS.  This is more detail than a formulaic recitation of the elements of a contract claim.  As to consideration, there is a plausible inference that by agreeing to allow Guardian to continue to make direct sales in GIS' otherwise exclusive territory, this was the consideration GIS gave in return for the sales commission paid by Guardian.  Also, the fact that Guardian made payments on sales, but stopped doing so abruptly in December 2014, provides an inference that Guardian continued to make sales in GIS' exclusive territory but began refusing to pay the agreed-upon commission.  Although the allegations are not of heightened specificity, the relevant, necessary terms of the contract have been alleged.  Guardian's motion to dismiss Plaintiff's Third Cause of Action for breach of the Bob's Discount Furniture Agreement is DENIED.

///

///

///

///

**3.**   **The Second and Fourth Causes of Action for Breach of the Implied Covenant of Good Faith and Fair Dealing in the Alabama, Florida, and Tennessee and the Bob's Discount Furniture Agreements Are Recognized by California Law And Are Not Duplicative of the Underlying Contract Claims**

Guardian asserts that outside the context of an insurance policy, California law does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when joined with a claim for breach of an express term of the same contract.  Guardian argues that GIS' Second Cause of Action for breach of the implied covenant of good faith and fair dealing with respect to the Alabama, Florida, and Tennessee Agreements and its Fourth Cause of Action for breach of the implied covenant with respect to Bob's Discount Furniture Agreement are duplicative of GIS' contract claims related to these agreements and must be dismissed.

GIS contends that with respect to both agreements, Guardian "engaged in bad faith conduct above and beyond merely breaching the Bob's Discount Furniture Agreement and the Alabama, Florida, and Tennessee Agreements."  Specifically, Guardian's purported termination of and refusal to perform its obligations to GIS under these agreements are "part of a series of wrongful, coercive acts whereby Guardian has tried to pressure GIS to enter into a new relationship and sign new contracts that are significantly more advantageous for Guardian and dramatically less advantageous for GIS."  (Doc. 21, 20:19-21.)  Therefore, GIS' claims for breaches of the implied covenant are not duplicative of its contract claims.

Conduct that breaches the covenant of good faith and fair dealing goes beyond mere breach of the contractual duty itself.  "It involves unfair dealing, whether or not it also constitutes breach of a consensual contract term, promoted by a conscious and deliberate act that 'unfairly frustrates the agreed common purposes and disappoints the reasonable expectation of the other party.'" *Celador Int'l Ltd. v. Walt Disney Co.*, 347 F. Supp. 2d 846, 852 (C.D. Cal. 2004) (quoting *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1395 (1990)).  In a claim for breach of the implied covenant, "[i]f the allegations do not go beyond the statement of a mere contract breach and, relying on the same alleged acts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous." *Careau & Co.*, 222 Cal. App. 3d at 1395.  A claim for breach of the implied covenant of good

1   faith and fair dealing is not duplicative of a breach of contract claim when a plaintiff alleges that

2   the defendant acted in bad faith to frustrate the benefits of the alleged contract.  *See Celador Int'l*

3   *Ltd.*, 347 F. Supp. 2d at 853.  As explained in *Celador*, the claim for breach of the covenant will

4   always be based on the same facts as the breach of contract, and the court "should not

5   mechanically inquire whether the same facts are alleged and whether the same remedy is sought.

6   Rather, the challenge brought by *Careau* and its progeny is to distinguish two claims based on the

7   same facts.  If they cannot be distinguished, then the natural conclusion is that they are

8   duplicative." *Id.*

9        Although Guardian argues breaches of the implied covenant of good faith and fair dealing

10   are not recognized under California law outside the insurance context, as discussed above, this is

11   not correct.[3]  A claim for breach of the implied covenant is viable so long as it is distinct from an

12   underlying breach of contract claim.  *Celador Int'l Ltd. v. Walt Disney Co.*, 347 F. Supp. 2d at

13   853; *see also Ladd v. Warner Bros. Entm't, Inc*, 184 Cal. App. 4th 1298, 1308 (2010) (recognizing

14   breach of implied covenant of good faith and fair dealing outside insurance context).

15        Additionally, GIS has sufficiently alleged bad-faith conduct on the part of Guardian

16   distinct from its breach of contract claims.  GIS alleges Guardian's conduct in refusing to pay

17   commission under Bob's Discount Furniture Agreement, Guardian's purported termination of the

18   Alabama, Florida, and Tennessee Agreements, and the threat to terminate every other existing

19   agreement was all intended by Guardian to force GIS to enter into a new "Distributorship

20   Agreement" that contains less advantageous terms and conditions for GIS than the existing

21   agreements.  (Doc. 1, ¶ 12.)  Moreover, in purporting to terminate the Alabama, Tennessee, and

22   Florida Agreements, Guardian allegedly "attempted to downplay the significance" of the notice to

23   terminate it sent to GIS and asserted that GIS and Guardian could continue to do business in these

24   territories despite the threat of termination, which GIS contends adversely affected its business and

25   business decisions.  Thus, not only has GIS alleged that the contracts were breached by Guardian's

26

---

27   [3] Claims for tort damages pursuant to the implied covenant of good faith and fair dealing are generally not recognized
in California outside the context of insurance law.  *Glendale Fed. Sav. & Loan Ass'n v. Marina View Heights Dev.*

28   *Co.*, 66 Cal. App. 3d 101, 135 n. 8 (1977) ("A bad faith cause of action sounding in tort has never been extended to
contractual relationships other than in the insurance field.").

behavior, but Guardian did so with a bad-faith motive to hurt GIS' business interests in an effort to leverage GIS into accepting a new agreement that is less advantageous than all the prior Distributor Agreements.  The allegations supporting the breaches of the implied covenant in GIS' Second and Fourth causes of action for breach of the implied covenant of good faith and fair dealing are sufficiently distinct from the underlying breaches of contract such that the implied covenant claims are not redundant and duplicative.

4.      **Iowa Franchise Law Declaratory Relief Causes of Action Six through Nine are DISMISSED Without Prejudice and With Leave to Amend**

GIS' Sixth through Ninth Causes of Action seek declaratory judgments that termination of the Iowa Agreement violates the 1992 and 2000 Iowa Franchise Acts.  (Doc. 1, ¶¶ 80-96.)  GIS alleges that the Midwest Agreement, which includes Iowa, is a franchise within the meaning of Iowa law.  Although GIS has a business presence in Iowa, Guardian is now requiring GIS to develop a physical presence in each state where it operates a franchise on behalf of Guardian. Iowa law does not allow a franchisor to terminate a franchise prior to the expiration of its term except for good cause and on written notice stating the basis for termination along with a reasonable time to cure the default.  Iowa Code § 523H.7.  GIS alleges Guardian has threatened to terminate the Midwest Agreement and GIS' exclusive distributorship in Iowa territory, but it gave no notice or explanation for this action other than the agreement was "no longer applicable to the current business."  GIS alleges this threatened termination without good cause violates Iowa Code § 523H.7.  Further, Guardian's failure to provide GIS with written notice or an opportunity to cure violates Iowa Code § 537A.10(7)(b), which is GIS' Seventh Cause of Action.  In its Eighth and Ninth Causes of Action, GIS alleges that Guardian's threatened termination of the Midwest Agreement also violates Iowa Code § 523H.10 and § 537A.10(11), which impose on the parties to the agreement a duty of good faith performance and enforcement of the franchise agreement.  GIS alleges that Defendant has breached its duty of good faith under Sections 523H.10 and 537A.10(11) by threatening to terminate the Midwest Agreement without good cause and by using the Midwest Agreement as leverage to force GIS to re-negotiate its other agreements with Guardian.

1

2          **a.      GIS' Physical Presence in the State of Iowa Is Insufficiently Pled**

3          Guardian contends GIS' Sixth, Seventh, Eighth, and Ninth causes of action regarding the

4   1992 and 2000 Iowa Franchise Acts must be dismissed.  Guardian argues that because GIS does

5   not allege that it operates from premises physically located in Iowa, its claims under the Iowa

6   Code are not viable.  The Iowa Code pertaining to franchises applies to any franchise in Iowa *so*

7   *long as* the premises from which the franchise is operated are physically located in the state of

8   Iowa.  *Am. Express. Fin. Advisors, Inc. v. Yantis*, 358 F. Supp. 2d 818, 827 (N.D. Iowa 2005).

9   Iowa law provides that a franchise is deemed to be operating in the state of Iowa only if the

10  franchisee's principal business office is *physically* located in Iowa.   Iowa Code § 523H.2 and

11  537A.10(2).    The  complaint  alleges  GIS  is  a  Pennsylvania  corporation  based  in  Pitcaim,

12  Pennsylvania.  Although GIS alleges it has a "business presence" in each state where it operates a

13  franchise on behalf of Guardian, GIS also alleges that Guardian is requiring GIS to develop a

14  physical presence in the Iowa, which suggests that GIS does not currently operate from premises

15  physically located in Iowa as required by both the 1992 and 2000 Acts.

16         GIS argues it operates from premises "physically located" in Iowa, despite that it does not

17  have a "physical presence" in Iowa.  Considering all allegations in the light most favorable to GIS,

18  this is sufficient to infer that GIS operates from Iowa as required under the Iowa Franchise Acts.

19         The Iowa Franchise Act of 1992 (the "1992 Act"), Iowa Code § 523H, *et seq*, and the Iowa

20  Franchise Act of 2000 (the "2000 Act"), Iowa Code § 537A.10, *et seq.*, were created to protect

21  franchisees operating in Iowa from abuses by franchisors and to equalize the bargaining power

22  between franchisees and franchisors.  *Equipment Mfrs. Inst. v. Janklow*, 300 F.3d 842, 861 (8th

23  Cir. 2002).   Both the 1992 Act and the 2000 Act apply to any franchise in Iowa as long as the

24  premises from which the franchise is operated are physically located in the state of Iowa:

25         This chapter applies to a new or existing franchise that is operated in the state of
           Iowa.  For purposes of this chapter, the franchise is operated in this state only if the
26         premises from which the franchise is operated is physically located in this state.
           For purposes of this chapter, a franchise including marketing rights in or to this
27         state, is deemed to be operated in this state only if the franchisee's principal
           business office is physically located in this state . . .
28

1     Iowa Code §§ 523H.2, 537A.10(2).

2        The complaint does not allege facts that GIS' "principle business office is physically

3     located" in Iowa; rather, it alleges that "GIS has a business presence in the state of Iowa."  There

4     is, however, no indication or other facts showing what that "business presence" is or how it meets

5     the requirements of the 1992 and 2000 Acts which provide that the franchisee's "principal business

6     office" must be physically located in the state of Iowa for a franchise to be considered to be

7     "operated" in Iowa.  GIS' bare allegation that it has a "business presence" in Iowa is insufficient to

8     maintain causes of action under the 1992 and 2000 Iowa Franchise Acts.  It is not clear, however,

9     that GIS cannot remedy this defect by pleading additional facts showing GIS operates a franchise

10    in Iowa in the manner required by the Acts.  Therefore, the Sixth through Ninth Causes of action

11    are DISMISSED without prejudice and with leave to amend.

12                    **b.    GIS May Plead Claims Under the 1992 Act and the 2000 Act**

13       To the extent GIS is able to sufficiently allege it operates in the state of Iowa, Guardian

14    argues only one of Iowa's Franchise Acts applies, not both.  In *Holiday Inns Franchising v.*

15    *Branstand*, the Eighth Circuit held that the 1992 Act could not constitutionally apply to franchises

16    governed by contracts signed before the 1992 Act's effective date.  29 F.3d 383, 384 (8th Cir.

17    1994).  Accordingly, when it was enacted, the 2000 Act expressly stated that it applied only to a

18    new or existing franchise that is subject to an agreement entered into on or after July 1, 2000.

19    Iowa Code §537A.10(2).  Guardian maintains that because GIS alleges the Distributor Agreement

20    was executed in 1998, only the 1992 Act applies – *i.e.*, by its express terms, the 2000 Act *cannot*

21    apply.

22       GIS argues Guardian ignores its allegation that GIS became a franchisee under the

23    agreement in 2007, and that the Midwest Agreement automatically renewed on an annual basis.

24    (Doc. 1, ¶ 8.)  "Each iteration of the Midwest Agreement to which GIS was a party therefore was

25    subject to both the 1992 Act and the 2000 Act."   (Doc. 21, 34: 1-2.)  Each Midwest Agreement to

26    which GIS was a party came *after* 1992 and 2000, subjecting Guardian to both the 1992 Act and

27    the 2000 Act under Iowa law.

28

Here, the original agreement was allegedly entered in 1998, but it was assigned to GIS in 2007 and renewed every year thereafter.  Neither the facts alleged nor the parties' arguments make clear whether the date of the original agreement or the dates of subsequent renewal agreements govern which Act applies.  Even if Guardian is correct and only one of the statutes may apply, GIS is permitted to state inconsistent claims while facts are developed to properly ascertain whether the assignment or the subsequent renewals govern which Act applies.  Federal Rule 8(d)(3) permits a party to state as many separate claims as it has, regardless of consistency.  It is plausible that a different Act would govern the original agreement and subsequent renewals of the agreement.  GIS is entitled to state its claim under both Acts, even if only one statute may ultimately apply.  Fed. R. Civ. Proc. 8(d)(3).

**5.      The Law Applicable to GIS' Tenth and Eleventh Causes of Action**

GIS' Tenth Cause of Action alleges a common law claim of negligence *per se* against Guardian.  (Doc. 1, ¶¶ 142-152.)  GIS alleges that, pursuant to the various Distributor Agreements, GIS is a "franchisee" within the meaning of the FTC Franchise Rule under 16 C.F.R. § 436.1(i), and Guardian is a "franchisor" under 16 C.F.R. § 436.1(k).  The FTC Franchise Rule requires the franchisor to provide GIS with disclosure documents, including the franchisor's financial information, patents, trademarks, and territories.[4]   GIS alleges Guardian never provided GIS with the necessary disclosures at any time, and this failure damaged GIS.  GIS' Eleventh Cause of Action asserts Guardian's failure to make required franchise disclosures under both federal and state law violated the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA").

Guardian contends that GIS' claim for negligence *per se* for failure to make disclosures required by the FTC Franchise Rule should be dismissed because (1) negligence *per se* is not a cause of action recognized in California absent a recognized underlying duty; (2) California does

---

[4] In 1978, the FTC promulgated a series of "disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures," known commonly as the Franchise Rule.  The FTC Franchise Rule requires franchisors to provide a prospective franchisee with a detailed disclosure statement prior to selling a franchise.  The disclosure statement must present certain enumerated facts about the franchisor's corporate history, its financial condition, the track record of other franchisees, and the background of its principle officers.  The FTC Franchise Rule was intended to protect prospective purchasers from the financial hardships that arisen when they purchase franchises or other business opportunity ventures without essential, reliable information about them.  Am. Jur. 2d, Private Franchise Contracts § 26 (citing 16 C.F.R. § 436.1).

not impose a common law duty of franchisors to provide prospective franchisees with the disclosure document outlined in the FTC Franchise Rule; and (3) the FTC Franchise Rules does not provide a private right of action and cannot form the basis of a negligence *per se* claim.

GIS argues that California law is not applicable to its claim for negligence *per se*. Pursuant the factors identified in *Davis Moreno Constr., Inc. v. Frontier Steel Bldgs. Corp*, No. CV-F-08-854-OWW-SMS, 2009 WL 1476990 (E.D. Cal. May 26, 2009), the jurisdictions where GIS suffered its injuries provide the appropriate applicable law.  If GIS were a franchisee in California, its remedy would lie under the California Franchise Relations Act rather than the doctrine of negligence *per se*.  Failure to apply the law of the states where GIS suffered its injuries, *i.e.*, the jurisdictions involved in the various Distributor Agreements, deprives GIS of a remedy for Guardian's franchise law violations, which would be contrary to public policy. Further, this claim arose in each of the jurisdictions in which Guardian offered a franchise and violated the FTC Franchise Rule.  In many of those states, federal courts have expressly held that violation of federal law is actionable as negligence *per se* even if the federal law giving rise to the duty does not expressly afford a private right of action – *i.e.* the FTC Franchise Rule.  GIS maintains this is clearly the law in Pennsylvania, as well as in many of the states where Guardian granted distribution rights in violation of the FTC Franchise Rule.  In other words, the unlawful conduct was experienced in jurisdictions which recognize a claim for failure to comply with federal law.  This weighs in favor of applying the law of other states.  Moreover, applying the negligence *per se* law of a foreign jurisdiction does not violate a fundamental public policy of California.  Rather, public policy of California requires disclosures of this nature.  If GIS were a California franchisee, its remedy would lie under the California Franchise Relations Act rather than the common law doctrine of negligence *per se*.  Depriving GIS of a remedy for Guardian's franchise law violations would be contrary to public policy of California and of other states with a materially greater interest in this controversy than California.

In its reply brief, Guardian argues that California law applies to these claims because the Distributor Agreements that form the basis of GIS' claims contain a forum selection clause that indicates California law will govern any dispute regarding the contract, including both GIS'

1  negligence *per se* claim *and* its claim under the UDTPA. Because California law does not

2  recognize a negligence *per se* claim and because the UDTPA claim arises under North Carolina

3  law and not California law, both claims must be dismissed.

4  In its sur-reply, GIS responds that such a choice-of-law provision does not apply to tort

5  causes of action and only governs claims arising under the contract. The language of the

6  Distributor Agreements is not broad enough to govern forum selection for tort claims that do not

7  arise under the scope of the Distributor Agreement.

8  In its supplemental reply brief, Guardian argues that California choice-of-law rules apply

9  to determine whether the choice-of-law provision in the Distributor Agreements applies to GIS'

10  claims. According to Guardian, California will give effect to a choice-of-law provision that relates

11  to any claim arising from the agreement, whether or not that claim sounds in contract or in tort.

12  **a.   Choice of Law**

13  A federal court sitting in diversity must apply the forum state's choice of law rules to

14  determine the controlling substantive law. *Fields v. Legacy Health System*, 413 F.3d 943, 950 (9th

15  Cir. 2005). Thus, a federal court in California exercising its diversity jurisdiction must ordinarily

16  follow California's choice-of-law rules. When a contract contains a choice-of-law provision,

17  courts applying California's choice-of-law rules follow *Nedlloyd Lines B.V. v. Super. Ct.*, 3 Cal.

18  4th 459 (1992). When there is no advance agreement on applicable law, but the action involves

19  claims of residents from outside California, the trial court may analyze the governmental interests

20  of the various jurisdictions involved to select the most appropriate law. *Washington Mutual Bank,*

21  *FA v. Super. Ct.*, 24 Cal. 4th 906, 915 (2001).

22  Under the *Nedlloyd* analysis, all claims "arising from or related to" a contract are covered

23  by the contract's choice-of-law clause, regardless of whether they are characterized as contract or

24  tort claims. *Nedlloyd*, 3 Cal. 4th at 470. "When two sophisticated, commercial entities agree to a

25  choice-of-law clause . . . , the most reasonable interpretation of their actions is that they intended

26  for the clause to apply to all causes of action arising from or related to their contract." *Id.* at 468.

27  In determining the enforceability of arm's length contractual choice-of-law provisions,

28  California courts apply the principles set forth in Restatement Second of Conflict of Laws section

187 (the "Restatement"), which reflects a strong policy favoring the enforcement of such provisions. *Id*. at 464-65 (citing Rest. 2d Confl. § 187). "[T]he proper approach under Restatement section 187, subdivision (2) is for the court first to determine either: (1) whether the chosen state has a substantial relationship to the parties or their transaction, or (2) whether there is any other reasonable basis for the parties' choice of law." If neither of these two tests is met, "that is the end of the inquiry, and the court need not enforce the parties' choice of law." *Id*. at 466. If either test is met, the court must next determine whether the chosen state's law is contrary to a fundamental policy of California. *Id.*

The second test is the governmental interest analysis applicable when the parties have not contractually agreed on the applicable law or where the plaintiff's claims do not arise under the contract provision, "but the action involves the claims of residents from outside California, [then] the trial court may analyze the governmental interests of the various jurisdictions involved to select the most appropriate law." *Washington Mutual Bank, FA*, 24 Cal. 4th. at 915. Under this test, the foreign law proponent must identify the applicable law in each potentially concerned state and must show it materially differs from the law of California. If the laws are materially different, the second step is to determine what interest, if any, each state has in having its own law applied to the case. Only if the foreign law proponent satisfies its burden of showing the first two elements will the court then determine whose interests would be more impaired if its laws were not applied.

### b.   The *Nedlloyd* Analysis Governs the Choice of Law

The forum state is California *and* the underlying agreements selected California as the choice of law to govern disputes. Therefore, the court must look to California choice-of-law rules to determine whether the contract governs the law of GIS' claims. Here, because there is a contract between the parties specifying their choice of law as California, the *Nedlloyd* analysis is applicable. GIS' contention in its sur-reply that choice-of-law contract provisions are not applicable to tort claims and its reliance on *Lincoln General Insurance Co. v. Access Claims Administrators, Inc.* ("*Lincoln General*"), No. Civ. S-07-1015-LKK-EFB, 2007 WL 2492436 (E.D. Cal. Aug. 30, 2007), are unpersuasive. The parties in *Lincoln General* had agreed to the application of Pennsylvania law. Thus, Pennsylvania choice-of-law rules were applied by the

1    court, not that of California.  *Id.* (citing *Nedlloyd* for the proposition that the choice of law clause

2    applies to interpreting the clause itself).  The court noted the choice-of-law provision was narrow –

3    it provided that the "Agreement shall be interpreted and construed in accordance with the laws of

4    the State of Pennsylvania."  *Id.* at *5.  To interpret the scope of the choice of law provision, the

5    court acknowledged it was bound by Pennsylvania law, noted there was no Pennsylvania case

6    directly on point, and proceeded to analyze other persuasive authority to determine how broadly to

7    interpret the scope of the provision.

8          Here, the choice-of-law provision provides that "[t]he choice of law of the parties is the

9    law of the State of California."  (*See, e.g.,* Doc. 1, Ex. 1, ¶ 13.)  Unlike *Lincoln General*, the

10   choice of law specifies California, not Pennsylvania to interpret its scope.  Therefore, the Court

11   must examine California law.

12         Under California law, the *Nedlloyd* test applies and broadly construes choice-of-law

13   provisions to encompass any claims – however styled – arising out of or related to the contract.

14   *Nedlloyd*, 3 Cal. 4th at 468-69.  *Nedlloyd* involved the following choice-of-law provision in a

15   shareholder's agreement:  "This agreement shall be governed by and construed in accordance with

16   Hong Kong law and each party hereby irrevocably submits to the non-exclusive jurisdiction and

17   service of process of the Hong Kong courts."  *Nedlloyd*, 3 Cal. 4th at 463.  Although the plaintiff

18   argued its fiduciary duty cause of action was not governed by the clause because it was

19   independent of the shareholders' agreement and outside its intended scope, the court disagreed,

20   finding that when "two sophisticated, commercial entities agree to a choice-of-law clause like the

21   one in this case, the most reasonable interpretation of their actions is that they intended for the

22   clause to apply to all causes of action arising from or related to their contract."  *Id.* at 469.

23   Moreover, the term "governed by" was broad wording reflecting the parties' clear contemplation

24   that the agreement was to be completely and absolutely controlled by Hong Kong law.  *Id.*  The

25   fiduciary duty claim only existed because of the shareholders' agreement, and thus the choice-of-

26   law provision in the shareholders' agreement controlled.  Further, the court reasoned its

27   interpretation of the clause was one that comported with common sense and commercial reality:

28   "We seriously doubt that any rational businessperson, attempting to provide by contract for an

efficient and businesslike resolution of possible future disputes, would intend that the laws of multiple jurisdictions would apply to a single controversy having its origin in a single, contract-based relationship." *Id.*

The choice-of-law claim in this case is similarly broad and sets forth the parties' choice of law as the State of California, with no exceptions or qualifications.  Moreover, both GIS' negligence *per se* claim and its UDTPA claim relate to Guardian's alleged failure to provide proper disclosures under the FTC Franchise Rule and state laws pertaining to franchisors.  GIS' claims of negligence *per se* and violations of the UDTPA arise directly out of Guardian's alleged failure to make disclosures pursuant to its duties as a franchisor under the Distributor Agreements. These claims arise specifically because GIS alleges the Distributor Agreements establish franchises, which allegedly trigger disclosures.  Without the Distributor Agreements, there would be no franchises and no concomitant disclosure requirements, and thus no claims for failure to make these disclosures.  As such, GIS' claims for negligence *per se* and violation of the UDTPA fall within the scope of the choice-of-law provision in the Distributor Agreements.  This is very similar to the fiduciary duty claims asserted by the plaintiff in *Nedlloyd*.  As the court noted in that case, the plaintiff would not have had a fiduciary duty claim *but for* the shareholders' agreement that contained the broad choice-of-law provision.  *Nedlloyd*, 3 Cal. 4th at 469 ("Nedlloyd's fiduciary duties, if any, arise from-and can exist only because of-the shareholders' agreement pursuant to which Seawinds's stock was purchased by Nedlloyd.")

          **c.**        **The Choice-of-Law Provision in the Distributor Agreements is Enforceable**

Once a court determines a claim falls within the scope of a choice-of-law provision, it must consider whether the clause is enforceable.  *Nedlloyd*, 3 Cal. 4th at 464-65.  In California, this analysis is governed by Restatement Section 187.  *Id.*  "[T]he proper approach under Restatement section 187, subdivision (2) is for the court first to determine either: (1) whether the chosen state has a substantial relationship to the parties or their transaction, or (2) whether there is any other reasonable basis for the parties' choice of law."  *Id.* at 466.

Here, Guardian had a substantial relationship to California at the time the Distributor Agreements were executed. Specifically, Guardian was doing business in California and had its principal place of business in California at the time the Distributor Agreements were signed. The Distributor Agreements themselves state that Guardian was a California Corporation, and they were executed in California. California therefore had a substantial relationship to the parties, and the parties' choice of law had a reasonable basis. *Nedlloyd*, 3 Cal. 4th at 467 (the chosen state has a substantial relationship to the parties or their contract when "one of the parties is domiciled" in that state.)

### d.    Fundamental Public Policy of California is Not Offended by Applying California Law

Once the party who seeks application of the choice-of-law provision demonstrates a substantial relationship, the party who would avoid the choice of law provision bears the burden of showing that the chosen state's law is contrary to a fundamental policy of California. *Nedlloyd*, 3 Cal. 4th at 466. If there is a fundamental conflict with California law, the court must determine whether California has a "materially greater interest than the chosen state in the determination of the particular issue. . . ." *Id.* (quoting Restatement § 187(2)).

GIS frames this analysis by arguing the application of California law would extinguish two of its claims, which would offend California public policy by depriving GIS of a remedy it would otherwise have were it a franchisee in California. GIS further argues that foreign jurisdictions – those jurisdictions involved in the Distributor Agreements – have a materially greater interest in this controversy than California. Specifically, GIS notes that Pennsylvania has a materially greater interest than California because this is where the Guardian's alleged disclosure failures were felt – *i.e.*, GIS' home state. Further, the states the Distributor Agreements relate to are also implicated because the claims involve franchise activity in those particular states. Finally, North Carolina has a materially greater interest than California because Guardian has its principal place of business there, and the decision not to disclose would have occurred in North Carolina.

The fact that application of the choice-of-law clause would extinguish claims is not a reason to apply different substantive law. For example, in *Medimatch, Inc. v. Lucent Technologies*

*Inc.*, 120 F. Supp. 2d 842, 861-62 (N.D. Cal. 2000), the court considered a choice-of-law provision that specified New Jersey law.  The plaintiffs conceded that New Jersey law applied, but argued that to the extent New Jersey law did not provide a remedy, they should be entitled to pursue their claim under California law.  The court determined that the "mere fact that the chosen law provides greater or lesser protection than California law, or that in a particular application the chosen law would not provide protection while California law would, are not reasons for applying California law."  *Id.*

Similarly here, GIS argues that to apply California law extinguishes its negligence *per se* claim and deprives it of a tort remedy it would have under the law of other jurisdictions that could potentially be applied.  The standard, however, is whether the chosen law – here, California – is so offensive to California public policy as to be "prejudicial to recognized standards of morality and to the general interest of the citizens."  *Wong v. Tenneco*, 39 Cal. 3d 126, 135-36 (1985).  Applying California law is not offensive to California public policy, even if claims of the out-of-state franchisee are extinguished because of application of the choice-of-law provision.

GIS also does not state which state's substantive law should govern its negligence *per se* claim.   There are multiple jurisdictions involved because the Distributor Agreements apply to locations in a number of states.  Moreover, GIS itself is a Pennsylvania corporation, and Guardian has its principal place of business in North Carolina.  GIS has not definitively identified what law should be applied to its negligence *per se* claim instead of California law or which particular foreign jurisdiction's laws necessarily permit a negligence per se claim.

Guardian correctly notes it is GIS' burden to show why foreign law should apply, and not the parties' choice-of-law agreement.  *Keegan v. Am. Honda Motor Co., Inc*., 284 F.R.D. 504 (C.D. Cal. 2012).  There is a strong policy in California favoring the enforcement of choice-of-law provisions.  *Nedlloyd*, 3 Cal. 4th at 464.  In the absence of a compelling argument regarding how application of California law will violate fundamental California public policy, California law shall apply.

1

2

### e.   Application of California Law Precludes GIS' Negligence *Per se* and UTDPA Causes of Action

3   Under California law, application of the doctrine of negligence *per se* means the conduct

4   prescribed by a statute has been adopted as the standard of care for a reasonable person in the

5   circumstances, and a violation of the statute is presumed to be negligence.   *Alcala v. Vazmar*

6   *Corp.*, 167 Cal. App. 4th 747, 755 (2008).   Negligence *per se*, however, is merely a codified

7   evidentiary doctrine and not an independent cause of action.   *Carson v. Depuy Spine, Inc.* 365 F.

8   App'x. 812 (9th Cir. 2010) (unpublished); *Campos v. City of Merced*, 709 F. Supp. 2d 944, 966

9   (E.D. Cal. 2010).   California law requires that an underlying claim of ordinary negligence must be

10   viable before the presumption of negligence *per se* based on the violation of a statute, regulation,

11   or ordinance may be applied.   *Rosales v. City of Los Angeles*, 82 Cal. App. 4th 419, 430 (2000).

12   California law does not recognize a negligence *per se* claim for failure to make disclosures under

13   the FTC Franchise Rule, and the FTC Franchise Rule does not itself confer a private right of

14   action.   A negligence *per se* claim must be dismissed when the complaint discloses no underlying

15   tort duty.   Moreover, GIS does not dispute that California law extinguishes GIS' negligence *per se*

16   claim for violations of the FTC Franchise Rule and state law versions of the FTC Franchise Rule.

17   GIS' Tenth Cause of Action for negligence *per se* is DISMISSED with prejudice and without leave

18   to amend.

19   GIS' Eleventh Cause of Action for violation of the North Carolina UDTPA is also subject

20   to dismissal under the Distributor Agreement choice-of-law provision.   The UDTPA is a North

21   Carolina statute, and the parties do not identify a choice-of-law exclusion or waiver provision in

22   the statute.   Because California law applies, GIS' UDTPA claim under North Carolina law is not

23   viable, and it is DISMISSED with prejudice and without leave to amend.

### IV.   CONCLUSION AND ORDER

25   For the reasons set forth above, Guardian's motion to dismiss is DENIED in part and

26   GRANTED in part.   Accordingly, it is HEREBY ORDERED that:

27   1.   Guardian's motion to dismiss under Rule 12(b)(1) is DENIED;

28

2.      Guardian's motion to dismiss Plaintiff's First, Second, Third, and Fourth Causes of Action under Rule 12(b)(6) is DENIED;

3.      GIS' Sixth, Seventh, Eighth, and Ninth Causes of Action are DISMISSED pursuant to Rule 12(b)(6) without prejudice and with leave to amend;

4.      GIS' Tenth and Eleventh Causes of Action are DISMISSED with prejudice and without leave to amend; and

5.      GIS may file an amended complaint within 14 days of the date of this order.

IT IS SO ORDERED.

Dated:   **June 30, 2015**                              **/s/ Sheila K. Oberto**
                                             UNITED STATES MAGISTRATE JUDGE