1  Dylan J. Liddiard, State Bar No. 203055
2  WILSON SONSINI GOODRICH & ROSATI
   Professional Corporation
3  650 Page Mill Road
   Palo Alto, California 94304
4  Telephone:  (650) 493-9300
   Facsimile:  (650) 565-5100
5  Email:  dliddiard@wsgr.com

6  Michael J. Lockerby (admitted *pro hac vice*)
7  FOLEY & LARDNER LLP
   Washington Harbour
8  3000 K Street, N.W. | Suite 600
   Washington, D.C. 20007
9  Telephone:  (202) 672-5300
   Facsimile:  (202) 672-5399
10 Email:  mlockerby@foley.com

11 *Attorneys for Plaintiff*

12              UNITED STATES DISTRICT COURT
13              EASTERN DISTRICT OF CALIFORNIA
                      FRESNO DIVISION
14
15 G.P.P., INC. d/b/a GUARDIAN INNOVATIVE     )   CASE NO.:  1:15-cv-00321-SKO
   SOLUTIONS,                                 )
16                                            )   SECOND AMENDED COMPLAINT
            Plaintiff,                        )
17                                            )   **JURY TRIAL DEMANDED**
        v.                                    )
18                                            )
19 GUARDIAN PROTECTION PRODUCTS, INC.         )
   and RPM WOOD FINISHES GROUP, INC.,         )
20                                            )
            Defendants.                       )
21                                            )

22         Plaintiff G.P.P., Inc. d/b/a Guardian Innovative Solutions ("GIS"), by and through its

23 attorneys, hereby complains and alleges against Guardian Protection Products, Inc. ("Guardian")

24 and RPM Wood Finishes Group, Inc. ("RPM" and with Guardian, "Defendants") as follows:

25                               **THE PARTIES**

26         1.      GIS, a Pennsylvania corporation based in Pitcairn, Pennsylvania, is a family-run

27 business that has purchased products from Guardian for nearly three decades.

28

   SECOND AMENDED COMPLAINT                   -1-
   CASE NO.  1:15-cv-00321-SKO

2.      Guardian is a Delaware corporation with its offices and primary place of business in Hickory, North Carolina.  Guardian, a self-described leader in the furniture protection industry, sells furniture and upholstery protection products, furniture warranties, and other related items to entities such as GIS, which in turn sell to retail chains and establishments.  In 2000, Guardian was acquired by RPM International, Inc., a multi-national, multi-billion dollar Fortune 300 company.

3.      RPM, Guardian's corporate parent or affiliate, is a Nevada corporation with its offices and primary place of business in Hickory, North Carolina.

## VENUE AND JURISDICTION

4.      Venue and jurisdiction are proper in this Court as this action arises out of written agreements between the parties deemed executed in the County of Stanislaus in the State of California and which contain forum selection clauses naming this Court as the forum for any actions arising thereunder.

5.      The parties are of diverse citizenship, and the amount in controversy exceeds the sum of $75,000 exclusive of interest and costs.

## FACTS COMMON TO ALL COUNTS

6.      On or about May 5, 1988, GIS and Guardian entered into a written agreement whereby GIS acquired exclusive distribution rights to Guardian's products in certain counties in Pennsylvania (the "Pennsylvania Agreement").  A true and correct copy of the Pennsylvania Agreement is attached hereto as Exhibit 1, and is incorporated herein by reference.  The Pennsylvania Agreement expressly required GIS to make a minimum initial purchase of Guardian's products of $40,000.  Provided GIS made purchases that were in sum sufficient to meet an annual purchase requirement, the Pennsylvania Agreement automatically renewed on an annual basis.

7.      On or about December 6, 1988, GIS and Guardian entered into a second written agreement whereby GIS acquired exclusive distribution rights to Guardian's products in Maryland, Washington D.C., the remaining counties in Pennsylvania not covered by the Pennsylvania Agreement, and specified counties in Western New York (the "Mid-Atlantic

Agreement"). A true and correct copy of the Mid-Atlantic Agreement is attached hereto as Exhibit 2, and is incorporated herein by reference. The Mid-Atlantic Agreement expressly required GIS to make an initial purchase of Guardian's products of $75,000 as consideration. Provided GIS made purchases that were in sum sufficient to meet an annual purchase requirement, the Mid-Atlantic Agreement automatically renewed on an annual basis.

8.      On or about April 2, 1990, GIS and Guardian entered into a third written agreement whereby GIS acquired exclusive distribution rights to Guardian's products in Ohio (the "Ohio Agreement"). A true and correct copy of the Ohio Agreement is attached hereto as Exhibit 3, and is incorporated herein by reference. The Ohio Agreement expressly required GIS to make an initial purchase of Guardian's products of $20,000 and to pay an additional $20,000 fee. Provided GIS made purchases that were in sum sufficient to meet an annual purchase requirement, the Ohio Agreement automatically renewed on an annual basis.

9.      On or about April 23, 2007, GIS also acquired exclusive distribution rights to Guardian's products in Illinois, Indiana, Iowa and certain counties in Eastern Missouri pursuant to a valid written assignment (the "2007 Assignment") of three additional written agreements originally entered into between Guardian and another company (the "Cook County Agreement," "Indiana Agreement," and "Midwest Agreement," respectively). A true and correct copy of the 2007 Assignment is attached hereto as Exhibit 4, and is incorporated herein by reference. True and correct copies of the Cook County, Indiana, and Midwest Agreements are attached hereto as Exhibits 5-7, respectively, and are incorporated herein by reference. Provided GIS made purchases that were in sum sufficient to meet an annual purchase requirement, the Cook County, Indiana, and Midwest Agreements automatically renewed on an annual basis. GIS paid $200,000 for these three agreements to the prior company. Guardian consented to the 2007 Assignment.

10.      On or about March 5, 2010, GIS also acquired exclusive distribution rights to Guardian's products in Alabama, Florida, and Tennessee pursuant to a valid written assignment (the "2010 Assignment") of three additional written agreements originally entered into between Guardian and another company (the "Alabama Agreement," "Florida Agreement," and

"Tennessee Agreement," respectively).  A true and correct copy of the 2010 Assignment is attached hereto as Exhibit 8, and is incorporated herein by reference.  True and correct copies of the Alabama, Florida, and Tennessee Agreements are attached hereto as Exhibits 9-11, respectively, and are incorporated herein by reference.  Provided GIS made purchases that were in sum sufficient to meet an annual purchase requirement, the Alabama, Florida, and Tennessee Agreements automatically renewed on an annual basis.  GIS paid $50,000 for these three agreements to the prior company.  Guardian consented to the 2010 Assignment.

11.   To recap, Guardian and GIS are parties to the following agreements (collectively, the "Agreements"), entered into on or about the following dates:

| Name of Agreement | Date of Agreement |
| --- | --- |
| Pennsylvania Agreement | May 5, 1988 |
| Mid-Atlantic Agreement | December 6, 1988 |
| Ohio Agreement | April 2, 1990 |
| Cook County Agreement | April 23, 2007 |
| Indiana Agreement | April 23, 2007 |
| Midwest Agreement | April 23, 2007 |
| Alabama Agreement | March 5, 2010 |
| Florida Agreement | March 5, 2010 |
| Tennessee Agreement | March 5, 2010 |

12.   Pursuant to the Agreements, GIS has been granted exclusive distribution rights to Guardian's products in numerous territories throughout the United States ("GIS's Exclusive Territory").

13.   Defendants have engaged in a series of wrongful, coercive acts, many of which continue to this day, including the following:

a.   refusal to pay commission due GIS;

b.   improper purported termination of the Alabama Agreement;

c.   improper purported termination of the Florida Agreement;

d.   improper purported termination of the Tennessee Agreement; and

e.      actual and implicit threats to terminate all of the existing Agreements while insisting that GIS enter into a new "Distributorship Agreement" that—while containing much less advantageous terms and conditions for GIS than its existing Agreements—is in fact a "franchise" within the meaning of federal and state law, but one that has been offered without providing the required disclosures and, in some states, without obtaining prior state registration of its "franchise" offering.

An expanded description of each of these wrongful acts follows.

### Refusal to Pay Commission under the Bob's Discount Furniture Agreement

14.      During the spring of 2010, GIS learned that Guardian, in violation of the Agreements, was directly selling products in GIS's Exclusive Territory to retail locations associated with one of the largest furniture chains in the country, Bob's Discount Furniture.

15.      GIS and Guardian agreed that Guardian would pay GIS a 5% commission on all sales of Guardian's products made to Bob's Discount Furniture retail locations in GIS's Exclusive Territory for as long as such sales were being made (the "Bob's Discount Furniture Agreement").  Guardian made such payments and continued to make such payments through November 14, 2014.

16.      In December 2014, Guardian unilaterally stopped paying GIS the 5% commission.

### Improper Purported Termination of the Alabama Agreement

17.      On or about October 23, 2013, Guardian sent a notice to GIS that purportedly terminated the Alabama Agreement (the "Alabama Notice").  A true and correct copy of the Alabama Notice is attached hereto as Exhibit 12.

18.      GIS informed Guardian that it had no basis to terminate the Alabama Agreement. GIS stated that the Alabama Notice was invalid and demanded that Guardian rescind the Alabama Notice immediately.

19.      In response to GIS's protest, Guardian attempted to downplay the significance of the Alabama Notice.  Johnny Green, Guardian's Vice President and General Manager, represented to GIS that GIS should not be concerned about the Alabama Notice and that

1   Guardian was merely attempting to renegotiate the Alabama Agreement.  Mr. Green further

2   represented that GIS and Guardian could continue to do business in Alabama, though the threat

3   of termination remained ever present, adversely affecting GIS's business and business decisions.

4          20.    In or around December 2014, Guardian informed GIS that the Alabama

5   Agreement had been terminated and stated that it would not recognize GIS's exclusive rights.

6                **Improper Purported Termination of the Florida Agreement**

7          21.    On or about October 23, 2013, Guardian sent a notice to GIS that purportedly

8   terminated the Florida Agreement (the "Florida Notice").  A true and correct copy of the Florida

9   Notice is attached hereto as Exhibit 13.

10         22.    GIS informed Guardian that it had no basis to terminate the Florida Agreement.

11  GIS stated that the Florida Notice was invalid and demanded that Guardian rescind the Florida

12  Notice immediately.

13         23.    In response to GIS's protest, Guardian attempted to downplay the significance of

14  the Florida Notice.  Johnny Green, Guardian's Vice President and General Manager, represented

15  to GIS that GIS should not be concerned about the Florida Notice and that Guardian was merely

16  attempting to renegotiate the Florida Agreement.  Mr. Green further represented that GIS and

17  Guardian could continue to do business in Florida, though the threat of termination remained

18  ever present, adversely affecting GIS's business and business decisions.

19         24.    In or around December 2014, Guardian informed GIS that the Florida Agreement

20  had been terminated and stated that it would not recognize GIS's exclusive rights.

21              **Improper Purported Termination of the Tennessee Agreement**

22         25.    On or about October 23, 2013, Guardian sent a notice to GIS that purportedly

23  terminated the Tennessee Agreement (the "Tennessee Notice").  A true and correct copy of the

24  Tennessee Notice is attached hereto as Exhibit 14.

25         26.    GIS informed Guardian that it had no basis to terminate the Tennessee

26  Agreement.  GIS stated that the Tennessee Notice was invalid and demanded that Guardian

27  rescind the Tennessee Notice immediately.

28

27.     In response to GIS's protest, Guardian attempted to downplay the significance of the Tennessee Notice.  Johnny Green, Guardian's Vice President and General Manager, represented to GIS that GIS should not be concerned about the Tennessee Notice and that Guardian was merely attempting to renegotiate the Tennessee Agreement.  Mr. Green further represented that GIS and Guardian could continue to do business in Tennessee, though the threat of termination remained ever present, adversely affecting GIS's business and business decisions.

28.     In or around December 2014, Guardian informed GIS that the Tennessee Agreement had been terminated and stated that it would not recognize GIS's exclusive rights.

**Violation of Federal and State Franchise Laws**

29.     Beginning in 1988, as provided in the Agreements, Guardian licensed and otherwise permitted GIS to use its "Guardian" trademarks, service marks, trade names, trade dress, and logos—including the federally registered stylized "G" (collectively, the "Licensed Trademarks").  Each of these Agreements licensed GIS to use the name "Guardian" in its trade name and to use the Licensed Trademarks in connection with the distribution of certain goods and services.  Pursuant to each of these Agreements, Guardian provided substantial assistance to GIS and exercised substantial control over GIS's business.  GIS marketed goods and services under the Licensed Trademarks pursuant to a "marketing plan" prescribed in substantial part by Guardian, and there has been a "community of interest" between Guardian and GIS in the goods and services sold under the Licensed Trademarks.  To obtain the trademark license, product distribution, and other rights granted by the Agreements, GIS has been required to make certain payments that have not been limited to the bona fide wholesale price of goods.

30.     Each Agreement licensed and otherwise authorized GIS to use the Licensed Trademarks—including the "Guardian" word mark and the stylized "G" logo—in its assigned exclusive territory.  Pursuant to each of the Agreements, GIS has been authorized to use and in fact has used a variant of the Guardian trade name as part of its own trade name, including as follows with respect to the following Agreements:

| Agreement | State(s) | Variant of Guardian Trade Name Used in Franchisee's Trade Name |
|---|---|---|
| Mid-Atlantic Agreement | Maryland, District of Columbia, New York, and remainder of Pennsylvania | Guardian Distributors of [city or state or appropriate geographic area], Guardian Protection Products of [city or state or appropriate geographic area], or GPP of [city or state or appropriate geographic area] (¶ 8) |
| Ohio Agreement | Ohio | Guardian Distributors of [city or state or appropriate geographic area], Guardian Protection Products of [city or state or appropriate geographic area], or Guardian of [city or state or appropriate geographic area] (¶ 9) |
| Cook County Agreement | Illinois | Guardian Distributors of [city or state or appropriate geographic area], Guardian Protection Products of [city or state or appropriate geographic area], or GPP of [city or state or appropriate geographic area] (¶ 8) |
| Indiana Agreement | Indiana | Guardian Distributors of [city or state or appropriate geographic area], Guardian Protection Products of [city or state or appropriate geographic area], or Guardian of [city or state or appropriate geographic area] (¶ 9) |
| Midwest Agreement | Illinois, Iowa, and Missouri | Guardian Midwest (¶ 9) |
| Alabama Agreement | Alabama | GPP Alabama (¶ 9) |
| Florida Agreement | Florida | Guardian Distributors of [city or state or appropriate geographic area], Guardian Protection Products of [city or state or appropriate geographic area], or GPP of [city or state or appropriate geographic area] (¶ 8) |
| Tennessee Agreement | Tennessee | GPP Tennessee (¶ 9) |

31.     In marketing and selling Guardian's products pursuant to the Agreements, GIS uses printed and promotional materials distributed by Guardian and bearing Guardian's trade name, trademarks, service marks, and other commercial symbols and marks, including the Licensed Trademarks.

32.     Pursuant to each of the Agreements:

a.     Guardian has provided substantial assistance to or exercised substantial control over GIS.

b.      GIS has sold goods and services in accordance with a marketing plan prescribed in substantial part by Guardian.

c.      GIS and Guardian have had a community of interest in marketing goods and services under the Licensed Trademarks.

d.      GIS paid a non-*de minimis* fee for the right to sell goods and services under the Licensed Trademarks that was not simply for the *bona fide* wholesale purchase price of goods.

33.     At no time before offering a "franchise" in connection with each of the foregoing Agreements (including any subsequent renewal) did Guardian ever provide GIS with a Uniform Franchise Offering Circular ("UFOC") or Franchise Disclosure Document ("FDD") in accordance with the FTC Franchise Rule, 16 CFR Part 436.

34.     At no time before offering a "franchise" in connection with each of the foregoing Agreements (including any subsequent renewal) did Guardian ever provide GIS with a UFOC or FDD in accordance with the franchise disclosure and registration laws of the following states (in addition to California):

| Franchise Agreement | State | Franchise Statute |
|---|---|---|
| Mid-Atlantic Agreement | Maryland | Maryland Franchise Registration and Disclosure Law (Md. Code Ann. §§ 14-201 - 14-233) |
| Mid-Atlantic Agreement | New York | New York Franchises Law (N.Y. Gen. Bus. Law § 680-95) |
| Indiana Agreement | Indiana | Indiana Franchises Law (Ind. Code §§ 23-2-2.5-1 - 23-2-2.5-51) |
| Cook County Agreement | Illinois | Illinois Franchise Disclosure Act (Ill. Comp. Stat. 1992, ch. 815 §§ 705/1-705/44) |

35.     At no time before offering a "franchise" in connection with each of the foregoing Agreements (including any subsequent renewal) did Guardian ever register its franchise offering in accordance with the franchise disclosure and registration laws of the following states (in addition to California):

| Franchise Agreement | State | Franchise Statute |
|---|---|---|
| Mid-Atlantic Agreement | Maryland | Maryland Franchise Registration and Disclosure Law (Md. Code Ann. §§ 14-201 - 14-233) |
| Mid-Atlantic Agreement | New York | New York Franchises Law (N.Y. Gen. Bus. Law § 680-95) |
| Indiana Agreement | Indiana | Indiana Franchises Law (Ind. Code §§ 23-2-2.5-1 - 23-2-2.5-51) |
| Cook County Agreement | Illinois | Illinois Franchise Disclosure Act (Ill. Comp. Stat. 1992, ch. 815 §§ 705/1-705/44) |

36.    On December 9, 2014, Guardian sent GIS correspondence claiming that the Florida, Alabama, and Tennessee Agreements had been terminated on October 23, 2013 "based on quota breaches in those states" while implicitly threatening termination of GIS's remaining Agreements in other states if GIS did not sign the new January 2015 form of "Distributorship Agreement." The stated grounds for termination of GIS's Agreements was that "[t]he old contracts held by [Franchisee] GIS are no longer applicable to the current business . . . . [Defendant] Corporate Guardian is seeking new contracts that reflect the current business relationship, and provide the appropriate market penetration to justify exclusive distribution rights." The grounds for termination set forth in the December 9, 2014 notice from Guardian are not permissible grounds for termination of GIS's existing Agreements.  Nor does Guardian's belief that "[t]he old contracts ... are no longer applicable to the current business" constitute "good cause" for termination as required by the "relationship" laws of certain states that comprise GIS's Exclusive Territory.

37.    Compared to GIS's existing Agreements, the new January 2015 form of "Distributorship Agreement" is much less advantageous for GIS.

38.    Although denominated as a "Distributorship Agreement," the new 2015 form contract offered by Guardian is in fact a "franchise" within the meaning of the FTC Franchise Rule and various state franchise disclosure and registration laws and is referred to hereafter as the "2015 Form Agreement." Like the existing Agreements, the 2015 Form Agreement was offered to GIS without the provision of the FDD required by the FTC Franchise Rule and various state franchise disclosure and registration laws, including the California Franchise Investment

Law.  Nor was this new franchise offering registered in those states where franchise registration is required.

39.    Pursuant to the Agreements, GIS has invested substantial time and money in building name recognition for and brand equity in the Licensed Trademarks.  Rather than recognize and reward GIS for its efforts, however, Guardian has sought to diminish and in some cases take away altogether the rights previously granted by the Agreements.  Guardian has done so for reasons unrelated to GIS's performance.  With respect to certain Agreements, Guardian terminated or attempted to terminate them without good cause.  With respect to others, Guardian amended or attempted to amend their terms and substantially changed or attempted to substantially change GIS's competitive circumstances—all without good cause.

40.    The conduct of Guardian for which GIS seeks declaratory relief, injunctive relief, compensatory damages, punitive damages, treble damages, and costs and attorneys' fees has occurred—at least in part—in California and North Carolina (along with the states in which the Agreements granted GIS distribution rights and in which Guardian offered GIS a "franchise").  California and North Carolina are where Guardian once had or now has its principal place of business and where many of the acts and omissions at issue occurred.  This conduct includes the following acts of "unfair competition" and "unlawful, unfair or fraudulent business act[s] or practice[s]" in violation of Cal. Bus. Prof. Code § 17200 *et. seq.* (the "California Deceptive Trade Practices Act"):

a.    offering a "franchise" without providing the UFOC or FDD required by the FTC Franchise Rule, 16 CFR Part 436;

b.    offering a "franchise" without providing the UFOC or FDD required by franchise registration laws in certain states (including—in addition to California—Maryland, New York, Indiana, Iowa, and Illinois);

c.    offering a "franchise" without complying with the registration and other filing requirements of statutes in certain states (including—in addition to California—Maryland, New York, Indiana, Iowa, and Illinois);

d.      terminating, constructively terminating, or attempting to terminate or constructively terminate the Agreements in violation of the "relationship" statutes applicable to franchises, dealerships, and distributorships in certain states (including Maryland, Illinois, Iowa, and Missouri);

e.      amending or attempting to amend the Agreements in violation of the "relationship" statutes applicable to franchises, dealerships, and distributorships in certain states (including Maryland, Illinois, Iowa, and Missouri); and

f.      substantially changing or attempting to substantially change the competitive circumstances of the Agreements in violation of the "relationship" statutes applicable to franchises, dealerships, and distributorships in certain states (including Illinois, Iowa, and Missouri).

41.    Guardian's wrongful conduct of which GIS complains also includes certain conduct that constitutes breach of contract, breach of the implied covenant of good faith and fair dealing, violation of the Illinois, Iowa, and Missouri state franchise laws, and violation of the Maryland Fair Distribution Act.

42.    With respect to certain Agreements, GIS will suffer irreparable harm if Guardian proceeds with the threatened or attempted termination, amendment, or substantial change in competitive circumstances described herein. With respect to certain other Agreements, GIS needs a judicial determination of its rights and obligations vis-à-vis Guardian.  Otherwise the parties face a multiplicity of litigation.  With respect to certain other Agreements, GIS has already suffered injury by virtue of Guardian's wrongful conduct—thereby entitling GIS to compensatory damages, punitive damages, and treble damages along with costs and attorneys' fees.

**Guardian's Sale of Furniture Protection Plans to Renaissance**

43.    Upon information and belief, in or around the second half of 2014, Guardian entered into a business partnership with a third-party reseller known as RenComGroup, LLC (d/b/a "Renaissance").

44.     Renaissance builds e-commerce websites for furniture retail stores.  Its place of business is 1341 North Delaware Avenue, Philadelphia, Pennsylvania 19125.  Renaissance is therefore located within GIS's Exclusive Territory for the distribution of Guardian products under the Pennsylvania and/or Mid-Atlantic Agreements.  Prior to its dealings with Guardian, Renaissance and GIS discussed entering into a business relationship whereby GIS would sell Guardian warranties to Renaissance for resale to Renaissance customers.

45.     Beginning in 2016, however, Renaissance became a direct customer of Guardian with respect to electronic furniture protection plans and then, in turn, began reselling those electronic warranties to its own customers.  Renaissance is currently offering its customers the ability to sell Guardian furniture protection plans through the e-commerce websites it develops for those customers.

46.     The warranties that Guardian has sold to Renaissance in Pennsylvania are the same warranties for which GIS has exclusive distribution rights under the Pennsylvania and Mid-Atlantic Agreements.

47.     Thus, despite clear and unambiguous agreements granting GIS exclusive rights to sell Guardian products to customers in the entire Commonwealth of Pennsylvania, Guardian has sold those same products to Renaissance in Pennsylvania, which Renaissance then resells to its own customers, while knowing that Renaissance is headquartered in Pennsylvania.

**Guardian's Relationship with RPM**

48.     Upon information and belief, at all times relevant to the allegations of this Complaint, RPM and Guardian have been alter egos of one another.  Among other facts evidencing this lack of separateness:

a.      Upon information and belief, the entities have common ownership;

b.      One individual, Ronnie Holman, is the president of both entities;

c.      Mr. Holman is also on the board of directors of both entities;

d.      Neither entity observes corporate formalities, such as holding board meetings;

1              e.       RPM pays Guardian's expenses, including paying the salaries of its

2    employees;

3              f.       Both entities share services, including banking services, despite having no

4    official shared services agreement between them;

5              g.       RPM pays the entity that underwrites Guardian's warranties which are

6    squarely at issue in this case;

7              h.       Mr. Holman has stated that, as President of both Guardian and RPM, he

8    "function[s] as one and the same"; and

9              i.       Mr. Holman has also admitted that Guardian and RPM are "operating as

10    one company."

11        49.      Thus, there is such a unity of interest between RPM and Guardian that the two

12    entities are no longer separate and RPM and Guardian are equally and jointly liable for the

13    wrongful conduct set forth in this Complaint.

14        50.      In the alternative, if RPM is in fact an affiliate or parent of Guardian, and a third

15    party to the agreements between Guardian and GIS, then RPM has directly and tortiously

16    interfered with Guardian's contractual relationship with GIS.

17        51.      RPM, and Mr. Holman in his capacity as President of RPM, actively directed and

18    approved of Guardian's wrongful conduct, including the termination of the Alabama, Florida,

19    and Tennessee Agreements and the breach of the Bob's Discount Furniture Agreement.

20        52.      Mr. Holman admitted that he gave Guardian's employees "the ability to proceed"

21    in terminating Guardian's agreements with GIS, and that the decision to terminate a Guardian

22    distributor such as GIS "ultimately rests with RPM."

23                               **FIRST CAUSE OF ACTION**

24             **Breach of the Alabama, Florida, and Tennessee Agreements**

25                           **(Against All Defendants)**

26        53.      GIS incorporates by reference paragraphs 1 through 52 as if fully set forth herein.

27        54.      The Alabama, Florida, and Tennessee Agreements provide GIS with exclusive

28    purchase rights for Guardian's products in the defined regions.

55.     Defendants breached their obligations under these three agreements by, *inter alia*, purporting to terminate or actually terminating the agreements without cause and refusing to recognize the agreements as continuing to be valid and in effect, as alleged above, without cause and in violation of the terms of the agreements, as alleged above.

56.     To date, GIS has performed all of its covenants, conditions, promises, and obligations in accordance with the terms of the agreements, except to the extent its performance has been excused by, *inter alia*, Defendants' conduct.

57.     As a direct and foreseeable result of Defendants' conduct, GIS has been damaged in an amount to be determined at trial.

WHEREFORE, GIS seeks relief as set forth in the prayers below.

## SECOND CAUSE OF ACTION

### Breach of the Implied Covenants of Good Faith
### and Fair Dealing of the Alabama, Florida, and Tennessee Agreements
### (Against All Defendants)

58.     GIS incorporates by reference paragraphs 1 through 57 as if fully set forth herein.

59.     The Alabama, Florida, and Tennessee Agreements contain covenants, implied in law, that Defendants would at all times act in good faith and deal fairly with GIS, and would not engage in any act that would prevent GIS from realizing the full benefit of the agreements.

60.     Conditions obligating Defendants to perform under the agreements occurred.

61.     Defendants acted in bad faith to frustrate the benefits of the agreements, and therefore breached Defendants' duty of good faith and fair dealing by, *inter alia*, purporting to terminate or actually terminating the agreements without cause and refusing to recognize the agreements as continuing to be valid and in effect, as alleged above.

62.     To date, GIS has performed all of its covenants, conditions, promises, and obligations in accordance with the terms of the agreements, except to the extent its performance has been excused by, for instance, Defendants' conduct.

63.     GIS was denied the benefits of the agreements by Defendants' bad faith conduct. Defendants' bad faith conduct therefore constitutes a breach of the implied covenant of good faith and fair dealing.

64.     As a direct and foreseeable result of Defendants' conduct, GIS has been damaged in an amount to be determined at trial.

WHEREFORE, GIS seeks relief as set forth in the prayers below.

## THIRD CAUSE OF ACTION

### Breach of the Bob's Discount Furniture Agreement
### (Against All Defendants)

65.     GIS incorporates by reference paragraphs 1 through 64 as if fully set forth herein.

66.     GIS and Defendants entered into an agreement whereby Defendants agreed to pay GIS a 5% commission on all sales Defendants made to Bob's Discount Furniture retail locations in GIS's Exclusive Territory.

67.     Defendants breached this agreement by failing to pay GIS all commission payable pursuant to the agreement, as alleged above.

68.     To date, GIS has performed all of its covenants, conditions, promises, and obligations in accordance with the terms of the agreement, except to the extent its performance has been excused by, for instance, Defendants' conduct.

69.     As a direct and foreseeable result of Defendants' conduct, GIS has been damaged in an amount to be determined at trial.

WHEREFORE, GIS seeks relief as set forth in the prayers below.

## FOURTH CAUSE OF ACTION

### Breach of the Implied Covenant of Good Faith and
### Fair Dealing of the Bob's Discount Furniture Agreement
### (Against All Defendants)

70.     GIS incorporates by reference paragraphs 1 through 69 as if fully set forth herein.

71.     The Bob's Discount Furniture Agreement contains a covenant, implied in law, that Defendants would at all times act in good faith and deal fairly with GIS, and would not engage in any act that would prevent GIS from realizing the full benefit of the agreement.

72.     Conditions obligating Defendants to perform under the agreement occurred.

73.     Defendants acted in bad faith to frustrate the benefits of the agreement, and therefore breached Defendants' duty of good faith and fair dealing by, *inter alia*, failing to pay GIS the full commission payable pursuant to the agreement, as alleged above.

74.     To date, GIS has performed all of its covenants, conditions, promises, and obligations in accordance with the terms of the agreement, except to the extent its performance has been excused by, for instance, Defendants' conduct.

75.     As a direct and foreseeable result of Defendants' conduct, GIS has been damaged in an amount to be determined at trial.

WHEREFORE, GIS seeks relief as set forth in the prayers below.

## FIFTH CAUSE OF ACTION

### Declaratory Judgment - Termination of the Cook County Franchise Would Violate the Illinois Franchise Disclosure Act, 815 ILCS 705/1 *et seq* (Against All Defendants)

76.     GIS incorporates by reference paragraphs 1 through 75 as if fully set forth herein.

77.     Pursuant to the Cook County Agreement, GIS agreed to sell and distribute Guardian's products in an exclusive sales territory in the state of Illinois (the "Illinois Territory").

78.     Defendants agreed that GIS would be their exclusive distributor or franchisee in the Illinois Territory.

79.     Pursuant to the Cook County Agreement, Defendants prescribed a marketing plan under which GIS was to promote, sell, and distribute Guardian's products through the Illinois Territory.

80.     The marketing plan consisted of, *inter alia*, use of "printed promotional and packaging materials distributed by [Defendant]" (Cook County Agreement ¶ 1), pricing set by Defendants (*Id*. ¶ 4), use of specific sales techniques such as GIS and Defendants maintaining a "close liaison" to solicit "regional and national chain store accounts and governmental accounts," (*Id*. ¶ 7(b)), and use of "sales aids, literature, product samples, and dealer presentation packets" provided to GIS by Defendants (*Id*. ¶ 9).

81.     The marketing plan also permitted GIS to use Guardian's trade name, trademark, service mark, and other commercial symbols. (*Id*. ¶ 8).

82.     In accordance with the marketing plan, GIS's promotion, sale, and distribution of Guardian's products was, at all times relevant herein, substantially associated with Guardian's trademark or trade name.

83.     GIS paid franchise fees to Defendants in the form of a minimum monthly purchase requirement ranging between of $4,000 and $10,000, and other fees.

84.     Consequently, the Cook County Agreement, at all times relevant herein, was a Franchise within the meaning of § 705/3(1) of the Illinois Franchise Disclosure Act (the "IFDA").

85.     GIS has a business presence in the state of Illinois and Defendants now require that GIS develop a physical presence in each state where it operates a franchise on behalf of Defendants.

86.     Section 705/19 of the IFDA prohibits termination of a franchise "except for 'good cause.'"  Subsection (b) defines "good cause" to include "the failure of the franchisee to comply with any lawful provisions of the franchise or other agreement and to cure such default after being given notice thereof and a reasonable opportunity to cure such default, which in no event need be more than 30 days."

87.     Defendants have threatened to terminate the Cook County Agreement and GIS's exclusive distributorship in the Illinois Territory.  Defendants gave no notice or explanation to GIS for this action other than that the Franchise Agreement was "no longer applicable to the current business."

88.     The unilateral and unsubstantiated belief that the Franchise Agreement is "no longer applicable to the current business" does not constitute "good cause" for termination under § 705/19.

89.     Defendants have stated no other basis or cause for terminating the Cook County Agreement.

90.    Section 705/26 of the IFDA provides a private right of action to recover damages, including attorneys' fees, against a franchisor that, *inter alia*, terminates a franchise without good cause.  Section 705/26 also imposes joint and several liability on every principal executive officer or director, every person occupying a similar status or performing similar functions, and every employee of a corporation who materially aids in the act or transaction constituting the violation.

WHEREFORE, GIS seeks relief as set forth in the prayers below.

### SIXTH CAUSE OF ACTION

### Violation of the California Business and Professions Code Sections 17200-17210
### (Against All Defendants)

91.    GIS incorporates by reference paragraphs 1 through 90 as if fully set forth herein.

92.    GIS was, at all times relevant hereto, engaged in commerce by selling and distributing Guardian's products pursuant to the Agreements.

93.    GIS and Defendants have been involved in a commercial relationship pursuant to the Agreements.

94.    Section 17200 of the California Business and Professions Code provides that "unfair competition shall mean and include any **unlawful, unfair or fraudulent business act or practice**" as well as conduct constituting false advertising.  Cal. Bus. & Prof. Code § 17200 (emphasis added).

95.    Section 17202 of the California Business and Professions Code states that "specific or preventive relief may be granted to enforce a penalty, forfeiture, or penal law in a case of unfair competition."  Cal. Bus. & Prof. Code § 17202.

96.    Section 17203 of the California Business and Professions Code grants this Court the ability to enjoin unlawful conduct as is defined therein, providing "[a]ny person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction."  Cal. Bus. & Prof. Code § 17203.

97.    The FTC Franchise Rule, 16 C.F.R. § *et seq*., requires a franchisor to provide prospective franchisees with a complete and accurate basic disclosure document containing

specific types of information in a form prescribed by regulation.  The FTC Franchise

Rule further provides that the failure to provide a franchisee with the necessary disclosures "***is***

***an unfair or deceptive act or practice*** in violation of § 5 of the Federal Trade Commission Act."

(emphasis added).

98.    Pursuant to the Agreements, GIS was to operate its distribution franchise while

utilizing and associating itself with Guardian's trade name, trademark, service mark, and other

commercial symbols.

99.    The Agreements granted Defendants authority and control over the manner in

which GIS operated its franchises.

100.    GIS was required to make payments to Defendants in excess of $500 pursuant to

the various Agreements.  These payments included a mandatory initial inventory purchase of

Guardian's products and equipment, a minimum monthly purchase requirement, and other fees

as a condition to commencing operation of the franchise.

101.    The FTC has issued an advisory opinion noting that "[w]hether a business

relationship constitutes a 'franchise,' is not dependent upon what the parties call the relationship

... [r]ather, a relationship is covered by the Franchise Rule if it satisfies the definitional elements

of a 'franchise' set forth in the Franchise Rule." Intent is not relevant under the FTC Rule; if the

defining elements are present the relationship is a franchise.  FTC Informal Staff Advisory

Op. 98-4 (1998).

102.    Consequently, GIS is a "franchisee" within the meaning of the FTC Franchise

Rule, 16 C.F.R. § 436.1(i), and falls within the class of persons that the FTC Franchise Rule,

which implements the Federal Trade Commission Act ("FTC Act"), was intended to protect.

103.    Defendants are "franchisors" within the meaning of the FTC Franchise Rule 16

C.F.R. § 436.1(k).

104.    The FTC Franchise Rule requires Defendants as franchisors to provide all GIS

franchisees with disclosure documents required by 16 C.F.R. § 436.2-6, including, *inter alia*, the

franchisor's financial information, patents, trademarks, and territories.  *See* 16 C.F.R.

§§ 426.2(a), 436.4, 426.6(a).

105.    Defendants never provided GIS with the necessary disclosures either at the outset of their franchise relationship, upon automatic renewal of any of the many Agreements, upon material changes to the parties' relationship, or in connection with the offer of the 2015 Form Agreement.  This failure was and is "an unfair or deceptive act or practice" under the FTC Franchise Rule.

106.    Each time that Defendants have offered a "franchise" in violation of the FTC Franchise Rule and applicable state franchise disclosure and registration laws, Defendants have thereby violated the California Business and Professions Code.

107.    The events giving rise to GIS's claim for violation of the California Business and Professions Code—including negotiation and signing of the Agreements—occurred, at least in part, in California.

108.    As a direct result of Defendants' failure to comply with the California Business and Professions Code, GIS has suffered and continues to suffer substantial damages.

WHEREFORE, GIS prays for judgment against Defendants for violation of the California Business and Professions Code and requests civil penalties for each such violation, for the Court to enjoin Defendants for these and future violations, and any other relief that this Court deems just and proper at trial.

## SEVENTH CAUSE OF ACTION

**Violation of the California Franchise Investment Law,
California Corporations Code Sections 31000-31516
(Against All Defendants)**

109.    GIS incorporates by reference paragraphs 1 through 108 as if fully set forth herein.

110.    GIS was, at all times relevant hereto, engaged in commerce by selling and distributing Guardian's products pursuant to the Agreements.

111.    GIS and Defendants have been involved in a commercial relationship pursuant to the Agreements.

112.    Section 31202 of the California Corporations Code makes it "unlawful for any person willfully to make any untrue statement of a material fact in any statement required to be

disclosed in writing pursuant to Section 31101, or ***willfully to omit to state*** in any such statement

any material fact which is required to be stated therein."  Cal. Corp. Code § 31202 (emphasis

added).

113.    Sections 31300 and 31301 of the California Franchise Investment Law provide

that an aggrieved party may recover damages from a person who offers a franchise in violation

of Section 31101, and that if such violation is willful, the aggrieved party may sue for rescission

of the offer.  Cal. Corp. Code § 31300-31301.

114.    Section 31302 of the California Franchise Investment Law makes partners,

officers, directors, and employees in a similar role at a violating company jointly and severally

liable for the actions of the company.  Cal. Corp. Code § 31302.

115.    Section 31101(c)(1) of the California Franchise Investment Law requires a

franchisor to make certain disclosures to potential franchisees.  Cal. Corp. Code § 31101(c)(1).

116.    Section 31101(c)(2) of the California Franchise Investment Law requires a

franchisor to disclose any "material modification of an existing franchise" by providing any and

all franchisees with written disclosures identifying and describing the modification or

modifications.  Cal. Corp. Code §31101(c)(2).

117.    A "franchise," as defined by the California Franchise Investment Law, is an

agreement between two or more persons by which a franchisee is granted the right to offer, sell,

or distribute goods under a system prescribed by a franchisor, the franchisee's business must be

operated pursuant to the franchisor's plan and substantially associated with the franchisor's

marks, and the franchisee is required to pay a franchise fee.  Cal. Corp. Code § 31005(a).

118.    The California Franchise Investment Law defines a "[f]ranchise fee" as "any fee

or charge that a franchisee or subfranchisor is required to pay or agrees to pay for the right to

enter into a business under a franchise agreement, including, but not limited to, any payment for

goods and services."  Cal. Corp. Code § 31011.

119.    The events giving rise to GIS's claim for violation of the California Franchise

Investment Law—including negotiation and signing of the Agreements—occurred, at least in

part, in California.

120.    The Agreements granted Defendants authority and control over the manner in which GIS operated its franchise.

121.    Pursuant to the Agreements, GIS was to operate its distribution franchise while using and associating itself with Guardian's trade name, trademark, service mark, and other commercial symbols.

122.    GIS was required to make payments to Defendants in excess of $500 pursuant to the various Agreements.  These payments included a mandatory initial inventory purchase of Guardian's products and equipment, a minimum monthly purchase requirement, and other fees as a condition to commencing operation of the franchise.

123.    Consequently, GIS is a "franchisee" within the meaning provided in the California Franchise Investment Law and falls within the class of persons that the law was intended to protect.  Cal. Corp. Code § 31006.

124.    Defendants are "franchisors" within the meaning of the California Franchise Investment Law.  Cal. Corp. Code § 31007.

125.    Defendants never provided GIS with the necessary disclosures either at the outset of their franchise relationship, upon automatic renewal of any of the many Agreements, or in connection with the offer of the 2015 Form Agreement.

126.    Each time that Defendants failed to provide these necessary disclosures, Defendant has thereby violated the California Franchise Investment Law.

127.    As a direct result of Defendants' failure to comply with the California Franchise Investment Law, GIS has suffered and continues to suffer substantial damages.

WHEREFORE, GIS prays for judgment against Defendants for violation of the California Franchise Investment Law and requests civil penalties for each such violation and any other relief that this Court deems just and proper.

**EIGHTH CAUSE OF ACTION**

**Breach of the Implied Covenants of Good Faith and Fair Dealing**
**of the Pennsylvania, Mid-Atlantic, Ohio, Cook County, Indiana, and Midwest Agreements**
**(Against All Defendants)**

128.    GIS incorporates by reference paragraphs 1 through 127 as if fully set forth herein.

129.    The Pennsylvania, Mid-Atlantic, Ohio, Cook County, Indiana, and Midwest Agreements are governed by California law and therefore contain an implied covenant of good faith and fair dealing.  This covenant obligates Defendants not to hinder or prevent GIS's ability to perform under the contract or receive the benefit of the contract.

130.    Defendants acted in bad faith by threatening the termination of the Pennsylvania, Mid-Atlantic, Ohio, Cook County, Indiana, and Midwest Agreements as a means of forcing GIS to renegotiate otherwise valid and binding contracts.  Defendants' conduct is part of a broader scheme to create unfair leverage and to pressure GIS into acceding to its new contract demands which are heavily in Defendants' favor.

131.    Defendants further acted in bad faith by usurping GIS's role as exclusive distributor in the GIS Territories.  On multiple occasions Defendants have attempted to harm the business reputation of GIS with the purpose of damaging GIS's relationship with its customers.  Such actions were again an attempt to strong-arm Plaintiff into involuntarily submitting to forced contract re-negotiations.

132.    Defendants' conduct, as alleged above, constitutes a breach of the covenant of good faith and fair dealing implied in every contract under California law.

133.    Defendants' interference with GIS's contractual rights has resulted in and will result in various harms including lost profits, increased costs, expenditure of attorneys' fees, and loss of good will.  For example, the ongoing threat of termination of the aforementioned agreements has remained ever present, adversely affecting GIS's business and business decisions and freezing its ability to grow that business.  This harm was intentional and foreseeable from Defendants' action.

WHEREFORE, GIS seeks relief as set forth in the prayers below.

1

**NINTH CAUSE OF ACTION**

2

**Breach of the Mid-Atlantic Agreement**
**(Against All Defendants)**

3

4

134.    GIS incorporates by reference paragraphs 1 through 133 as if fully set forth

5

herein.

6

135.    The Pennsylvania and Mid-Atlantic Agreements provide GIS with exclusive

7

purchase rights for Guardian's products in the entire Commonwealth of Pennsylvania, including

8

the County of Philadelphia under the Mid-Atlantic Agreement.

9

136.    Defendants breached their obligations under the Mid-Atlantic Agreement by, *inter*

10

*alia*, selling Guardian's products to Renaissance, a third-party customer, in Philadelphia,

11

Pennsylvania, which customer then resells those products to third-party purchasers.

12

137.    To date, GIS has performed all of its covenants, conditions, promises, and

13

obligations in accordance with the terms of the agreement, except to the extent its performance

14

has been excused by, *inter alia*, Defendants' conduct.

15

138.    As a direct and foreseeable result of Defendants' conduct, GIS has been damaged

16

in an amount to be determined at trial.

17

WHEREFORE, GIS seeks relief as set forth in the prayers below.

18

**TENTH CAUSE OF ACTION**

19

**Tortious Interference with Contract**
**(Against RPM) (In the Alternative)**

20

21

139.    GIS incorporates by reference paragraphs 1 through 138 as if fully set forth

22

herein.

23

140.    The Agreements described herein between Guardian and GIS provide GIS with

24

exclusive purchase rights for Guardian's products in defined regions set forth in those

25

Agreements.

26

141.    RPM has direct knowledge of those Agreements.

27

142.    RPM intentionally induced Guardian to breach its contractual relationships with

28

GIS by, *inter alia*, actively directing Guardian to terminate the Alabama, Florida, and Tennessee

1    Agreements, and to breach all other Agreements as set forth herein, thereby disrupting GIS's

2    contractual relationship with Guardian.

3          143.    As a direct result of RPM's conduct, Guardian wrongfully terminated the

4    Alabama, Florida, and Tennessee Agreements and breached its other Agreements with GIS as set

5    forth herein, thereby disrupting GIS's contractual relationship with Guardian.

6          144.    To date, GIS has performed all of its covenants, conditions, promises, and

7    obligations in accordance with the terms of the Agreements, except to the extent its performance

8    has been excused by, *inter alia*, Defendants' conduct.

9          145.    As a direct and foreseeable result of RPM's conduct, GIS has been damaged in an

10   amount to be determined at trial.

11         146.    RPM used improper means in interfering with Guardian's contractual relationship

12   with GIS. The purpose of RPM's interference was to pressure GIS to accede to new contract

13   terms that would be unfavorable to GIS.

14         WHEREFORE, GIS seeks relief as set forth in the prayers below.

15                           **PRAYER FOR RELIEF**

16         WHEREFORE, GIS prays for the following relief and judgment:

17         (a)    A declaration that the Alabama, Florida, and Tennessee Agreements were not

18   properly terminated and are currently valid and in full effect;

19         (b)    A declaration that termination of the Cook County, Illinois, Mid-Atlantic, and

20   Midwest Agreements would violate state law, as described above;

21         (c)    An award of compensatory damages in an amount according to proof;

22         (d)    Treble damages;

23         (e)    Punitive damages;

24         (f)    Pre-judgment interest on its damages in an amount to be determined at trial;

25         (g)    Costs of suit, including GIS's actual and/or reasonable attorneys' fees and

26   experts' fees; and

27         (h)    Such other relief as the Court deems just and proper.

28

## JURY TRIAL DEMANDED

GIS hereby demands a trial by jury of all claims so triable.


Dated: July 29, 2016                          Respectfully submitted,

                                              s/ Dylan J. Liddiard
                                              Dylan J. Liddiard, State Bar No. 203055
                                              WILSON SONSINI GOODRICH & ROSATI
                                              Professional Corporation
                                              650 Page Mill Road
                                              Palo Alto, California 94304
                                              Telephone:  (650) 493-9300
                                              Facsimile:  (650) 565-5100
                                              Email:  dliddiard@wsgr.com

                                              Michael J. Lockerby
                                              (admitted *pro hac vice*)
                                              FOLEY & LARDNER LLP
                                              Washington Harbour
                                              3000 K Street, N.W. | Suite 600
                                              Washington, D.C. 20007
                                              Telephone:  (202) 672-5300
                                              Facsimile:  (202) 672-5399
                                              Email:  mlockerby@foley.com

                                              *Attorneys for Plaintiff*