1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

9   G.P.P., INC. d/b/a GUARDIAN
    INNOVATIVE SOLUTIONS,
10
                Plaintiff,
11
12          v.
13
    GUARDIAN PROTECTION PRODUCTS,
14  INC., RPM WOOD FINISHES GROUP,
    INC.,                                    Case No.  1:15-cv-00321-SKO
15
                Defendants.                  **ORDER GRANTING IN PART AND**
16  _____/        **DENYING IN PART THE PARTIES'**
                                             **MOTIONS FOR SUMMARY JUDGMENT**
17
                                             **(Docs. 92, 93, 98)**
18
    GUARDIAN PROTECTION PRODUCTS,
19  INC.,
20
                Counterclaimant,
21
22          v.
23  G.P.P., INC. d/b/a GUARDIAN
    INNOVATIVE SOLUTIONS,
24
                Counter-defendant.
25  _____/
26
27
28

Before the Court are Defendant/Counterclaimant Guardian Protection Products, Inc.'s ("Guardian") Motion for Partial Summary Judgment as to the First Cause of Action in the Counterclaim for Declaratory Relief ("Guardian's Motion"), (Doc. 92), both Defendants' joint Motion for Partial Summary Judgment as to the Second Amended Complaint ("Defendants' Motion"), (Doc. 93), and Plaintiff/Counterdefendant G.P.P., Inc. d/b/a Guardian Innovative Solutions' ("GIS") Motion for Summary Judgment ("GIS's Motion"), (Doc. 98).  For the reasons provided herein, the Court GRANTS IN PART and DENIES IN PART all three of these motions.

## I.      BACKGROUND

This action involves a dispute arising out of agreements in which GIS agreed to be the exclusive distributor for Guardian's products in certain geographic areas.  GIS is "a Pennsylvania corporation based in Pitcairn, Pennsylvania . . . that, together with its predecessors, has been a warehousing distributor for Guardian for nearly three decades."  (Doc. 98, Ex. 2, Joint Statement of Undisputed Facts ("JSOF") ¶ 1.)  Guardian "was incorporated under the laws of the State of Delaware on January 14, 2000" and its "primary place of business is in Hickory, North Carolina." (*Id.* ¶¶ 5–6.)  Defendant RPM Wood Finishes Group, Inc. ("RPM") "is a Nevada corporation with its primary place of business in Hickory, North Carolina."  (*Id.* ¶ 7.)

**A.      Factual Background**

   1.      The Agreements

"As of January 2013, GIS and Guardian were parties to nine valid [warehousing distributor agreements]" (collectively, the "Agreements"), "which grant GIS the exclusive right to distribute 'Guardian Products' in all or parts of eleven states and the District of Columbia covered by those various Agreements."  (*Id.* ¶ 12.)  The Agreements were initially executed between 1988 and 1998 by Guardian Protection Products, Inc. a "California corporation," with its "business address" in California.  (*See* Doc. 120, Exs. 1–9.)  That entity was incorporated under the laws of California in 1985, and was dissolved in 1999.  (*See* Doc. 96, Decl. of Calvin Davis in Supp. of Defendants' Motion ("Davis Decl."), Exs. F & H.)  Defendant/Counterclaimant Guardian became a party to the Agreements pursuant to an Agreement for the Purchase and Sale of Assets executed on February 1, 2000.  (*See* Doc. 95, Decl. of Ronnie Holman in Supp. of Defendants' Motion ("Holman

Decl."), Exs. A & B; JSOF ¶ 11.)  The Agreements provide that GIS currently has distribution rights to certain Guardian products in the following geographic areas: (1) certain counties in Pennsylvania (the "Pennsylvania Agreement"), (*see* Doc. 120, Ex. 1); (2) the remaining counties in Pennsylvania, Maryland, the District of Columbia, and certain counties in New York (the "Mid-Atlantic Agreement"), (*id.*, Ex. 2); (3) Ohio (the "Ohio Agreement"), (*id.*, Ex. 3); (4) Cook County in Illinois (the "Cook County Agreement"), (*id.*, Ex. 4); (5) Indiana (the "Indiana Agreement"), (*id.*, Ex. 5); (6) the remaining counties in Illinois, Iowa, and certain counties in Missouri (the "Midwest Agreement"), (*id.*, Ex. 6); (7) Alabama (the "Alabama Agreement"), (*id.*, Ex. 7); (8) Florida (the "Florida Agreement"), (*id.*, Ex. 8); and (9) Tennessee (the "Tennessee Agreement"), (*id.*, Ex. 9).  All of the Agreements "are governed by California law."  (JSOF ¶ 13.)

The Agreements provide that GIS "is . . . granted the right to represent itself as the Authorized Distributor for Guardian Labeled Products for the area(s) outlined . . . for the purpose of the promotion, solicitation and sale of Guardian Labeled Distributor Products within the . . . assigned area(s)."  (Doc. 120, Ex. 1 ¶ 1; *id.*, Ex. 2 ¶ 1; *id.*, Ex. 3 ¶ 1; *id.*, Ex. 4 ¶ 1; *id.*, Ex. 5 ¶ 1; *id.*, Ex. 6 ¶ 1; *id.*, Ex. 7 ¶ 1; *id.*, Ex. 8 ¶ 1; *id.*, Ex. 9 ¶ 1.)  The Agreements also provide the following "quota requirement":

> The term of this Agreement is for the period of one (1) year beginning on the date of execution of this document.  [GIS] shall be entitled to automatic renewals at the end of each anniversary of this Agreement for an indefinite period, provided only that within each twelve (12) months of said anniversary, [GIS] shall purchase [Guardian Labeled Distributor Products] in quantities equal to or more than that delineated on Addendum #1 which is attached hereto, including both the initial and monthly purchases up to and including the annual purchase requirement.  In the event [GIS] fails to meet or exceed said purchase amount, [GIS] shall be notified that [it] is in violation of this Agreement and will be given sixty (60) days to effect compliance.  In the event [GIS] fails to effect compliance within the sixty (60) day period, Guardian shall have the right to terminate this Agreement . . . .

(*Id.*, Ex. 3 ¶ 5; *id.*, Ex. 4 ¶ 5; *id.*, Ex. 5 ¶ 5; *id.*, Ex. 6 ¶ 5; *id.*, Ex. 7 ¶ 5; *id.*, Ex. 9 ¶ 5; *see also id.*, Ex. 1 ¶ 5 (stating that the quota "quantities" are described in "paragraph two" and providing a ninety day period for GIS to cure); *id.*, Ex. 2 ¶ 5 (stating that the quota "quantities" are "referenced in paragraph two . . . and delineated on Addendum #1"); *id.*, Ex. 4 ¶ 5 (same); *id.*, Ex. 8 ¶ 5

(same).)  The Florida, Alabama, and Tennessee Agreements include an attached "Addendum #1"

describing a "monthly . . . purchase requirement."  (*Id.*, Ex. 7 at 11; *id.*, Ex. 8 at 23; *id.*, Ex. 9 at

11.)

   With the exception of the Pennsylvania Agreement, the Agreements all provide the

following description of "Guardian Labeled Distributor Products":

> For the purposes of this Agreement, the term Guardian Labeled Distributor
> Products shall be construed to mean; Products that are produced or caused to be
> produced by [Guardian] which are identified as Guardian Products on the front
> panel of the product label.  It is understood that unless specifically noted by a
> mutually agreed upon Addendum hereto, Guardian Labeled Distributor Products
> shall be only those items indicated on [a specific exhibit] which is attached hereto.

(*Id.*, Ex. 2 ¶ 7(c); *id.*, Ex. 3 ¶ 8; *id.*, Ex. 4 ¶ 7(c); *id.*, Ex. 5 ¶ 8; *id.*, Ex. 6 ¶ 8; *id.*, Ex. 7 ¶ 8; *id.*, Ex.

8 ¶ 7(c); *id.*, Ex. 9 ¶ 8.)  The Pennsylvania Agreement, on the other hand, does not include any

description of which products qualify as "Guardian Labeled Distributor Products."  (*See id.*, Ex. 1.)

   The Florida and Mid-Atlantic Agreements include an attached exhibit that provides a list of

products that qualify as "Guardian Labeled Distributor Products."  (*See id.*, Ex. 2 at 11–16; *id.*, Ex.

8 at 11–16.)  Unlike these two agreements, the Ohio, Cook County, Indiana, Midwest, Alabama,

and Tennessee Agreements do not include a similar exhibit providing a list of products that qualify

as "Guardian Labeled Distributor Products," or an addendum otherwise describing what constitutes

these products.  (*See id.*, Exs. 3–7, 9.)

   All of the Agreements also include the following non-compete provision:

> As another and further consideration for the execution of this Agreement, [GIS]
> agrees that it will not compete with [Guardian] by selling competing products
> during the term of this [A]greement in its assigned area(s).  "[C]ompeting products"
> mean products of comparable claims or qualities.  Should [Guardian] develop new
> products and amend [a specified exhibit] to reflect said new products and prices,
> [GIS] agrees not to sell products which compete with said new products.

(*Id.*, Ex. 1 ¶ 10; *id.*, Ex. 2 ¶ 11; *id.*, Ex. 3 ¶ 12; *id.*, Ex. 4 ¶ 11; *id.*, Ex. 5 ¶ 12; *id.*, Ex. 6 ¶ 10; *id.*,

Ex. 7 ¶ 10; *id.*, Ex. 8 ¶ 11; *id.*, Ex. 9 ¶ 10.)

   With the exception of the Pennsylvania Agreement, the Agreements each provide the

following notice and cure provision:

> Should either party be in material breach or non-compliance of any of the terms of this Agreement, the other party may terminate this Agreement by giving written notice of such breach or non-compliance and the right to correct the breach. If the breach is not corrected or compliance is not made within sixty (60) days of the date of such notice, this Agreement may be terminated at the end of said sixty (60) day period.

(*Id.*, Ex. 2 ¶ 16; *id.*, Ex. 3 ¶ 18; *id.*, Ex. 4 ¶ 16; *id.*, Ex. 5 ¶ 18; *id.*, Ex. 6 ¶ 16; *id.*, Ex. 7 ¶ 16; *id.*, Ex. 8 ¶ 16; *id.*, Ex. 9 ¶ 16.) The Pennsylvania Agreement does not include a similar provision. (*See id.*, Ex. 1.)

2. <u>The Purported Breach and Termination of the Florida, Alabama, and Tennessee Agreements</u>

On August 19, 2013, a representative of Guardian sent letters to GIS with a subject line that states "[s]ales [q]uotas." (Doc. 124, Decl. of Dylan J. Liddiard in Supp. of GIS's Motion ("Liddiard Decl."), Exs. P–R.) In these letters, Guardian states that "[a] review of [its] sales records for the months of June and July indicate that [GIS] ha[s] failed to meet [its] quota for" Florida, Alabama, and Tennessee "pursuant to [these Agreements]." (*Id.*) The letters further compare GIS's "purchases," as compared to the "quota[s]." (*Id.*) Guardian states that the letter is a "notice of that breach" and "demand[s] that the breach be cured in sixty (60) days as required by the [Agreements]." (*Id.*) Finally, the letters provide that "[f]ailure to cure the breach of the sales quota requirements will result in termination of the agreement and of [GIS's] distribution rights for the territory." (*Id.*)

On October 23, 2013, a representative of Guardian sent three additional letters to GIS. (Doc. 67, Exs. 12–14.) In these letters, Guardian states that "[t]he cure period has now expired and the breach has not been remedied." (*Id.*) As such, Guardian states that it "is exercising its right to terminate [GIS's] distribution agreement for th[e] territory[ies]" covered by the Florida, Alabama, and Tennessee Agreements. (*Id.*)

Despite these notices of termination, Guardian did not follow through with the termination of the Florida, Alabama, and Tennessee Agreements. (*See, e.g.*, Davis Decl., Ex. B at 252:7–13; Doc. 103, Ex. 4, Decl. of Johnny Green in Supp. of Guardian's Opp. to GIS's Motion ("Green

5

1   Decl.") ¶ 11.)  As such, the parties continue to operate under the Florida, Alabama, and Tennessee

2   Agreements to this day.  (*Id.*)  Additionally, Guardian has not sent termination notices regarding

3   "the Pennsylvania, Mid-Atlantic, Ohio, Cook County, Indiana, or Midwest Agreements."  (JSOF ¶

4   22.)

5           3.      The Purported Agreement Regarding Bob's Discount Furniture

6           On December 22, 2010, the President of Guardian, Ronnie Holman, met with

7   representatives of GIS regarding Guardian's sales of products to a third party, Bob's Discount

8   Furniture, in the areas covered by the Agreements.  (*See* Doc. 103, Ex. 5, Decl. of Ronnie Holman

9   in Supp. of Guardian's Opp. to GIS's Motion ("Second Holman Decl.") ¶ 3.)  Following this

10  meeting, GIS's Vice President of Sales and Training, Christopher Schall, and Guardian's

11  President, Ronnie Holman, had additional discussions in a January 13, 2011 e-mail exchange.

12  (Liddiard Decl., Ex. V.)  In this e-mail exchange, Mr. Schall noted that "documentation of our

13  agreement concerning Bob's Discount Furniture has slipped through the cracks."  (*Id.* at 2.)  Mr.

14  Schall then wrote the following: "During our meeting with Ronnie Holman on 12/22/10 it was

15  made clear that we should anticipate 5% of the earnings for all sales processed by Bob's Discount

16  Furniture that occur in any states that fall under the licensed distribution area in our Guardian

17  contract."  (*Id.*)  Mr. Holman stated the following in response:  "Just to make sure we are all have

18  [sic] the same understanding, this will be for warranties sold in your territory, not for warranties

19  sold in your neighbors [sic] territory to people living in your territory who may have traveled into

20  a neighboring Guardian . . . territory to shop."  (*Id.* at 1.)  Mr. Holman did not offer any other

21  statements conflicting with Mr. Schall's description of the purported agreement.  (*See id.*)  GIS

22  contends that these discussions produced a binding contract (the "Bob's Discount Furniture

23  Agreement").  (*See, e.g.*, Doc. 123 at 23–26.)

24          Subsequent to these discussions, Guardian "made $40,741.55 in commission payments to"

25  GIS "[f]or nearly four years from 2011 to 2014," which were "based on 5% of sales made by

26  Guardian to Bob's Discount Furniture stores located within" the geographic areas covered by the

27  Agreements.  (Doc. 98, Ex. 2 ¶ 26.)  In November 2014, Guardian unilaterally terminated these

28  commission payments to GIS.  (*See, e.g.*, Liddiard Decl., Ex. E at 114:1–5.)  Nonetheless,

Guardian continued to sell products to Bob's Discount Furniture in geographic areas covered by the Agreements.  (*See, e.g.*, *id.*, Ex. G at 230:20–231:25.)

4.    GIS's Alleged Sale of dreamGUARD Products

In 2010 or 2011, certain owners of GIS created a separate company, CDFC, Inc.  (Doc. 107, Pl.'s Resp. to Guardian's Statement of Undisputed Facts ("PRSOF") ¶ 15.)  GIS and CDFC, Inc. have shared owners, (Doc. 92, Ex. 3 at 37:20–22), identical directors, (*id.*, Ex. 5 at 57:8–25), some shared officers, (*see id.*, Ex. 3 at 37:14–38:15), some shared employees, (*see id.* at 38:16–39:6), and use of the same facility, (*see id.*, Ex. 5 at 35:9–13).  Additionally, a former partial owner of GIS did not hold an ownership interest in CDFC, Inc., (*see* Doc. 105, Decl. of Deborah Gibson in Opp. to Guardian's Motion ("Gibson Decl.") ¶¶ 3–5), and some employees of both GIS and CDFC, Inc. receive separate paychecks from each entity, (Doc. 129, Decl. of Dylan J. Liddiard in Opp. to Defendants' Motion ("Second Liddiard Decl."), Ex. OO at 46:14–25).

Beginning in 2011, CDFC, Inc. began selling a "micro fleece mattress protector" under the brand name dreamGUARD in geographic areas covered by the Agreements.  (*See, e.g.*, Doc. 92, Ex. 5 at 160:3–10; PRSOF ¶¶ 26 & 31.)  At the same time, Guardian also sold "micro fleece mattress protectors."  (PRSOF ¶ 27.)

5.    Electronic Furniture Protection Plans

"[I]n or around June 2009," Guardian "first began selling" electronic furniture protection plans ("EFPPs").  (GIS's Statement of Undisputed Facts in Supp. of GIS's Motion ("PSOF") ¶ 32.)  These EFPPs are electronic warranties provided by Guardian and underwritten by AIG and/or Chartis.  (*See, e.g.*, Doc. 92, Ex. 3 at 272:23–273:1; Second Liddiard Decl., Ex. SS.)  They are "virtual product[s] that only exists once (1) an ultimate consumer purchases it and (2) it is electronically registered."  (Green Decl., ¶ 5.)  "When a customer purchases an EFPP, he or she receives the following two documents: (1) a cover sheet that describes the specific coverages for the plan that the customer purchased and (2) the EFFP's 'terms and conditions' with more specific details."  *Id.*  These documents "are delivered to the customer via e-mail shortly after the registration or, if the customer has no e-mail or is unwilling to provide it, they are e-mailed to the retailer who either prints them and hands hard copies to the consumer in the store or puts them in

1   the mail to the consumer." *Id.*  "The EFPP's explanatory papers are not delivered in a box or any

2   special container." *Id.*

3          Guardian permitted GIS to purchase EFPPs for resale and counted GIS's sales of EFPPs

4   towards GIS's quotas under the Agreements.  (Liddiard Decl., Ex. G at 202:23–203:20; *see also*

5   JSOF ¶ 21 (stating that "[t]he numbers cited in Guardian's notices of breach of the Alabama,

6   Florida, and Tennessee Agreements included the sale of electronic furniture protection plans").)

7   **B.     Procedural History**

8          GIS filed its initial complaint on February 27, 2015.  (Doc. 1.)  On April 23, 2015,

9   Guardian filed a motion to dismiss this initial complaint.  (Doc. 16.)  As pertinent for purposes of

10  the instant opinion, GIS argued in its briefing regarding the motion to dismiss that it properly

11  brought a claim under the North Carolina Unfair and Deceptive Trade Practices Act due to

12  Guardian's connections to North Carolina.  (*See, e.g.*, Doc. 30 at 25–27.)  Guardian, on the other

13  hand, noted that the Agreements include a choice-of-law provision selecting California law and

14  argued that GIS had not met its burden as to why a foreign law should apply.  (*See id.*)

15         By its order entered on June 30, 2015, the Court granted in part and denied in part

16  Guardian's motion to dismiss.  (Doc. 30.)  In this order, the Court found that California law

17  applied and, as such, GIS's claim under the North Carolina Unfair and Deceptive Trade Practices

18  Act was "not viable."  (*Id.* at 27.)  The Court therefore dismissed this claim "with prejudice and

19  without leave to amend."  (*Id.*)

20         GIS filed the currently operative Second Amended Complaint ("SAC") on July 29, 2016.

21  (Doc. 67.)  The SAC includes the following causes of action: (1) First Cause of Action―breach of

22  contract relating to the Florida, Alabama, and Tennessee Agreements, (*see id.* ¶¶ 53–57); (2)

23  Second Cause of Action―breach of the implied covenant of good faith and fair dealing as to the

24  Florida, Alabama, and Tennessee Agreements, (*see id.* ¶¶ 58–64); (3) Third Cause of

25  Action―breach of contract relating to the Bob's Discount Furniture Agreement, (*see id.* ¶¶ 65–

26  69); (4) Fourth Cause of Action―breach of the implied covenant of good faith and fair dealing as

27  to the Bob's Discount Furniture Agreement, (*see id.* ¶¶ 70–75); (5) Fifth Cause of Action―a claim

28  alleging that termination of the Cook County Agreement would violate the Illinois Franchise

1  Disclosure Act, (*see id.* ¶¶ 76–90); (6) Sixth Cause of Action—a claim alleging the violation of

2  California Business and Professions Code Sections 17200 to 17210, (*see id.* ¶¶ 91–108); (7)

3  Seventh Cause of Action—a claim alleging a violation of the California Franchise Investment Law

4  (the "CFIL"), (*see id.* ¶¶ 109–127); (8) Eighth Cause of Action—breach of the implied covenant

5  of good faith and fair dealing regarding the Pennsylvania, Mid-Atlantic, Ohio, Cook County,

6  Indiana, and Midwest Agreements, (*see id.* ¶¶ 128–133); (9) Ninth Cause of Action—breach of

7  contract as to the Mid-Atlantic Agreement, (*see id.* ¶¶ 134–138); and (10) Tenth Cause of

8  Action—tortious interference with contract against only Defendant RPM, (*see id.* ¶¶ 139–146).

9  GIS requests the following relief in the SAC: (1) "[a] declaration that the Alabama, Florida, and

10  Tennessee Agreements were not properly terminated and are currently valid and in full effect;" (2)

11  "[a] declaration that termination of the Cook County, Illinois, Mid-Atlantic, and Midwest

12  Agreements would violate state law;" (3) compensatory, treble, and punitive damages; (4) pre-

13  judgment interest; and (5) attorneys' fees and costs.  (*Id.* at 26.)

14       Guardian also filed counterclaims, which include the following: (1) First

15  Counterclaim—requests for declaratory relief regarding (a) "[w]hether Guardian is entitled to

16  immediately terminate the . . . Agreements due to [GIS's] breaches of their express and implied

17  terms," (b) "[w]hether the [EFPPs] qualify as a Guardian Product within the scope of the rights

18  granted by the . . . Agreements," (c) "[if] the [EFPPs] are within the scope of the . . . Agreements,

19  whether Guardian may establish a purchase quota for the [EFPPs] above that applicable to the

20  [o]riginal [p]roducts," and (d) "[w]hether [GIS] has used its best efforts to promote the sale of

21  Guardian Products in the exclusive distribution territories established by the . . . Agreements,"

22  (Doc. 36 ¶¶ 26–30); (2) Second Counterclaim—breach of the Florida, Alabama, and Tennessee

23  Agreements, (*see id.* ¶¶ 31–34); (3) Third Counterclaim—breach of the implied covenant of good

24  faith and fair dealing as to the Florida, Alabama, and Tennessee Agreements, (*see id.* ¶¶ 35–38);

25  (4) Fourth Counterclaim—breach of the Pennsylvania, Mid-Atlantic, Ohio, Cook County, Indiana,

26  and Midwest Agreements, (*see id.* ¶¶ 39–42); (5) Fifth Counterclaim—breach of the implied

27  covenant of good faith and fair dealing as to the Pennsylvania, Mid-Atlantic, Ohio, Cook County,

28  Indiana, and Midwest Agreements, (*see id.* ¶¶ 43–46); and (6) Sixth Counterclaim—breach of

1  California Commercial Code Section 2306, subdivision 2, (*see id.* ¶¶ 47–50).  In its counterclaims,

2  Guardian requests declaratory relief, as well as compensatory damages, pre-judgment interest, and

3  attorneys' fees and costs.  (*Id.* at 36.)

4      On November 9, 2016, Guardian filed Guardian's Motion.  (Doc. 92.)   GIS filed its

5  opposition on December 7, 2016, (Doc. 104), and Guardian filed its reply on December 14, 2016,

6  (Doc. 111).

7      Defendants filed Defendants' Motion on November 9, 2016.  (Doc. 93.)  GIS filed its

8  opposition on December 7, 2016, (Doc. 106), and Defendants filed their reply on December 14,

9  2016, (Doc. 110).

10     Finally, GIS filed GIS's Motion on November 9, 2016.  (Doc. 98.)  Defendants filed their

11 opposition on December 7, 2016, (Doc. 103), and GIS filed its reply on December 14, 2016, (Doc.

12 112).

13     By its order entered on December 16, 2016, the Court found that Guardian's Motion,

14 Defendants' Motion, and GIS's Motion "are suitable for decision without oral argument" and

15 vacated the hearing regarding these motions.  (Doc. 118.)  Accordingly, Guardian's Motion,

16 Defendants' Motion, and GIS's Motion are all fully briefed and ready for disposition.

17                          **II.    LEGAL STANDARD**

18     "Federal Rule of Civil Procedure 56 governs motions for summary judgment," *Smith v.*

19 *Union Pac. R.R. Co.*, No. 2:12–cv–00656–TLN–CKD, 2013 WL 5718874, at *2 (E.D. Cal. Oct.

20 16, 2013), and provides, in part, that "[t]he court shall grant summary judgment if the movant

21 shows that there is no genuine dispute as to any material fact and the movant is entitled to

22 judgment as a matter of law," Fed. R. Civ. P. 56(a).  In evaluating a motion for summary

23 judgment, the court "must draw all reasonable inferences supported by the evidence in favor of the

24 non-moving party and then decide whether any genuine issues of material fact exist." *Guidroz-*

25 *Brault v. Mo. Pac. R.R. Co.*, 254 F.3d 825, 829 (9th Cir. 2001).  "A fact issue is genuine 'if the

26 evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.*

27 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "A material fact is one that

28

1  may affect the outcome of the case under the applicable law." *Cotta v. Cty. of Kings*, 79 F. Supp.

2  3d 1148, 1156 (E.D. Cal. 2015) (citing *Liberty Lobby, Inc.*, 477 U.S. at 248).

3  "A party seeking summary judgment bears the initial burden of informing the court of the

4  basis for its motion and of identifying those portions of the pleadings and discovery responses that

5  demonstrate the absence of a genuine issue of material fact." *Soremekun v. Thrifty Payless, Inc.*,

6  509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see,*

7  *e.g.*, Fed. R. Civ. P. 56(c)(1)(A) (stating that a party seeking summary judgment must support

8  their motion by "citing to particular parts of materials in the record, including depositions,

9  documents, electronically stored information, affidavits or declarations, stipulations (including

10 those made for purposes of the motion only), admissions, interrogatory answers, or other

11 materials").  "The exact nature of this responsibility, however, varies depending on whether the

12 issue on which summary judgment is sought is one in which the movant or the nonmoving party

13 carries the ultimate burden of proof." *Cotta*, 79 F. Supp. 3d at 1157 (citations omitted).  "Where

14 the moving party will have the burden of proof on an issue at trial, the movant must affirmatively

15 demonstrate that no reasonable trier of fact could find other than for the moving party."

16 *Soremekun*, 509 F.3d at 984.  On the other hand, a moving party that does not carry "the ultimate

17 burden of persuasion at trial" must "either produce evidence negating an essential element of the

18 nonmoving party's claim or defense or show that the nonmoving party does not have enough

19 evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire &*

20 *Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000) (citations omitted).

21 "If a moving party fails to carry its initial burden of production, the nonmoving party has

22 no obligation to produce anything, even if the nonmoving party would have the ultimate burden of

23 persuasion at trial." *Id.* at 1102–03 (citations omitted).  "In such a case, the nonmoving party may

24 defeat the motion for summary judgment without producing anything." *Id.* at 1103 (citation

25 omitted).

26 However, "[i]f the moving party meets its initial burden, the non-moving party must set

27 forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a

28 genuine issue for trial.'" *Soremekun*, 509 F.3d at 984 (quoting *Liberty Lobby, Inc.*, 477 U.S. at

250). Stated differently, "[i]n order to avoid summary judgment, a non-movant must show a genuine issue of material fact by presenting *affirmative evidence* from which a jury could find in its favor." *F.T.C. v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009) (citing *Liberty Lobby, Inc.*, 477 U.S. at 257). "A non-movant's bald assertions or a mere scintilla of evidence in his favor are both insufficient to withstand summary judgment." *Id.* (citing *Galen v. Cty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007)); *see, e.g.*, *Soremekun*, 509 F.3d at 984 ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment." (citations omitted)); *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir. 1997) ("Once the [moving party] has made a prima facie case for summary judgment, the [non-moving party] cannot rely on general denials; [they] must produce significant probative evidence that demonstrates that there is a genuine issue of material fact for trial." (citing *Liberty Lobby, Inc.*, 477 U.S. at 249–50)).

"In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence." *Soremekun*, 509 F.3d at 984. "That remains the province of the jury or fact finder." *Cotta*, 79 F. Supp. 3d at 1157 (citation omitted). "Rather, [the court] draws all inferences in the light most favorable to the nonmoving party." *Soremekun*, 509 F.3d at 984 (citing *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987)). "The evidence presented by the parties must be admissible." *Id.* (citing Fed. R. Civ. P. 56(e)).

## III. DISCUSSION

**A. GIS's Motion as to its Claims in the SAC Shall be Denied and Defendants' Motion as to GIS's Claims Shall be Granted in Part and Denied in Part.**

All parties seek summary judgment as to certain of GIS's claims in the SAC. In particular, all parties request summary judgment as to the First Cause of Action (breach of the Florida, Alabama, and Tennessee Agreements), and the Second Cause of Action (breach of the implied covenant of good faith and fair dealing as to the Florida, Alabama, and Tennessee Agreements). (*See, e.g.*, Doc. 93, Ex. 1 at 15–24; Doc. 123 at 16–23, 28–30.) Additionally, GIS seeks summary

judgment on the Third Cause of Action (breach of the Bob's Discount Furniture Agreement) and the Ninth Cause of Action (breach of the Mid-Atlantic Agreement).  (*See, e.g.*, Doc. 123 at 23–28.)  Defendants also seek summary judgment on the Fifth Cause of Action (whether termination of the Cook County Agreement would violate the Illinois Franchise Disclosure Act), the Sixth Cause of Action (violation of the California Business and Professions Code), the Seventh Cause of Action (violation of the CFIL), and the Eighth Cause of Action (breach of the implied covenant of good faith and fair dealing as to the Pennsylvania, Mid-Atlantic, Ohio, Cook County, Indiana, and Midwest Agreements).  (*See, e.g.*, Doc. 93, Ex. 1 at 15–36.)

The Court shall address, in turn, each of GIS's claims that are the subject of the motions for summary judgment.  For the reasons that follow, the Court denies GIS's Motion as to its claims in the SAC and grants in part and denies in part Defendants' Motion, insofar as Defendants seek summary judgment on certain of GIS's claims.

1.   The Parties' Motions for Summary Judgment on GIS's Claim for Breach of the Alabama, Florida, and Tennessee Agreements (First Cause of Action) Shall Be Denied.

All parties move for summary judgment regarding GIS's claim for breach of contract under California law due to Guardian's purported termination of the Florida, Alabama, and Tennessee Agreements.  (*See, e.g.*, Doc. 93, Ex. 1 at 15–24; Doc. 123 at 16–23.)  For the reasons that follow, the Court finds that no party is entitled to summary judgment on this claim.

"To establish a breach of contract under California law, [a plaintiff] must show the following: (1) existence of a contract, (2) performance by the plaintiff or excuse for nonperformance, (3) breach by the defendant, and (4) damages."  *Gulf Ins. Co. v. Hi-Voltage Wire Works, Inc.*, 388 F. Supp. 2d 1134, 1136 (E.D. Cal. 2005) (citing *First Commercial Mortg. Co. v. Reece*, 89 Cal. App. 4th 731, 744 (2001)).  "Generally, whether a party has performed as required by a contract, or breached it, is a question of fact."  *Britz Fertilizers, Inc. v. Bayer Corp.*, 665 F. Supp. 2d 1142, 1161 (E.D. Cal. 2009) (citations omitted); *see, e.g.*, *Stonebrae, L.P. v. Toll Bros., Inc.*, No. C-08-0221 EMC, 2009 WL 1082067, at *5 (N.D. Cal. Apr. 22, 2009) ("Ordinarily,

whether a party has performed as required under a contract is a question of fact for a jury, not a judge, to decide." (citations omitted)).

GIS alleges—and Defendants do not contest—that the Florida, Alabama, and Tennessee Agreements are valid contracts.  (*See, e.g.*, Doc. 123 at 16.)  As such, the first element of this breach of contract claim is satisfied.

Turning to the second and third elements, the parties disagree as to whether GIS performed under these agreements and, correspondingly, whether Defendants breached these agreements when it sent GIS termination notices.   These disagreements center around conflicting interpretations of the agreements.  For purposes of the instant analysis, the Court shall first interpret the relevant language in the agreements and then address the remaining elements of GIS's breach of contract claim.

a.   *The Agreements Provide for Monthly Purchase Quotas for Each Geographic Area.*

"Under California law, the interpretation of a written contract is a matter of law for the court even though questions of fact are involved." *Britz Fertilizers, Inc.*, 665 F. Supp. 2d at 1159 (quoting *Southland Corp. v. Emerald Oil Co.*, 789 F.2d 1441, 1443 (9th Cir. 1986)).  "The basic goal of contract interpretation is to give effect to the parties' mutual intent at the time of contracting." *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 109 Cal. App. 4th 944, 955 (2003) (citations omitted).  "When a contract is reduced to writing, the parties' intention is determined from the writing alone, if possible." *Id.* (citation omitted).  "Unless the words in a contract are used in a technical manner or are defined in the contract, the words of a contract are to be understood in their ordinary and popular sense." *Britz Fertilizers, Inc.*, 665 F. Supp. 2d at 1159–60 (citations omitted).  "When interpreting a contract, '[t]he whole of a contract is to be taken together' with 'each clause helping to interpret the other.'" *Id.* at 1160 (quoting Cal. Civ. Code § 1641).  "In addition, a court 'may not read the contract in a manner that leads to an absurd result.'" *Id.* (quoting *Kassbaum v. Steppenwolf Prods., Inc.*, 236 F.3d 487, 491 (9th Cir. 2000)).

The parties have three pertinent disagreements regarding the interpretation of the Florida, Alabama, and Tennessee Agreements: (1) whether these agreements provide for purchase or sale quotas; (2) whether these agreements provide for monthly or annual quotas; and (3) whether these quotas require GIS to make the requisite purchases specifically for the geographic area covered by each agreement. (*See, e.g.*, Doc. 103 at 6–15; Doc. 112 at 4–10; Doc. 123 at 16–23.) Specifically, GIS contends that these agreements provide for annual purchase quotas that may be satisfied by total purchases, rather than purchases on a per-territory basis. (*See, e.g.*, Doc. 112 at 4–10.) Conversely, Defendants assert that these agreements provide for monthly sales quotas that may be satisfied only by sales in each territory. (*See, e.g.*, Doc. 103 at 6–15.)

As to the first disagreement, the Florida, Alabama, and Tennessee Agreements provide for purchase—as opposed to sales—quotas. These agreements provide, in pertinent part, that GIS "shall be entitled to automatic renewals at the end of each anniversary of" the agreements "provided only that . . . [GIS] shall *purchase* Guardian labeled Products in quantities equal to or more than that delineated on Addendum #1 . . . , including both the initial and monthly *purchases* up to and including the annual purchase requirement." (Doc. 120, Ex. 7 ¶ 5 (emphases added); *id.*, Ex. 9 ¶ 5 (same); *see also id.*, Ex. 8 ¶ 5 (stating that the quota "quantities" are "referenced in paragraph two . . . and delineated on Addendum #1").) This language explicitly links the quota to purchases, as opposed to sales. Similarly, the "Appendix #1" referenced in this contractual language describes only a "monthly . . . *purchase* requirement" and omits any reference to a sales requirement. (*Id.*, Ex. 7 at 11; *id.*, Ex. 8 at 23; *id.*, Ex. 9 at 11.) Based on this clear language, the Florida, Alabama, and Tennessee Agreements provide only for purchase quotas.

Defendants nonetheless assert that the separate language in these agreements describing "the purpose" of the agreements as "the promotion, solicitation and sale of Guardian Labeled Distributor Products" indicates that the quotas relate to sales. (*See, e.g.*, Doc. 103 at 15–16.) The Court is not persuaded by this argument. The language referenced by Defendants describes the general purpose of the agreements and not the quota GIS must satisfy to renew the agreements. (*See* Doc. 120, Ex. 7 ¶ 1; *id.*, Ex. 8 ¶ 1; *id.*; Ex. 9 ¶ 1.) To the extent this general purpose language conflicts with the specific quota language, the Court finds that the specific language describing

purchase quotas governs over the general language describing the purpose of the agreements.  *See, e.g.*, *Boghos v. Certain Underwriters at Lloyd's of London*, 36 Cal. 4th 495, 504 (2005) (noting that, where "provisions . . . are truly inconsistent," the "more specific contractual provisions control over more general ones" (citations omitted)).

Furthermore, the Court notes that Defendants' proffered interpretation of the agreements would render the repeated references to a purchase requirement as mere surplusage.  The Court declines to interpret the Florida, Alabama, and Tennessee Agreements in a manner that would eliminate the pertinent language regarding purchase requirements.  *See, e.g.*, *id.* at 503 (stating that a "general rule of contract interpretation . . . . disfavor[s] constructions of contractual provisions that would render other provisions surplusage").  Accordingly, the Court finds that the Florida, Alabama, and Tennessee Agreements provide for purchase quotas—*not* sales quotas.

Regarding the parties' second disagreement—a monthly or annual quota—the Florida, Alabama, and Tennessee Agreements provide for monthly quotas: "[GIS] shall purchase Guardian labeled Products in quantities equal to or more than that delineated [in] Addendum #1 . . . , including both the initial and *monthly* purchases up to and including the annual purchase requirement."  (Doc. 120, Ex. 7 ¶ 5 (emphasis added); *id.*, Ex. 9 ¶ 5 (same); *see also id.*, Ex. 8 ¶ 5 (stating that the quota "quantities" are "referenced in paragraph two . . . and delineated on Addendum #1").)  Addendum 1, in turn, provides for a specified "*monthly* . . . purchase requirement."  (*Id.*, Ex. 7 at 11 (emphasis added); *id.*, Ex. 8 at 23 (same); *id.*, Ex. 9 at 11 (same).)  This contractual language specifies that the quotas are on a monthly basis, as opposed to an annual basis.

GIS does not address the "monthly . . . purchase requirement" in Addendum 1 and, instead, argues that the reference to an "annual purchase requirement" indicates that the agreements provide only for an annual requirement.  (*See, e.g.*, Doc. 112 at 9–10.)  The Court disagrees.  The contracts specify that the quota is for "quantities equal to or more than" those provided in Addendum #1.  (Doc. 120, Ex. 7 ¶ 5; *id.*, Ex. 9 ¶ 5; *see also id.*, Ex. 8 ¶ 5 (stating that the quota "quantities" are "referenced in paragraph two . . . and delineated on Addendum #1").)  Addendum

#1 then references only a monthly quota and omits any reference to an annual quota. (*Id.*, Ex. 7 at 11; *id.*, Ex. 8 at 23; *id.*, Ex. 9 at 11.)

Additionally, an interpretation that the agreements provide only for an annual quota would render the pertinent reference to a "monthly . . . purchase requirement" in Addendum #1 as mere surplusage. By contrast, an interpretation that the Florida, Alabama, and Tennessee Agreements include monthly requirements which, when multiplied by twelve, result in a corresponding annual requirement gives effect to each provision in these agreements. The Court declines GIS's invitation to ignore the pertinent language describing a "monthly . . . requirement" and, instead, shall give effect to each provision of the agreements. *See, e.g.*, *Quezada v. Loan Ctr. of Cal., Inc.*, No. CIV. 08-177 WBS KJM, 2008 WL 5100241, at \*7 (E.D. Cal. Nov. 26, 2008) ("[U]nder California contract law, '[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.'" (second alteration in original) (quoting *Navarro v. Mukasey*, 518 F.3d 729, 734 (9th Cir. 2008))). The Court therefore finds that the Florida, Alabama, and Tennessee Agreements provide for monthly quotas and *not* only annual quotas.

As to the third disagreement, the Court finds that the Florida, Alabama, and Tennessee Agreements require GIS to make the requisite purchases specifically for the geographic area covered by each agreement. On this point, the Florida Agreement includes language that materially differs from the Alabama and Tennessee Agreements. In particular, the Florida Agreement includes an addendum that explicitly states that "the monthly purchase requirement" is "for the State of Florida." (Doc. 67, Ex. 10 at 14.) As such, under the clear language of the Florida Agreement, the monthly quota pertains solely to purchases for the State of Florida. (*See id.*)

Unlike the Florida Agreement, the Alabama and Tennessee Agreements do not include language in the provisions relating to the quotas that either explicitly ties those quotas to a specific geographic area, or indicates that the quotas may be satisfied by purchases for any geographic area. (*See* Doc. 120, Ex. 7 at 11; *id.*, Ex. 9 at 11.) As these provisions do not resolve this issue, the Court looks to the Alabama and Tennessee Agreements, as a whole, for further guidance. *See,*

*e.g.*, *Tehama-Colusa Canal Auth. v. U.S. Dep't of Interior*, 819 F. Supp. 2d 956, 987 (E.D. Cal. 2011) ("A written contract must be read as a whole and every part interpreted with reference to the whole, with preference given to reasonable interpretations." (quoting *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir. 1999))); *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 648 (2003) ("[L]anguage in a contract must be interpreted as a whole, and in the circumstances of the case . . . ." (citation omitted)).  As Defendants correctly note, the first paragraph of the Alabama and Tennessee Agreements provides that GIS "is . . . granted the right to represent itself as [a distributor of Defendants' products] for the purpose of promotion, solicitation and sale of Guardian Labeled Distributor Products *within the aforementioned assigned area(s)*."  (Doc. 67, Ex. 9 ¶ 1 (emphasis added); *id.*, Ex. 11 ¶ 1 (same).)  The "aforementioned assigned area[]," in turn, is defined as the geographic area covering each agreement—namely, the State of Alabama for the Alabama Agreement and the State of Tennessee for the Tennessee Agreement.  (*Id.*, Ex. 9 at 7; *id.*, Ex. 11 at 7.)  Thus, both of these agreements pertain to specific geographic areas and are not otherwise divorced from a geographic limitation.

Once these limiting provisions are read in conjunction with quota provisions, it is apparent that the quotas for the Alabama and Tennessee Agreements similarly pertain solely to the geographic areas covered by each agreement.  The Court therefore finds that the Florida, Alabama, and Tennessee Agreements all require GIS to make the requisite monthly purchases specifically for the geographic area covered by each agreement.[1]

---

[1] GIS argues that, "[e]ven if [GIS] were required to allocate purchases on a per-territory basis, . . . [Defendants] ha[ve] waived any right . . . to require such allocation" by failing to require such during the over two-decade duration of the Florida, Alabama, and Tennessee Agreements.  (Doc. 123 at 19–21.)  "Waiver is the intentional relinquishment of a known right after full knowledge of the facts and depends upon the intention of one party alone."  *Oakland Raiders v. Oakland-Alameda Cty. Coliseum, Inc.*, 144 Cal. App. 4th 1175, 1189 (2006) (citation omitted).  "Waiver does not require any act or conduct by the other party" and "the *pivotal* issue in a claim of waiver is the intention of the party who allegedly relinquished the known legal right."  *Id.* at 1189–90 (citation omitted).  As to implied waiver, "where a plaintiff has knowledge of the defendant's breach and continues to perform under the contract and/or accepts the defendant's performance without notifying the defendant of the breach, a waiver is fairly implied."  *Roling v. E*Trade Sec. LLC*, 860 F. Supp. 2d 1035, 1039 (N.D. Cal. 2012) (citing *A.B.C. Distrib. Co. v. Distillers Distrib. Corp.*, 154 Cal. App. 2d 175, 187 (1957)).

  In the present case, GIS has failed to point to any evidence in the record demonstrating that Guardian intentionally relinquished its contractual rights to have a purchase quota for each geographic area covered by the Florida, Alabama, and Tennessee Agreements.  (*See* Doc. 123 at 19–21.)  *See generally Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001) ("The district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the . . . papers with adequate references so that it could conveniently be found.").  Indeed, GIS has not even directed the Court to evidence that Guardian was *aware* before June of 2013 that GIS was not making purchases for each specific geographic area.  (*See id.*)  To the

18

1    In summary, the Florida, Alabama, and Tennessee Agreements each provide for monthly

2    purchase quotas, and GIS only satisfies those quotas if it makes the requisite monthly purchases

3    specifically for the geographic area covered by each agreement.  With these issues of contractual

4    interpretation resolved, the Court now turns to the remaining elements of GIS's First Cause of

5    Action.

6                    b.    *There are Genuine Issues of Material Fact as to Whether GIS Performed,*
                           *or if Performance was Excused.*

7

8    The second element of a breach of contract claim under California law requires a plaintiff

9    to show that they "performed [their] contractual duties or [were] excused from nonperformance."

10   *Boland, Inc. v. Rolf C. Hagen (USA) Corp.*, 685 F. Supp. 2d 1094, 1101 (E.D. Cal. 2010)

11   (citations omitted).  The record is not clear as to whether GIS performed their contractual duties

12   under the Florida, Alabama, and Tennessee Agreements.  Guardian sent breach letters to GIS on

13   August 19, 2013, in which Defendants state that GIS failed to meet its monthly purchase quotas

14   for June and July of 2013 under the Florida, Alabama, and Tennessee Agreements.[2]  (Liddiard

15   Decl., Exs. P–R.)  Defendants have not directed the Court to any further evidence establishing

16   whether, in fact, GIS satisfied its monthly purchase quotas for June and July of 2013.[3]  Similarly,

---

17   contrary, as GIS itself asserts, "[i]t is undisputed that the parties never bothered to exchange records showing when or
18   how much product was purchased for (or sold by) [GIS] in any given territory."  (*Id.* at 15.)  Absent evidence of an
     intentional or knowing waiver, the Court finds that Guardian has not intentionally or impliedly waived its right to a
     per-territory purchase quota.

19           GIS also argues that Guardian is "estopped from making . . . a claim" pursuant to "its right to claim any
20   breach of contract for failure to allocate" the purchase quotas on a per-territory basis under the doctrine of equitable
     estoppel.  (*See* Doc. 123 at 20–21.)  "The doctrine of equitable estoppel is founded on concepts of equity and fair
21   dealing" and "provides that a person may not deny the existence of a state of facts if he intentionally led another to
     believe a particular circumstance to be true and to rely upon such belief to his detriment."  *Oakland Raiders*, 144 Cal.
22   App. 4th at 1189 (citation omitted).  "The traditional elements of estoppel" include the following: (1) "the party to be
     estopped must be apprised of the facts;" (2) "he must intend that his conduct shall be acted upon, or must so act that
23   the party asserting the estoppel had a right to believe it was so intended;" (3) the other party must be ignorant of the
     true state of fact;" and (4) "he must rely upon the conduct to his injury."  *Id.* (citation omitted).
24           The Court is not persuaded by GIS's equitable estoppel argument.  As with its waiver argument, GIS fails to
     point to any evidence indicating that Guardian was "apprised" of the pertinent facts—namely, that GIS was not
25   satisfying the contractual purchase quotas on a per-territory basis—when it did not provide a notice of a breach before
     June of 2013.  (*See* Doc. 123 at 20–21.)  Absent such evidence, GIS's equitable estoppel argument similarly fails.
26   [2] The Court notes that these notices of breach also reference "sales quota[s]."  (Liddiard Decl., Exs. P–R.)  However,
     the actual description of the breach references only deficient levels of "purchases."  (*See id.*)
27   [3] Guardian asserts that GIS admitted to not meeting the quotas in June and July of 2013 in an e-mail exchange on
     August 22, 2013.  (*See* Doc. 103 at 17 (citing Doc. 103, Ex. 3, Decl. of Calvin Davis in Opp. to GIS's Motion
28   ("Second Davis Decl.") at 30–31).)  As GIS correctly notes, this e-mail exchange addresses "inventory *sales*" and not
     the relevant *purchase* quotas.  (*See* Second Davis Decl. at 30–31 (emphasis added).)  The Court therefore finds that
     this communication is not relevant in determining whether GIS satisfied its *purchase* quotas.

GIS states—without providing supporting evidence—that, "[e]ven if its purchase quota were measured on a month-by-month or territory-by-territory basis, [GIS] still satisfied its purchase quota(s) at all relevant times." (GIS's Resps. & Objs. to Def.'s First Set of Interrogs. at 7.)[4]  As the parties have not directed the Court to evidence supporting their respective assertions regarding whether GIS failed to meet its monthly purchase quotas for June and July of 2013, the Court declines to weigh the conflicting conclusory allegations.  Instead, whether GIS adequately performed under these agreements by meeting the requisite monthly purchase quotas is a question of fact properly left to the fact finder.[5]

---

[4] On December 7, 2016, Guardian filed Evidentiary Objections in Opposition to GIS's Motion (the "First Objection"). (Doc. 103, Ex. 6.)  In the First Objection, Guardian objects to evidence that is irrelevant—and therefore moot—to the instant opinion, with two pertinent exceptions.  First, Guardian objects to GIS's use of its interrogatory responses at the summary judgment stage.  As the Ninth Circuit has noted, courts "refuse[] to find a genuine issue where the only evidence presented is uncorroborated and self-serving testimony." *Carter v. Clark Cty.*, 459 F. App'x 635, at *1 (9th Cir. 2011) (citation omitted).  While GIS's interrogatories, by themselves, may be insufficient to defeat summary judgment, Guardian has failed to direct the Court to evidentiary support on the issue of breach of the Florida, Alabama, and Tennessee Agreements. Further, even if GIS breached, summary judgment is not warranted because there remain genuine issues of material fact as to whether GIS's purported nonperformance was excused. Accordingly, Guardian's objection relating to GIS's interrogatory response is properly overruled.

Second, Guardian objects—without any analysis or citation to authority—to certain portions of Christopher Nolan's deposition relating to the damages GIS has suffered since receiving the termination letters on the basis that this testimony is speculative and conclusory, improper opinion testimony, lack of foundation, and lack of personal knowledge. (*See* Doc. 103, Ex. 6 at 6.)  The Court is again not persuaded by Guardian's objection.  Christopher Nolan is the Executive Vice President of GIS. (Doc. 98, Ex. 1 ¶ 1.)  As such, he has unique and relevant personal knowledge regarding any harm GIS may have suffered.  Absent any specific further objection to this testimony, the Court finds that Guardian's objection regarding Mr. Nolan's testimony is properly overruled.

For these reasons, the Court OVERRULES Guardian's First Objection. (Doc. 103, Ex. 6.)

[5] GIS also argues that Defendants "received exactly what [they] bargained for in the Agreements: a guaranteed minimum amount of product purchases by [GIS] each year." (Doc. 123 at 18.)  GIS asserts that, as such, "any failure by [GIS] to formally allocate purchases on a per-territory basis" is not a "material breach" of the Florida, Alabama, and Tennessee Agreements that "could . . . have formed a basis to terminate" these agreements. (*Id.* at 12–13.)

In the context of breaches of contractual requirements, California law "recognizes that although every instance of noncompliance with a contract's terms constitutes a breach, not every breach justifies treating the contract as terminated." *Boston LLC v. Juarez*, 245 Cal. App. 4th 75, 82 (2016) (citation omitted).  "Following the lead of the Restatements of Contracts, California courts allow termination only if the breach can be classified as 'material,' 'substantial,' or 'total.'" *Id.* (citation omitted).  "[A] term may be 'material' in one of two ways: [i]t may be a necessary term, without which there can be no contract; or, it may be an important term that affects the value of the bargain." *Vasile v. Flagship Fin. Grp., LLC*, No. 2:12–CV–02912–KJM–CKD, 2014 WL 2700896, at *4 (E.D. Cal. June 13, 2014) (first alteration in original) (quoting *Facebook, Inc. v. Pac. Nw. Software, Inc.*, 640 F.3d 1034, 1037 (9th Cir. 2011)).

If GIS failed to perform (or subsequently cure that nonperformance) as required by the Florida, Alabama, and Tennessee Agreements in June and July of 2013, there remains the question as to whether that failure was a material deviation from the terms of these agreements that would justify Guardian's termination of the agreements.  In particular, while Guardian may have gained the benefit of GIS purchasing sufficient products to satisfy the aggregate quotas of these agreements, Guardian would have lost the benefit of GIS purchasing products specifically for the geographic area covered by each agreement.

Nonetheless, California law "accepts that '[w]hether a breach is so material as to constitute cause for the injured party to terminate a contract is ordinarily a question for the trier of fact.'" *Del Mar Seafoods, Inc. v. Cohen*, No. C 07-02952 WHA, 2008 WL 1734749, at *8 (N.D. Cal. Apr. 11 2008) (quoting *Superior Motels, Inc. v. Rinn*

1    GIS argues that, regardless of whether it met its quotas for June and July of 2013 under the

2    Florida, Alabama, and Tennessee Agreements, its performance or nonperformance was excused

3    due to Guardian's conduct.  (*See, e.g.*, Doc. 123 at 21–22.)   Defendants, in turn, argue that

4    Guardian did not prevent or hinder GIS's performance. (*See, e.g.*, Doc. 103 at 19–20.)

5    "Under California contract law, a party to a contract has a duty to do everything incumbent

6    upon him or her to accomplish the purpose of the contract, and a duty not to do anything which

7    interferes with the right of the other party to receive the benefits of the contract." *Pedraza v.

8    Alameda Unified Sch. Dist.*, No. 05–04977 CW, 2011 WL 4507111, at *10 (N.D. Cal. Sept. 29,

9    2011) (citing *Corson v. Brown Motel Invs., Inc.*, 87 Cal. App. 3d 422, 427 (1978) and *Ladd v.

10   Warner Bros. Entm't, Inc.*, 184 Cal. App. 4th 1298, 1306 (2010)).   "Moreover, hindrance of the

11   other party's performance operates to excuse that party's nonperformance." *Erich v. Granoff*, 109

12   Cal. App. 3d 920, 930 (1980); *see, e.g.*, Cal. Civ. Code § 1511 ("The want of performance of an

13   obligation . . . , in whole or in part, or any delay therein, is excused . . . [w]hen such performance .

14   . . is prevented or delayed by the act of the creditor . . . ."); *Hamilton v. Willms*, No. CV F 02-

15   6583, 2005 WL 3143712, at *11 (E.D. Cal. Nov. 22, 2005) ("If a defendant by his own acts has

16   prevented performance of a contract, the defendant may not rely on the lack of performance."

17   (citing *Patrick J. Ruane, Inc. v. Parker*, 185 Cal. App. 2d 488, 504 (1960))).

18   The Court finds that summary judgment is similarly not warranted in favor of any party on

19   the issue of whether GIS's performance was excused.  On August 19, 2013, Guardian sent letters

20   to GIS alleging that GIS failed to meet its quotas under the Florida, Alabama, and Tennessee

21   Agreements.  (*See* Liddiard Decl., Exs. P–R.)  Pursuant to these agreements, the August 19, 2013

22   letters also included a "demand that the breach be cured in sixty (60) days." (*Id.*)  However, there

23   are genuine issues of material fact as to whether GIS was given the requisite opportunity to cure

24   the purported failure to meet quotas under these agreements.  In particular, in a memorandum

25   dated August 12, 2013 to Guardian distributors from Guardian's representative, Johnny Green,

26

27   *Motor Hotels, Inc.*, 195 Cal. App. 3d 1032, 1051–52 (1987)).  The Court therefore finds that the materiality of GIS's
purported nonperformance under the Florida, Alabama, and Tennessee Agreements is properly reserved for the jury.

28   *See, e.g., id.* (noting that materiality is a "question . . . of degree, to be answered, if there is doubt, by the triers of the
facts" (quoting *Superior Motels, Inc.*, 195 Cal. App. 3d at 1051)).

1   Guardian stated that "[a] number of the distributor contracted territories will be given a legal
2   notice of breach and allowed an opportunity to cure," but also stated that "purely buying inventory
3   is no longer an option for cure."   (*Id.*, Ex. O at 2.)   Similarly, in Guardian's Rule 30(b)(6)
4   deposition, Guardian's same representative—Johnny Green—stated that, as Defendants are "no
5   longer selling paper warranties," distributors "would actually have to perform [their] way into a
6   cure because it's measured by retail *sales* instead of stock in a warehouse."   (*Id.*, Ex. E at 49:17–
7   50:7 (emphasis added).)

8           Contrary to these representations from Guardian, the Florida, Alabama, and Tennessee
9   Agreements include only monthly *purchase* quotas and do not impose quotas based on sales.  As
10  such, these statements from Guardian's representative indicate that Guardian hindered GIS's
11  ability to cure any purported default by imposing a *sales* quota, rather than a *purchase* quota.

12          Nonetheless, Mr. Green also provided statements in his declaration that GIS could, in fact,
13  "cure[] its defaults by purchasing [certain products], or by selling [EFPPs]."  (Green Decl. ¶ 10.)
14  As such, there is contradictory evidence as to whether Guardian hindered GIS's ability to cure any
15  purported defaults by imposing a sales requirement that is not present in the Florida, Alabama, and
16  Tennessee Agreements, or if Guardian would have permitted GIS to cure any defaults through
17  additional purchases.  This issue is properly left to the fact finder.

18              c.   *There are Genuine Issues of Material Fact as to Whether Defendants*
19                   *Breached the Florida, Alabama, and Tennessee Agreements.*

20          The third element of GIS's breach of contract claim requires GIS to show that Guardian
21  "breached [its] contractual duties."   *Boland, Inc. v. Rolf C. Hagen (USA) Corp.*, 685 F. Supp. 2d
22  1094, 1101 (E.D. Cal. 2010) (citations omitted).  GIS argues that Guardian breached the Florida,
23  Alabama, and Tennessee Agreements by terminating these agreements due to "[f]abricated
24  [o]bligations."  (Doc. 123 at 10.)  Defendants, in turn, argue that Guardian had cause to terminate
25  these agreements due to GIS's failure to perform.  (*See* Doc. 103 at 14–23.)

26          The issue of whether Guardian breached the Florida, Alabama, and Tennessee Agreements
27  by terminating these agreements will thus be determined by the second element of GIS's
28  claim—*i.e.*, whether GIS performed as required under these agreements, or otherwise was excused

1  from performing.   As discussed above, there are genuine issues of material fact as to GIS's

2  performance or excuse for nonperformance.   As such, the Court cannot determine whether GIS has

3  established the breach element at this juncture and the determination of breach is properly left to

4  the finder of fact.

5          d.      There are Genuine Issues of Material Fact Regarding Whether GIS
                   Suffered Damages.
6

7          Defendants move for summary judgment on GIS's breach of contract claim based solely

8  on their argument that GIS has failed to establish the fourth element of a breach of contract claim.

9  (Doc. 93, Ex. 1 at 15–24.)   Under this final element, GIS must show that its "damages were a

10  result of the breach."   *Boland, Inc.*, 685 F. Supp. 2d at 1101 (citations omitted).   "A fundamental

11  rule of law is that whether the action be in tort or contract compensatory damages cannot be

12  recovered unless there is a causal connection between the act or omission complained of and the

13  injury sustained."   *Britz Fertilizers, Inc. v. Bayer Corp.*, 665 F. Supp. 2d 1142, 1167 (E.D. Cal.

14  2009) (quoting *McDonald v. John P. Scripps Newspaper*, 210 Cal. App. 3d 100, 104 (1989)).

15         Defendants offer two pertinent arguments as to why they are entitled to summary judgment

16  on this claim. [6]   First, Defendants assert that summary judgment is warranted because GIS "lacks

17  any evidence that Guardian's purported breach of" the Florida, Alabama, and Tennessee

18  Agreements "caused damage."   (Doc. 93, Ex. 1 at 8.)   The Court disagrees.   GIS has provided

19  evidence that it declined to make certain business decisions due to Guardian's unexecuted

20

---

21  [6] In its opposition to Defendants' Motion, GIS first argues that the Court should deny Defendants' Motion as to GIS's
    breach of contract claim because, even if GIS did not suffer "pecuniary loss," it nonetheless may recover nominal

22  damages.   (Doc. 106 at 12–13.)   GIS is correct that "a showing of actual damages is not required to establish a breach
    of contract" under California law, "as a party may obtain nominal damages for a breach."   *PNY Techs., Inc. v. Miller,
    Kaplan, Arase & Co.*, Case No. 15-cv-01728-MMC, 2016 WL 5462456, at *4 (N.D. Cal. Sept. 28, 2016) (citations

23  omitted); *see, e.g.*, *Tribeca Cos. v. First Am. Title Ins. Co.*, 239 Cal. App. 4th 1088, 1103 n.12 (2015) ("Generally, a
    plaintiff who proves a breach of duty (including breach of contract) but fails to show any appreciable detriment—*i.e.*,

24  damages—nevertheless may . . . recover nominal damages and, when appropriate, costs of suit." (emphasis added)
    (citations omitted)); *Sweet v. Johnson*, 169 Cal. App. 2d 630, 632 (1959) ("A plaintiff is entitled to recover nominal

25  damages for the breach of a contract, despite inability to show that actual damage was inflicted upon him, since the
    defendant's failure to perform a contractual duty is, in itself, a legal wrong that is fully distinct from the actual

26  damages.").
           However, the Ninth Circuit has found that, under California law, nominal damages are insufficient to survive

27  summary judgment.   *Ruiz v. Gap, Inc.*, 380 F. App'x 689, 691–92 (9th Cir. 2010).   Instead, to survive summary
    judgment, "a breach of contract claim requires a showing of appreciable and actual damage."   *Id.* (quoting *Aguilera v.

28  Pirelli Armstrong Tire Corp.*, 223 F.3d 1010, 1015 (9th Cir. 2010)).   The Court is therefore not persuaded by GIS's
    argument that its First Cause of Action can survive based only on a showing of nominal damages.

1   termination of the Florida, Alabama, and Tennessee Agreements.   (*See, e.g.*, Second Liddiard

2   Decl., Ex. OO at 178:21–181:9.)[7]   Further, GIS has supplied evidence that these cautionary

3   business decisions resulted in actual economic harm to GIS.   (*See, e.g.*, *id.*, Ex. NN at 310:3–

4   311:12; *id.*, Ex. OO at 183:17–184:22.)   The Court finds that this evidence raises a genuine issue

5   of material fact as to whether GIS suffered damages due to Guardian's purported breach of the

6   Florida, Alabama, and Tennessee Agreements.   *See, e.g.*, *HiRel Connectors, Inc. v. United States*,

7   No. CV01–11069 DSFVBKX, 2006 WL 3618008, at *1 n.3 (C.D. Cal. July 18, 2006) ("Whether

8   [the plaintiff] was damaged in the form of lost profits is a question for the trier of fact.").

9        Second, Defendants assert that they are entitled to summary judgment as to GIS's breach

10   of contract claim because "any damage that [GIS] may have suffered was [not] foreseeable."[8]

11   (Doc. 93, Ex. 1 at 8.)   The Court is similarly not persuaded by this argument.   Under California

12   law, "[g]eneral damages are often characterized as those that flow directly and necessarily from a

13   breach of contract, or that are a natural result of a breach."   *Lewis Jorge Constr. Mgmt., Inc. v.*

14   *Pomona Unified Sch. Dist.*, 34 Cal. 4th 960, 968 (2004) (citations omitted).   "Unlike general

15   damages, special damages are those losses that do not arise directly and inevitably from" the

16   breach and, "[i]nstead, . . . are secondary or derivative losses arising from circumstances that are

17   particular to the contract or to the parties."   *Id.* "Special damages are recoverable if the special or

18   particular circumstances from which they arise were actually communicated to or known by the

19   breaching party (a subjective test) or were matters of which the breaching party should have been

20   aware at the time of contracting (an objective test)."   *Id.* at 968–69 (citations omitted).   "Special

21   damages will not be presumed from the mere breach but represent loss that occurred by reason of

22   _____

23   [7] On December 15, 2016, Guardian filed an Objection to GIS's Evidence Filed Belatedly in Support of its Motion for
     Summary Judgment (the "Second Objection"), in which Guardian objects to the additional evidence GIS filed in
24   support of GIS's Motion.   (Doc. 116.)   The Court notes that, to the extent any of this additional evidence is relevant to
     the analysis in the instant opinion, GIS provided it to the Court in conjunction with its initial motion and/or
25   oppositions.   GIS thus did not file the pertinent evidence solely in conjunction with a reply and, consequently,
     Guardian's Second Objection is properly overruled.   *Cf. Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996)
26   ("[W]here new evidence is presented in a reply to a motion for summary judgment, the district court should not
     consider the new evidence without giving the [non-]movant an opportunity to respond." (quoting *Black v. TIC Inv.*
27   *Corp.*, 900 F.2d 112, 116 (7th Cir. 1990))).
           Accordingly, the Court OVERRULES the Second Objection.   (Doc. 116.)
28   [8] The Court notes that Defendants do not move for summary judgment as to any particular type of damage.   (*See, e.g.*,
     Doc. 93, Ex. 1.)   Instead, the only issue regarding the damages element presently before the Court is whether GIS has
     shown any form of viable damages that may sustain its claim in its First Cause of Action.

1    injuries following from the breach."  *Id.* at 969 (citation omitted).  "Special damages are among

2    the losses that are foreseeable and proximately caused by the breach of a contract."  *Id.* (citation

3    omitted); *see, e.g.*, *Fresno Rock Taco, LLC v. Nat'l Sur. Ins. Corp.*, No. 1:11–cv–845–SKO, 2015

4    WL 135720, at *18 (E.D. Cal. Jan. 9, 2015) ("Contract damages are generally limited to those

5    within the contemplation of the parties when the contract was entered into or at least reasonably

6    foreseeable by them at that time; consequential damages beyond the expectations of the parties are

7    not recoverable." (quoting *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 515

8    (1994))).

9          Here, Guardian sent the termination letters to GIS in October 2013.  (Doc. 67, Exs. 12–14.)

10   Nonetheless, Guardian did not follow through with the termination of the Florida, Alabama, and

11   Tennessee Agreements and, consequently, the parties continue to operate under these agreements

12   to this day.  (*See, e.g.*, Davis Decl., Ex. B at 252:7–13; Green Decl. ¶ 11.)  Despite this ongoing

13   relationship, GIS has provided evidence that the looming threat of Guardian terminating these

14   agreements resulted in GIS foregoing certain business opportunities, such as hiring new

15   employees or pursuing business opportunities.  (*See, e.g.*, Second Liddiard Decl., Ex. OO at

16   178:21–181:9.)  A jury may certainly find that it was reasonably foreseeable to the parties at the

17   time of contracting that GIS would forego certain business options related to the Florida,

18   Alabama, and Tennessee Agreements if Guardian sent letters purporting to terminate these

19   agreements, regardless of whether Guardian immediately executed those terminations.  As such,

20   the Court finds that there are genuine issues of material fact as to whether GIS was damaged by

21   Guardian's purported breach of the Florida, Alabama, and Tennessee Agreements.[9]

22   ───────────────

23   [9] Defendants offer two additional arguments regarding the damages element of GIS's First Cause of Action that require a brief discussion.  First, Defendants argue that summary judgment is appropriate because GIS failed to "fulfill[] its duty to mitigate its purported damage."  (Doc. 93, Ex. 1 at 8.)  The Court disagrees.  As correctly noted by

24   GIS, "[w]hether a plaintiff acted reasonably to mitigate damages . . . is a factual matter to be determined by the trier of fact."  *Agam v. Gavra*, 236 Cal. App. 4th 91, 111 (2015) (quoting *Powerhouse Motorsports Grp., Inc. v. Yamaha*

25   *Motor Corp. U.S.A.*, 221 Cal. App. 4th 867, 884 (2013)).  As such, the question of whether GIS mitigated its damages is not properly before the Court at the instant summary judgment stage.  *See, e.g.*, *Hitek Software LLC v. Timios, Inc.*,

26   No. CV 12–709 CAS (AJWx), 2012 WL 2366368, at *6 (C.D. Cal. June 18, 2012) ("[T]he resolution of th[e] question [of mitigation] goes to the amount of damages, if any, that plaintiff may recover rather than to defendants' liability.").

27       Second, Defendants argue that summary judgment is appropriate as to the First Cause of Action because GIS "seeks lost profit damages which are not recoverable" because GIS "has chosen to continue its performance under the [Agreements] after Defendants' purported repudiation of those contracts."  (Doc. 93, Ex. 1 at 8.)  This argument

28   mischaracterizes GIS's First Cause of Action.  In this claim, GIS alleges that Guardian breached the Florida, Alabama,

In summary, there are pervasive genuine issues of material fact as to the second (performance or excuse), third (breach), and fourth (damages) elements of GIS's breach of contract claim in its First Cause of Action.  As such, neither party is entitled to summary judgment on this claim.   Accordingly, the Court DENIES GIS's Motion, (Doc. 98), and Defendants' Motion, (Doc. 93), insofar as the parties request summary judgment on the First Cause of Action.

    2.   <u>The Parties' Motions for Summary Judgment on GIS's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing as to the Florida, Alabama, and Tennessee Agreements (Second Cause of Action) Shall Be Denied.</u>

The parties next move for summary judgment on the Second Cause of Action, (*see, e.g.*, Doc. 93, Ex. 1 at 8; Doc. 123 at 28–30), in which GIS alleges that Defendants violated the implied covenant of good faith and fair dealing through their conduct related to the Florida, Alabama, and Tennessee Agreements, (*see* Doc. 67 ¶¶ 58–64).  For the reasons that follow, the Court finds that summary judgment is not warranted as to this claim.

"It has long been recognized in California that '[t]here is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement.'"  *Kransco v. Am. Empire Surplus Lines Ins. Co.*, 23 Cal. 4th 390, 400 (2000) (alteration in original) (quoting *Comunale v. Traders & Gen. Ins. Co.*, 50 Cal. 2d 654, 658 (1958)); *see, e.g.*, *Marsu, B.V. v. Walt Disney Co.*, 185 F.3d 932, 937 (9th Cir. 1999) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." (quoting *Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 371 (1992))).  "The covenant of good faith and fair dealing is implied in every contract as a method to protect the interests of the parties in having the contractual promises and purposes performed."  *Khan v. CitiMortgage, Inc.*, 975 F. Supp. 2d 1127, 1142 (E.D. Cal. 2013)

---

and Tennessee Agreements by "purporting to terminate or actually terminating the agreements without cause."  (Doc. 67 ¶ 55.)  At no point in this claim does GIS allege any form of anticipatory repudiation that may implicate this doctrine.  (*See id.* ¶¶ 53–57.)  *Compare Boland, Inc. v. Rolf C. Hagen (USA) Corp.*, 685 F. Supp. 2d 1094, 1101 (E.D. Cal. 2010) ("Under California law, a claim for breach of contract includes four elements: that a contract exists between the parties, that the plaintiff performed his contractual duties or was excused from nonperformance, that the defendant breached those contractual duties, and that plaintiff's damages were a result of the breach." (citations omitted)), *with Shahani v. United Commercial Bank*, 457 B.R. 775, 783 (N.D. Cal. 2011) ("A party asserting express anticipatory repudiation must demonstrate that (1) the other party absolutely and unequivocally refused to perform and (2) it (the party asserting anticipatory repudiation) effectuated the other party's breach by materially changing its position and treating the repudiation as final." (citations omitted)).  The Court therefore declines Defendants' invitation to recast GIS's First Cause of Action as a claim for anticipatory repudiation.

(quoting *Love v. Fire Ins. Exch.*, 221 Cal. App. 3d 1136, 1147 (1990)).  "The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another."  *Marsu, B.V.*, 185 F.3d at 937 (quoting *Carma Developers (Cal.), Inc.*, 2 Cal. 4th at 372).  "Such power must be exercised in good faith."  *Id.* (quoting *Carma Developers (Cal.), Inc.*, 2 Cal. 4th at 372).

"It is universally recognized [that] the scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract."  *Carma Developers (Cal.), Inc.*, 2 Cal. 4th at 373 (citations omitted).  "[T]he implied covenant of good faith is read into contracts in order to protect the express covenants or promises of the contract, not to protect some general public policy interest not directly tied to the contract's purpose."  *Id.* (citation omitted).  "The covenant thus cannot be endowed with an existence independent of its contractual underpinnings," or "impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement."  *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 349–50 (2000) (citation omitted); *cf. Saldate v. Wilshire Credit Corp.*, 268 F.R.D. 87, 106 (E.D. Cal. 2010) ("[T]he implied covenant will only be recognized to further the contract's purpose; it will not be read into a contract to prohibit a party from doing that which is expressly permitted by the agreement itself." (alteration in original) (quoting *Wolf v. Walt Disney Pictures & Television*, 162 Cal. App. 4th 1107, 1120 (2008))).

Nonetheless, "[t]he covenant is implied . . . to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenant) frustrates the other party's rights of the benefits of the contract."  *Marsu, B.V.*, 185 F.3d at 937–38 (second alteration in original) (quoting *L.A. Equestrian Ctr., Inc. v. City of L.A.*, 17 Cal. App. 4th 432, 447 (1993)).  As such, "[a] 'breach of a specific provision of the contract is not a necessary prerequisite' to a breach of an implied covenant of good faith and fair dealing."  *Marsu, B.V.*, 185 F.3d at 937 (quoting *Carma Developers (Cal.), Inc.*, 2 Cal. 4th at 373).  "Were it otherwise, the covenant would have no practical meaning, for any breach thereof would necessarily involve breach of some other term of the contract."  *Carma Developers (Cal.), Inc.*, 2 Cal. 4th at 373.

1    Additionally, it is not "necessary that the party's conduct be dishonest." *Id.* "Dishonesty

2   presupposes subjective immorality; the covenant of good faith can be breached for objectively

3   unreasonable conduct, regardless of the actor's motive." *Id.* (citation omitted).

4    "The elements necessary to establish a breach of the covenant of good faith and fair

5   dealing" include the following: "(1) the parties entered into a contract; (2) the plaintiff fulfilled his

6   obligations under the contract; (3) any conditions precedent to the defendant's performance

7   occurred; (4) the defendant unfairly interfered with the plaintiff's rights to receive the benefits of

8   the contract; and (5) the plaintiff was harmed by the defendant's conduct." *Reinhardt v. Gemini*

9   *Motor Transp.*, 879 F. Supp. 2d 1138, 1145 (E.D. Cal. 2012) (citations omitted); *see, e.g.*, *Ahmadi*

10  *v. United Cont'l Holdings, Inc.*, No. 1:14–CV–00264–LJO–JLT, 2014 WL 1281056, at *4 (E.D.

11  Cal. Mar. 31, 2014) (providing the same elements (citation omitted)).  "Importantly, to state a

12  claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must identify

13  the specific contractual provision that was frustrated." *Ahmadi*, 2014 WL 1281056, at *4 (quoting

14  *Plastino v. Wells Fargo Bank*, 873 F. Supp. 2d 1179, 1191 (N.D. Cal. 2012)).

15    The Court finds that no party is entitled to summary judgment on GIS's Second Cause of

16  Action.  As discussed at length above, there are genuine issues of material fact as to whether (1)

17  GIS fulfilled its obligations under the Florida, Alabama, and Tennessee Agreements; (2) Guardian

18  unfairly interfered with GIS's rights to receive the benefits of these agreements when Guardian

19  sent letters notifying GIS of the termination of these agreements; and (3) GIS was harmed by

20  Guardian's conduct.  These issues are therefore properly reserved for the finder of fact. *Cf. Hicks*

21  *v. E.T. Legg & Assocs.*, 89 Cal. App. 4th 496, 509 (2001) ("The issue of whether the implied

22  covenant of good faith and fair dealing has been breached is ordinarily 'a question of fact unless

23  only one inference [can] be drawn from the evidence.'"  (quoting *Paulfrey v. Blue Chip Stamps*,

24  150 Cal. App. 3d 187, 194 (1983))).

25    Accordingly, the Court DENIES GIS's Motion, (Doc. 98), and Defendants' Motion, (Doc.

26  93), to the extent the parties request summary judgment on GIS's Second Cause of Action.

27  //

28

1

3.    <u>GIS's Motion for Summary Judgment on its Claim for Breach of the Bob's Discount Furniture Agreement (Third Cause of Action) Shall Be Denied.</u>

2

3

GIS also requests summary judgment on its Third Cause of Action, (*see* Doc. 123 at 23–26), in which GIS alleges that Defendants breached the Bob's Discount Furniture Agreement, (*see* Doc. 67 ¶¶ 65–69).  The Court finds that summary judgment is not appropriate as to this claim.

4

5

As noted previously, GIS "must show the following" elements "[t]o establish a breach of contract under California law": "(1) existence of a contract, (2) performance by the plaintiff or excuse for nonperformance, (3) breach by the defendant, and (4) damages."  *Gulf Ins. Co. v. Hi-Voltage Wire Works, Inc.*, 388 F. Supp. 2d 1134, 1136 (E.D. Cal. 2005) (citing *First Commercial Mortg. Co. v. Reece*, 89 Cal. App. 4th 731, 745 (2001)).  The Court shall address each element, in turn.

6

7

8

9

10

11

12

        a.    *There Was Not a Valid Contract as to Two Agreements and There Are Genuine Issues of Material Fact Regarding Whether There Was a Valid Contract for the Remaining Agreements.*

13

14

The parties initially disagree as to the first element—whether the Bob's Discount Furniture Agreement constitutes a contract.  Specifically, Guardian argues that this agreement does not constitute a contract because there was no mutual consent or consideration.  (Doc. 103 at 24–26.) "In California, to prove the existence of a contract, a plaintiff must show: [1] parties capable of contracting, (2) the parties' consent, (3) a lawful object, and (4) consideration."  *Arch Ins. Co. v. Sierra Equip. Rental, Inc.*, No. 2:12-cv-00617-KJM-KJN, 2016 WL 4000932, at *4 (E.D. Cal. July 25, 2016) (citation omitted); *see, e.g.*, Cal. Civ. Code § 1550 ("It is essential to the existence of a contract that there should be: 1. [p]arties capable of contracting; 2. [t]heir consent; 3. [a] lawful object; and . . . 4. [a] sufficient cause or consideration.").  Here, it is undisputed that the parties were capable of contracting and the object of the purported Bob's Discount Furniture Agreement was lawful.  As such, only the second and fourth elements pertaining to the existence of a contract are at issue.

15

16

17

18

19

20

21

22

23

24

25

26

i.    <u>Consent</u>

27

As to the second element—the parties' consent—"[i]t is undisputed that under California law, mutual assent is a required element of contract formation."  *Knutson v. Sirius XM Radio Inc.*,

28

771 F.3d 559, 565 (9th Cir. 2014). "Parties consent when they 'all agree upon the same thing in the same sense.'" *Arch Ins. Co.*, 2016 WL 4000932, at *4 (citing Cal. Civ. Code § 1580 and *Bustamante v. Intuit, Inc.*, 141 Cal. App. 4th 199, 209 (2006)). "Mutual assent may be manifested by written or spoken words, or by conduct, and acceptance of contract terms may be implied through action or inaction." *Knutson*, 771 F.3d at 565 (citations omitted). "Thus, 'an offeree, knowing that an offer has been made to him but not knowing all of its terms, may be held to have accepted, by his conduct, whatever terms the offer contains.'" *Id.* (quoting *Windsor Mills, Inc. v. Collins & Aikman Corp.*, 25 Cal. App. 3d 987, 991 (2014)). "Ultimately, '[t]he existence of mutual consent is determined by objective rather than subjective criteria, the test being what the outward manifestations of consent would lead a reasonable person to believe.'" *Arch Ins. Co.*, 2016 WL 4000932, at *4 (citing *Meyer v. Benko*, 55 Cal. App. 3d 937, 943 (1976)).

The evidence demonstrates that Guardian consented to the Bob's Discount Furniture Agreement. On December 22, 2010, the President of Guardian, Ronnie Holman, met with representatives of GIS. (Second Holman Decl. ¶ 3.) The parties now disagree as to whether a contract was reached at this meeting, or the reasons each party may or may not have entered a contract. Nonetheless, both parties agree that this meeting resulted in an agreement whereby Guardian would pay GIS a 5% commission on sales to Bob's Discount Furniture in the geographic areas covered by GIS's Agreements. (*Id.*; Liddiard Decl., Ex. L at 83:19–85:5.)

Subsequent to this meeting, GIS's Vice President of Sales and Training, Christopher Schall, and Guardian's President, Ronnie Holman, had an e-mail exchange on January 13, 2011. (Liddiard Decl, Ex. V.) In this e-mail exchange, Mr. Schall stated that "documentation of our agreement concerning Bob's Discount Furniture has slipped through the cracks" and then wrote the following: "During our meeting with Ronnie Holman on 12/22/10 it was made clear that we should anticipate 5% of the earnings for all sales processed by Bob's Discount Furniture that occur in any states that fall under the licensed distribution area in our Guardian contract." (*Id.* at 2.) Mr. Holman stated the following in response: "Just to make sure we are all have [sic] the same understanding, this will be for warranties sold in your territory, not for warranties sold in your neighbors [sic] territory to people living in your territory who may have traveled into a

1    neighboring Guardian . . . territory to shop." (*Id.* at 1.) Mr. Holman did not offer any other

2    statements conflicting with Mr. Schall's description of the agreements. (*See id.*) Finally, pursuant

3    to the agreement reached by the parties, it is uncontested that Guardian paid a five-percent

4    commission on all of its sales to Bob's Discount Furniture in the territories covered by the

5    Agreements to GIS for almost four years until November 2014. (*See, e.g.*, Liddiard Decl., Ex. E at

6    108:19–113:6.)

7         The Court finds that the oral agreement between the parties on December 22, 2010, the

8    written exchange between Mr. Holman and Mr. Schall on January 13, 2011, and the parties'

9    subsequent conduct all demonstrate that GIS and Guardian mutually consented to the same

10   fundamental terms. In particular, both parties agreed that Guardian would pay to GIS five percent

11   of Guardian's sales to Bob's Discount Furniture in the geographic areas covered by Guardian's

12   Agreements with GIS.[10] In exchange, both parties agreed that GIS would permit Guardian to

13   make these sales in these areas. Accordingly, the Court finds that there was mutual consent for

14   this agreement.

15                         ii.    Consideration

16        Guardian also argues that this arrangement was not a valid contract because GIS provided

17   no consideration. (Doc. 103 at 24–26.) Of course, "[i]t is essential to the existence of a contract

18   that there should be . . . sufficient cause or consideration." Cal. Civ. Code § 1550. Good

19   consideration includes "[a]ny benefit conferred, or agreed to be conferred, upon the promisor, by

20   any other person, to which the promisor is not lawfully entitled, or any prejudice suffered, or

21   agreed to be suffered, by such person, other than such as he is at the time of consent lawfully

22   bound to suffer, as an inducement to the promisor." Cal. Civ. Code § 1605. "[O]rdinarily, a court

23

---

24   [10] The Court notes that, in his January 13, 2011 e-mail, GIS's representative, Mr. Schall referenced "5% of the *earnings* for all sales processed by Bob's Discount Furniture that occur in any states that fall under the licensed

25   distribution area in our Guardian contract." (Liddiard Decl, Ex. V at 2.) However, the parties' December 22, 2010 oral agreement, as well as their subsequent conduct, clearly demonstrate that the parties' mutually consented to Guardian paying GIS five percent of all *sales*—not earnings from sales—to Bob's Discount Furniture that occur in the

26   areas covered by the Agreements. Indeed, while the parties now disagree on whether there was mutual consent, they do agree that the arrangement reached by the parties involved Guardian paying five percent of its sales to Bob's

27   Discount Furniture that occur in the covered areas. (*See, e.g.*, Doc. 103 at 25; Doc. 123 at 24 n.4.) The Court therefore finds that, despite Mr. Schall's reference to earnings in his January 13, 2011 e-mail, the parties mutually

28   consented to Guardian paying to GIS five percent of Guardian's relevant sales to Bob's Discount Furniture.

1    will not weigh the sufficiency of the consideration once it has found it to be of some value."

2    *Walters v. Calderon*, 25 Cal. App. 3d 863, 876 (1972).   "[A]ll the law requires for sufficient

3    consideration is the proverbial 'peppercorn.'"   *San Diego City Firefighters, Local 145 v. Bd. of*

4    *Admin. of San Diego City Emps.' Ret. Sys.*, 206 Cal. App. 4th 594, 619 (2012) (quoting *Third*

5    *Story Music, Inc. v. Waits*, 41 Cal. App. 4th 798, 808–09 & n.5 (1995)).

6         In the present action, the issue of consideration for the Bob's Discount Furniture

7    Agreement turns on the distributor Agreement under consideration.   In each of GIS's Agreements

8    with Guardian, GIS was "grant[ed] . . . the exclusive right to distribute 'Guardian [Labeled

9    Distributor] Products.'"   (Doc. 98, Ex. 2 ¶ 12.)   As such, GIS gave up this exclusive distribution

10   right to the extent it granted permission to Guardian to sell "Guardian Labeled Distributor

11   Products" directly to Bob's Discount Furniture in the geographic areas covered by the

12   Agreements.   The Court finds that—to the extent Guardian sold "Guardian Labeled Distributor

13   Products" to Bob's Discount Furniture in the geographic areas covered by the Agreements—this

14   constitutes sufficient consideration to support the Bob's Discount Furniture Agreement.   *See, e.g.*,

15   *Rice v. Brown*, 120 Cal. App. 2d 578, 582 (1953) ("The slightest consideration is sufficient to

16   support the most onerous obligation; the inadequacy . . . is for the parties to consider at the time of

17   making the agreement, and not for the court when it is sought to be enforced." (citation omitted)).

18         However, this finding does not end the instant analysis.   In particular, the Agreements

19   include material differences on the issue of "Guardian Labeled Distributor Products."   The Florida

20   and Mid-Atlantic Agreements provide, in relevant part, that "[i]t is understood that unless

21   specifically noted by a mutually agreed upon Addendum hereto, Guardian Labeled Distributor

22   Products shall be only those items indicated on Exhibit #A which is attached hereto."[11]   (Doc. 120,

23   Ex. 2 ¶ 7; *id.*, Ex. 8 ¶ 7.)   This language clearly provides that, unless there is a pertinent

---

[11] The Mid-Atlantic, Ohio, Cook County, Indiana, Midwest, Florida, Alabama, and Tennessee Agreements all also define the term "Guardian Labeled Distributor Product" as "[p]roducts that are produced or caused to be produced by [Guardian] which are identified as Guardian Products on the front panel of the product label."   The Court notes that there may be a conflict between this general definition and the specific list of products provided in the exhibits to these agreements.   In other words, certain products may constitute "Guardian Labeled Distributor Products" under the general definition even if they are omitted from the lists in the exhibits.   However, to the extent there is any conflict, the Court finds that the specific and explicitly *exclusive* list of products governs.   *See, e.g.*, *Boghos v. Certain Underwriters at Lloyd's of London*, 36 Cal. 4th 495, 504 (2005) (noting that, where "provisions . . . are truly inconsistent," the "more specific contractual provisions control over more general ones" (citations omitted)).

addendum, the list of products provided in "Exhibit #A" are the *only* products that qualify as "Guardian Labeled Distributor Products."[12]  (*See id.*, Ex. 2 ¶ 7; *id.*, Ex. 8 ¶ 7.)

Here, the record reflects that Guardian sold only "private-label products . . . under the brand name 'Bob's Goof Proof'" to Bob's Discount Furniture in the areas covered by the Agreements.  (Second Holman Decl. ¶ 3.)  This product name is not included under the Exhibit A provided in the Florida and Mid-Atlantic Agreements.  (*See* Doc. 120, Ex. 2 at 11–16; *id.*, Ex. 8 at 11–16.)  Additionally, these two Agreements do not include an addendum indicating that these products qualify as "Guardian Labeled Distributor Products."  (*See id.*, Exs. 2 & 8.)

As these products are omitted from these exhibits and there is no relevant addendum, they do not qualify as "Guardian Labeled Distributor Products" for purposes of the Florida and Mid-Atlantic Agreements.  Consequently, the Florida and Mid-Atlantic Agreements did not accord GIS an exclusive right to distribute these products in the geographic areas covered by these agreements.  Absent such right, GIS did not give up any form of consideration by permitting Guardian to distribute "private-label products . . . under the brand name 'Bob's Goof Proof'" in these areas.  Without consideration, the Bob's Discount Furniture Agreement is not a valid and binding contract.  *See, e.g.*, Cal. Civ. Code § 1550 ("It is essential to the existence of a contract that there should be . . . sufficient cause or consideration.").  Accordingly, the Court finds that the Bob's Discount Furniture Agreement is not a valid contract to the extent it pertains to the geographic areas covered by the Florida and Mid-Atlantic Agreements.  As there was no valid contract pertaining to sales in these geographic areas, GIS's request for summary judgment

---

[12] By its order entered on January 5, 2017, the Court directed the parties to file the following: (1) "the exhibits . . . listing the 'Guardian Labeled Distributor Products' for each of the [Agreements] . . . ;" and (2) "any 'mutually agreed upon Addendum[s],' as referenced in the [A]greements' paragraph pertaining to the 'Guardian Labeled Distributor Products' included in these [A]greements."  (Doc. 119.)  In response to this order, GIS filed an April 30, 2015 e-mail which GIS argues "replaced the product list exhibits to the [Agreements]."  (Doc. 121.)

As noted above, with the exception of the Pennsylvania Agreement, the Agreements each provide that "[i]t is understood that unless specifically noted by a mutually agreed upon Addendum hereto, Guardian Labeled Distributor Products shall be only those items indicated on [a specific exhibit] which is attached hereto.  (Doc. 120, Ex. 2 ¶ 7(c); *id.*, Ex. 3 ¶ 8; *id.*, Ex. 4 ¶ 7(c); *id.*, Ex. 5 ¶ 8; *id.*, Ex. 6 ¶ 8; *id.*, Ex. 7 ¶ 8; *id.*, Ex. 8 ¶ 7(c); *id.*, Ex. 9 ¶ 8.)  The exhibit GIS filed relating to an April 30, 2015 e-mail exchange is not an exhibit or addendum attached to the Agreements.  (*See* Doc. 121, Ex. 1.)  To the contrary, the e-mail addresses a "price list" and does not otherwise provide any indication that it is a relevant "Addendum hereto," as required by the Agreements.  (*See id.*)  Accordingly, the Court finds that the April 30, 2015 e-mail and its associated materials are not relevant to the determination as to what products qualify as "Guardian Labeled Distributor Products."

regarding Guardian's sales to Bob's Discount Furniture in the geographic areas covered by the Florida and Mid-Atlantic Agreements fails.

Turning next to the Ohio, Cook County, Indiana, Midwest, Alabama, and Tennessee Agreements, each of these agreements includes the same language limiting the products that qualify as "Guardian Labeled Distributor Products" to those provided in a specified attached exhibit. (*See* Doc. 120, Ex. 3 ¶ 8; *id.*, Ex. 4 ¶ 7(c); *id.*, Ex. 5 ¶ 8; *id.*, Ex. 6 ¶ 8; *id.*, Ex. 7 ¶ 8; *id.*, Ex. 9 ¶ 8.) However, the record is deficient insofar as the relevant exhibit providing the product list is not available for any of these agreements. (*See id.*, Exs. 3–7, 9.) Additionally, these agreements do not include an addendum that indicates whether the products Guardian sold to Bob's Discount Furniture qualify as "Guardian Labeled Distributor Products." (*See id.*, Exs. 3–7, 9.)

Absent these exhibits or a relevant addendum, the Court is left to speculate as to whether the exhibits include the pertinent "private-label products . . . under the brand name 'Bob's Goof Proof'" that Guardian sold to Bob's Discount Furniture in the geographic areas covered by these agreements. The Court declines to speculate at this stage as to what these exhibits may or may not provide. Instead, the Court finds that there is a genuine issue of material fact as to whether Guardian sold "Guardian Labeled Distributor Products" to Bob's Discount Furniture in the geographic areas covered by the Ohio, Cook County, Indiana, Midwest, Alabama, and Tennessee Agreements. If these products do not qualify as "Guardian Labeled Distributor Products" under these agreements, then GIS did not provide consideration for the Bob's Discount Furniture Agreement as to the geographic areas covered by these agreements. As such, the Court also finds that there are genuine issues of material fact regarding whether GIS provided consideration—and, consequently, whether there was a valid contract—for the Bob's Discount Furniture Agreement, to the extent this agreement pertains to Guardian's sales to Bob's Discount Furniture in the geographic areas covered by the Ohio, Cook County, Indiana, Midwest, Alabama, and Tennessee Agreements.

//

Finally, the Pennsylvania Agreement differs from the other Agreements insofar as it does not include *any* definition of what constitutes "Guardian Labeled Distributor Products."[13]   (*See* Doc. 120, Ex. 1.)   Absent any guidance in the Pennsylvania Agreement as to the definition of "Guardian Labeled Distributor Products," this term is reasonably susceptible to numerous different potential meanings, including as both including or excluding the products Guardian sold to Bob's Discount Furniture.   The Court therefore finds that this term is ambiguous as it is used in the Pennsylvania Agreement.   *See, e.g.*, *Cal. Sportfishing Prot. All. v. USA Waste of Cal., Inc.*, No. CIV. 2:11–2663 WBS KJN, 2012 WL 2339810, at *7 (E.D. Cal. June 19, 2012) ("Language is ambiguous if it 'is reasonably susceptible of more than one application to material facts.'" (quoting *Dore v. Arnold Worldwide, Inc.*, 39 Cal. 4th 384, 391 (2006))).

The parties' course of conduct in this case indicates that the products Guardian sold to Bob's Discount Furniture *may* be "Guardian Labeled Distributor Products."   *See generally id.* ("Although the parol evidence rule prohibits the use of extrinsic evidence where the contract 'is intended to be a final express of that agreement and a complete and exclusive statement of the terms,' extrinsic evidence is admissible to explain or interpret ambiguous language." (quoting *Lonely Maiden Prods., LLC v. Goldentree Asset Mgmt., LP*, 201 Cal. App. 4th 368, 376 (2011))). In particular, Guardian paying the commissions, in and of itself, indicates that these products were covered by the Pennsylvania Agreement.   Nonetheless, Guardian offered conflicting evidence that Guardian paid the commissions merely to placate GIS's concerns regarding a third party receiving commissions.   (*See* Second Holman Decl. ¶ 3.)

It is not for the Court to resolve this issue, as the California courts have cautioned that, if a "contract is ambiguous, the conflict is ordinarily a genuine dispute of material fact inappropriate for resolution on summary judgment."   *Lennar Mare Island, LLC v. Steadfast Ins. Co.*, 176 F. Supp. 3d 949, 964 (E.D. Cal. 2016) (citing *San Diego Gas & Elec. Co. v. Canadian Hunter Mktg. Ltd.*, 132 F.3d 1303, 1307 (9th Cir. 1997) and *WYDA Assocs. v. Merner*, 42 Cal. App. 4th 1702,

---

[13] The Court notes that the Pennsylvania Agreement includes two exhibits that list products.   (*See* Doc. 120, Ex. 1 at 10–21.)   However, unlike the remaining agreements, the Pennsylvania Agreement does not include language indicating that these exhibits list the products that constitute "Guardian Labeled Distributor Products."   (*See* Doc. 120, Ex. 1.)

1710 (1996)); *see, e.g.*, *Cal. Sportfishing Prot. All.*, 2012 WL 2339810, at *7 ("Summary

judgment is inappropriate . . . if the court cannot determine the parties' intent at the time of

contracting without judging the credibility of the extrinsic evidence." (citing *City of Hope Nat'l*

*Med. Ctr. v. Genentech, Inc.*, 43 Cal. 4th 375, 395 (2008))).   As such, the Court finds that the

question of whether the products Guardian sold to Bob's Discount Furniture are "Guardian

Labeled Distributor Products" under the Pennsylvania Agreement presents a genuine issue of

material fact that is inappropriate for disposition at the summary judgment stage.

Correspondingly, the Court finds that there is a genuine issue of material fact regarding whether

GIS provided consideration—and, consequently, whether there was a valid contract—for the

Bob's Discount Furniture Agreement, insofar as this agreement encompassed Guardian's sale of

products to Bob's Discount Furniture in the area covered by the Pennsylvania Agreement.

In summary, the Court finds that the Bob's Discount Furniture Agreement was not a valid

contract insofar as it encompassed Guardian's sales of products to Bob's Discount Furniture in the

geographic areas covered by the Florida and Mid-Atlantic Agreements.   The Court also finds that

there are genuine issues of material fact as to whether GIS provided consideration for the Bob's

Discount Furniture Agreement—and, consequently, whether there was a valid contract—to the

extent this agreement pertained to Guardian's sales of products to Bob's Discount Furniture in the

geographic areas covered by the Pennsylvania, Ohio, Cook County, Indiana, Midwest, Alabama,

and Tennessee Agreements.   The Court next turns to the remaining elements of GIS's breach of

contract claim in the Third Cause of Action.

        *b.*     *GIS Performed Under the Contract.*

GIS must next show that it performed under the Bob's Discount Furniture Agreement, or

an excuse for nonperformance.   *Gulf Ins. Co. v. Hi-Voltage Wire Works, Inc.*, 388 F. Supp. 2d

1134, 1136 (E.D. Cal. 2005) (citing *First Commercial Mortg. Co. v. Reece*, 89 Cal. App. 4th 731,

745 (2001)).   It is uncontested that GIS performed under the Bob's Discount Furniture Agreement

by permitting Guardian to sell products to Bob's Discount Furniture in the geographic areas

covered by the Agreements.   (*See, e.g.*, Liddiard Decl., Ex. E at 111:19–114:6.)   The Court

therefore finds that the performance element is satisfied.

    *c.*  *There are Genuine Issues of Material Fact as to Whether Guardian Breached the Contract.*

  Under the third element for a breach of contract claim, GIS must show that Defendants breached the Bob's Discount Furniture Agreement.  *Gulf Ins. Co.*, 388 F. Supp. 2d at 1136 (citing *Reece*, 89 Cal. App. 4th at 745).  The record reflects that Guardian unilaterally terminated its commission payments to GIS in November of 2014, (*see, e.g.*, Lilliard Decl., Ex. E at 114:1–5), but continued to sell products to Bob's Discount Furniture in the geographic areas covered by the Agreements, (*see, e.g.*, *id.*, Ex. G at 230:20–231:25).  To the extent the Bob's Discount Furniture Agreement was a valid contract as to these areas, Guardian's failure to continue its obligation of paying a commission of five percent of sales was a breach of the terms of this contract.

  Guardian nonetheless argues that it did not breach the Bob's Discount Furniture Agreement because this agreement "lacked any duration term and, thus, was fully terminable at-will after a reasonable time had elapsed following notice."  (Doc. 103 at 26–27.)  California courts have addressed "three possibilities . . . courts will face in determining the duration of . . . a contract."  *Cal. Earthquake Auth. v. Metro. W. Sec., LLC*, 712 F. Supp. 2d 1124, 1131 (E.D. Cal. 2010) (citing *Consol. Theaters, Inc. v. Theatrical Stage Emps. Union, Local 16*, 69 Cal. 2d 713, 724–25 (1968)).  "First, a court must determine whether the contract contains an express term of duration."  *Id.* (citing *Consol. Theaters, Inc.*, 69 Cal. 2d at 724).  This first possibility is inapplicable here, as the Bob's Discount Furniture Agreement did not include an express term of duration.[14]

  Second, "[i]f . . . no express provision as to duration exists, 'the court must determine whether the intention of the parties as to duration can be implied from the nature of the contract and the circumstances surrounding it.'"  *Id.* (quoting *Consol. Theaters, Inc.*, 69 Cal. 2d at 725).  *See generally Consol. Theaters, Inc.*, 69 Cal. 2d at 727 ("California courts have not hesitated to imply a term of duration when the nature of the contract and surrounding circumstances afford a reasonable ground for such implication.").  In the present case, while the January 13, 2011 e-mail

---

[14] GIS argues that the Bob's Discount Furniture Agreement included an express term of duration based on the conduct of the parties.  (*See* Doc. 123 at 18–19.)  The Court disagrees.  The record regarding the oral and written understanding of the parties, while referencing the respective obligations of the parties, does not provide any type of express agreement regarding duration.  (*See, e.g.*, Liddiard Decl., Ex. V.)

exchange between the parties does not reference duration, (*see* Liddiard Decl., Ex. V), a jury may find that the formal oral agreement between the parties on December 22, 2010 included an implied duration term based on the parties' conduct.  Specifically, a jury may find that the Bob's Discount Furniture Agreement would continue so long as Guardian sold products to Bob's Discount Furniture in the geographic areas covered by the distributor Agreements.  Regardless, whether, in fact, the parties agreed to this implied term is a question properly reserved for the finder of fact. *See, e.g.*, *Boland, Inc. v. Rolf C. Hagen (USA) Corp.*, 685 F. Supp. 2d 1094, 1105 (E.D. Cal. 2010) ("For written contracts, this determination is a question of law for the court. . . .  For oral contracts, however, the California Supreme Court has held that whether the contract contains an implied term as to duration is a question for the jury." (citations omitted)).

Finally, if there is no express or implied term of duration, "the law usually implies that the term of duration shall be at least a reasonable time, and that the obligations under the contract shall be terminable at will by any party upon reasonable notice after such a reasonable time has elapsed." *Consol. Theatres, Inc.*, 69 Cal. 2d at 728.  *See generally id.* ("This rule is generally applicable, for instance, to exclusive sales agency and distributorship contracts." (citations omitted)).  "[T]he purpose of the [reasonable notice] rule is to allow the obligor an opportunity to recoup expenses made in execution of the contract." *Boland, Inc.*, 685 F. Supp. 2d at 1106–07.

In this case, the parties operated under the Bob's Discount Furniture Agreement for almost four years.  (*See, e.g.*, Liddiard Decl., Ex. E at 108:19–113:6.)  Guardian then notified GIS that it was terminating its payment of commissions in a letter dated November 12, 2014, (*see id.*, Ex. X), and ceased these payments in December 2014, (*see, e.g.*, Doc. 67 ¶ 16; Doc. 86 ¶ 16).  This notice and the duration of the Bob's Discount Furniture Agreement *may* satisfy the reasonable notice and reasonable time requirements.  However, the parties failed to address these requirements.  The Court therefore cannot determine whether these requirements are satisfied if a duration term was not otherwise implied in the Bob's Discount Furniture Agreement. *Cf. Boland, Inc.*, 685 F. Supp. 2d at 1107 (finding that the plaintiff "raised a triable question as to whether [it] 'expended a substantial sum of money or value or has substantially rearranged [its] business' in connection

with the contract, such that the contract . . . could only be terminated after a reasonable time and with reasonable notice" (quoting *Consol. Theatres, Inc.*, 69 Cal. 2d at 728 n.13)).

For these reasons, the Court finds that there are genuine issues of material fact regarding whether Defendant breached the Bob's Discount Furniture Agreement. These issues are properly left to the jury.

>    *d.*    *GIS Suffered Damages.*

The final element of a breach of contract claim requires GIS to show that its "damages were a result of the breach." *Boland, Inc.*, 685 F. Supp. 2d at 1101 (citations omitted). This element is uncontested here. Specifically, if Guardian breached the Bob's Discount Furniture Agreement by discontinuing the commissions in December 2014, GIS suffered damages in the form of these absent commission payments. Accordingly, the Court finds that the damages element of GIS's Third Cause of Action is satisfied.

In summary, there remain genuine issues of material fact on GIS's Third Cause of Action as to whether (1) the parties entered into a valid and binding contract; and (2) Guardian breached this contract. Accordingly, the Court DENIES GIS's Motion, (Doc. 98), to the extent GIS requests summary judgment on the Third Cause of Action.

>    4.    <u>Defendants' Motion for Summary Judgment on GIS's Declaratory Judgment Claim (Fifth Cause of Action) Shall Be Granted.</u>

Defendants next request summary judgment on GIS's declaratory judgment claim in the Fifth Cause of Action. (*See* Doc. 93, Ex. 1 at 24–25.) For the following reasons, the Court finds that summary judgment is warranted on this claim.

The Declaratory Judgment Act provides, in relevant part, that "[i]n a case of actual controversy within its jurisdiction . . . , any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). "[T]he phrase 'case of actual controversy' in the Act refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007). The Supreme Court's decisions "have required that the dispute be 'definite and concrete, touching the legal relations of parties having adverse legal interests'; and that it be

'real and substantial' and 'admi[t] of specific relief of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Id.* (alteration in original) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240–41 (1937)). As the Court noted in *Maryland Casualty Co. v. Pacific Coal & Oil Co.*: "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." 312 U.S. 270, 273 (1941). "In effect, [the Declaratory Judgment Act] brings to the present a litigable controversy, which otherwise might only by [sic] tried in the future." *Bunce v. Ocwen Loan Servicing, LLC*, No. CIV. 2:13-00976 WBS EFB, 2013 WL 3773950, at *3 (E.D. Cal. July 17, 2013) (quoting *Societe de Conditionnement en Aluminium v. Hunter Eng'g Co.*, 655 F.2d 938, 943 (9th Cir. 1981)).

> a. *There Is No Judiciable Case or Controversy Entitling GIS to Declaratory Relief.*

Defendants contend that there is no actual controversy regarding this issue because GIS has no evidence that Defendants have ever terminated the Cook County Agreement or threatened to do so. (Doc. 93, Ex. 1 at 17.) In support of its Motion, Defendants submit the Declaration of Ronnie Holman, President of both Guardian and RPM. (Doc. 95.) Mr. Holman declares that "Guardian will not terminate the Cook County Agreement on the basis that the contract is 'no longer applicable to the current business.'" (Holman Decl. ¶ 7.) Accordingly, Defendants contend that the Court lacks jurisdiction to issue declarations in the absence of a real and existing case.

GIS responds that there is a genuine dispute of material fact as to whether Defendants have threatened to terminate, and/or are still plotting to terminate, the Cook County Agreement. (Doc. 106 at 1819.) In support of its argument, GIS points to a memorandum sent by Guardian's Vice President and General Manager, Johnny Green, to GIS's President, Frank Gibson, on December 9, 2014, in which Guardian stated that "[t]he old contracts held by GIS [including the Cook County Agreement] are no longer applicable to the current business, nor are they relevant to the current business model" (the "December 2014 Memorandum"). (Liddiard Decl., Ex. Y.) According to

GIS, Mr. Holman's Declaration, which only narrowly promises that Guardian will not terminate the Cook County Agreement "on the basis that the contract is 'no longer applicable to the current business,'" does not foreclose the possibility that Defendants will terminate the Cook County Agreement for some other reason.  (Doc. 106 at 19.)

It is uncontroverted that Defendants have not terminated the Cook County Agreement. (JSOF ¶ 22.)  The only evidence of any "threatened" termination of the Cook County Agreement by Defendants is the December 2014 Memorandum.  (Liddiard Decl., Ex. Y.)   But the December 2014 Memorandum does not demonstrate a threat—implicit or otherwise—by Defendants to terminate the Cook County Agreement.   While it is technically true that the Cook County Agreement is one of the "old contracts" to which Guardian refers in the December 2014 Memorandum, this memorandum provides that the intent was to "offer exclusive rights to GIS" for Kentucky, Ohio, Pennsylvania, and Indiana "under the terms of the new contract."   (*Id.*) Indeed, the draft agreement attached to the December 2014 Memorandum concerns only those four territories.  (*See id.*, Ex. U.)  While this could be read to implicitly threaten termination of existing contracts covering *those states*, the same cannot be said for a contract covering *Illinois*, *i.e.*, the Cook County Agreement.

Even if this Court were to construe the December 2014 Memorandum as Guardian levying a threat to terminate the Cook County Agreement, "the facts alleged, under all the circumstances," fail to show a "substantial controversy . . . of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Md. Cas. Co.*, 312 U.S. at 273.  The *only* rationale for the termination of the Cook County Agreement set forth in the December 2014 Memorandum, and cited in the SAC, is that the contract is "no longer applicable to the current business."  (*See* Doc. 67 ¶ 87; *see also id.* ¶ 89 ("Defendants have stated no other basis or cause for terminating the Cook County Agreement.").)   Yet Mr. Holman states, in his (uncontroverted) declaration, that Defendants "will not terminate the Cook County Agreement on the basis that the contract is 'no longer applicable to the current business.'"  (Holman Decl. ¶ 7.)

Given the undisputed evidence that Defendants will not terminate the Cook County Agreement on the basis that it is "no longer applicable to the current business"—the sole basis for

1    the "threat of termination" of the Cook County Agreement alleged in the SAC and argued by

2    GIS—there is no judiciable case or controversy and, consequently, GIS is not entitled to

3    declaratory relief.  *See Harbor Distrib. Corp. v. GTE Operations Support Inc.*, 176 F. Supp. 3d

4    204, 211 (E.D.N.Y. 2016) (dismissing claim under the Declaratory Judgment Act for want of case

5    or controversy where the defendants represented to the court that they had no present intent to

6    terminate a lease, and refusing to issue a declaration that the defendants' future termination would

7    be improper); *see also Halo Optical Prods., Inc. v. Liberty Sport, Inc.*, No. 6:14-CV-00282, 2016

8    WL 796069, at *2 (N.D.N.Y. Feb. 22, 2016) (observing that a Declaratory Judgment Act claim

9    would fail for lack of case or controversy where there was no intent to terminate an agreement);

10   *City of Parma, Ohio v. Cingular Wireless*, *LLC*, 278 F. App'x 636, 641–42 (6th Cir. 2008)

11   (dismissing Declaratory Judgment Act claim because there was no case or controversy where both

12   parties agreed that the defendants were not entitled to terminate the agreement).  Nor is GIS

13   entitled to a declaration that any future attempt by Defendants to terminate the Cook County

14   Agreement would violate the Illinois Franchise Disclosure Act.  *See Harbor Distrib. Corp.*, 176 F.

15   Supp. 3d at 211 (refusing to issue a declaration that the defendants' future termination of the

16   subject leases would be improper because it "would require the Court to assume that defendants

17   will eventually terminate the lease," which is "inappropriate"); *Advanced Glob. Tech., LLC v. XM*

18   *Satellite Radio, Inc.*, No. 07 CIV. 3654 (JSR), 2007 WL 3196208, at *3 (S.D.N.Y. Oct. 29, 2007)

19   (refusing to issue declaratory judgment that certain potential future conduct would constitute a

20   breach of contract as it "involve[d] contingent issues not ripe for adjudication"); *Metro Motors,*

21   *LLC v. Nissan Motor Corp. in USA*, 170 F. Supp. 2d 888, 890 (D. Minn. 2001) (holding that

22   declaratory relief was unwarranted where the court would be required to presume both that the

23   defendants would terminate the agreement and what their basis for doing so would be); *see also*

24   *Bunce*, 2013 WL 3773950, at *4 (refusing to issue declaratory judgment on grounds that

25   "[p]roviding declaratory relief at this stage would be an impermissible 'opinion advising what the

26   law would be upon a hypothetical state of facts'" (quoting *MedImmune*, 549 U.S. at 127)).

27        Accordingly, the Court GRANTS Defendants' Motion, (Doc. 93), insofar as Defendants

28   request summary judgment on GIS's Fifth Cause of Action.

1         5.    <u>Defendants' Motion for Summary Judgment on GIS's Claim for a Violation of the</u>
              <u>California Business and Professions Code Section 17200 *et seq.* (Sixth Cause of</u>

2                  <u>Action) Shall Be Denied.</u>

3         Defendants contend that GIS's Sixth Cause of Action is barred because California

4    Business and Professions Code § 17200 *et seq.* ("Section 17200") does not apply to non-California

5    residents where none of the alleged misconduct or injuries occurred in California. (Doc. 93, Ex. 1

6    at 18–19.) Defendants further assert that the Agreements' California choice-of-law provision does

7    not make GIS's Section 17200 claim applicable in this case. Finally, Defendants contend that,

8    even if GIS's Section 17200 claim were to apply, it would fail as a matter of law because it is

9    predicated on a violation of a regulation promulgated under the Federal Trade Commission Act

10   ("FTCA"), 15 U.S.C. § 45(a), which does not provide for a private right of action. (*Id*. at 21–23.)

11        GIS responds that Defendants are estopped from relying upon statements regarding its lack

12   of contacts with California and domicile in North Carolina to challenge GIS's Section 17200

13   claim because such statements directly contradict Guardian's previous statements made in support

14   of its motion to dismiss GIS's now-dismissed North Carolina unfair competition claim. (Doc. 106

15   at 22–24.) According to GIS, the Court dismissed the North Carolina unfair competition claim

16   based on Guardian's previous statements and arguments and GIS thereafter amended its complaint

17   to substitute claims for violations of Section 17200 and the CFIL. GIS contends that Guardian

18   should be judicially estopped from relying upon facts and arguments that contradict its prior

19   representations to the Court, and, as such, Defendants' challenge to its Section 17200 claim fails.

20   GIS further asserts that even if judicial estoppel does not apply, summary judgment is not

21   appropriate because the fact that the Agreements were executed in California provides a sufficient

22   nexus with California to support a Section 17200 claim. (*Id.* at 24.) Finally, GIS contends that the

23   Court can look to the FTCA for guidance as to what qualifies as "unfair and deceptive" for

24   purposes of Section 17200 claims. (*Id.* at 27.)

25              *a.*    *Judicial Estoppel Does Not Bar Defendants' Challenge to GIS's Section*
26                   *17220 Claim.*

27        Judicial estoppel "is an equitable doctrine that precludes a party from gaining an advantage

28   by asserting one position, and then later seeking an advantage by taking a clearly inconsistent

position." *McClatchy Newspapers, Inc. v. Cont'l Cas. Co.*, No. 1:14-CV-00230-LJO, 2015 WL 2340246, at *9 (E.D. Cal. May 13, 2015) (citing *Rissetto v. Plumbers & Steamfitters Local 343*, 94 F.3d 597, 600–01 (9th Cir. 1996)). The purpose of judicial estoppel is to "protect the integrity of the judicial process by 'prohibiting parties from deliberately changing positions according to the exigencies of the moment.'" *Baughman v. Walt Disney World Co.*, 685 F.3d 1131, 1133 (9th Cir. 2012) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749–50 (2001)).

"Federal law governs the application of judicial estoppel in federal courts." *Johnson v. Oregon*, 141 F.3d 1361, 1364 (9th Cir. 1998). The application of judicial estoppel is within the discretion of the district court. *Baughman*, 685 F.3d at 1133 (citing *New Hampshire*, 532 U.S. at 749–50). In determining whether to apply judicial estoppel, a court may consider (1) whether the party's later position was inconsistent with its initial position; (2) whether the party successfully persuaded the court to accept its earlier position; and (3) whether the party would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped from asserting the inconsistent position. *New Hampshire*, 532 U.S. 742, 750–51.

The Ninth Circuit has rejected a "per se rule" regarding the application of judicial estoppel. *Fredenburg v. Contra Costa Cty. Dep't of Health Servs.*, 172 F.3d 1176, 1179 (9th Cir. 1999). In *Fredenburg*, the Court "acknowledged that estoppel might be appropriate when the inconsistency of statements and positions was so blatant as to demonstrate that a claimant is playing fast and loose with the courts," but stated that its "clear preference was that inconsistent statements simply be considered along with other evidence to see whether they were so damaging that no rational trier of fact could rule in the [party's] favor." *Id.* (citations omitted). Therefore, "[j]udicial estoppel applies when a party's position is tantamount to a knowing misrepresentation to or even fraud on the court." *Johnson*, 141 F.3d at 1369 (citation omitted).

Here, GIS has not met its burden of proving that the position Guardian took in its motion to dismiss briefing is inconsistent with the position Defendants now assert. The issue before the Court on Guardian's motion to dismiss GIS's North Carolina Uniform Deceptive Trade Practices Act ("UDTPA") claim was whether the Agreements' California choice-of-law provisions were enforceable and, if so, whether those provisions barred GIS's UDTPA claim. (*See* Doc. 22 at 9–

10; Doc. 25 at 3–5; Doc. 26 at 2–10.)  In asserting in its motion to dismiss that California law applied to GIS's UDTPA claim, Guardian pointed to the Agreements' identification of "Guardian as a California corporation" with its "business address" in California, as well as GIS's own allegation in its initial complaint that the lawsuit "arises out of written agreements . . . deemed executed in the County of Stanislaus."  (Doc. 22 at 7; *see also* Doc. 26 at 2.)  However, Guardian also asserted in its motion to dismiss briefing that, "[s]ince Guardian has existed, Guardian's and RPM's primary place of business . . . has always been in North Carolina.  California has never been Guardian's or RPM's primary place of business."  (Doc. 26 at 19.)  Similarly, in Defendants' Motion, Defendants state that "[n]either GIS nor Defendants are California residents . . . and none of Defendants' conduct giving rise to this dispute occurred in California."  (Doc. 93, Ex. 1 at 3.)

These statements are not inconsistent.  The "Guardian" entity that is referenced in the Agreements as a "California corporation," with its "business address" in California, is not the same "Guardian" entity that is a party to this lawsuit.  The former "Guardian" entity, Guardian Protection Products, was incorporated under the laws of California in 1985 and dissolved in 1999.  (*See* Davis Decl., Exs. F & H.)  The latter "Guardian" entity—the party in the instant lawsuit—incorporated under the laws of Delaware in 2000, (*see* Holman Decl. ¶¶ 1–2), and was not an original party to the Agreements.  Instead, the Guardian in this action became a party to the Agreements pursuant to an Agreement for the Purchase and Sale of Assets executed on February 1, 2000.  (*See id.*, Exs. A & B.)  As such, Guardian's statements regarding its residency and ties to California in its motion to dismiss briefing and its briefing as to Defendants' Motion are not inconsistent.

Nor does Guardian now take a legal position that is inconsistent with the one it took in its motion to dismiss briefing.  Guardian did not, for example, argue in its motion to dismiss that a claim brought under Section 17200 would have merit.  Indeed, consistent with the position it advocates in Defendants' Motion, Guardian expressly refused to "accept the viability" of GIS's Section 17200 claim in its brief in opposition to GIS's motion for clarification of the Court's order dismissing the UDTPA claim.  (Doc. 37 at 9.)

//

In sum, GIS has presented insufficient evidence to show that Guardian made any inconsistent statements, much less committed fraud on the Court.  The Court therefore rejects GIS's judicial estoppel argument.

> b.    *GIS's Claim Does Not Require Extraterritorial Application of Section 17200.*

Section 17200 provides, in pertinent part, that "[a]s used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice . . . and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code."  Cal. Bus. & Prof'l Code § 17200.  Section 17200 "defines 'unfair competition' very broadly, to include 'anything that can properly be called a business practice and that at the same time is forbidden by law.'"  *Chabner v. United of Omaha Life Ins. Co.*, 225 F.3d 1042, 1048 (9th Cir. 2000) (quoting *Farmers Ins. Exch. v. Superior Court*, 2 Cal. 4th 377, 395 (1992)).  "By proscribing any unlawful business practice, section 17200 borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable."  *Cel-Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999) (quoting *State Farm Fire & Cas. Co. v. Superior Court*, 45 Cal. App. 4th 1093, 1103 (1996)).

Because a violation of Section 17200 is a state law claim, it only "reaches any unlawful business act or practice committed *in California.*"  *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1207 (2011) (emphasis added) (citing Cal. Bus. & Prof'l Code § 17200).  California's Supreme Court has made clear that there is a strong presumption against the extraterritorial application of California law.  In *Sullivan v. Oracle Corp.*, the court reiterated this long-held rule:

> However far the Legislature's power may theoretically extend, we presume the Legislature did not intend a statute to be "operative, with respect to occurrences outside the state, . . . unless such intention is clearly expressed or reasonably to be inferred from the language of the act or from its purpose, subject matter or history."

*Id.* at 1207 (citation omitted) (quoting *Diamond Multimedia Sys., Inc. v. Superior Court*, 19 Cal. 4th 1036, 1059 (1999)).  The *Sullivan* court made explicit that this presumption applies to Section

17200, noting that "[n]either the language of [Section 17200] nor its legislative history provides any basis for concluding the Legislature intended [Section 17200] to operate extraterritorially," and, therefore, the presumption against extraterritoriality "applies to [Section 17200] in full force." *Id.*; *see also O'Connor v. Uber Techs., Inc.*, 58 F. Supp. 3d 989, 1007 (N.D. Cal. 2014). Put simply, Section 17200 "does not apply to actions occurring outside of California that injure non-residents."[15] *Ice Cream Distribs. of Evansville, LLC v. Dreyer's Grand Ice Cream, Inc.*, C-09-5815 CW, 2010 WL 3619884, at *8 (N.D. Cal. Sept. 10, 2010) (citation omitted), *aff'd*, 487 F. App'x 362 (9th Cir. 2012).

The undisputed facts in the present case do not entail an extraterritorial application of Section 17200. In its SAC, GIS alleges that Guardian offered a "franchise" in connection with the Agreements "without providing the [Uniform Franchise Offering Circular] or [Franchise Disclosure Document] required by the FTC Franchise Rule, 16 CFR Part 436," and the franchise registration laws "in certain states (including—in addition to California—Maryland, New York, Indiana, Iowa, and Illinois)." (Doc. 67 ¶¶ 33–35, 40; *see also id.* ¶ 106.) GIS also alleges that Defendants violated Section 17200 by "offering a 'franchise' without complying with the registration and other filing requirements of statutes in certain states (including—in addition to California—Maryland, New York, Indiana, Iowa, and Illinois)." (*Id.* ¶ 40(c).)

The Franchise Rule[16] defines "franchise" as:

> any continuing commercial relationship or arrangement, whatever it may be called, in which the terms of the offer or contract specify . . . that: (1) [t]he franchisee will obtain the right to operate a business that is identified or associated with the franchisor's trademark, or to offer, sell, or distribute goods, services, or commodities that are identified or associated with the franchisor's trademark; (2) [t]he franchisor will exert or has authority to exert a significant degree of control over the franchisee's method of operation, or provide significant assistance in the franchisee's method of operation; and (3) [a]s a condition of

---

[15] The California choice-of-law provisions in the Agreements do not overcome the presumption against extraterritorial application of California law. *See O'Connor v. Uber Techs., Inc.*, 58 F. Supp. 3d 989, 1005 (N.D. Cal. 2014) ("A contractual choice of law provision that incorporates California law presumably incorporates all of California law – including California's presumption against extraterritorial application of its law."); *Cotter v. Lyft, Inc.*, 60 F. Supp. 3d 1059, 1065 (N.D. Cal. 2014) ("Even if the choice of law provision were intended to confer upon out-of-state drivers a cause of action for violation of California's wage and hour laws, it could not do so. An employee cannot create by contract a cause of action that California law does not provide.").

[16] The FTC Franchise Rule is a Federal Trade Commission regulation promulgated pursuant to the FTCA. *See Nieman v. DryClean U.S.A. Franchise Co.*, 178 F.3d 1126, 1129 (11th Cir. 1999).

obtaining or commencing operation of the franchise, the franchisee makes a required payment or commits to make a required payment to the franchisor or its affiliate.

16 C.F.R. § 436.1(h).  A "franchisee" is "any person who is granted a franchise." [17]  *Id.* § 436.1(i).

Here, the "offer[s] or contract[s]" that give rise to the "continuing commercial relationship" between Guardian and GIS are, as alleged in the SAC, the Agreements.  It is undisputed that the Agreements were entered into by a California corporation (Guardian's predecessor-in-interest) and were deemed executed in California.  (*See* Doc. 67, Exs. 1–3, 5–7, 9–11; Doc. 67 ¶ 4 ("[T]his action arises out of written agreements between the parties deemed executed in the County of Stanislaus in the State of California."); *id.* ¶ 107 ("The events giving rise to GIS's claim for violation of the California Business and Professions Code—including negotiation and signing of the Agreements—occurred, at least in part, in California."); Doc. 26 at 2.)  Guardian itself emphasized the "parties' relationship with California *at the time of contracting*" when it argued for the application of California law to GIS's claims in its motion to dismiss briefing.  (Doc. 26 at 2.)  In that same briefing, Guardian acknowledged that GIS's unfair competition claim "arise[s] from" the Agreements because "[t]he FTC Franchise Rule applies only if GIS is a 'franchisee.'  Whether GIS is a 'franchisee' cannot be determined without examining the [Agreements'] terms . . . ."  (*Id.* at 10.)

The Court agrees that the determination of whether Defendants violated the Franchise Rule and/or state franchise laws depends on an examination of the Agreements, as they are the "offer or contract" that gives rise to an alleged "franchise."  These Agreements were made by a *California corporation in California*.  Therefore, there is a sufficient nexus between California and the franchise law violations that form the basis of GIS's Section 17200 claim, and Guardian's motion for summary judgment on this claim shall be denied.  *See Gross v. Symantec Corp.*, No. C 12-00154 CRB, 2012 WL 3116158, at *6 (N.D. Cal. July 31, 2012) ("[Section 17200] allows claims

---

[17] The definitions of "franchise" and "franchisee" set forth in the state franchise laws upon which GIS also predicates its Section 17200 claim are similar to that found in the Franchise Rule.  (*See, e.g.*, Cal. Corp. Code §§ 31005(a) ("franchise"), 31006 ("franchisee"); Md. Code Ann., Bus. Reg. §§ 14-201(e)(1) ("franchise"), (g) ("franchisee"); N.Y. Gen. Bus. Law §§ 681(3) ("franchise"), (4) ("franchisee"); Ind. Code Ann. §§ 23-2-2.5-1(a) ("franchise"), (b) ("franchisee"); Iowa Code Ann. §§ 523H.1(3) ("franchise"), (5) ("franchisee"); 815 Ill. Comp. Stat. Ann. 705/3(1) ("franchise"), (2) ("franchisee").).

by non-California plaintiffs when the alleged misconduct or injuries occurred in California. . . . [T]he location of the alleged conduct giving rise to liability controls application of [Section 17200].”); *Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 598 (C.D. Cal. 2008) (“[E]xtraterritorial application of [Section 17200] is not barred where the alleged wrongful conduct occurred in California.”); *cf. Sajfr v. BBG Commc'ns, Inc.*, No. 10CV2341 AJB NLS, 2012 WL 398991, at *4 (S.D. Cal. Jan. 10, 2012) (finding that the application of California state law is impermissible where the alleged misconduct “simply has no connection to California”).

> c.   *GIS Is Not Precluded From Using the Franchise Rule as a Predicate Law for Its Section 17200 Claim.*

The FTCA declares as “unlawful” any “[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce,” but it does not contain any provision that allows private parties to sue for violations of the Act.  15 U.S.C. § 45(a).  The Ninth Circuit has held that, in order to bring a claim under Section 17200, “[i]t does not matter whether the underlying statute also provides for a private cause of action; section 17200 can form the basis for a private cause of action even if the predicate statute does not.”[18]  *Chabner*, 225 F.3d at 1048–50 (citation omitted).

There are limits on the causes of action that can be maintained under Section 17200.  A court may not allow a plaintiff to “plead around an absolute bar to relief simply by recasting the cause of action as one for unfair competition.”  *Id.* at 1048 (quoting *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 182–83) (1999)).  However, this limit is “rather narrow.” *Id.*  To “forestall an action under [section 17200], another provision must actually ‘bar’ the action or clearly permit the conduct.”  *Id.*; *see also Process Specialties, Inc. v. Sematech, Inc.,* No. CIV. S-00-414FCD PAN, 2001 WL 36105562, at *14 (E.D. Cal. Nov. 8, 2001) (“Virtually any law-federal, state or local-can serve as a predicate for a UCL claim, unless the defendant is privileged, immunized by another statute, or the predicate statute expressly bars its enforcement under the

---

[18] California state courts have similarly held that statutes with no private right of action can serve as the basis for a Section 17200 claim.  *See Troyk v. Farmers Grp., Inc.*, 171 Cal. App. 4th 1305, 1335 (2009); *McKell v. Wash. Mut., Inc.*, 142 Cal. App. 4th 1457, 1475 (2006); *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 950 (2002); *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 17 Cal. 4th 553, 566–67 (1998), *superseded by statute on other grounds as stated in Californians For Disability Rights v. Mervyn's, LLC,* 39 Cal. 4th 223 (2006).

1   UCL."). *Compare Hartless v. Clorox Co.*, No. 06CV2705, 2007 WL 3245260, at *4 (S.D. Cal.

2   2007) (holding that a UCL claim cannot be predicated on FIFRA due to Congress' express

3   rejection of private actions to enforce FIFRA), *with Stop Youth Addiction, Inc. v. Lucky Stores,*

4   *Inc.,* 17 Cal. 4th 553, 566–67 (1998) (permitting provision of California penal code to serve as

5   basis for UCL claim because plaintiff sought relief from unfair competition, not enforcement of

6   penal laws), *superseded by statute on other grounds as stated in Californians For Disability*

7   *Rights v. Mervyn's, LLC*, 39 Cal. 4th 223 (2006)).

8          The narrow limitations on causes of action under Section 17200 do not prevent GIS's

9   claim in the Sixth Cause of Action.  No statutory provision permits Defendants to offer a franchise

10  without complying with disclosure, registration, and other filing requirements under the Franchise

11  Rule, and Defendants do not appear to dispute this fact.  Instead, Defendants acknowledge—in a

12  footnote—that "several" California cases have permitted a Section 17200 claim to arise from a

13  statute lacking a private right of action, yet contend that the Franchise Rule cannot serve as a

14  predicate statute because it "establishes a comprehensive regulatory scheme that only the

15  government is empowered to enforce."  (Doc. 93, Ex. 1 at 30 n.5.)  However, Defendants do not

16  cite to any provision in either the Franchise Rule or the FTCA that explicitly precludes private

17  actions for violations of the Act.  Indeed, courts in this Circuit have routinely allowed Section

18  17200 claims predicated on FTCA violations to proceed.  *See, e.g., Heartland Payment Sys., Inc.*

19  *v. Mercury Payment Sys., LLC,* No. C 14-0437 CW, 2015 WL 3377662, at *5–6 (N.D. Cal. Feb.

20  23, 2015); *Torres v. JC Penney Corp.*, No. 12-CV-01105-JST, 2013 WL 1915681, at *7 (N.D.

21  Cal. May 8, 2013); *Baker v. Aegis Wholesale Corp.*, No. C 09–5280 PJH, 2010 WL 2853915, at

22  *8 (N.D. Cal. July 21, 2010).

23         Defendants rely on *O'Donnell v. Bank of America, National Association*, 504 F. App'x

24  566, 568 (9th Cir. 2013), in support of their contention that the FTCA, and by extension the

25  Franchise Rule, cannot be used as a predicate statute for a Section 17200 claim.[19]  *O'Donnell*,

26  however, can be found only in the Federal Appendix, and is therefore not binding on the courts of

27

28  ───────────────
[19]  The only other case Defendants cite in support of this proposition, *Sperling v. DSW Inc.*, No.
EDCV151366JGBSPX, 2016 WL 354319, at *2 (C.D. Cal. Jan. 28, 2016), cites *O'Donnell* in dicta.

1   this Circuit.  *See* 9th Cir. R. 36-3 ("Unpublished dispositions and orders of this Court are not

2   precedent . . . .").  Moreover, *O'Donnell* did *not* address the question of whether the FTCA

3   explicitly "bars" private actions, holding only that the plaintiff's Section 17200 claim failed

4   because the FTCA "doesn't create a private right of action."  *Id.* at 568.  This holding is

5   inconsistent with both *Chabner* and California state cases that have repeatedly held that even

6   statutes with no private right of action can serve as the basis for a Section 17200 claim.  The Court

7   therefore finds *O'Donnell* unpersuasive in the instant analysis.

8         Even if the Court were to find, in accordance with *O'Donnell*, that GIS cannot assert a

9   cause of action for a violation of the Franchise Rule under Section 17200, summary judgment on

10  this claim would not be appropriate.  Because GIS's claim under Section 17200 is also based on

11  the alleged failure to comply with *state* franchise laws—in addition to the Franchise

12  Rule—dismissal is not warranted.[20]  *See Jacobo v. Ross Stores, Inc.*, No. CV-15-04701-MWF-

13  AGR, 2016 WL 3483206, at *5 (C.D. Cal. June 17, 2016) (refusing to dismiss with prejudice the

14  plaintiff's Section 17200 claim predicated on the FTCA because the claim was also based on

15  alleged violations of California state law).  Finally, GIS's claim is not limited to the "unlawful"

16  prong of Section 17200, as GIS alleges that Defendants' failure to provide disclosures in

17  connection with the offering of a franchise is also "unfair" and "fraudulent," independent of the

18  Franchise Rule and state law.  (Doc. 67 ¶ 105.)  *See Torres*, 2013 WL 1915681, at *6 ("An act can

19  be alleged to violate any or all of the three prongs of the UCL – unlawful, unfair, or fraudulent.").

20  Defendants do not mention—much less move for summary judgment on—GIS's claim under the

21  "unfair" and "fraudulent" prongs of Section 17200.[21]

22  _____

23  [20] GIS alleges that Defendants engaged in unfair competition under Section 17200 by failing to meet disclosure, registration, and filing requirements under various state franchise laws, including Maryland, New York, Indiana, Iowa, and Illinois (in addition to California).  (*See* Doc. 67 ¶¶ 33–35, 40, 94–106.)  Although neither party addresses

24  the issue in their briefing, at least one court in this district has held that foreign state law may serve as the basis for a Section 17200 claim.  *See Process Specialties, Inc. v. Sematech, Inc.*, No. CIV. S–00–414FCD PAN, 2001 WL 36105562, at *15 (E.D. Cal. Nov. 8, 2001) (holding that the plaintiff may bring its Section 17200 claim based on a

25  violation of Delaware law).  *But see Hilton v. Apple Inc.*, No. CV137674GAFAJWX, 2014 WL 10435005, at *4 (C.D. Cal. Apr. 18, 2014) (dismissing Section 17200 claim based on the Florida Deceptive and Unfair Trade Practices Act

26  because "[i]f the [c]ourt were to allow incorporation of [this act] into California law . . . . [Section 17200] would, for lack of a more polite phrase, swallow lesser laws whole").

27  [21] The California Supreme Court has defined "unfair" conduct under Section 17200 as "conduct that threatens an

28  incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition."  *Cel-*

1   In view of the foregoing, the Court DENIES Defendants' Motion, (Doc. 93), insofar as

2   Defendants request summary judgment on GIS's Section 17200 claim in the Sixth Cause of

3   Action.

4         6.   <u>Defendants' Motion for Summary Judgment on GIS's Claim for Violation of the</u>

5            <u>CFIL (Seventh Cause of Action) Shall Be Granted in Part and Denied in Part.</u>

6   Defendants assert that a portion of GIS's CFIL claim in the Seventh Cause of Action is

7   time-barred due to the application of an "absolute" four-year statute of limitations period.  (Doc.

8   93, Ex. 1 at 24–25.)   Specifically, Defendants contend that the CFIL's four-year statute of

9   limitations bars any portion of GIS's CFIL claim arising from Guardian's alleged failure to make

10  disclosures required by the CFIL prior to December 6, 2010, *i.e.*, four years prior to GIS filing the

11  instant lawsuit on February 27, 2015 (plus an additional 84-day "tolling period" agreed to by the

12  parties).  (*See* Doc. 93, Ex. 1 at 25; Davis Decl., Ex. L.)

13  Defendants further assert that GIS's remaining CFIL claim fails because Defendants never

14  sold a franchise "in this state" (*i.e.*, California), as required by the CFIL, and that even if

15  Defendants were found to have sold a franchise "in this state," the CFIL expressly exempts

16  franchise sales to non-resident franchisees operating outside of California from its disclosure

17  requirements.  (Doc. 93, Ex. 1 at 26–27.)   Finally, Defendants contend that the Agreements'

18  California choice-of-law provision does not make GIS's CFIL claim applicable in this case.  (*Id.* at

19  28–29.)

20  GIS contends that the CFIL's four-year statute of limitations does not bar its claims

21  because the "statute of limitations clock" is reset every year at the time the Agreements renew, and

22  the "2014 Agreements" are entirely new offers of franchise that occurred within the applicable

23  statute of limitations.  (Doc. 106 at 27–29.)  GIS asserts that there is therefore a genuine issue of

24  material fact as to whether the statute of limitations has expired.  (*Id.*)  Finally, GIS asserts that

25  summary judgment on GIS's CFIL claim is not appropriate because GIS sold a franchise "in this

26

27  *Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 187 (1999).  A business practice is "fraudulent" within
the meaning of Section 17200 if "members of the public are likely to be deceived."  *Kasky v. Nike, Inc.*, 27 Cal. 4th

28  939, 951 (2002).   Again, Defendants do not address either the "unfair" prong or the "fraudulent" prong in their
briefing regarding Defendants' Motion.

state" (*i.e.,* California) by virtue of the Agreements having been executed in California, and that the CFIL does not exempt out-of-state franchisees from its disclosure requirements because (1) the Agreements were made and executed in California, and (2) the exemption does not apply to GIS's claims under the CFIL.[22]  (*Id.* at 24–26.)

> a.   *GIS's CFIL Claim Related to the Agreements is Time-Barred; GIS's CFIL Claim Related to the 2015 Form Agreement is Not.*

In the Seventh Cause of Action, GIS alleges that Defendants violated section 31202 of the CFIL, Cal. Corp. Code. § 31202.  (Doc. 67 ¶ 112.)   Section 31202 makes it unlawful "willfully to make any untrue statement of a material fact in any statement required to be disclosed in writing pursuant to Section 31101, or willfully to omit to state in any such statement any material fact which is required to be stated therein."  Section 31101 of the CFIL requires that—to be exempt from the requirements of Part 2 of the CFIL[23]—a franchisor must disclose certain enumerated information "in writing to each prospective franchisee, at least 10 business days prior to the execution by the prospective franchisee of any binding franchise or other agreement, or at least 10 business days prior to the receipt of any consideration."  Cal. Corp. Code § 31101(c).

Section 31202 simply makes certain conduct unlawful; it does not contain a private right of action.  Under Section 31300, however, a person who offers or sells a franchise in violation of Section 31202 "shall be liable to the franchisee  . . . who may sue for damages caused thereby, and if the violation is willful, the franchisee may also sue for rescission."[24]  *Id.* § 31300.  The statute of limitations for a Section 31300 claim appears in Section 31303: "No action shall be maintained to enforce any liability created under Section 31300 unless brought before the expiration of four years after the act or transaction constituting the violation, [or] the expiration of one year after the discovery by the plaintiff of the fact constituting the violation . . . whichever shall first expire."  *Id.*

---

[22] GIS also argues that judicial estoppel bars Defendants' challenge to GIS's CFIL claim.  For the reasons set forth above, *see* Section III.A.5.a, *supra*, GIS's judicial estoppel argument fails.

[23] Part 2 of the CFIL is titled "Regulation of the Sale of Franchises."  *See* Cal. Corp. Code §§ 3110-31157.

[24] Elsewhere in their briefing, GIS asserts that it has alleged a claim under Section 31301 of the CFIL.  (*See* Doc. 106 at 26 ("Here, GIS's claims, as set forth in the [SAC], arise under Cal. Corp. Code §§ 31202 and 31300-*31301* . . . ." (emphasis added)).)  While GIS does make reference to Section 31301 in its SAC, a claim under Section 31301 is predicated on a violation of Section 31201, *see* Cal. Corp. Code § 31301, of which GIS makes *no* mention in the SAC, (*see* Doc. 67).  Thus, the Court need not address the effect of the two-year limitations period that applies to such a claim.  *See* Cal. Corp.Code § 31304.

§ 31303.  The California Court of Appeals has held that the statute of limitations set forth in Section 31303 "impose[s] absolute limits" and is not subject to tolling.  *See People ex rel. Dep't of Corps. v. SpeeDee Oil Change Sys., Inc.*, 95 Cal. App. 4th 722, 724 & 726–27 (2002).

"The act or transaction constituting the violation" is the making of untrue statements or omission of material facts in the disclosure document provided to a potential franchisee pursuant to section 31101, subdivision (c).  Under section 31101(c), such disclosure must be made "at least 10 business days prior to the execution by the prospective franchisee of any binding franchise or other agreement, or at least 10 business days prior to the receipt of any consideration."  Cal. Corp. Code. § 31101(c).  Thus, the statute is directed at conduct that occurs 10 business days prior to the execution of the purported franchise agreement.  *See, e.g., Celsi v. H & R Block Tax Servs. LLC*, No. A132634, 2012 WL 2914293, at *5 (Cal. Ct. App. July 17, 2012).

Here, GIS alleges that it entered into the Pennsylvania Agreement on May 5, 1988; the Mid-Atlantic Agreement on December 6, 1988; and the Ohio Agreement on April 2, 1990.  (Doc. 67 ¶¶ 6–8, 11.)  According to GIS, it became a party to (1) the Cook County, Indiana, and Midwest Agreements on April 23, 2007, and (2) the Florida, Alabama, and Tennessee Agreements on March 5, 2010.  (*Id.* ¶¶ 9–11.)  Ten (10) business days before each of these dates is more than four years (plus the additional 84-day "tolling period" agreed to by the parties) prior to February 27, 2015, the date GIS filed this lawsuit.

In response, GIS asserts that "Defendants have not presented any evidence – let alone undisputed evidence" that the automatic annual renewal of the Agreements "maintained identical terms or did not otherwise materially change the parties' relationship so as to require franchise disclosures," and contends that such automatic renewals "would each reset the statute of limitations clock."  (Doc. 106 at 28.)  As an initial matter, Defendants, as the party without the burden of proof at trial, do not need to produce evidence that the automatic annual renewal of the Agreements did not, for example, result in a "material modification" of that Agreement under Section 31101(c)(2).  *See J & J Sports Prods. Inc. v. Cabrera*, No. 214CV2667JAMEFBPS, 2016 WL 3126114, at *2 (E.D. Cal. June 3, 2016) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 885 (1990)), *report and recommendation adopted sub nom. by* 2016 WL 4248055 (E.D. Cal. Aug.

1   11, 2016).  Rather, Defendants "need only point to matters which demonstrate the absence of a

2   genuine material factual issue."  *Id.*; *see also id.* ("[W]here the nonmoving party will bear the

3   burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made

4   in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on

5   file.'" (alteration in original) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986))).

6   As the party bearing the burden of proof at trial, it is *GIS's* burden to produce evidence sufficient

7   to establish a genuine issue of material fact; GIS has not done so.[25]  Accordingly, the Court finds

8   that GIS's CFIL claim for failure to provide disclosures in connection with the Agreements is

9   time-barred.   The Court therefore GRANTS Defendants' Motion, (Doc. 93), to the extent

10  Defendants request summary judgment on GIS's CFIL claim based on those Agreements.

11      In addition to the Agreements, however, GIS also bases its CFIL claim on a form

12  "Distributor Agreement" that was attached to the December 2014 Memorandum.  (*See* Doc. 67 ¶¶

13  36–38, 125.)   GIS alleges that this form agreement, dated January 2015 (the "2015 Form

14  Agreement"), is "a 'franchise' within the meaning of the FTC Franchise Rule and various state

15  franchise disclosure and registration laws and . . . was offered to GIS without the provision of the

16  [franchise disclosure documents] required by the FTC Franchise Rule and various state franchise

17  disclosure and registration laws, including the [CFIL]."  (*Id.* ¶ 38; *see also id.* ¶ 125.)

18      Defendants do not argue in their motion that GIS's CFIL claim based on the 2015 Form

19  Agreement is time-barred.  Nor could they.  It is uncontroverted that the 2015 Form Agreement

20  was transmitted to GIS on December 9, 2014.  GIS filed its lawsuit on February 27, 2015, which is

21  well within the statute of limitations period under Section 31303.  GIS's CFIL claim based on the

22  2015 Form Agreement is therefore not time-barred.

23

24  [25] GIS's assertion that the Agreements' automatic annual renewal would "reset the statute of limitations clock"—for
    which it cites no legal authority—is undermined by case law.  *See, e.g., Salvesen v. La-Z-Boy, Inc.,* No.
25  EDCV1402105VAPDTBX, 2014 WL 12465444, at *4 (C.D. Cal. Nov. 21, 2014) (denying application for preliminary
    injunction where the plaintiff claimed that the amendment of an agreement "triggered a new statute of limitations" as
26  to its CFIL claim, observing "[t]he plain language of the sections 31300 and 31303 dictates that to the extent [the
    plaintiff's CFIL] claim is predicated on [a]greements entered into outside the limitations period, it is likely to be time-
27  barred"); *Celsi v. H & R Block Tax Servs. LLC*, A132634, 2012 WL 2914293, at *5 (Cal. Ct. App. July 17 2012)
    (affirming the district court's decision sustaining a demurrer and dismissing CFIL claims where the plaintiff argued
28  that conduct subsequent to the acquisition of the franchise rendered prior statements false and actionable under the
    CFIL.).

b.   *Neither the Limitation in Section 31119 nor the Exemption Set Forth in Section 31105 of the CFIL Applies to GIS's Claim.*

Defendants first contend that GIS's CFIL claim fails because Section 31119 only applies to a sale of a franchise "in this state," and there is no evidence that Defendants ever sold a franchise in California.  Section 31119 makes it "unlawful" to do the following:

> [S]ell any franchise in this state that is subject to registration under this law without first providing to the prospective franchisee, at least 14 days prior to the execution by the prospective franchisee of any binding franchise or other agreement, or at least 14 days prior to the receipt of any consideration, whichever occurs first, a copy of the franchise disclosure document, together with a copy of all proposed agreements relating to the sale of the franchise.

Cal. Corp. Code § 31119.

While Defendants are correct that Section 31119 is limited to the sale of a franchise in California, they overlook the fact that GIS does *not* plead a claim under Section 31119.  Instead, GIS's CFIL claim is brought under Sections 31300, 31202, and 31101.  (*See* Doc. 67 ¶¶ 112–116; *see also* Doc. 106 at 26 ("GIS's claims, as set forth in the [SAC], arise under Cal. Corp. Code §§ 31202 and 31300–31301 . . . .").)  Section 31202 makes it unlawful "willfully to make any untrue statement of a material fact in any statement required to be disclosed in writing pursuant to Section 31101, or willfully to omit to state in any such statement any material fact which is required to be stated therein."  Cal. Corp. Code § 31202.  Section 31101 of the CFIL requires a franchisor, in order to be exempt from the requirements of Part 2 of the CFIL, to disclose certain enumerated information to a prospective franchisee.  *Id.* § 31101(c).  Finally, Section 31300, provides a private right of action against a person who offers or sells a franchise in violation of Section 31202.  None of these Sections are limited to conduct occurring "in this state."

Defendants' additional argument that Section 31105 exempts franchisors from producing disclosure documents to non-resident franchisees operating outside of California is equally unavailing.  Section 31105 provides the following:

> Any offer, sale, or other transfer of a franchise, or any interest in a franchise, to a resident of another state or any territory or foreign country, shall be exempted from the provisions of Chapter 2 (commencing with Section 31110) of this part, if all locations from which sales, leases or other transactions between the franchised

56

business and its customers are made, or goods or services are distributed, are physically located outside this state.

Cal. Corp. Code § 31105.  Put another way, Section 31105 exempts franchisors, for example, "from producing [franchise disclosure documents] to out-of-state franchisees" under Section 31119.  *Samica Enters., LLC v. Mail Boxes Etc. USA, Inc.*, 637 F. Supp. 2d 712, 725 (C.D. Cal. 2008).

Again, GIS does not plead a failure to provide disclosure documents under Section 31119; instead, it alleges misrepresentations and omissions in written statements required to be disclosed under Section 31101, in violation of Section 31202 and made actionable by Section 31300.  While Section 31119 falls under Part 2, Chapter 2, of the CFIL—and therefore is covered by the exemption in Section 31105—Sections 31202 and 31300 do *not*.  Instead, Sections 31202 and 31300 are provisions of Parts 3 and 4, respectively, of the CFIL, to which Section 31105's exemption does not apply.  *See It's Just Lunch Int'l LLC. v. Island Park Enter. Grp., Inc.*, No. EDCV08-367-VAPJCRX, 2008 WL 4683637, at *5 (C.D. Cal. Oct. 21, 2008) ("Section 31105 only precludes claims under Part 2, Chapter 2, of the California Corporations Code.  [The counterclaimants], however, rely on sections outside of Part 2, Chapter 2, including sections 31201 and 31220.  Accordingly, insofar as [the counterdefendant] relies on the provisions of section 31105, the dismissal of [the counterclaimants'] fourth claim is unwarranted." (citation omitted)).  Accordingly, the Court DENIES Defendants' Motion, (Doc. 93), insofar as Defendants request summary judgment on GIS's remaining CFIL claim based on the 2015 Form Agreement.

> 7. <u>Defendants' Motion for Summary Judgment on GIS's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing as to the Pennsylvania, Mid-Atlantic, Ohio, Cook County, Indiana, and Midwest Agreements (Eighth Cause of Action) Shall Be Denied.</u>

Like their arguments directed to GIS's First and Second Causes of Action, Defendants move for summary judgment on GIS's Eighth Cause of Action—breach of the implied covenant of good faith and fair dealing in the Pennsylvania, Mid-Atlantic, Ohio, Cook County, Indiana, and Midwest Agreements—based solely on their argument that GIS has failed to establish that GIS's damages were a result of Guardian's purported breach.  (Doc. 93, Ex. 1 at 8–9, 21–24.)  Because

genuine issues of material fact exist on this issue, *see* section III.A.1.d, *supra*, the Court DENIES Defendants' Motion, (Doc. 93), insofar as Defendants request summary judgment on the Eighth Cause of Action.

8. <u>GIS's Motion for Summary Judgment on its Claim for Breach of the Mid-Atlantic Agreement (Ninth Cause of Action) Shall Be Denied.</u>

GIS contends that summary judgment is appropriate on its claim that Defendants breached the Mid-Atlantic Agreement because the undisputed evidence shows that Guardian sold "Guardian furniture protection products" to RemComGroup, LLC, d/b/a Renaissance ("Renaissance"), a customer located in Pennsylvania—*i.e.*, "within the Exclusive Territory covered by that Agreement." (Doc. 123 at 27.) Guardian responds that it did not breach the Mid-Atlantic Agreement by selling to Renaissance in Pennsylvania because it was a "national account" to which Guardian was entitled to sell products and, further, because the products Guardian sold to Renaissance are not products within the exclusive distribution rights provided by the Mid-Atlantic Agreement. (Doc. 103 at 19–20.)

*a. The Mid-Atlantic Agreement Grants GIS the Exclusive Right to Sell "Guardian Labeled Distributor Products" in Philadelphia.*

The Mid-Atlantic Agreement grants GIS the exclusive right to sell "Guardian Labeled Distributor Products" in "the State of Pennsylvania, all other areas not coverd [sic] by the [Pennsylvania Agreement]." (Doc. 120, Ex. 2; *see also* Doc. 67 ¶ 135; Doc. 86 ¶ 47; JSOF ¶ 10.) "Guardian Labeled Distributor Products" are defined in the Mid-Atlantic Agreement as the following:

> Products that are produced or caused to be produced by [Guardian] which are identified as Guardian Products on the front panel of the product label. It is understood that unless specifically noted by a mutually agreed upon Addendum hereto, Guardian Labeled Distributor Products shall be only those items indicated on Exhibit A which is attached hereto.

(Doc. 120, Ex. 2 ¶ 7(c).) Thus, "unless specifically noted by a mutually agreed upon Addendum," only those products listed on Exhibit A constitute "Guardian Labeled Distributor Products" for which the Mid-Atlantic Agreement grants GIS the exclusive right to sell in Pennsylvania. *See id.*

It is undisputed that Guardian has sold EFPPs to Renaissance in Philadelphia, an area

located within the geographic territory encompassed by the Mid-Atlantic Agreement.  (Doc. 86 ¶¶ 44–45, 47; *see also* Liddiard Decl., Ex. D at 2–3; *id.*, Ex. H at 17–18, 20–22; *id.*, Ex. N at 14; *id.*, Ex. EE.)  Guardian has submitted evidence that an EFPP is a "virtual product that only exists once (1) an ultimate consumer purchases it and (2) it is electronically registered."  (Green Decl. ¶ 5.)  According to Mr. Green, "[w]hen a customer purchases an EFPP, he or she receives the following two documents: (1) a cover sheet that describes the specific coverages for the plan that the customer purchased and (2) the EFFP's [sic] 'terms and conditions' with more specific details."  *Id.*  These documents "are delivered to the customer via e-mail shortly after the registration or, if the customer has no e-mail or is unwilling to provide it, they are e-mailed to the retailer who either prints them and hands hard copies to the consumer in the store or puts them in the mail to the consumer."  *Id.*  "The EFPP's explanatory papers are not delivered in a box or any special container."  *Id.*

> b.    *There is a Genuine Issue of Material Fact as to Whether Guardian's Sale of Electronic Furniture Protection Plans to Renaissance in Philadelphia breached the Mid-Atlantic Agreement.*

The Court finds that there is a genuine issue of material fact as to whether Guardian breached the Mid-Atlantic Agreement by selling EFPPs to Renaissance in Philadelphia. Specifically—for purposes of the instant analysis where GIS is the movant—the Court finds a material fact issue as whether the EFPPs, which are "virtual products" comprised of documents that are "not delivered in a box or any special container," are "Guardian Labeled Distributor Products."[26]  The EFPPs are not listed on Exhibit A to the Mid-Atlantic Agreement, (*see* Doc. 120, Ex. 2 at 11–16), and there is no "mutually agreed upon Addendum" to the Mid-Atlantic Agreement that "specifically notes" the addition of the EFPPs to the list of "Guardian Labeled Distributor Products" indicated on Exhibit A in the record.

Accordingly, the Court DENIES GIS's Motion, (Doc. 98), to the extent GIS requests summary judgment on its Ninth Cause of Action.[27]

---

[26] Indeed, the Court finds below that the EFPPs are not "Guardian Labeled Distributor Products" under the Mid-Atlantic Agreement.  *See* section III.B.3, *infra*.

[27] Because the Court has found a genuine issue of material fact as to whether the EFPPs fall within the scope of the Mid-Atlantic Agreement, it need not reach the additional question of whether Renaissance was a "national account,"

**B.    The Parties' Motions for Summary Judgment on Guardian's Counterclaim for Declaratory Relief (First Counterclaim) Shall Be Granted in Part and Denied in Part.**

GIS and Guardian both move for summary judgment as to certain requests for declaratory relief in Guardian's Counterclaim for Declaratory Relief (First Counterclaim).  (*See, e.g.*, Doc. 92; Doc. 123 at 32–41.)  For the reasons that follow, the Court grants in part and denies in part the parties' motions for summary judgment as to Guardian's First Counterclaim.

1.    The Declaratory Judgment Requirements are Satisfied.

The federal Declaratory Judgment Act provides, in pertinent part, that "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."[28]  28 U.S.C. § 2201(a).  "The Ninth Circuit has recognized that the Declaratory Judgment Act was enacted to afford an added remedy to one who is uncertain of his rights and who desires an early adjudication without having to wait until he is sued by his adversary."  *Knapp v. Depuy Synthes Sales Inc.*, 983 F. Supp. 2d 1171, 1176 (E.D. Cal. 2013) (citation omitted).

"The Declaratory Judgment Act embraces both constitutional and prudential concerns."  *Gov't Emps. Ins. Co. v. Dizol*, 133 F.3d 1220, 1222 (9th Cir. 1998).  "A lawsuit seeking federal declaratory relief must first present an actual case or controversy within the meaning of Article III,

---

which would purportedly permit Guardian to sell products to Renaissance in Philadelphia without breaching the Mid-Atlantic Agreement.

[28] In its First Counterclaim, Guardian requests declaratory relief, but fails to address the authority for the Court to provide such relief.  (*See* Doc. 36 ¶¶ 26–30; *see also id.* at 12 (requesting a "judicial declaration," but not providing the authority for such a declaration).)  In Guardian's Motion, Guardian requests declaratory relief and, in support of this request, cites to both the federal Declaratory Judgment Act and California Code of Civil Procedure § 1060.  (*See* Doc. 92 at 8–9.)  As such, it is not clear based on these filings whether Guardian requests declaratory relief pursuant to the federal Declaratory Judgment Act or under California law.

In the present action, the Court sits by diversity jurisdiction.  (*See, e.g.*, Doc. 67 ¶ 5.)  Nonetheless, "[t]he propriety of granting declaratory relief in federal court is a procedural question governed by federal law, even when the court's jurisdiction is based on diversity of citizenship."  *Brosious v. JP Morgan Chase Bank, N.A.*, No. 15–cv–0047–KJM–DAD, 2015 WL 3486953, at *3 (E.D. Cal. June 2, 2015) (citing *Golden Eagle Ins. Co. v. Travelers Cos.*, 103 F.3d 750, 753 (9th Cir. 1996), *overruled on other grounds by Gov't Emps. Ins. Co. v. Dizol*, 133 F.3d 1220 (9th Cir. 1998)); *see, e.g.*, *In re Adobe Sys., Inc. Privacy Litig.*, 66 F. Supp. 3d 1197, 1219 (N.D. Cal. 2014) (finding that the federal Declaratory Judgment Act applied in a diversity case due to the procedural nature of declaratory judgment).  The Court therefore construes Guardian's declaratory judgment claim in its First Counterclaim as requesting declaratory relief pursuant to the federal Declaratory Judgment Act and not under California law.  Regardless of this procedural question, however, "[t]he state and federal standards for declaratory judgment are . . . generally equivalent."  *Paul Evert's RV Country, Inc. v. Universal Underwriters Ins. Co.*, CIV. NO. 1:15-00124, 2016 WL 3277175, at *2 (E.D. Cal. June 14, 2016) (citing 28 U.S.C. § 2201(a) and Cal. Civ. Proc. Code § 1060).

section 2 of the United States Constitution and must fulfill statutory jurisdictional prerequisites." *Knapp*, 983 F. Supp. 2d at 1176 (citing *Dizol*, 133 F.3d at 1222–23). As to the actual case or controversy requirement, the Supreme Court stated that the dispute must "be definite and concrete, touching the legal relations of parties having adverse legal interests; and that it be real and substantial and admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (citation omitted). "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* (citation omitted).

In this case, the declaratory relief Guardian requests in its First Counterclaim pertains to an immediate and ongoing dispute between the parties. The Court therefore finds that the actual case or controversy requirement is satisfied as to this claim.

Regarding the statutory jurisdictional prerequisites, "[t]he Declaratory Judgment Act does not itself confer federal subject matter jurisdiction." *Knapp*, 983 F. Supp. 2d at 1176. As such, "there must be an independent basis for such jurisdiction." *Id.* (citation omitted).

The Court has diversity jurisdiction over this case. As such, the jurisdictional prerequisite is satisfied. *See, e.g., id.* (noting that the statutory jurisdictional prerequisites of the Declaratory Judgment Act were satisfied where the court's "subject matter jurisdiction [was] properly predicated on diversity of citizenship").

As to the prudential concern, "when faced with an action for declaratory relief, the district court must also, in the exercise of its discretion, be satisfied that entertaining the action is appropriate." *Id.* (citing *Dizol*, 133 F.3d at 1223). Specifically, "the court must decide whether to exercise its jurisdiction by analyzing the factors set out in *Brillhart v. Excess Ins. Co.*, 316 U.S. 491 . . . (1942), and its progeny." *Principal Life Ins. Co. v. Robinson*, 394 F.3d 665, 669 (9th Cir. 2005) (citation omitted). "In *Brillhart*, the Court articulated three factors that courts should consider when examining the propriety of entertaining a declaratory judgment action: avoiding needless determination of state law issues; discouraging forum shopping; and avoiding duplicative

1  litigation." *R.R. Street & Co. v. Transp. Ins. Co.*, 656 F.3d 966, 975 (9th Cir. 2011) (citation

2  omitted).

3      The Court finds that the *Brillhart* factors are not implicated in this case.  In particular, the

4  requests for declaratory judgment in the First Counterclaim do not implicate the needless

5  determination of state law issues, there is no indication that the parties engaged in forum shopping

6  as to this counterclaim, and there is no evidence in the record of parallel state or federal litigation.

7  The Court therefore finds that the *Brillhart* factors do not weigh against the Court exercising its

8  jurisdiction over the First Counterclaim.

9      Turning to the substance of the parties' motions, GIS and Guardian both request summary

10 judgment as to the following requests for declaratory relief in the First Counterclaim: (1) whether

11 GIS sold competing dreamGUARD products in the areas covered by the Agreements and thereby

12 violated the non-compete provision of the Agreements, (*see* Doc. 92 at 8–13; Doc. 123 at 38–41);

13 and (2) whether the EFPPs qualify as "Guardian Labeled Distributor Products," (*see* Doc. 92 at

14 13–14; Doc. 123 at 30–32).  GIS also moves for summary judgment as to the additional request

15 for declaratory relief in this counterclaim regarding whether GIS "failed to use 'best efforts' to

16 promote the sale of Guardian Products within" the territories covered by the Agreements.  (*See*

17 Doc. 123 at 32–38.)  The Court shall address each issue, in turn.

18     2.   <u>There are Genuine Issues of Material Fact as to Whether GIS's Sale of</u>
           <u>dreamGUARD Products Violated the Agreements.</u>

19

20     GIS and Guardian both first move for summary judgment on Guardian's request for a

21 declaration that it may terminate the Agreements due to GIS's purported sale of dreamGUARD

22 products in the areas covered by the Agreements.  (*See, e.g.*, *id.* at 32–35; Doc. 92 at 8–13.)  This

23 issue turns on (1) whether GIS breached the Agreements, and (2) if GIS breached, whether the

24 terms of the Agreements permit Guardian to terminate due to the breach.  For the reasons that

25 follow, the Court finds that neither party is entitled to summary judgment on this request for

26 declaratory relief in the First Counterclaim.[29]

27

28 _____

[29] GIS argues that the Court need not reach the merits of Guardian's declaratory judgment claim pertaining to GIS's purported sale of dreamGUARD products.  In particular, GIS asserts that "Guardian's declaratory judgment claim as

    *a. There are Genuine Issues of Material Fact Regarding whether CDFC, Inc. is the Alter Ego of GIS.*

  As an initial matter, it is clear that a third party, CDFC, Inc.—and *not* GIS—actually sold the dreamGUARD products in the areas covered by the Agreements.  (*See, e.g.*, Doc. 92, Ex. 5 at 160:3–10.)  It is also uncontested that, if CDFC, Inc. is not the alter ego of GIS, CDFC, Inc. is not bound by the non-compete provision in the Agreements and, correspondingly, its sale of dreamGUARD products does not violate the Agreements.  *Cf. Berglund v. Arthroscopic & Laser Surgery Center of San Diego, L.P.*, 44 Cal. 4th 528, 536 (2008) ("It goes without saying that a contract cannot bind a nonparty." (quoting *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002))).  Thus, the preliminary question is whether CDFC, Inc. is the alter ego of GIS, such that CDFC, Inc.'s sale of dreamGUARD products may be imputed to GIS for purposes of determining whether GIS breached the Agreements.

---

to CDFC's sale of [dreamGUARD] products should be immediately dismissed as duplicative of its breach of contract claims based on the exact same conduct."  (Doc. 104 at 12.)  The Court disagrees.

  The Ninth Circuit has noted that "[d]eclaratory relief can be denied when it will neither serve a useful purpose in clarifying and settling the legal relations in issue nor terminate the proceedings and afford relief from the uncertainty and controversy faced by the parties."  *United States v. State of Wash.*, 759 F.2d 1353, 1357 (9th Cir. 1985) (citations omitted).  As such, a "proper inquiry is whether" the claim for declaratory judgment "serve[s] any useful purpose." *City of Lindsay v. Sociedad Quimica y Minera de Chile S.A.*, No. CV–F–11–0046 LJO SMS, 2011 WL 2516159, at *3 (E.D. Cal. June 21, 2011) (citation omitted).  "[W]here a [party] has alleged a substantive cause of action, a declaratory relief claim should not be used as a superfluous second cause of action for the determination of identical issues subsumed within the first." *Id.* at *2 (first alteration in original) (quoting *Jensen v. Quality Loan Serv. Corp.*, 702 F. Supp. 2d 1183, 1189 (E.D. Cal. 2010)).  In other words, "[d]eclaratory relief is unnecessary where an adequate remedy exists under some other cause of action." *Id.* (citation omitted).  "For that reason, 'courts have dismissed companion claims for declaratory relief where [a] breach of contract claim[] resolve[s] the dispute completely and render[s] additional relief inappropriate.'" *Diversified Capital Invs., Inc. v. Sprint Commc'ns, Inc.*, Case No. 15-cv-03796-HSG, 2016 WL 2988864, at *9 (N.D. Cal. May 24, 2016) (citing *Davis v. Capitol Records, LLC*, No. 12-cv-1602, 2013 WL 1701746, at *3–4 (N.D. Cal. Apr. 18, 2013)).  "Declaratory relief is appropriate, however, where a breach of contract claim will not settle all of the contractual issues concerning which plaintiff seeks declaratory relief." *StreamCast Networks, Inc. v. IBIS LLC*, No. CV 05-04239 MMM (Ex), 2006 WL 5720345, at *4 (C.D. Cal. May 2, 2006) (citations omitted).  Ultimately, a claim for declaratory relief is only inappropriate due to redundancy if "it is clear that there is a complete identity of factual and legal issues between [a claim] and the counterclaim." *City of Lindsay*, 2011 WL 2516159, at *3 (quoting *Stickrath v. Globalstar, Inc.*, No. C07-1941 THE, 2008 WL 2050990, at *4 (N.D. Cal. May 13, 2008)).

  In this case, Guardian's request for declaratory relief in the First Counterclaim pertaining to GIS's purported sale of dreamGUARD products and Guardian's breach of contract claims in the Second, Third, and Fourth Counterclaims do not share a complete identity of factual and legal issues.  (*See* Doc. 36 ¶¶ 26–42.)  GIS is correct that all of these counterclaims allege that GIS violated certain terms of the parties' Agreements.  (*See id.*)  However, Guardian's request for declaratory judgment goes one step further and requests a declaration as to "[w]hether Guardian is entitled to immediately terminate the [Agreements] due to [GIS's] breaches."  (*Id.* ¶ 27.)  As such, resolution of the breach of contract counterclaims will not fully resolve Guardian's request for declaratory relief in the First Counterclaim.

"Under the alter ego doctrine, . . . when the corporate form is used to . . . accomplish some . . . wrongful or inequitable purpose, the courts will ignore the corporate entity and deem the corporation's acts to be those of the persons or organizations actually controlling the corporation, in most instances the equitable owners." *Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523, 538 (2000) (citations omitted).   "The alter ego doctrine prevents individuals or other corporations from misusing the corporate laws by the device of a sham corporate entity formed for the purpose of committing fraud or other misdeeds." *Id.* (citation omitted).

In California, the following "two conditions must be met before the alter ego doctrine will be invoked": (1) "there must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist;" and (2) "there must be an inequitable result if the acts in question are treated as those of the corporation alone." *Id.* (citations omitted).   Under the first prong, courts consider a litany of factors, such as (1) "inadequate capitalization;" (2) "commingling of funds and other assets of the two entities;" (3) "the holding out by one entity that it is liable for the debts of the other;" (4) "identical equitable ownership in the two entities;" (5) "use of the same offices and employees;" (6) "use of one as a mere conduit for the affairs of the other;" (7) "disregard of corporate formalities;" (8) "lack of segregation of corporate records;" and (9) "identical directors and officers." *Virtualmagic Asia, Inc. v. Fil-Cartoons, Inc.*, 99 Cal. App. 4th 228, 245 (2002) (citing *Tomaselli v. Transamerica Ins. Co.*, 25 Cal. App. 4th 1269, 1285 (1994)).   "This long list of factors is not exhaustive" and these "factors may be considered '[a]mong' others 'under the particular circumstances of each case.'"   *Morrison Knudsen Corp. v. Hancock, Rothert & Bunshoft*, 69 Cal. App. 4th 223, 250 (1999) (alteration in original) (quoting *Associated Vendors, Inc. v. Oakland Meat Co.*, 210 Cal. App. 2d 825, 838 (1962)).   Additionally, "[n]o single factor is determinative, and instead a court must examine all the circumstances to determine whether to apply the doctrine." *Virtualmagic Asia, Inc.*, 99 Cal. App. 4th at 245 (citation omitted).

There are genuine issues of material fact as to whether this first prong is satisfied.   Some pertinent factors weigh in favor of a finding that GIS and CDFC, Inc. share a unity of interest, such as shared ownership, (Doc. 92, Ex. 3 at 37:20–22), identical directors, (*id.*, Ex. 5 at 57:8–25),

1    at least some shared officers, (*see id.*, Ex. 3 at 37:14–38:15), some shared employees, (*see id.* at

2    38:16–39:6), and use of the same facility, (*see id.*, Ex. 5 at 35:9–13).   However, other

3    considerations weigh against a finding of shared unity of interest, including that a former part

4    owner of GIS during the time in question did not hold an interest in CDFC, Inc., (*see* Doc. 105 ¶¶

5    3–5), and at least certain employees receive separate paychecks from each entity, (Second

6    Liddiard Decl., Ex. OO at 46:14–25).

7        Ultimately, the prong related to unity of interest is a "fact-specific" inquiry. *Virtualmagic*

8    *Asia, Inc.*, 99 Cal. App. 4th at 244.   Based on the meager and divergent evidence in this case, the

9    Court cannot determine as a matter of law that GIS and CDFC, Inc. share a unity of interest.   This

10   inquiry is properly reserved for the finder of fact.   *See, e.g.*, *Mid-Century Ins. Co. v. Gardner*, 9

11   Cal. App. 4th 1205, 1213 (1992) (noting that the issue of whether there is "separate existence of

12   the corporate entity" is "one for the trier of fact").

13       As to the second prong under the alter ego doctrine—an inequitable result—the moving

14   party must show that "some conduct amounting to bad faith makes it inequitable for the corporate

15   owner to hide behind the corporate form." *Sonora Diamond Corp.*, 83 Cal. App. 4th at 539; *see,*

16   *e.g.*, *Hoang v. Vinh Phat Supermarket, Inc.*, No. CIV. 2:13–00724 WBS GGH, 2013 WL

17   4095042, at \*14 (E.D. Cal. Aug. 13, 2013) ("To allege the inequitable result element of the alter

18   ego theory, [the moving party] must [show] bad-faith conduct by [the other party]." (citing

19   *Gardner*, 9 Cal. App. 4th at 1213)).   "[T]he kind of inequitable result that makes alter ego liability

20   appropriate is an abuse of the corporate form, such as under-capitalization or misrepresentation of

21   the corporate form to creditors." *Hoang*, 2013 WL 4095042, at \*14 (quoting *Firstmark Capital*

22   *Corp. v. Hempel Fin. Corp.*, 859 F.2d 92, 94 (9th Cir. 1988)).   "[W]hile the doctrine does not

23   depend on the presence of actual fraud, it is designed to prevent what would be fraud or injustice,

24   if accomplished." *Id.* (quoting *Associated Vendors, Inc.*, 210 Cal. App. 2d at 838).

25       The current record is insufficient to determine whether GIS acted in bad faith.   The record

26   reflects that GIS "formed" CDFC, Inc. because a third party "was aggressively pursuing" some of

27   GIS's accounts and purported "issues surrounding" some of Guardian's products.   (Doc. 92, Ex. 6

28   at 2–3.)   However, Guardian has not directed the Court to any evidence showing that GIS formed

CDFC, Inc. to circumvent the parties' Agreements, or to otherwise act in bad faith.  Absent such evidence, there remain genuine issues of material fact as to the second prong of the alter ego doctrine.

    *b.*  *The dreamGUARD Products are Competing Products.*

   Guardian next asserts that, if GIS actually sold the dreamGUARD products, then it violated the non-compete provision in the Agreements.  (*See, e.g.*, Doc. 92 at 12–13.)  Each of the Agreements includes the following non-compete provision:

> [GIS] agrees that it will not compete with [Guardian] by selling competing products during the term of this Agreement in its assigned area(s).  For purposes of this Agreement, "competing products" mean products of comparable claims or qualities. Should [Guardian] develop new products and amend Exhibit "B" to reflect said new products and prices, [GIS] agrees not to sell products which compete with said new products.

(Doc. 120, Ex. 3 ¶ 12; *id.*, Ex. 5 ¶ 12; *id.*, Ex. 6 ¶ 10; *id.*, Ex. 7 ¶ 10; *id.*, Ex. 9 ¶ 10; *see also* Doc. 120, Ex. 1 ¶ 10 (providing a similar non-compete provision with differences that are not material for purposes of the instant dispute); *id.*, Ex. 2 ¶ 11 (same); *id.*, Ex. 4 ¶ 11 (same); *id.*, Ex. 8 ¶ 11 (same).)

   The record indicates that the dreamGUARD mattress protectors at issue are "competing products" with those offered by Guardian.  The record reflects that both dreamGUARD and Guardian produced "a micro fleece mattress protector."  (Doc. 92, Ex. 4 at 260:1–17).)  Further, there is testimonial evidence in the record that the dreamGUARD mattress protector is a "direct knockoff" of a comparable product offered by Guardian.  (Green Decl. ¶ 13.)  Finally, GIS cites to no evidence in the record indicating that the dreamGUARD mattress protector is not a "competing product," as defined in the Agreements.[30]  (*See* Doc. 104 at 20–21.)

   Based on the available record, the Court finds that the dreamGUARD mattress protector is a "competing product," as that term is defined in the Agreements.  Accordingly, the Court finds

---

[30] In its brief, GIS asserts that Guardian "stay[ed] out of the business" of producing its competing mattress protector. (Doc. 104 at 20.)  However, as GIS itself concedes, Guardian did continue to sell its mattress protectors, to some extent.  (*Id.* at 21.)  As such, both dreamGUARD and Guardian sold the mattress protectors at issue during the same time period.

1    that, *if* GIS sold the dreamGUARD mattress protectors, then it sold a "competing product" and

2    thereby violated the non-compete provisions in the Agreements.

3                              *c.    Guardian did Not Provide the Requisite Notice and Opportunity to Cure.*

4           GIS asserts that, even if it did violate the non-compete provision of the Agreements,

5    summary judgment is not appropriate as to this counterclaim because Guardian failed to provide

6    the requisite written notice and opportunity to cure.[31]   (*See* Doc. 104 at 18–19; Doc. 123 at 41.)

7    The Court agrees with GIS's position.

8           With one exception, each of the Agreements includes the following "notice and cure"

9    provision:

10

11           Should either party be in material breach or non-compliance of any of the terms of
             this Agreement, the other party may terminate this Agreement by giving written

12           notice of such breach or non-compliance and the right to correct the breach.  If the
             breach is not corrected or compliance is not made within sixty (60) days of the date

13           of such notice, this Agreement may be terminated at the end of said sixty (60) day
             period.

14

15    (Doc. 120, Ex. 2 ¶ 16; *id.*, Ex. 3 ¶ 18; *id.*, Ex. 4 ¶ 16; *id.*, Ex. 5 ¶ 18; *id.*, Ex. 6 ¶ 16; *id.*, Ex. 7 ¶ 16;

16    *id.*, Ex. 8 ¶ 16; *id.*, Ex. 9 ¶ 16.)   Based on this language, Guardian may only terminate the

17    Agreements if it provides GIS with written notice of the purported violation followed by a sixty

18    day period to cure the breach.  However, the record in this case indicates that Guardian failed to

19    provide the contractually mandated written notice, as well as the required sixty day period to cure

20    the purported breach.  (*See, e.g.*, Liddiard Decl., Ex. E at 153:5–13 (constituting the deposition

21    transcript of Johnny Green, Guardian's Rule 30(b)(6) representative, in which Mr. Green states

22    that notice "was done in person" and that, "[a]s far as [he] kn[ew]," Guardian did not provide

23    written notice or an opportunity to cure).)  Absent the contractually required written notice and

24    opportunity to cure, Guardian is not entitled to terminate the Agreements due to GIS's purported

25    breach related to the sale of dreamGUARD products.  *See generally Stonebrae, L.P. v. Toll Bros.,*

26

27    [31]  In its briefing, Guardian's only argument regarding this notice and cure issue is that it "is irrelevant to the
      declaration sought by this motion." (Doc. 111 at 7.)  Defendants provide no support for this assertion.  (*See* Doc.

28    111.)  As provided herein, the Court disagrees and finds that whether Guardian complied with the notice and cure
      requirements is highly relevant on the issue of whether it may immediately terminate the Agreements.

1   *Inc.*, No. C-08-0221 EMC, 2009 WL 1082067, at *5 (N.D. Cal. Apr. 22, 2009) ("Ordinarily,

2   whether a party has performed as required under a contract is a question of fact for a jury, not a

3   judge, to decide." (citations omitted)).   Accordingly, Guardian is not entitled to summary

4   judgment on its request for a declaration that it may immediately terminate the Agreements due to

5   GIS's supposed sale of dreamGUARD products—but only insofar as the Agreements include this

6   notice and cure provision.[32]   *Cf. Kim v. Shellpoing Partners, LLC*, CASE NO. 15cv611-LAB

7   (BLM), 2016 WL 1241541, at *8 (S.D. Cal. Mar. 30, 2016) ("[The plaintiff] was obligated to

8   comply with the notice and cure provision before filing suit.   Because she did not, this claim must

9   be dismissed.").

10       In summary, the Court finds that there are genuine issues of material fact as to whether

11   CDFC, Inc. is the alter ego of GIS.   Further, the Court finds that the record indicates that Guardian

12   did not satisfy the notice and cure provision of the Agreements as to GIS's purported breach due

13   to the sale of dreamGUARD products.   Accordingly, the Court DENIES Guardian's Motion, (Doc.

14   92), insofar as Guardian requests summary judgment on its request for a declaration that it may

15   immediately terminate the Agreements due to GIS's purported sale of a competing product.

16       *d.*     *There are Genuine Issues of Material Fact on the Issues of Waiver and*
17               *Estoppel.*

18       GIS moves for summary judgment on Guardian's First Counterclaim on the basis that it is

19   "precluded by the doctrines of waiver and estoppel."   (Doc. 123 at 39.)   The Court finds that

20   summary judgment is not warranted on the basis of waiver or estoppel.

21       Turning first to the issue of waiver, "[w]aiver is the intentional relinquishment of a known

22   right after full knowledge of the facts and depends upon the intention of one party alone."

23   *Oakland Raiders v. Oakland-Alameda Cty. Coliseum, Inc.*, 144 Cal. App. 4th 1175, 1189 (2006)

24   (citation omitted).   "Waiver does not require any act or conduct by the other party" and "the

25   *pivotal* issue in a claim of waiver is the intention of the party who allegedly relinquished the

26

27   ───────────────
     [32] The Court notes that the Pennsylvania Agreement does not include a notice and cure provision applicable to
     breaches that are unrelated to quotas.   (*See* Doc. 120, Ex. 1.)   As such, the Court's analysis and finding regarding
28   Guardian's failure to provide the requisite written notice and opportunity to cure the purported violation of the non-
     compete provision does not apply to the Pennsylvania Agreement.

1 known legal right." *Id.* at 1189–90 (citation omitted).  As to implied waiver, "where a plaintiff has

2 knowledge of the defendant's breach and continues to perform under the contract and/or accepts

3 the defendant's performance without notifying the defendant of the breach, a waiver is fairly

4 implied."  *Roling v. E\*Trade Sec. LLC*, 860 F. Supp. 2d 1035, 1039 (N.D. Cal. 2012) (citing

5 *A.B.C. Distrib. Co. v. Distillers Distrib. Corp.*, 154 Cal. App. 2d 175, 187 (1957)).

6       "The burden is on the party claiming a waiver of right to prove it by clear and convincing

7 evidence that does not leave the matter to speculation."  *Britz Fertilizers, Inc. v. Nationwide*

8 *Agribusiness Ins. Co.*, No. 1:10–cv–02051–AWI–MJS, 2013 WL 5519605, at \*30 (E.D. Cal. Oct.

9 3, 2013) (quoting *Ringler Assocs. Inc. v. Md. Cas. Co.*, 80 Cal. App. 4th 1165, 1188 (2000)).  "As

10 a general rule, doubtful cases will be decided against the existence of a waiver."  *Id.* (quoting

11 *Ringler Assocs. Inc.*, 80 Cal. App. 4th at 1188).

12       Here, there is conflicting evidence as to whether Guardian waived any claim of breach of

13 contract due to GIS's purported sale of dreamGUARD products.  In particular, there is evidence in

14 the record that—while Guardian "has been aware of the sale of dreamGUARD mattress protectors

15 since before . . . January 2011," (Doc. 98, Ex. 2 ¶ 27)—it nonetheless did not provide a written

16 notice of breach or file a lawsuit until after GIS initiated the instant litigation, (*see* Liddiard Decl.,

17 Ex. E at 152:16–157:20).  There is also evidence that Guardian encouraged some third parties to

18 purchase dreamGUARD products.  (*See, e.g.*, *id.*, Ex. L at 250:22–252:21.)

19       However, there is also evidence that Guardian never intentionally relinquished its right to

20 allege a breach.  In particular, years prior to the initiation of the instant suit, Guardian *orally*

21 notified GIS that it considered the sale of dreamGUARD products to be a breach of the

22 Agreements.  (*See, e.g.*, Second Holman Decl. ¶ 2.)  This action indicates that Guardian did not

23 intentionally relinquish its right to declare the sale of dreamGUARD products as a breach of the

24 Agreements.

25       The Court finds that this conflicting evidence regarding whether Guardian intentionally

26 waived its right to claim a breach due to the sale of dreamGUARD products constitutes a genuine

27 issue of material fact.  It is for the jury, and not the Court, to weigh this conflicting evidence.

28

As to the issue of estoppel, "[t]he doctrine of equitable estoppel is founded on concepts of equity and fair dealing" and "provides that a person may not deny the existence of a state of facts if he intentionally led another to believe a particular circumstance to be true and to rely upon such belief to his detriment." *Oakland Raiders*, 144 Cal. App. 4th at 1189 (citation omitted).  Thus, "[w]hile the question of waiver ordinarily turns on the intent of the party against whom it is asserted, estoppel focuses solely on the party's *conduct*."  *Id.*  "The traditional elements of estoppel" include the following: (1) "the party to be estopped must be apprised of the facts;" (2) "he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended;" (3) the other party must be ignorant of the true state of fact;" and (4) "he must rely upon the conduct to his injury."  *Id.* (citation omitted).  "The party seeking to establish an estoppel must show" each of these elements "by clear and convincing evidence."  *In re Marriage of Brinkman*, 111 Cal. App. 4th 1281, 1289 (2003) (citation omitted).

The Court finds that there are genuine issues of material fact as to the second element of equitable estoppel.  As noted above, there is evidence that Guardian (1) was aware of the sale of dreamGUARD products, but did not serve written notice of breach or file a lawsuit, (*see* Doc. 98, Ex. 2 ¶ 27; Liddiard Decl., Ex. E at 152:16–157:20); and (2) encouraged some third parties to purchase dreamGUARD products, (*see, e.g.*, *id.*, Ex. L at 250:22–252:21).   However, while Guardian did not serve written notice of a breach, the record does reflect that Guardian *orally* notified GIS that the sale of dreamGUARD products was a breach of the Agreements.  (*See, e.g.*, Second Holman Decl. ¶ 2.)

The Court finds that this contradictory evidence creates a genuine issue of material fact as to whether Guardian's conduct demonstrated that it permitted GIS to sell dreamGUARD products.  The weighing of this evidence is also appropriately left to the decider of fact.

For the foregoing reasons, the Court DENIES GIS's Motion, (Doc. 98), insofar as GIS requests summary judgment on the First Counterclaim based on the doctrines of waiver and estoppel.

3.  <u>The EFPPs are Not Covered by Two Agreements and There are Genuine Issues of Material Fact Regarding Whether these Products are Covered by the Remaining Agreements.</u>

GIS and Guardian both move for summary judgment on another request for declaratory relief in the First Counterclaim—whether the electronic furniture protection plans sold by Guardian are "Guardian Labeled Distributor Products" covered by the Agreements.  (*See, e.g.*, Doc. 92 at 13–14; Doc. 123 at 30–32.)  This determination turns on the Agreement under consideration.

The Florida and Mid-Atlantic Agreements provide, in pertinent part, that "[i]t is understood that unless specifically noted by a mutually agreed upon Addendum hereto, Guardian Labeled Distributor Products shall be only those items indicated on Exhibit #A which is attached hereto."[33]  (Doc. 120, Ex. 2 ¶ 7; *id.*, Ex. 8 ¶ 7.)  As noted above, this language provides that, unless there is a relevant addendum, the list of products provided in "Exhibit #A" are the *only* products that qualify as "Guardian Labeled Distributor Products."  (*See id.*, Ex. 2 ¶ 7; *id.*, Ex. 8 ¶ 7.)  EFPPS—or any variation of an electronic protection plan—are not listed on these exhibits.  (*See id.*, Ex. 2 ¶ 7; *id.*, Ex. 8 ¶ 7.)   Additionally, these agreements do not include an addendum providing that these products qualify as "Guardian Labeled Distributor Products."  (*See id.*, Exs. 2 & 8.)  As such, the Court finds that EFPPs are not "Guardian Labeled Distributor Products" under the Florida and Mid-Atlantic Agreements.

Turning to the Ohio, Cook County, Indiana, Midwest, Alabama, and Tennessee Agreements, these agreements include the same language that, absent a relevant addendum, limits

---

[33] As stated above, while most of the Agreements include a general definition of "Guardian Labeled Distributor Products" that may conflict with the attached product lists, the Court finds that the specific and explicitly *exclusive* list of products governs.  *See, e.g.*, *Boghos v. Certain Underwriters at Lloyd's of London*, 36 Cal. 4th 495, 504 (2005) (noting that, where "provisions . . . are truly inconsistent," the "more specific contractual provisions control over more general ones" (citations omitted)).

GIS also urges the Court to consider the parties' course of conduct in this analysis.  However, "California law establishes that the parties' course of conduct . . . 'can only be applied when the contract is ambiguous, and cannot be used when the contract is unambiguous.'"  *Stockton Exec. Limousine Charter Serv., Inc. v. Union Pac. R.R.*, No. CIVS041999LKKPAN, 2006 WL 769623, at *6 (E.D. Cal. Mar. 27, 2006) (quoting *Crestview Cemetery Ass'n v. Dieden*, 54 Cal. 2d 744, 754 (1960)).  In this case, all of the Agreements—with the exception of the Pennsylvania Agreement—unambiguously provide that, absent a relevant addendum, "Guardian Labeled Distributor Products shall be only those items indicated on" a specified exhibit "which is attached hereto."  (Doc. 120, Ex. 2 ¶ 7; *id.*, Ex. 3 ¶ 8; *id.*, Ex. 4 ¶ 7(c); *id.*, Ex. 5 ¶ 8; *id.*, Ex. 6 ¶ 8; *id.*, Ex. 7 ¶ 8; *id.*, Ex. 8 ¶ 7; *id.*, Ex. 9 ¶ 8.)  As this language is unambiguous, the Court declines to consider the parties' course of conduct when making this determination.

1  the products that qualify as "Guardian Labeled Distributor Products" to those provided in a

2  specified attached exhibit.  (*See* Doc. 120, Ex. 3 ¶ 8; *id.*, Ex. 4 ¶ 7(c); *id.*, Ex. 5 ¶ 8; *id.*, Ex. 6 ¶ 8;

3  *id.*, Ex. 7 ¶ 8; *id.*, Ex. 9 ¶ 8.)  However, those pertinent exhibits providing product lists are not a

4  part of the record for this case.  (*See id.*, Exs. 3–7, 9.)  Additionally, these agreements do not

5  include an addendum that addresses whether EFPPs qualify as "Guardian Labeled Distributor

6  Products."  (*See id.*)

7       Absent these exhibits or a relevant addendum, the Court is left to speculate as to whether

8  EFPPs are included as "Guardian Labeled Distributor Products."  The Court declines to engage in

9  speculation as to the contents of evidence that is not in the record for this case.  The Court

10  therefore finds that there is a genuine issue of material fact as to whether EFPPs are "Guardian

11  Labeled Distributor Products" under the Ohio, Cook County, Indiana, Midwest, Alabama, and

12  Tennessee Agreements.

13       Finally, as noted previously, the Pennsylvania Agreement does not include *any* definition

14  of what constitutes "Guardian Labeled Distributor Products."[34]   (*See* Doc. 120, Ex. 1.)   The

15  absence of any guidance in the Pennsylvania Agreement renders the meaning of "Guardian

16  Labeled Distributor Products" ambiguous, insofar as this term may be susceptible to numerous

17  different meanings.  In particular, in the context of the instant analysis, this term may either

18  encompass or exclude EFPPs.  Therefore, as noted above, the term "Guardian Labeled Distributor

19  Products" is ambiguous as it is used in the Pennsylvania Agreement.  *See, e.g.*, *Cal. Sportfishing*

20  *Prot. All. v. USA Waste of Cal., Inc.*, No. CIV. 2:11–2663 WBS KJN, 2012 WL 2339810, at \*7

21  (E.D. Cal. June 19, 2012) ("Language is ambiguous if it 'is reasonably susceptible of more than

22  one application to material facts.'" (quoting *Dore v. Arnold Worldwide, Inc.*, 39 Cal. 4th 384, 391

23  (2006))).

24       As previously stated, if a "contract is ambiguous, the conflict is ordinarily a genuine

25  dispute of material fact inappropriate for resolution on summary judgment."  *Lennar Mare Island,*

26

---

27  [34] The Court notes that the Pennsylvania Agreement includes two exhibits that list products.  (*See* Doc. 120, Ex. 1 at
   10–21.)   However, unlike the remaining agreements, the Pennsylvania Agreement does not include language
28  indicating that these exhibits list the products that constitute "Guardian Labeled Distributor Products."  (*See* Doc. 120,
   Ex. 1.)

*LLC v. Steadfast Ins. Co.*, 176 F. Supp. 3d 949, 964 (E.D. Cal. 2016) (citing *San Diego Gas & Elec. Co. v. Canadian Hunter Mktg. Ltd.*, 132 F.3d 1303, 1307 (9th Cir. 1997) and *WYDA Assocs. v. Merner*, 42 Cal. App. 4th 1702, 1710 (1996)); *see, e.g.*, *Cal. Sportfishing Prot. All.*, 2012 WL 2339810, at *7 ("Summary judgment is inappropriate . . . if the court cannot determine the parties' intent at the time of contracting without judging the credibility of the extrinsic evidence." (citing *City of Hope Nat'l Med. Ctr. v. Genentech, Inc.*, 43 Cal. 4th 375, 395 (2008))).   The Court therefore finds that there is a genuine issue of material fact regarding whether EFPPs are "Guardian Labeled Distributor Products" under the Pennsylvania Agreement.   This question is properly reserved for the decider of fact.

In summary, the Court finds that EFPPs are not "Guardian Labeled Distributor Products" covered by the Florida and Mid-Atlantic Agreements.   The Court also finds that there are genuine issues of material fact as to whether EFPPs are "Guardian Labeled Distributor Products" under the Pennsylvania, Ohio, Cook County, Indiana, Midwest, Alabama, and Tennessee Agreements.

Accordingly, the Court GRANTS Guardian's Motion, (Doc. 92), to the extent Guardian seeks summary judgment on its request for a declaration in its First Counterclaim that EFPPs are not within the scope of the Florida and Mid-Atlantic Agreements.   The Court also DENIES both GIS's Motion, (Doc. 98), and Guardian's Motion, (Doc. 92), insofar as these parties seek summary judgment on the request for a declaration in the First Counterclaim regarding whether EFPPs are "Guardian Labeled Distributor Products" under the Pennsylvania, Ohio, Cook County, Indiana, Midwest, Alabama, and Tennessee Agreements.

### 4.      The Agreements Do Not Include a Best Efforts Requirement.

GIS seeks summary judgment on Guardian's request for a declaration in the First Counterclaim that GIS failed to use "best efforts" to promote Guardian's products.   (*See* Doc. 123 at 32–38.)   For the following reasons, the Court finds that summary judgment in favor of GIS is warranted on this issue.[35]

---

[35] GIS initially argues that it is entitled to summary judgment on all of Guardian's counterclaims alleging a violation of a "best efforts" requirement because Guardian has not complied with the notice and cure provision of the Agreements.   (*See* Doc. 123 at 32–34.)   The Court disagrees.

As an initial matter, the Court notes that the Agreements do not explicitly provide a "best efforts" requirement.[36]  (*See* Doc. 120, Exs. 1–9.)  Thus, if such a requirement exists, it must be implied.

Under California law, "covenants to use 'good faith' or 'best efforts' to generate profits for a licensor are 'routinely implied where the licensor grants exclusive promotional or licensing rights in exchange for a percentage of profits or royalties,' even though the licensee does not expressly promise to do anything."  *Wolf v. Walt Disney Pictures & Television*, 162 Cal. App. 4th 1107, 1120 (2008) (quoting *Third Story Music, Inc. v. Waits*, 41 Cal. App. 4th 798, 805 (1995)); *see, e.g.*, Cal. Com. Code § 2306, subd. 2 ("A lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale.").  "However, an implied covenant will not be read into a contract to

---

Each of the Agreements—with the exception of the Pennsylvania Agreement—include the following notice and cure provision:

> Should either party be in material breach or non-compliance of any of the terms of this Agreement, the other party may terminate this Agreement by giving written notice of such breach or non-compliance and the right to correct the breach.  If the breach is not corrected or compliance is not made within sixty (60) days of the date of such notice, this Agreement may be terminated at the end of said sixty (60) day period.

(Doc. 120, Ex. 2 ¶ 16; *id.*, Ex. 3 ¶ 18; *id.*, Ex. 4 ¶ 16; *id.*, Ex. 5 ¶ 18; *id.*, Ex. 6 ¶ 16; *id.*, Ex. 7 ¶ 16; *id.*, Ex. 8 ¶ 16; *id.*, Ex. 9 ¶ 16.)  As discussed at length above, this provision prevents Guardian from *terminating* these Agreements without satisfying the requirements related to written notice and opportunity to cure.  Thus, where Guardian sought the option to terminate the Agreements absent the requisite written notice and opportunity to cure, the Court found that summary judgment was not warranted.

However, Guardian's counterclaims relating to "best efforts" present a different situation.  Specifically, Guardian's claims asserting a violation of a "best efforts" obligation do *not* include a request to terminate the Agreements.  As such, under the plain language of the notice and cure provision, Guardian did not have to provide written notice and an opportunity to cure before asserting these counterclaims.  *See, e.g.*, *Flint Emergency Med., LLC v. Macon Cty. Med. Ctr., Inc.*, Civil Action No. 5:12–CV–105 (MTT), 2013 WL 5507279, at *8 (M.D. Ga. Oct. 2, 2013) (addressing a similar notice and cure provision regarding terminating the agreement and stating that "a party that terminates the [a]greement without abiding by [the notice and cure provision] breaches the [a]greement with respect to the manner of its termination, but that party does not preclude itself from asserting other claims for breach pursuant to the [a]greement," "[n]or has it undercut its ability to raise its opponent's breaches as a defense").

For these reasons, the Court find that GIS is not entitled to summary judgment on Guardian's counterclaims relating to a "best efforts" obligation due to Guardian's failure to comply with the Agreements' notice and cure provision.  Of course, the Pennsylvania Agreement does not include this provision, so GIS is similarly not entitled to summary judgment on this issue under that agreement.

[36] In their briefing, Guardian implies that an express "best efforts" obligation is included in the Agreements based on language in the Agreements stating that their purpose is "the promotion, solicitation, and sale of Guardian Labeled Distributor Products."  (Doc. 103 at 37.)  However, the Court notes that nothing in this language imposes an express best efforts requirement.  (*See id.*)

74

1    prohibit a party from doing something that is expressly permitted by the agreement." *Vectren*

2    *Commc'ns Servs. v. City of Alameda*, No. C 08–3137 SI, 2009 WL 2566722, at *4 (N.D. Cal. Aug.

3    18, 2009) (citing *Carma Developers Cal., Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 374

4    (1992)).   Correspondingly, "there can be no implied covenant where the subject is completely

5    covered by the contract." *Third Story Music, Inc.*, 41 Cal. App. 4th at 804 (citation omitted).

6         GIS argues that the minimum monthly purchase quotas provided in the Agreements

7    completely cover GIS's purchasing obligations, thereby precluding the application of an implied

8    best efforts requirement.  (*See* Doc. 123 at 34–38.)  The Court agrees.  Under California law, the

9    best efforts requirement applies to contracts "unless otherwise agreed" by the parties.  Cal. Com.

10   Code § 2306, subd. 2.  In *Third Story Music, Inc. v. Waits*, the court found that it was unnecessary

11   to "imply a covenant . . . to protect the enforceability of the contract, or otherwise to effectuate the

12   clear and obvious intent of the parties" because a party otherwise agreed to pay a "guaranteed

13   minimum amount no matter what efforts were undertaken."  41 Cal. App. 4th at 808–09.  The

14   court noted that "[t]he law refuses to read into contracts anything by way of implication except

15   upon grounds of obvious necessity" and such necessity was lacking where the parties contracted

16   for a minimum requirement, thereby ensuring "legally adequate consideration" and a binding

17   contract.   *Id.* (citation omitted).   In interpreting similar "best efforts" requirements in other

18   jurisdictions, courts have likewise found "that where the parties to a contract have specifically

19   agreed to quantity terms, the [best efforts requirement] is inapplicable." *Monetti, S.p.A. v. Anchor*

20   *Hocking Corp.*, No. 87 C 9594, 1992 WL 67852, at *1 (N.D. Ill. Mar. 23, 1992) (citing *Gerard v.*

21   *Almouli*, 746 F.2d 936, 939 (2d Cir. 1984)); *see, e.g.*, *Permanence Corp. v. Kennametal, Inc.*, 908

22   F.2d 98, 103 (6th Cir. 1990) (addressing a Pennsylvania contract and finding that "[t]he

23   implication of a best efforts obligation [was] not necessary to establish mutuality of obligation"

24   where the party was otherwise guaranteed certain payments); *Aventis Envtl. Sci. USA LP v. Scotts*

25   *Co.*, 383 F. Supp. 2d 488, 505 (S.D.N.Y. 2005) (applying Delaware law and finding that "the

26   implied 'best efforts' clause was unnecessary" because, in relevant part, the agreement included a

27   "[m]inimum [purchase] [c]ommitment"); *Vacuum Concrete Corp. of Am. v. Am. Mach. &*

28   *Foundry Co.*, 321 F. Supp. 771, 774 (S.D.N.Y. 1971) (declining to "imply[]" a best efforts

1  requirement where the licensor of products agreed, in pertinent part, to receive "a very substantial

2  minimum annual royalty . . . in lieu of obtaining an express agreement from" the other party to use

3  best efforts, thereby "protect[ing] itself against the possibility that the [other party] might do

4  nothing").

5      In the present case, each of the Agreements includes a minimum monthly purchase quota.

6  Guardian ensured through this quota—rather than an express or implied obligation of best

7  efforts—that it would receive consideration, as well as the right to terminate the Agreements if,

8  after the requisite notice and opportunity to cure, GIS failed to satisfy the quotas.  Simply put, the

9  parties elected for quotas instead of an implied "best efforts" requirement.  *Cf. Third Story Music,*

10 *Inc.*, 41 Cal. App. 4th at 805 ("[C]ovenants to use 'good faith' or 'best efforts' to generate profits

11 for the licensor are routinely implied where the licensor grants exclusive promotional or licensing

12 rights in exchange for a percentage of profits or royalties, *but the licensee does not expressly*

13 *promise to do anything*." (emphasis added) (citation omitted)).  As such, the Court declines to

14 imply a best efforts requirement where the parties "otherwise agreed" to a system of quotas.  *See,*

15 *e.g.*, Cal. Com. Code § 2306, subd. 2 (stating that "an obligation . . . to use best efforts" is implied

16 in "exclusive dealing" contracts "unless" the parties "otherwise agree[]").  The parties were free to

17 provide for a best efforts obligation in their Agreements; absent such language, however, the Court

18 finds that the parties elected to contract around a best efforts requirement in favor of specific quota

19 requirements.  As the Agreements do not include a best efforts requirement, GIS is entitled to

20 summary judgment on Guardian's counterclaim for declaratory relief alleging a violation of GIS's

21 best efforts obligation.

22     For these reasons, the Court GRANTS GIS's Motion, (Doc. 98), to the extent GIS seeks

23 summary judgment on Guardian's request in the First Counterclaim for a declaration that GIS

24 failed to use best efforts.

25 **C.   GIS's Motion for Summary Judgment on Guardian's Other Counterclaims Shall Be**
        **Granted in Part and Denied in Part.**
26

27     Finally, GIS moves for summary judgment on Guardian's counterclaims for (1) breach of

28 the Alabama, Florida, and Tennessee Agreements (Second Counterclaim); (2) breach of the

1  implied covenant of good faith and fair dealing as to the Alabama, Florida, and Tennessee

2  Agreements (Third Counterclaim); (3) breach of the Pennsylvania, Mid-Atlantic, Ohio, Cook

3  County, Indiana, and Midwest Agreements (Fourth Counterclaim); (4) Breach of the implied

4  covenant of good faith and fair dealing in the Pennsylvania, Mid-Atlantic, Ohio, Cook County,

5  Indiana, and Midwest Agreements (Fifth Counterclaim); and (5) breach of the California

6  Commercial Code section 2306, subd. 2 (Sixth Counterclaim).  GIS's arguments directed to these

7  causes of action are the same as those directed to Guardian's counterclaim for declaratory relief,

8  *see* sections III.B.2.d (waiver and estoppel as to the Second through Fifth Counterclaims) and

9  III.B.4 (best efforts obligation as to all counterclaims), *supra*.

10  Accordingly, for the reasons set forth above, the Court (1) GRANTS GIS's Motion, (Doc.

11  98), insofar as GIS requests summary judgment on Guardian's allegations in the counterclaims

12  that GIS failed to use best efforts; and (2) DENIES GIS's Motion, (*id.*), to the extent GIS requests

13  summary judgment on Guardian's Second through Fifth Counterclaims on the basis of waiver or

14  estoppel.[37]

15  **IV.   CONCLUSION**

16  For the reasons provided herein, the Court GRANTS IN PART and DENIES IN PART

17  Guardian's Motion, (Doc. 92), Defendants' Motion, (Doc. 93), and GIS's Motion, (Doc. 98).

18  Specifically, the Court GRANTS Guardian's Motion, (Doc. 92), to the extent Guardian seeks

19  summary judgment on its request for a declaration in its First Counterclaim that EFPPs are not

20  within the scope of the Florida and Mid-Atlantic Agreements.  The Court DENIES the remainder

21  of Guardian's Motion.  (*Id.*)

22

23

---

24  [37] GIS also moves for summary judgment on Guardian's Sixth Counterclaim, in which Guardian alleges that GIS violated California Commercial Code § 2306, subdivision 2 by failing to use best efforts to promote Guardian's products.  (*See* Doc. 123 at 38.)  GIS argues that summary judgment is warranted as to this counterclaim because (1) the Agreements do not include an implied best efforts obligation; and (2) Section 2306, subdivision 2 does not provide a private right of action.  (*Id.*)

As discussed herein, the Court finds that the Agreements do not include an implied obligation for GIS to use best efforts.  Summary judgment is therefore warranted as to this counterclaim and the Court need not otherwise address GIS's additional argument as to whether Section 2306, subdivision 2 provides a private right of action.

Accordingly, the Court GRANTS GIS's Motion, (Doc. 98), insofar as GIS requests summary judgment on Guardian's Sixth Counterclaim.

1    The Court also GRANTS Defendants' Motion, (Doc. 93), insofar as Defendants request

2  summary judgment on (1) GIS's Fifth Cause of Action, and (2) GIS's CFIL claim based on the

3  Agreements in the Seventh Cause of Action.  The Court DENIES the remainder of Defendants'

4  Motion.  (*Id.*)

5    Finally, the Court GRANTS GIS's Motion, (Doc. 98), to the extent GIS requests summary

6  judgment on (1) Guardian's allegations in all of the counterclaims that GIS failed to use best

7  efforts; and (2) the Sixth Counterclaim.  The Court DENIES the remainder of GIS's Motion.  (*Id.*)

8    Accordingly, the Court DISMISSES the following: (1) GIS's Fifth Cause of Action; (2)

9  GIS's CFIL claim based on the Agreements in the Seventh Cause of Action; (3) Guardian's claims

10  in all of its counterclaims that GIS failed to use best efforts; and (4) Guardian's Sixth

11  Counterclaim.

12

13  IT IS SO ORDERED.

14  Dated:   **January 18, 2017**                        /s/ *Sheila K. Oberto*

15                                          UNITED STATES MAGISTRATE JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28