1
2
3
4
5
6
# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

8

9   G.P.P., INC. d/b/a GUARDIAN
    INNOVATIVE SOLUTIONS,
10
                    Plaintiff,
11
12          v.
13
    GUARDIAN PROTECTION PRODUCTS,
14  INC., RPM WOOD FINISHES GROUP,      Case No. 1:15-cv-00321-SKO
    INC.,
15                                      **ORDER DENYING DEFENDANTS'**
                    Defendants.         **SUCCESSIVE MOTION FOR PARTIAL**
16  _____/   **SUMMARY JUDGMENT**
17                                       **(Doc. 184)**

18  GUARDIAN PROTECTION PRODUCTS,
    INC.,
19
                    Counterclaimant,
20
21          v.
22
    G.P.P., INC. d/b/a GUARDIAN
23  INNOVATIVE SOLUTIONS,
24                  Counter-defendant.
    _____/
25
26
27
28

Pending before the Court is the Successive Motion for Partial Summary Judgment ("Defendants' Motion") brought by Defendant and Counterclaimant Guardian Protection Products, Inc. ("Guardian") and Defendant RPM Wood Finishes Group, Inc. (Doc. 184.) For the reasons provided herein, the Court DENIES the Motion. (*Id.*)

## I.     BACKGROUND

The Court fully described the background for this case in its January 18, 2017 Order Granting in Part and Denying in Part the Parties' Motions for Summary Judgment (the "January Order"). (Doc. 133.) As such, the Court shall not repeat the full background for this matter.

### A.     The Agreements and the Product Language

As is relevant here, Guardian and Plaintiff/Counter-defendant G.P.P., Inc. d/b/a Guardian Innovative Solutions ("GIS") are parties to six warehousing distributor agreements (collectively, the "Agreements"), "which grant GIS the exclusive right to distribute 'Guardian Products' in" the geographic areas covered by those Agreements. (Doc. 98, Ex. 2 ¶ 12.) Specifically, the Agreements provide that GIS has distribution rights to certain Guardian products in the following geographic areas: (1) certain counties in Pennsylvania (the "Pennsylvania Agreement"), (Doc. 120, Ex. 1); (2) Ohio (the "Ohio Agreement"), (*id.*, Ex. 3); (3) Indiana (the "Indiana Agreement"), (*id.*, Ex. 5); (4) the remaining counties in Illinois, Iowa, and certain counties in Missouri (the "Midwest Agreement"), (*id.*, Ex. 6); (5) Alabama (the "Alabama Agreement"), (*id.*, Ex. 7); and (6) Tennessee (the "Tennessee Agreement"), (*id.*, Ex. 9).[1] All of the Agreements "are governed by California law." (Doc. 98, Ex. 2 ¶ 13.)

With the exception of the Pennsylvania Agreement, the Agreements all provide the following pertinent description of "Guardian Labeled Distributor Products": "It is understood that unless specifically noted by a mutually agreed upon Addendum hereto, Guardian Labeled Distributor Products shall be only those items indicated in Exhibit 'B' which is attached hereto" (the "Product Language"). (Doc. 120, Ex. 5 ¶ 8; *id.*, Ex. 6 ¶ 8; *id.*, Ex. 7 ¶ 8; *id.*, Ex. 9 ¶ 8; *see*

---

[1] Guardian and GIS are parties to three additional agreements, which provide distribution rights to GIS for certain Guardian products in (1) the remaining counties in Pennsylvania, Maryland, the District of Columbia, and certain counties in New York (the "Mid-Atlantic Agreement"), (Doc. 120, Ex. 2), (2) Cook County in Illinois, (*id.*, Ex. 4), and (3) Florida, (*id.*, Ex. 8). These additional three agreements are not at issue for purposes of Defendants' Motion. (*See, e.g.*, Doc. 184 at 5 n.1.)

*also id.*, Ex. 3 ¶ 8 (providing an identical statement regarding "Guardian Labeled Distributor Products" in the Ohio Agreement, with the exception that the "Exhibit 'B'" is described as "a part of this Agreement").)  The Ohio, Indiana, Midwest, Alabama, and Tennessee Agreements in the record do not include an "Exhibit 'B'" providing a list of products that qualify as "Guardian Labeled Distributor Products," or an addendum otherwise describing what constitutes these products.  (*See id.*, Exs. 3, 5–7, 9.)  Unlike the other Agreements, the Pennsylvania Agreement does not include any description of which products qualify as "Guardian Labeled Distributor Products."  (*See id.*, Ex. 1.)

**B.  EFPPs and the Price Lists**

"[I]n June of 2009," Guardian "began selling" electronic furniture protection plans ("EFPPs").  (Doc. 184, Ex. 2 ¶ 2.)  These EFPPs are electronic warranties provided by Guardian and underwritten by AIG and/or Chartis.  (*See, e.g.*, Doc. 92, Ex. 3 at 272:23–273:1; Doc. 130, Ex. 3.)  Guardian permitted GIS to purchase EFPPs for resale and counted GIS's sales of EFPPs towards GIS's quotas under the Agreements.  (*See, e.g.*, Doc. 125, Ex. 6 at 202:23–203:20; *see also* Doc. 98, Ex. 2 ¶ 21 (stating that "[t]he numbers cited in Guardian's notices of breach of the Alabama, Florida, and Tennessee Agreements included the sale of [EFPPs]").)

Guardian and its distributors, including GIS, devoted resources to convert from the sale of paper warranties to EFPPs.  (*See, e.g.*, Doc. 127, Ex. 6 at 2; Doc. 148, Ex. 1 at 248:12–250:24.)  GIS "lost several key accounts during this [conversion] process."  (Doc. 127, Ex. 6 at 2.)

Additionally, during the course of their relationship, Guardian sent certain correspondences to GIS and other distributors that included lists of Guardian products.  (*See, e.g.*, Doc. 184, Exs. 7–10; Doc. 196.)  The parties have identified certain of these lists of products that GIS may or may not argue are "Addend[a]" under the Agreements (the "Price Lists").[2]  (*See, e.g.*, Doc. 184, Exs.

---

[2] In its order entered on May 1, 2017, the Court "note[d] that, in their briefing regarding Defendants' Motion . . . , the parties reference certain 'price lists,' which [GIS] may or may not assert are 'Addend[a],' as that term is used in the Agreements' Product Language."  (Doc. 189 (citations omitted).)  The Court then ordered the parties to "each file a brief . . . in which the parties state the precise location in the docket of this case of each purported 'Addend[a]' that the Court should consider for purposes of addressing Defendants' Motion."  (*Id.* (emphasis omitted).)  The Court further cautioned "the parties that it will *only* consider the purported 'Addend[a]' identified by the parties in th[is] briefing . . . and not any other potential 'Addend[a]' . . . when ruling on Defendants' Motion."  (*Id.*)

7–10; Doc. 196.)   GIS also contends—and Defendants have not contested—that EFPPs are included in at least some of these Price Lists.  (*See, e.g.*, Doc. 185, Ex. 2 ¶ 24.)

## C.    The Bob's Discount Furniture Agreement

In addition to the Agreements, GIS contends in this litigation that certain discussions between representatives of Guardian and GIS in 2010 regarding Guardian's sales of products to a third party, Bob's Discount Furniture, in areas covered by the Agreements resulted in a binding contract (the "Bob's Discount Furniture Agreement").  (*See, e.g.*, Doc. 123 at 23–26.)  Under the purported Bob's Discount Furniture Agreement, Guardian paid commissions to GIS in exchange for Guardian selling products to Bob's Discount Furniture in these areas.  (*See, e.g.*, Doc. 128; Doc. 165, Ex. 5 at 84:7–85:5.)

The parties have only referenced a single product that Guardian allegedly sold to Bob's Discount Furniture in the areas covered by the Agreements—"private-label products . . . under the brand name 'Bob's Goof Proof.'"  (Doc. 103, Ex. 5 ¶ 3.  *See generally* Doc. 185 at 9 (providing GIS's assertion that "Bob's Goof Proof warranties are the same as ordinary EFPPs").)  "Guardian first began selling private-label products under the brand name 'Bob's Goof Proof' on May 28, 2010 . . . ."  (Doc. 184, Ex. 2 ¶ 3.)

Subsequent to the parties' 2010 discussions, Guardian "made $40,741.55 in commission payments to" GIS "[f]or nearly four years from 2011 to 2014," which were "based on 5% of sales made by Guardian to Bob's Discount Furniture stores."  (Doc. 98, Ex. 2 ¶ 26.)  In November 2014, Guardian unilaterally terminated these commission payments to GIS.  (Doc. 125, Ex. 2 at 114:1–6.)

## D.    Pertinent Procedural Background

By its order entered on March 14, 2017, the Court ordered "that the parties may conduct additional discovery regarding the Product Language under the Ohio, Indiana, Midwest, Alabama, and Tennessee Agreements, as well as the meaning of 'Guardian Labeled Distributor Products' under the Pennsylvania Agreement" (cumulatively, the "Additional Discovery").  (Doc. 177 at 3.)

---

On May 3, 2017, GIS and Defendants each filed their briefs in response to the Court's May 1, 2017 order. (Docs. 191 & 192.)  In these briefs, the parties identified the Price Lists that are at issue for purposes of Defendants' Motion.  (*See* Doc. 191 at 2; Doc. 192 at 1–2.)

In its order entered on March 31, 2017, the Court permitted the parties to file second or successive summary judgment motions.  (Doc. 183 at 3.)  However, the Court "specifically tailored" this "opportunity for additional summary judgment motions" to "the expanded factual record in this case relating to the Additional Discovery."  (*Id.* at 3–4.)  Consequently, "if a party could have raised a motion for summary judgment during the initial summary judgment round in this case before the Additional Discovery, they [could] not raise that motion during this second round of summary judgment."  (*Id.* at 4 (citations omitted).)  Given the present posture of this case, the Court also set limits on the briefing schedule and length of briefs associated with this second round of summary judgment motions.  (*See id.* at 3 & 6.)

Defendants filed Defendants' Motion on April 20, 2017.  (Doc. 184.)  GIS filed its opposition to Defendants' Motion on April 27, 2017, (Doc. 185), and Defendants filed their reply in support of this motion on May 2, 2017, (Doc. 190).  The Court then heard oral argument regarding Defendants' Motion on May 4, 2017.  (Doc. 194.)  As such, Defendants' Motion is ready for disposition.

## II.    LEGAL STANDARD

"Federal Rule of Civil Procedure 56 governs motions for summary judgment," *Smith v. Union Pac. R.R. Co.*, No. 2:12–cv–00656–TLN–CKD, 2013 WL 5718874, at *2 (E.D. Cal. Oct. 16, 2013), and provides, in part, that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a).  In evaluating a motion for summary judgment, the court "must draw all reasonable inferences supported by the evidence in favor of the non-moving party and then decide whether any genuine issues of material fact exist."  *Guidroz-Brault v. Mo. Pac. R.R. Co.*, 254 F.3d 825, 829 (9th Cir. 2001).  "A fact issue is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "A material fact is one that may affect the outcome of the case under the applicable law."  *Cotta v. Cty. of Kings*, 79 F. Supp. 3d 1148, 1156 (E.D. Cal. 2015) (citing *Liberty Lobby, Inc.*, 477 U.S. at 248).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see, e.g.*, Fed. R. Civ. P. 56(c)(1)(A) (stating that a party seeking summary judgment must support their motion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials"). "The exact nature of this responsibility, however, varies depending on whether the issue on which summary judgment is sought is one in which the movant or the nonmoving party carries the ultimate burden of proof." *Cotta*, 79 F. Supp. 3d at 1157 (citations omitted). "Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun*, 509 F.3d at 984. On the other hand, a moving party that does not carry "the ultimate burden of persuasion at trial" must "either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000) (citations omitted).

"If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Id.* at 1102–03 (citations omitted). "In such a case, the nonmoving party may defeat the motion for summary judgment without producing anything." *Id.* at 1103 (citation omitted).

However, "[i]f the moving party meets its initial burden, the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *Soremekun*, 509 F.3d at 984 (quoting *Liberty Lobby, Inc.*, 477 U.S. at 250). Stated differently, "[i]n order to avoid summary judgment, a non-movant must show a genuine issue of material fact by presenting *affirmative evidence* from which a jury could find in

its favor." *F.T.C. v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009) (citing *Liberty Lobby, Inc.*, 477 U.S. at 257). "A non-movant's bald assertions or a mere scintilla of evidence in his favor are both insufficient to withstand summary judgment." *Id.* (citing *Galen v. Cty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007)); *see, e.g.*, *Soremekun*, 509 F.3d at 984 ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment." (citations omitted)); *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir. 1997) ("Once the [moving party] has made a prima facie case for summary judgment, the [non-moving party] cannot rely on general denials; [they] must produce significant probative evidence that demonstrates that there is a genuine issue of material fact for trial." (citing *Liberty Lobby, Inc.*, 477 U.S. at 249–50)).

"In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence." *Soremekun*, 509 F.3d at 984. "That remains the province of the jury or fact finder." *Cotta*, 79 F. Supp. 3d at 1157 (citation omitted). "Rather, [the court] draws all inferences in the light most favorable to the nonmoving party." *Soremekun*, 509 F.3d at 984 (citing *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987)). "The evidence presented by the parties must be admissible." *Id.* (citing Fed. R. Civ. P. 56(e)).

### III.     GUARDIAN'S FIRST COUNTERCLAIM

Defendants first argue that summary judgment is warranted on Guardian's First Counterclaim to the extent this claim seeks declaratory judgment that EFPPs are not covered by the Agreements.[3]  (*See* Doc. 184 at 9–19.)  Specifically, Defendants argue that EFPPs are not

---

[3] In its opposition brief, GIS argues that Defendants' Motion exceeds the scope of permissible successive motions for summary judgment. (*See* Doc. 185 at 9–10.)  The Court disagrees with this argument, as Defendants adequately assert in Defendants' Motion how this motion arises out of and directly relates to the Additional Discovery.  (*See* Doc. 184 at 8–9.)  The Court therefore finds that Defendants' Motion complies with the limitations provided in the Court's March 31, 2017 order.

Defendants, in turn, repeatedly argue in their reply brief that GIS's opposition to Defendants' Motion, as well as the supporting materials submitted with the opposition, do not comply with either the scope or the length limitations imposed by the Court in its March 31, 2017 order.  (*See* Doc. 190 at 2–3, 8–9.)  The Court similarly disagrees with this argument.

As to scope, the Court's March 31, 2017 order only imposed limitations on "the new grounds to move on [a] claim or issue," and *not* on responsive arguments or positions.  (Doc. 183 at 4.)  As such, GIS was under no obligation to establish how its arguments in its opposition arose out of and directly relate to the Additional Discovery.  (*See id.*)

"Guardian Labeled Distributor Products" under the Product Language, which—with the exception of the Pennsylvania Agreement—is provided in each of the Agreements. (*See id.* at 9–17.) GIS argues in response that (1) EFPPs are covered by the Product Language, (2) the parties modified the Agreements to include EFPPs through their course of conduct, and (3) Guardian is estopped from arguing that EFPPs are not covered by the Agreements. (*See* Doc. 185 at 10–18.) The Court shall address each of these issues, in turn.

A.      **The Agreements' Product Language**

Defendants argue that summary judgment is warranted on Guardian's First Counterclaim because EFPPs are not covered products under the terms of the Product Language. (*See* Doc. 184 at 9–17.) The Court disagrees with Defendants' position.

"Under California law, the interpretation of a written contract is a matter of law for the court even though questions of fact are involved." *Britz Fertilizers, Inc. v. Bayer Corp.*, 665 F. Supp. 2d 1142, 1159 (E.D. Cal. 2009) (quoting *Southland Corp. v. Emerald Oil Co.*, 789 F.2d 1441, 1443 (9th Cir. 1986)). "The basic goal of contract interpretation is to give effect to the parties' mutual intent at the time of contracting." *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.*, 109 Cal. App. 4th 944, 955 (2003) (citations omitted). "When a contract is reduced to writing, the parties' intention is determined from the writing alone, if possible." *Id.* (citation omitted). "Unless the words in a contract are used in a technical manner or are defined in the contract, the words of a contract are to be understood in their ordinary and popular sense." *Britz Fertilizers, Inc.*, 665 F. Supp. 2d at 1159–60 (citations omitted). "When interpreting a contract, '[t]he whole of a contract is to be taken together' with 'each clause helping to interpret the other.'" *Id.* at 1160 (quoting Cal. Civ. Code § 1641). "In addition, a court 'may not read the contract in a manner that leads to an absurd result.'" *Id.* (quoting *Kassbaum v. Steppenwolf Prods., Inc.*, 236 F.3d 487, 491 (9th Cir. 2000)).

---

Further, GIS's opposition brief includes only fifteen pages of argument, (*see* Doc. 185 at 4–19), which complies with the length limitation imposed by the Court in its March 31, 2017 order, (*see* Doc. 183 at 6). While Defendants may now take issue with the length of the supporting materials GIS included with the opposition brief, the Court's March 31, 2017 order placed no restrictions on such materials. (*See id.* at 2–6.)

For these reasons, the Court also finds that GIS's opposition to Defendants' Motion, (Doc. 185), complies with the Court's March 14, 2017 order.

8

In this case, with the exception of the Pennsylvania Agreement, each of the Agreements includes the following Product Language: "It is understood that unless specifically noted by a mutually agreed upon Addendum hereto, Guardian Labeled Distributor Products shall be only those items indicated in Exhibit 'B' which is attached hereto." (Doc. 120, Ex. 5 ¶ 8; *id.*, Ex. 6 ¶ 8; *id.*, Ex. 7 ¶ 8; *id.*, Ex. 9 ¶ 8; *see also id.*, Ex. 3 ¶ 8 (providing an identical statement regarding "Guardian Labeled Distributor Products" in the Ohio Agreement, with the exception that the "Exhibit 'B'" is described as "a part of this Agreement").) Thus, the Product Language provides the following two distinct descriptions of "Guardian Labeled Distributor Products": (1) "only those items indicated in Exhibit 'B' which is attached hereto," (2) "unless specifically noted by a mutually agreed upon Addendum hereto."[4] (*Id.*, Ex. 5 ¶ 8; *id.*, Ex. 6 ¶ 8; *id.*, Ex. 7 ¶ 8; *id.*, Ex. 9 ¶ 8; *see also id.*, Ex. 3 ¶ 8 (providing that, absent a pertinent addendum, the covered products are "indicated in Exhibit 'B' which is a part of this Agreement").)

Turning to the "Addendum" provision of the Product Language, Defendants argue, in relevant part, that the Price Lists are not covered by the Agreements because they do not satisfy the "specifically noted" requirement of the Product Language. (*See, e.g.*, Doc. 184 at 11–12.) The Court agrees. A plain reading of the Product Language requires that the potential addenda to the Agreements must "specifically note[]," in some way, that they provide items that are "Guardian Labeled Distributor Products" under the Agreements. (*See* Doc. 120, Ex. 3 ¶ 8; *id.*, Ex. 5 ¶ 8; *id.*, Ex. 6 ¶ 8; *id.*, Ex. 7 ¶ 8; *id.*, Ex. 9 ¶ 8.) *See generally Britz Fertilizers, Inc.*, 665 F. Supp. 2d at

---

[4] In its opposition, GIS appears to assert that the Product Language is "inherently ambiguous." (Doc. 185 at 4.) However, the Court has already found that the Product Language is not patently ambiguous. (Doc. 133 at 71 n.33.) Further, the Court also previously stated that the Product Language does not contain a latent ambiguity. (*See* Doc. 179 at 49–50.) *See generally State Farm Life Ins. Co. v. Brockett*, 737 F. Supp. 2d 1146, 1152 (E.D. Cal. 2010) ("California recognizes two forms of ambiguity: patent and latent. Patent ambiguity appears on the face of the text itself while latent ambiguity arises from extrinsic evidence that casts doubt on the plain meaning of the text." (citation omitted)). In particular, the Court noted that GIS's argument "regarding course of conduct would expand [the Product Language] to a universe of other potential products that are completely unrelated to this contractual language" and "[t]his interpretation is irreconcilable with the explicitly exclusionary [Product Language]." (Doc. 179 at 49–50.) As such, "the Court determined that in light of GIS's evidence regarding course of conduct, the dispositive text of the agreements is not reasonably susceptible to the contrary interpretation urged by GIS." (*Id.* at 50.) *See generally Brockett*, 737 F. Supp. 2d at 1153 ("For latent ambiguity to exist, the text must be reasonably susceptible to an interpretation (supported by extrinsic evidence) that is at odds with the plain meaning of the text."); *Dore v. Arnold Worldwide, Inc.*, 39 Cal. 4th 384, 391 (2006) ("[E]ven if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible." (citation omitted)).
   In short, the Court has already addressed and rejected GIS's ambiguity argument regarding the Product Language. The Court therefore finds that GIS's redundant ambiguity argument in its opposition lacks merit.

1159–60 ("Unless the words in a contract are used in a technical manner or are defined in the contract, the words of a contract are to be understood in their ordinary and popular sense." (citations omitted)). The methods of demonstrating this connection with the Agreements may vary—for example, the purported addendum could "specifically note[]," in some way, that (1) it is an "Addendum" to the Agreements, (2) the products indicated in the addendum are "Guardian Labeled Distributor Products," or (3) the products indicated in the addendum are covered by the Agreements. Conversely, if a purported addendum provides no specific indication that it includes items that are covered by the Agreements, then it is not a valid "Addendum" under the plain meaning of the Product Language.[5] (*See* Doc. 120, Ex. 3 ¶ 8; *id.*, Ex. 5 ¶ 8; *id.*, Ex. 6 ¶ 8; *id.*, Ex. 7 ¶ 8; *id.*, Ex. 9 ¶ 8.)

In connection with Defendants' Motion, the parties provided numerous Price Lists that GIS contends include EFPPs and constitute "Addend[a]" under the Product Language. (*See* Doc. 184, Exs. 7–10; Doc. 196.) However, none of these Price Lists "specifically note[]," in any form, that (1) they are "Addend[a]" to the Agreements, (2) the products listed in the Price Lists are "Guardian Labeled Distributor Products," or (3) the products listed in the Price Lists are covered by the Agreements. (*See* Doc. 184, Exs. 7–10; Doc. 196.) Indeed, the Price Lists provide no statement, whatsoever, specifically linking the products listed on the Price Lists with the Agreements. (*See* Doc. 184, Exs. 7–10; Doc. 196.) As the Price Lists lack this language, the Price Lists do not satisfy the "specifically noted" requirement of the Product Language. (*See* Doc. 120, Ex. 3 ¶ 8; *id.*, Ex. 5 ¶ 8; *id.*, Ex. 6 ¶ 8; *id.*, Ex. 7 ¶ 8; *id.*, Ex. 9 ¶ 8.) The Court therefore finds that

---

[5] GIS appears to argue in its briefing that a different interpretation of the "specifically noted" requirement is appropriate. Specifically, GIS asserts that the Price Lists satisfy the "specifically noted" requirement because "Guardian's products *are* 'specifically noted' in the [Price Lists], just as they were in the original Exhibits." (Doc. 185 at 13.) The Court is not persuaded by GIS's argument.

The plain language of the Product Language provides that, to be a valid "Addendum," a document must "specifically note[]," in some way, that it is expanding the covered products beyond the items listed in the "Exhibit 'B.'" (*See* Doc. 120, Ex. 3 ¶ 8; *id.*, Ex. 5 ¶ 8; *id.*, Ex. 6 ¶ 8; *id.*, Ex. 7 ¶ 8; *id.*, Ex. 9 ¶ 8.) By contrast, to adopt GIS's interpretation of this requirement, the Court would have to divorce the words "specifically noted" from the remainder of the Product Language. The Court declines GIS's invitation to adopt this strained interpretation of the Product Language and, instead, shall follow a natural reading of this language. *See, e.g.*, *Kurtin v. Elieff*, 215 Cal. App. 4th 455, 471–72 (2013) ("All else being equal, . . . courts prefer a more natural reading of text to a less natural one, whether that text be found in a statute or a contract." (citations omitted)); *cf.* Cal. Civ. Code § 1638 ("The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity.").

the Price Lists are not "Addend[a]" under the Product Language.[6]  Further, as the parties have not

directed the Court to any documents beyond the Price Lists that are purportedly "Addend[a]," (*see,*

*e.g.*, Doc. 191 at 2; Doc. 192), the Court also finds that there are no documents in the record that

constitute "Addend[a]" under the Product Language.

These determinations do not, however, resolve the question of whether EFPPs are

"Guardian Labeled Distributor Products" under the Product Language.  While the record does not

include valid "Addend[a]," the Product Language provides one additional method for determining

whether products are covered by the Agreements—namely, covered products include "those items

indicated in [an] Exhibit 'B'" to the Agreements.  (*See* Doc. 120, Ex. 3 ¶ 8; *id.*, Ex. 5 ¶ 8; *id.*, Ex. 6

¶ 8; *id.*, Ex. 7 ¶ 8; *id.*, Ex. 9 ¶ 8.)

In its January Order, the Court previously found that the record did not include a relevant

addendum or exhibit providing the "Guardian Labeled Distributor Products."  (Doc. 133 at 72.)

The Court further "decline[d] to engage in speculation" as "to whether EFPPs are included as

'Guardian Labeled Distributor Products'" in "these exhibits or a relevant addendum."  (*Id.*)  The

Court therefore found "that there is a genuine issue of material fact as to whether EFPPs are

'Guardian Labeled Distributor Products' under" the Agreements.  (*Id.*)

The present situation is materially identical for purposes of this analysis.  Just like at the

first summary judgment stage, there is no relevant exhibit in the record listing the products that are

covered by the Agreements.  Further, Defendants have not directed the Court to any evidence

demonstrating that EFPPs were not or could not have been listed in a specified exhibit.[7]  As in the

January Order, the Court declines to engage in speculation as to the contents of evidence that is

---

[6] Of course, neither Defendants nor GIS contend that the Price Lists are an "Exhibit 'B'" to the Agreements.  (*See* Docs. 184–185, 190.)

[7] In their briefing Defendants argue that "the only reasonable interpretation of what . . . was included on Exhibit 'B' are the products Guardian was selling at the time it entered into each of the Agreements."  (Doc. 190 at 6; *see also id.* at 3 (arguing that it is "indisputabl[e]" that the exhibits specified in the Product Language "do not include" EFPPs or "private label products . . . under the brand name 'Bob's Goof Proof'").)  In support of this assertion, Defendants cite evidence that Guardian first sold EFPPs in 2009 and Bob's Goof Proof in May 2010.  (*See, e.g.*, Doc. 184, Ex. 2 ¶ 3.)  However, this evidence does not directly support Defendants' proffered interpretation.  While Guardian may have begun to sell EFPPs and Bob's Goof Proof long after the parties entered into the Agreements, this is not the pertinent question as to the specified exhibits.  Instead, the question is whether EFPPs and Bob's Goof Proof were not or could not have been listed on these exhibits.  Defendants fail to direct the Court to evidence on this dispositive issue and have failed to direct the Court to any evidence supporting their purportedly "reasonable interpretation" of what products were included on the specified exhibits.

not in the record for this case—namely, any relevant exhibit under the Product Language. The Court therefore finds that there is a genuine issue of material fact as to whether EFPPs are "Guardian Labeled Distributor Products" under the Product Language.[8]  As such, summary judgment is not appropriate as to Guardian's request for declaratory relief relating to EFPPs in the First Counterclaim.

---

[8] As noted previously, while the Pennsylvania Agreement covers "Guardian Labeled Distributor Products," it does not include the Product Language, or, indeed, *any* description of what constitutes such products. (*See* Doc. 120, Ex. 1.) Defendants nonetheless argue that "the term 'Guardian Labeled Distributor Products'" in the Pennsylvania Agreement "should be interpreted in the same manner as the other Agreements" because the Agreements all are part of substantially one transaction and the Pennsylvania Agreement was incorporated by reference in the Mid-Atlantic Agreement. (Doc. 184 at 18.)

As to Defendants' first point, the Pennsylvania Agreement and the remaining Agreements are not part of substantially one transaction because the Pennsylvania Agreement does not relate to the same subject matter as the other Agreements.  In particular, the Pennsylvania Agreement addresses a geographic area different than the remaining Agreements and there is no overlap between the areas covered by the other Agreements.  Further, Defendants have not cited any evidence demonstrating that the parties intended the various Agreements—including the Pennsylvania Agreement—to be part of substantially one transaction.  *Cf. Versaci v. Superior Court*, 127 Cal. App. 4th 805, 814 (2005) (addressing whether separate agreements form part of substantially one transaction and stating that "[w]hether a document is incorporated into the contract depends on the parties' intent as it existed at the time of contracting").  Consequently, the Pennsylvania Agreement is not part of substantially one transaction for purposes of analyzing the Agreements.  *See, e.g.*, *Ramirez v. Baxter Credit Union*, Case No. 16-cv-03765-SI, 2017 WL 118859, at *3 (N.D. Cal. Jan. 12, 2017) ("Under California law, when several contracts relating to the same subject matter are executed by the same parties, they are generally considered together as if contained in a single document." (citing *Versaci*, 127 Cal. App. 4th at 814)).

Additionally, the Pennsylvania Agreement was not incorporated into another Agreement.  While the Mid-Atlantic Agreement references the Pennsylvania Agreement, this reference is included to *explicitly exclude* the geographic area covered by the Pennsylvania Agreement from the scope of the Mid-Atlantic Agreement and *not* to incorporate the terms of the Pennsylvania Agreement into the terms of another Agreement. (*See* Doc. 120, Ex. 2 at 22 (stating, in relevant part, that the Mid-Atlantic Agreement covered "all other areas not coverd [sic] by the [Pennsylvania Agreement]" in "the State of Pennsylvania")); *cf. Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1262 (9th Cir. 2017) (noting "California's general rule that 'parties may validly incorporate by reference into their contract the terms of another document' provided certain conditions are met" (quoting *Slaught v. Bencomo Roofing Co.*, 25 Cal. App. 4th 744, 748 (1994))).

For these reasons, the Court declines Defendants' invitation to interpret the Pennsylvania Agreement in the same manner as the remaining Agreements as to the meaning of "Guardian Labeled Distributor Products."  Instead, as previously found by the Court in its January Order, the absence of any guidance in the Pennsylvania Agreement renders the meaning of "Guardian Labeled Distributor Products" ambiguous—insofar as this term is used in this agreement—and there is a genuine issue of material fact regarding whether EFPPs are covered products under the Pennsylvania Agreement. (Doc. 133 at 72–73.)  *See generally Epic Commc'ns, Inc. v. Richwave Tech., Inc.*, 237 Cal. App. 4th 1342, 1354 (2015) (concluding that contractual language "was patently ambiguous" and therefore "consult[ing] extrinsic," including "the parties' subsequent conduct," to "determine the parties' intent").  This question is properly reserved for the decider of fact.

**B.    Implied Modification Through Subsequent Course of Performance**

GIS argues that summary judgment is also not warranted on Guardian's First Counterclaim because the parties modified the Agreements to cover EFPPs through their course of performance.[9]  (*See* Doc. 185 at 10–15.)  The Court agrees with GIS's position.

"California contract law recognizes the principle of implied modification by conduct." *Gen. Elec. Capital Corp. v. MSI Modular Sys.*, Case No. CV 14-09873-RGK (JEMx), 2015 WL 11438597, at *2 (C.D. Cal. Aug. 17, 2015) (citing *Diamond Woodworks, Inc. v. Argonaut Ins. Co.*, 109 Cal. App. 4th 1020, 1038 (2003), *disagreed with on other grounds by Simon v. San Paolo U.S. Holding Co.*, 35 Cal. 4th 1159, 1182–83 (2005)); *see also* Cal. Com. Code § 1303(f) ("[A] course of performance is relevant to show a waiver or modification of any term inconsistent with the course of performance.").  *See generally Emp'rs Reinsurance Co. v. Superior Court*, 161 Cal. App. 4th 906, 920–21 (2008) ("Not only is course of performance relevant in ascertaining the meaning of the parties' agreement, it may supplement or qualify the terms of the agreement, or show a waiver or modification of any term inconsistent with the course of performance." (citations omitted)).  "When one party has, through oral representations and conduct or custom,

_____

[9] In its reply brief, Defendants argue that the Court should reject GIS's course-of-performance argument because it already declined to consider this argument in its January Order.  (Doc. 190 at 3.)  Defendants are correct that, in its January Order, the Court found that the Product Language was "unambiguous" and therefore "decline[d] to consider the parties' course of conduct."  (Doc. 133 at 71 n.33.)  Nonetheless, Defendants mischaracterize this finding for two separate reasons.

First, during the hearing regarding the parties' motions in limine, the Court specifically noted that it "erred" in making this finding and, instead, the Court should have "engaged in the correct analysis pursuant to *Pacific Gas & Electric Company . . . and its progeny*."  (Doc. 179 at 49.)  *See generally Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.*, 69 Cal. 2d 33 (1968).  As such, to the extent Defendants now argue the Court should again rely on the same analysis regarding the purported ambiguity of the Product Language, the Court has already rejected that improper analysis.  (*See* Doc. 179 at 49.)

Second, Defendants are conflating separate legal theories.  The passage in the Court's January Order that Defendants cite pertained to potential patent ambiguities in the Product Language.  (*See* Doc. 133 at 71 n.33.)  Similarly, the Court's corrected description of the proper analysis at the motion-in-limine hearing addressed potential patent and latent ambiguities in the Product Language.  (*See* Doc. 179 at 48–50.)  However, GIS provides a separate and distinct legal theory regarding course of conduct in its opposition—namely, that the parties modified the Agreements through their subsequent course of conduct.  (*See* Doc. 185 at 10–15.)  Consequently, the Court's prior rulings regarding potential ambiguities in the Product Language—or the meaning of this language—are irrelevant to this analysis.  *See, e.g., Emp'r Reinsurance Co. v. Superior Court*, 161 Cal. App. 4th 906, 920–21 (2008) ("Not only is course of performance relevant in ascertaining the meaning of the parties' agreement, it may supplement or qualify the terms of the agreement, or show a waiver or modification of any term inconsistent with the course of performance." (citations omitted)).

For these reasons, the Court declines Defendants' invitation to extrapolate the Court's prior ruling in the January Order regarding the ambiguity of the Product Language to GIS's present argument regarding implied modification.

13

subsequently behaved in a manner antithetical to one or more terms of an express written contract, he or she has induced the other party to rely on the representations and conduct or custom." *Wagner v. Glendale Adventist Med. Ctr.*, 216 Cal. App. 3d 1379, 1388 (1989). "In that circumstance, it would be . . . inequitable to deny the relying party the benefit of the other party's apparent modification of the written contract." *Id.*

Thus, "where the subsequent conduct of parties is inconsistent with and clearly contrary to provisions of the written agreement, the parties' modification setting aside the written provisions will be implied." *Diamond Woodworks, Inc.*, 109 Cal. App. 4th at 1038 (citing *Garrison v. Edward Brown & Sons*, 25 Cal. 2d 473, 479 (1944)). Indeed, "a written agreement may be modified by the parties' conduct, even if the written agreement includes a clause expressly prohibiting modification." *Alvarado Orthopedic Research, L.P. v. Linvatec Corp.*, No. 11–CV–246–IEG (RBB), 2013 WL 2351814, at *4 (S.D. Cal. May 24, 2013) (citing *Wagner*, 216 Cal. App. 3d at 1388); *cf.* Cal. Com. Code § 2209(2) ("A signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded . . . ."); *Stanley v. Univ. of S. Cal.*, 178 F.3d 1069, 1078 (9th Cir. 1999) ("[P]laintiff cannot rely on pre-contract implied terms when contract was integrated; plaintiff cannot rely on post-contract implied terms when contract required all modifications be written . . . ." (citing *Haggard v. Kimberly Quality Care, Inc.*, 39 Cal. App. 4th 508 (1995))). However, "[b]efore a contract modifying a written contract can be implied, the conduct of the parties according to the findings of the trial court must be inconsistent with the written contract so as to warrant the conclusion that the parties intended to modify the written contract." *Alvarado Orthopedic Research, L.P.*, 2013 WL 2351814, at *4 (quoting *Diamond Woodworks, Inc.*, 109 Cal. App. 4th at 1038).

GIS argues that there are genuine issues of material fact as to whether the parties impliedly modified the Agreements—and, in particular, the Product Language—through their course of performance by treating EFPPs as products that are covered under the Agreements.[10] (*See* Doc. 185 at 10–15.) The Court agrees.[11]

---

[10] The Pennsylvania Agreement does not provide any definition of "Guardian Labeled Distributor Products." (*See* Doc. 120, Ex. 1.) Consequently, there is no language for the parties' course of performance regarding covered products to contradict and implied modification is not implicated. *See, e.g., Diamond Woodworks, Inc. v. Argonaut*

As noted previously, the Product Language provides two distinct descriptions of "Guardian Labeled Distributor Products": (1) "only those items indicated in Exhibit 'B' which is attached hereto," (2) "unless specifically noted by a mutually agreed upon Addendum hereto." (Doc. 120, Ex. 5 ¶ 8; *id.*, Ex. 6 ¶ 8; *id.*, Ex. 7 ¶ 8; *id.*, Ex. 9 ¶ 8; *see also id.*, Ex. 3 ¶ 8 (providing that, absent a pertinent addendum, the covered products are "indicated in Exhibit 'B' which is a part of this Agreement").) However, GIS has presented evidence that the parties engaged in a course of performance that is inconsistent with and contrary to the Product Language. Specifically, GIS has provided evidence that Guardian periodically sent price lists—such as the Price Lists discussed above—to GIS and GIS was allowed to distribute the products provided on those lists in the territories governed by the Agreements. (*See, e.g.*, Doc. 186, Ex. 1 at 27:4–16 (providing the 30(b)(6) deposition of Guardian's representative, Ronnie Holman, in which Mr. Holman states that, in the context of the Indiana and Midwest Agreements, the parties "updated" price lists "periodically" and "the way the parties did business was that GIS had the exclusive right to sell" the products on the lists "in its territories"); *id.* at 32:11–20 (providing Mr. Holman's statement that, presuming "that there was no Exhibit B" to the Alabama and Tennessee Agreements, he agreed that "the parties understood that the products subject to those contracts were the products contained on Guardian's product price lists that it distributed to the distributors from time to time"); *id.*, Ex. 2 at 21:16–21 (providing the deposition testimony of Guardian's Vice President,

*Ins. Co.*, 109 Cal. App. 4th 1020, 1038 (2003) ("[W]here the subsequent conduct of parties is inconsistent with and clearly contrary to provisions of the written agreement, the parties' modification setting aside the written provisions will be implied." (citing *Garrison v. Edward Brown & Sons*, 25 Cal. 2d 473, 479 (1944))). The Court therefore construes GIS's argument regarding implied modification as pertaining only to the other Agreements.

[11] In their reply brief, Defendants argue that "the Agreements . . . expressly provide . . . for written modifications" and, as such, "conduct should not factor into the Court's analysis" regarding implied modification. (Doc. 190 at 4–5.) Defendants fail to cite any provision of the Agreements in support of their assertion that the Agreements only provide for written modifications. (*See id.*)

Contrary to Defendants' unsupported argument, the Agreements do not include *any* language requiring that a modification be in writing. (*See* Doc. 120, Ex. 3; *id.*, Ex. 5; *id.*, Ex. 6; *id.*, Ex. 7; *id.*, Ex. 9.) As such, California's doctrine of implied modification is not foreclosed by the terms of the parties' Agreements. *See, e.g.*, Cal. Com. Code § 1303(f) ("Subject to Section 2209, a course of performance is relevant to show a waiver or modification of any term inconsistent with the course of performance."); *see also id.* § 2209(2) ("A signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded . . . ."); *cf. Holmes v. Ministerios De Amistad, Inc.*, No. D042531, 2004 WL 1789635, at *11 (Cal. Ct. App. Aug. 11, 2004) (interpreting the California Court of Appeals' decision in *Diamond Woodworks, Inc. v. Argonaut Inc. Co.*, 109 Cal. App. 4th 1020 (2003) as permitting implied modification "notwithstanding [a] contract term requiring all modifications to be in writing" if the parties "waive[d] . . . the written modifications provision," or modified the contract "to eliminate that provision and add others").

Johnny Green, in which Mr. Green states that, at least after Mr. Green "joined Guardian in October of 2012, if you wanted to find out what products were available to GIS from Guardian, you would want to look at the distributor price list"); *id.*, Ex. 3 at 36:9–18 (providing the deposition testimony of Christopher Nolan, GIS's Executive Vice President, in which Mr. Nolan states that "GIS received price lists from Guardian" and GIS "took those to . . . [GIS's] exclusive territory" and that was "how [GIS] conducted business with Guardian for many, many years and do to this day"). *See generally id.*, Ex. 2 at 33:21–24 (providing Mr. Green's statement that the products "Guardian made available to GIS" were "[n]ot pursuant to any particular agreement" and Guardian's "authorized distributor, such as GIS, would have access to anything on that distribution list").) Indeed, GIS's Executive Vice President, Christopher Nolan, testified that the "items" on price lists that Guardian sent to GIS were "what [GIS] had exclusive rights, territorial rights to" and that GIS was "required to purchase those products." (*Id.*, Ex. 3 at 35:18–36:1; *see, e.g.*, Doc. 149 ¶ 6 (providing the declaration of Christopher Nolan, GIS's Executive Vice President, in which Mr. Nolan states that "Guardian required GIS to distribute those products that were included on these updated product lists, rather than the lists originally attached to the [Agreements]").)

Additionally, GIS contends—and Defendants do not contest—that the list of products provided in at least some of the price lists included EFPPs. (*See, e.g.*, Doc. 185, Ex. 2 ¶ 24; *see also* Doc. 196 (providing Price Lists, some of which discuss "Chartis" or "AIG" warranties); *cf.* Doc. 149 ¶ 5 (stating that "[a]ll of the products listed" on a price list attached to a memorandum with the subject line "Notice of Pending Changes – Effective June 1, 2015" are "EFPPs, as indicated by the 'EW-' prefix in the 'Item Number' column"). Finally, there is also evidence in the record that Guardian included GIS's sales of EFPPs when determining whether GIS sold sufficient "Guardian Labeled Distributor Products" under the quotas for the Agreements. (*See, e.g.*, Doc. 98, Ex. 2 ¶ 21 (providing the parties' joint statement that "[t]he numbers cited in Guardian's notices of breach of the Alabama, Florida, and Tennessee Agreements included the sale of [EFPPs]"); Doc. 125, Ex. 2 at 139:16–140:7 (providing Mr. Green's testimony that he did not "think" Guardian "explicitly went to anybody," including GIS, "and said that [EFPPs] don't

apply" towards quotas); *id.*, Ex. 6 at 203:11–17 (providing Mr. Holman's testimony that EFPPs "counted towards [GIS's] quotas"); *see also* Doc. 186, Doc. 2 at 40:19–41:11 (providing Mr. Green's testimony that "at least since the time [Mr. Green] joined Guardian in October of 2012," he "considered that all products on a Guardian product price list would count towards GIS's quotas").)

In sum, GIS has presented sufficient evidence that, at least prior to the initiation of this litigation, the parties consistently treated EFPPs as products that are covered by the Agreements. Of course, if the parties treated EFPPs as "Guardian Labeled Distributor Products" without designating EFPPs as covered products under one of the two methods provided in the Product Language, then this course of performance is inconsistent with and contrary to the Product Language. Nonetheless, GIS has presented sufficient course-of-performance evidence to create a triable issue as to whether the parties mutually intended to modify the Agreements to include EFPPs as "Guardian Labeled Distributor Products."[12] The Court therefore finds that there is a genuine issue of material fact as to whether the parties modified the Agreements through their course of performance to include EFPPs as products that are covered by the Agreements. As such, summary judgment is not appropriate as to Defendants' First Counterclaim based on this theory of implied modification.

## C. Equitable Estoppel

GIS also argues that Defendants' Motion should be denied as to the First Counterclaim because Guardian is "estopped from claiming that EFPPs . . . are not 'Guardian Labeled Distributor Products.'" (Doc. 185 at 15.) The Court again agrees with GIS's position.

---

[12] Guardian argues that there was no implied modification to the Agreements because GIS never supplied consideration for such a modification. (*See* Doc. 184 at 15–16.) This argument is unavailing, as the consideration provided for any such modification is inherent in this relationship—Guardian purportedly offered additional or new products to GIS and Guardian received compensation once GIS distributed those products. *Cf. Diamond Woodworks, Inc. v. Argonaut Ins. Co.*, 109 Cal. App. 4th 1020, 1038 (2003) (noting that "[n]o additional consideration was needed" for an implied modification to a contract where "[t]he parties *mutually* dispensed with the subject requirements of the contract by quid pro quo conduct antithetical to the written terms of the contract"). *See generally San Diego City Firefighters, Local 145 v. Bd. of Admin. of San Diego City Emps.' Ret. Sys.*, 206 Cal. App. 4th 594, 619 (2012) ("[A]ll the law requires for sufficient consideration is the proverbial 'peppercorn.'" (quoting *Third Story Music, Inc. v. Waits*, 41 Cal. App. 4th 798, 808–09 & n.5 (1995))).

"The doctrine of equitable estoppel is founded on concepts of equity and fair dealing" and "provides that a person may not deny the existence of a state of facts if he intentionally led another to believe a particular circumstance to be true and to rely upon such belief to his detriment." *Oakland Raiders v. Oakland-Alameda Cty. Coliseum, Inc.*, 144 Cal. App. 4th 1175, 1189 (2006) (citation omitted); *see, e.g.*, *Hair v. California*, 2 Cal. App. 4th 321, 328–29 (1991) ("The essence of an estoppel . . . is that the party to be estopped has by false language or conduct led another to do that which he would not otherwise have done and as a result thereof that he has suffered injury." (alteration in original) (quoting *In re Lisa R.*, 13 Cal. 3d 636, 645 (1975))); *see also* Cal. Evid. Code § 623 ("Whenever a party has, by his own statement or conduct, intentionally and deliberately led another to believe a particular thing true and to act upon such belief, he is not, in any litigation arising out of such statement or conduct, permitted to contradict it."). This doctrine "is applicable where the conduct of one side has induced the other to take such a position that it would be injured if the first should be permitted to repudiate its acts." *Old Republic Ins. Co. v. FSR Brokerage, Inc.*, 80 Cal. App. 4th 666, 678 (2000) (citation omitted). "Equitable estoppel . . . focuses on the *conduct* of the party to be estopped and the reasonable inferences that [may] be drawn by the other party." *BNSF Ry. Co. v. San Joaquin Valley R.R. Co.*, No. CV F 08–1086 AWI SMS, 2012 WL 1355662, at *12 (E.D. Cal. Apr. 18, 2012) (citing *Oakland Raiders*, 144 Cal. App. 4th at 1190).

In California, "[t]he traditional elements of estoppel" include the following: (1) "the party to be estopped must be apprised of the facts;" (2) "he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended;" (3) the other party must be ignorant of the true state of fact;" and (4) "he must rely upon the conduct to his injury." *Oakland Raiders*, 144 Cal. App. 4th at 1189 (citation omitted). "Where any one of the elements of equitable estoppel is absent, the claim must fail." *Am. Cas. Co. of Reading, Pa. v. Baker*, 22 F.3d 880, 892 (9th Cir. 1994) (quoting *Hair*, 2 Cal. App. 4th at 328).

In this case, each of the elements is satisfied with regard to EFPPs. As to the first element, the record reflects that Guardian was apprised of the pertinent facts—namely, that GIS was selling EFPPs, which Guardian, itself, distributed to GIS. (*See, e.g.*, Doc. 98, Ex. 1 ¶ 7 (providing

Christopher Nolan's statement that "GIS first began purchasing [EFPPs] from Guardian for certain of GIS's customers in or around June 2009"); Doc. 149 ¶ 5 (providing Christopher Nolan's statement that "[a]ll of the products listed" on a price list attached to a memorandum sent by Guardian with the subject line "Notice of Pending Changes – Effective June 1, 2015" are "EFPPs, as indicated by the 'EW-' prefix in the 'Item Number' column").) Regarding the second element, Guardian's conduct in distributing EFPPs to GIS and counting GIS's sales of these products towards GIS's quotas under the Agreements, (*see, e.g.*, Doc. 125, Ex. 6 at 203:11–17), demonstrates a clear intent that Guardian intended for GIS to sell these products and consider EFPPs as covered products under the Agreements, (*see, e.g.*, Doc. 149 ¶ 9 (providing Christopher Nolan's statement that "[a]t a meeting with its distributors in or around April 2012 (which [he] attended), Guardian assured GIS that EFPPs would be covered under the [Agreements]")). As to the third element, GIS has presented sufficient evidence that, prior to this litigation, it was not aware of Guardian's present position that EFPPs are not covered by the Agreements. (*See, e.g.*, *id.* ¶¶ 8–13.) Finally, regarding the fourth element, GIS has provided evidence that it relied on Guardian's conduct regarding EFPPs to its injury, including by expending substantial resources to transition its business from paper to electronic warranties to coordinate with Guardian's shift to the sale of EFPPs, (*see* Doc. 148, Ex. 1 at 248:12–250:24 (providing Mr. Green's deposition testimony, in which he describes the burdens for Guardian and its distributors in transitioning to EFPPs); Doc. 127, Ex. 6 at 2 (constituting a letter from Charles Gibson of GIS to Johnny Green of Guardian, in which Mr. Gibson describes the resources and efforts required for the "conversion" to EFFPs)), as well as by "los[ing] several key accounts during this process," (Doc. 127, Ex. 6 at 2).

The Court thus finds that there are genuine issues of material fact as to whether Guardian should be estopped from contending that EFPPs are not "Guardian Labeled Distributor Products" under the Agreements. Defendants' Motion is therefore properly denied as to the First Counterclaim based on GIS's estoppel theory.[13]

---

[13] In their reply, Defendants argue that, "if the Court were inclined to consider GIS's latest estoppel claim in connection with Guardian's motion, due process would require that the Court again continue trial and re-open discovery" because "Guardian was not permitted to obtain such discovery under the limited scope of the Additional Discovery period." (Doc. 190 at 8–9.) The Court disagrees with Defendants' position.

For the above reasons, the Court DENIES Defendants' Motion, (Doc. 184), insofar as Defendants move for summary judgment on Guardian's request for declaratory relief relating to EFPPs in the First Counterclaim.

## IV.    GIS'S THIRD CAUSE OF ACTION

Defendants next move for summary judgment on GIS's Third Cause of Action, (*see* Doc. 184 at 17–18), in which GIS alleges that Defendants breached the Bob's Discount Furniture Agreement, (*see* Doc. 67 ¶¶ 65–69). Specifically, Defendants argue that the Bob's Discount Furniture Agreement was not a valid contract because it lacked consideration and, as such, GIS's Third Cause of Action fails. (*See* Doc. 184 at 17–18.) GIS responds that summary judgment is not warranted on this claim because there are genuine issues of material fact as to whether (1) the Bob's Discount Furniture Agreement was supported by consideration; and (2) Guardian is estopped from claiming that Bob's Goof Proof is not a covered product under the Agreements and, correspondingly, that the Bob's Discount Furniture Agreement is not supported by consideration.[14] (*See* Doc. 185 at 9–10, 15–18.)

### A.    General Discussion Regarding Consideration

"In California, to prove the existence of a contract, a plaintiff must show: [1] parties capable of contracting, (2) the parties' consent, (3) a lawful object, and (4) consideration." *Arch Ins. Co. v. Sierra Equip. Rental, Inc.*, No. 2:12-cv-00617-KJM-KJN, 2016 WL 4000932, at *4

---

As previously noted by the Court, the Additional Discovery was necessary because GIS indicated that it was pursuing a new legal theory regarding the Product Language and "fail[ed] to adequately produce evidence during the initial discovery period that GIS eventually intended to rely on at trial." (Doc. 183 at 5.) Nonetheless, the Court found that "the sanction of exclusion of this evidence was not appropriate under the pertinent standard." (*Id.*)

GIS's estoppel argument regarding the First Counterclaim, on the other hand, is not a new argument for which the parties did not previously have an opportunity to engage in discovery. Indeed, GIS first raised estoppel as a defense in its answer to Guardian's counterclaims almost two years ago. (*See* Doc. 43 at 7 (providing GIS's assertion in its September 21, 2015 Answer to Counterclaims that "Guardian's Counterclaims are barred in whole or in part by the equitable doctrine of estoppel with respect to the parties' asserted rights and obligations under the . . . Agreements").) As such, the parties had ample opportunity to address this estoppel argument during the initial discovery period in this case and a re-opening of discovery is not warranted.

For these reasons, the Court is not persuaded by Defendants' argument that the Court should re-open discovery if it considers GIS's estoppel argument. (*See* Doc. 190 at 8–9.)

[14] It is not clear based on GIS's briefing whether it also pursues an implied-modification theory regarding Bob's Goof Proof—namely, that the parties impliedly modified the Agreements to include Bob's Goof Proof as a covered product, so the Bob's Discount Furniture Agreement is supported by consideration. (*See* Doc. 185.) Instead, GIS's discussion regarding implied modification focuses on EFPPs, generally, and the Price Lists. (*See id.* at 10–15.) Absent any specific discussion regarding implied modification in the context of the Bob's Goof Proof product, the Court declines to engage in a speculative analysis of what GIS may or may not argue on this topic.

(E.D. Cal. July 25, 2016) (citation omitted); *see, e.g.*, Cal. Civ. Code § 1550 ("It is essential to the existence of a contract that there should be: 1. [p]arties capable of contracting; 2. [t]heir consent; 3. [a] lawful object; and . . . 4. [a] sufficient cause or consideration."). Of course, "[i]t is essential to the existence of a contract that there should be . . . sufficient cause or consideration." Cal. Civ. Code § 1550. Good consideration includes "[a]ny benefit conferred, or agreed to be conferred, upon the promisor, by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered, or agreed to be suffered, by such person, other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor." Cal. Civ. Code § 1605. "[O]rdinarily, a court will not weigh the sufficiency of the consideration once it has found it to be of some value." *Walters v. Calderon*, 25 Cal. App. 3d 863, 876 (1972). "[A]ll the law requires for sufficient consideration is the proverbial 'peppercorn.'" *San Diego City Firefighters, Local 145 v. Bd. of Admin. of San Diego City Emps.' Ret. Sys.*, 206 Cal. App. 4th 594, 619 (2012) (quoting *Third Story Music, Inc. v. Waits*, 41 Cal. App. 4th 798, 808–09 & n.5 (1995)).

As discussed by the Court in its January Order, the issue of whether GIS provided consideration for the Bob's Discount Furniture Agreement turns on whether the product that Guardian sold pursuant to this purported agreement—Bob's Goof Proof—is a "Guardian Labeled Distributor Product" under the Agreements. If this product is covered by the Agreements, then GIS gave consideration by permitting Guardian to sell this product in the geographic areas covered by the Agreements. (*See, e.g.*, Doc. 133 at 32 (providing the Court's finding in the January Order "that—to the extent Guardian sold 'Guardian Labeled Distributor Products' to Bob's Discount Furniture in the geographic areas covered by the Agreements—this constitutes sufficient consideration to support the Bob's Discount Furniture Agreement" (citing *Rice v. Brown*, 120 Cal. App. 2d 578, 582 (1953))). However, if this product is not covered by the Agreements, then GIS gave no consideration for the Bob's Discount Furniture Agreement and GIS's Third Cause of Action fails. (*See id.* at 33 (stating that if the Agreement under consideration "did not accord GIS an exclusive right to distribute these products in the geographic areas covered by these agreements," then "GIS did not give up any form of consideration by permitting Guardian to distribute [the products] in these areas").)

**B.     The Agreements' Product Language**

Guardian argues that summary judgment is appropriate on GIS's Third Cause of Action, as the Bob's Discount Furniture Agreement lacked consideration because the Bob's Goof Proof product is not a covered product under the terms of the Agreements.  (*See* Doc. 184 at 17–18.) The Court disagrees.

All of the Agreements—with the exception of the Pennsylvania Agreement—include the Product Language, which provides the following two descriptions of "Guardian Labeled Distributor Products": (1) "only those items indicated in Exhibit 'B' which is attached hereto," (2) "unless specifically noted by a mutually agreed upon Addendum hereto."  (Doc. 120, Ex. 5 ¶ 8; *id.*, Ex. 6 ¶ 8; *id.*, Ex. 7 ¶ 8; *id.*, Ex. 9 ¶ 8; *see also id.*, Ex. 3 ¶ 8 (providing that, absent a pertinent addendum, the covered products are "indicated in Exhibit 'B' which is a part of this Agreement").) The Court previously found herein that there are no documents in the record that constitute "Addend[a]" under the Product Language.

However, the Court cannot make a similar finding regarding the "Exhibit 'B'" to the Agreements, as these exhibits are not in the record for this case.  As the Court found in its January Order, "[a]bsent these exhibits or a relevant addendum, the Court is left to speculate as to whether the exhibits include the pertinent 'private-label products . . . under the brand name Bob's Goof Proof'" that Guardian sold to Bob's Discount Furniture in the geographic areas covered by the Agreements.  (Doc. 133 at 34.)  The Court again declines to speculate at this stage as to what these exhibits may or may not provide.  Instead, the Court finds that there is a genuine issue of material fact as to whether Guardian sold "Guardian Labeled Distributor Products" to Bob's Discount Furniture in the geographic areas covered by the Agreements that include the Product Language—*i.e.*, all of the Agreements, with the exception of the Pennsylvania Agreement.

Of course, if these products do not qualify as "Guardian Labeled Distributor Products" under the Product Language, then GIS did not provide consideration for the Bob's Discount Furniture Agreement.  As such, the Court also finds that there are genuine issues of material fact regarding whether GIS provided consideration—and, consequently, whether there was a valid contract—for the Bob's Discount Furniture Agreement, to the extent this agreement pertains to

Guardian's sales of products to Bob's Discount Furniture in the geographic areas covered by the Agreements that include the Product Language.[15]  These issues are properly reserved for the finder of fact.

**C.     Equitable Estoppel**

GIS argues that summary judgment is also inappropriate as to its Third Cause of Action because Defendants are estopped from claiming that the Bob's Goof Proof product is not covered by the Agreements.  (*See* Doc. 185 at 15–18.)  The Court agrees with GIS's position.

As noted previously, "[t]he traditional elements of estoppel" in California include the following: (1) "the party to be estopped must be apprised of the facts;" (2) "he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended;" (3) "the other party must be ignorant of the true state of fact;" and (4) "he must rely upon the conduct to his injury."  *Oakland Raiders v. Oakland-Alameda Cty. Coliseum, Inc.*, 144 Cal. App. 4th 1175, 1189 (2006) (citation omitted).  "Where any one of the elements of equitable estoppel is absent, the claim must fail."  *Am. Cas. Co. of Reading, Pa. v. Baker*, 22 F.3d 880, 892 (9th Cir. 1994) (quoting *Hair v. California*, 2 Cal. App. 4th 321, 328 (1991)).

GIS has supplied sufficient evidence to overcome summary judgment on this issue.  As to the first element, GIS has provided evidence that Guardian was apprised of the pertinent facts—that GIS believed Guardian was selling products that were covered by the Agreements to Bob's Discount Furniture.  (*See, e.g.*, Doc. 165, Ex. 5 at 84:7–85:5 (providing Christopher Nolan's

---

[15] The Pennsylvania Agreement provides a different analysis, as it does not include the Product Language, or any other guidance as to the definition of "Guardian Labeled Distributor Products."  (*See* Doc. 120, Ex. 1.)  As previously found by the Court in its January Order, this term is ambiguous as it is used in the Pennsylvania Agreement and the record includes contradictory evidence as to whether the products Guardian sold to Bob's Discount Furniture are "Guardian Labeled Distributor Products."  (Doc. 133 at 35.)

As such, like in the January Order, the Court finds that there is a genuine issue of material fact as to whether Guardian sold products covered by the Pennsylvania Agreement to Bob's Discount Furniture in the geographic areas covered by this agreement.  *See, e.g.*, *Cal. Sportfishing Prot. All. v. USA Waste of Cal., Inc.*, No. CIV. 2:11–2663 WBS KJN, 2012 WL 2339810, at *7 (E.D. Cal. June 19, 2012) ("Summary judgment is inappropriate . . . if the court cannot determine the parties' intent at the time of contracting without judging the credibility of the extrinsic evidence." (citing *City of Hope Nat'l Med. Ctr. v. Genentech, Inc.*, 43 Cal. 4th 375, 395 (2008)))).  Correspondingly, the Court finds that there is a genuine issue of material fact regarding whether GIS provided consideration—and thus whether there was a valid contract—for the Bob's Discount Furniture Agreement, insofar as this agreement encompassed Guardian's sales of products to Bob's Discount Furniture in the areas covered by the Pennsylvania Agreement.

testimony regarding the parties purportedly entering into the Bob's Discount Furniture Agreement); Doc. 128 (constituting an e-mail exchange between Christopher Schall of GIS and Ronnie Holman of Guardian on January 13, 2011).) Regarding the second element, GIS has presented evidence that Guardian engaged in conduct to further this impression insofar as Guardian purportedly entered into the Bob's Discount Furniture Agreement to pay GIS commissions in exchange for Guardian selling products to Bob's Discount Furniture in the geographic areas covered by the Agreements. (*See, e.g.*, Doc. 128 (providing an e-mail purportedly memorializing certain terms of the Bob's Discount Furniture Agreement).) As to the third element, there is no indication in the record that GIS was aware of Guardian's current position that Bob's Goof Proof products were not covered by the Agreements until after Guardian discontinued its commission payments to GIS. Finally, there is evidence in the record that GIS relied to its detriment on Guardian's conduct. Specifically, absent the Bob's Discount Furniture Agreement, GIS could have pursued its purported exclusive distribution rights under the Agreements to the extent these rights were potentially infringed by Guardian's sales of products that were covered by the Agreements to Bob's Discount Furniture in the geographic areas governed by the Agreements. (*See id.*)

In summary, the Court finds that GIS has presented sufficient evidence to create genuine issues of material fact on its estoppel argument relating to GIS's Third Cause of Action. As such, summary judgment is not warranted as to this claim.

For these reasons, the Court DENIES Defendants' Motion, (Doc. 184), to the extent Defendants request summary judgment on GIS's Third Cause of Action.

### IV.    GIS'S FOURTH CAUSE OF ACTION

Defendants also argue that summary judgment is appropriate on GIS's Fourth Cause of Action, (*see* Doc. 184 at 17–18), in which GIS argues that Defendants breached the implied covenant of good faith and fair dealing associated with the Bob's Discount Furniture Agreement, (*see* Doc. 67 ¶¶ 70–75). The Court disagrees with Defendants' position.

"It has long been recognized in California that '[t]here is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of

the other to receive the benefits of the agreement.'" *Kransco v. Am. Empire Surplus Lines Ins. Co.*, 23 Cal. 4th 390, 400 (2000) (alteration in original) (quoting *Comunale v. Traders & Gen. Ins. Co.*, 50 Cal. 2d 654, 658 (1958)); *see, e.g.*, *Marsu, B.V. v. Walt Disney Co.*, 185 F.3d 932, 937 (9th Cir. 1999) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." (quoting *Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 371 (1992))). "The covenant of good faith and fair dealing is implied in every contract as a method to protect the interests of the parties in having the contractual promises and purposes performed." *Khan v. CitiMortgage, Inc.*, 975 F. Supp. 2d 1127, 1142 (E.D. Cal. 2013) (quoting *Love v. Fire Ins. Exch.*, 221 Cal. App. 3d 1136, 1147 (1990)). "The elements necessary to establish a breach of the covenant of good faith and fair dealing" include the following: "(1) the parties entered into a contract; (2) the plaintiff fulfilled his obligations under the contract; (3) any conditions precedent to the defendant's performance occurred; (4) the defendant unfairly interfered with the plaintiff's rights to receive the benefits of the contract; and (5) the plaintiff was harmed by the defendant's conduct." *Reinhardt v. Gemini Motor Transp.*, 879 F. Supp. 2d 1138, 1145 (E.D. Cal. 2012) (citations omitted); *see, e.g.*, *Ahmadi v. United Cont'l Holdings, Inc.*, No. 1:14–CV–00264–LJO–JLT, 2014 WL 1281056, at *4 (E.D. Cal. Mar. 31, 2014) (providing the same elements (citation omitted)).

Here, Defendants argue that GIS fails to establish the first element of this claim. Specifically, as with their arguments regarding GIS's Third Cause of Action, Defendants contend that the Bob's Discount Furniture Agreement is not supported by consideration—and thus is not a valid contract—so GIS's Fourth Cause of Action must fail. (*See* Doc. 184 at 18.)

The Court previously found that there are genuine issues of material fact as to whether the Bob's Discount Furniture Agreement is supported by consideration and, consequently, whether it is a valid contract. As there are genuine issues of material fact as to the first element of GIS's Fourth Cause of Action, the Court finds that summary judgment is not warranted on this claim.

Accordingly, the Court DENIES Defendants' Motion, (Doc. 184), insofar as Defendants request summary judgment on GIS's Fourth Cause of Action.

//

# V.    CONCLUSION

For the reasons provided herein, the Court DENIES Defendants' Motion.  (Doc. 184.)

IT IS SO ORDERED.

Dated:    **May 9, 2017**                                    /s/ *Sheila K. Oberto*
                                                      UNITED STATES MAGISTRATE JUDGE